UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES L. ALEXANDER; ALEXANDER & CATALANO LLC; and PUBLIC CITIZEN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS J. CAHILL, in his official capacity as Chief Counsel for the Departmental Disciplinary Committee for the Appellate Division of the New York Court of Appeals, First Department; DIANA MAXFIELD KEARSE, in her official capacity as Chief Counsel for the Grievance Committee for the Second and Eleventh Judicial Districts; GARY L. CASELLA, in his official capacity as Chief Counsel for the Grievance Committee for the Ninth Judicial District; RITA E. ADLER, in her official capacity as Chief Counsel for the Grievance Committee for the Tenth Judicial District; MARK S. OCHS in his official capacity as Chief Attorney for the Committee on Professional Standards for the Appellate Division of the New York Court of Appeals, Third Department; ANTHONY J. GIGLIOTTI, in his official capacity as acting Chief Counsel for the Grievance Committee for the Fifth Judicial District; DANIEL A. DRAKE, in his official capacity as acting Chief Counsel for the Grievance Committee for the Seventh Judicial District; and VINCENT L. SCARSELLA, in his official capacity as acting Chief Counsel for the Grievance Committee for the Eighth Judicial District, <br><br> Defendants. | Civil Action No. _____ |

**COMPLAINT**

Dockets.Justia.com

1.      This is a suit for injunctive and declaratory relief under 42 U.S.C. § 1983 against the chief counsels of New York's lawyer disciplinary committees, seeking declaratory and injunctive relief against enforcement of the state's new mandatory ethics rules governing lawyer advertising. The ethics rules, as amended effective February 1, 2007, allow for arbitrary and discriminatory enforcement and impose onerous restrictions on both commercial and noncommercial speech that the state has no legitimate interest in regulating. The amended rules are therefore unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution.

## I. Jurisdiction

2.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## II. Parties

3.      Plaintiff James L. Alexander is a resident of Onondaga, New York. Alexander was admitted to the New York State Bar in 1984 and has actively practiced law in New York for the past twenty-three years. He is a member of the New York State Bar Association, the Onondaga County Bar Association, and the American Association for Justice, and serves on the Board of Directors of the New York State Trial Lawyers Association. Alexander is the managing partner of the firm Alexander & Catalano.

4.      Plaintiff Alexander & Catalano LLC is a New York law firm founded by plaintiff Alexander and his partner Peter Catalano in 1996. The firm has offices in Syracuse and Rochester, New York. It employs eight attorneys licensed in New York and other jurisdictions who represent clients in personal injury and wrongful death claims. Alexander & Catalano communicates its services to the public through broadcast media, print advertisements, and other

forms of public media. The firm also operates a website from within New York at http://www.alexanderandcatalano.com/.

     5.     Plaintiff Public Citizen, Inc. is a nonprofit public interest organization with approximately 100,000 members nationwide, including more than 9,450 in New York. Public Citizen Litigation Group (PCLG) is a division of Public Citizen that conducts litigation in state and federal courts. Of PCLG's eight staff lawyers, two are licensed to practice law in New York. PCLG has solicited clients in New York for representation on a pro bono basis and has represented clients before state and federal courts in New York. PCLG distributes a variety of educational materials to the public. It also operates websites at http://www.citizen.org/litigation/ and http://www.cyberSLAPP.org/, and co-sponsors the Consumer Law & Policy Blog at http://www.clpblog.org/, all of which are accessible from within New York. Public Citizen has an interest in protecting its New York members, who will be deprived of information about their legal rights and available legal services under the amendments.

     6.     Defendant Thomas J. Cahill is Chief Counsel for the Departmental Disciplinary Committee for the First Department of the Appellate Division of the New York Court of Appeals.

     7.     Defendant Diana Maxfield Kearse is Chief Counsel for the Grievance Committee for the Second and Eleventh Judicial Districts, which are part of the Second Department of the Appellate Division of the New York Court of Appeals.

     8.     Defendant Gary I. Casella is Chief Counsel for the Grievance Committee for the Ninth Judicial District, which is part of the Second Department of the Appellate Division of the New York Court of Appeals.

9.      Defendant Rita E. Adler is Chief Counsel for the Grievance Committee for the Tenth Judicial District, which is part of the Second Department of the Appellate Division of the New York Court of Appeals.

10.     Defendant Mark S. Ochs is Chief Attorney for the Committee on Professional Standards for the Third Department of the Appellate Division of the New York Court of Appeals.

11.     Anthony J. Gigliotti is acting Chief Counsel for the Grievance Committee for the Fifth Judicial District, which is part of the Fourth Department of the Appellate Division of the New York Court of Appeals.

12.     Daniel A. Drake is acting Chief Counsel for the Grievance Committee for the Seventh Judicial District, which is part of the Fourth Department of the Appellate Division of the New York Court of Appeals.

13.     Vincent L. Scarsella is acting Chief Counsel for the Grievance Committee for the Eighth Judicial District, which is part of the Fourth Department of the Appellate Division of the New York Court of Appeals.

### III.  Factual Allegations

**A.     Rules Governing Lawyer Discipline in New York**

14.     The Appellate Division of the New York Supreme Court is responsible for enforcing professional discipline against lawyers in the state. N.Y. Judiciary Law § 90(2). The Appellate Division is authorized to censure, suspend, or disbar lawyers guilty of "professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice." *Id.*

15. Pursuant to this authority, the presiding justices of the four departments of the Appellate Division are responsible for adopting the Disciplinary Rules of New York's Code of Professional Responsibility as joint rules of the Appellate Division. The rules define "professional misconduct" as used in the Judiciary Law. *See* 22 NYCRR § 603.2 (1st Dept.); 22 NYCRR § 691.2 (2d Dept.); 22 NYCRR § 806.2 (3d Dept.); 22 NYCRR § 1022.17 (4th Dept.). Lawyers who violate the rules are subject to various forms of discipline, including censure, suspension, or disbarment.

16. Each department of the Appellate Division operates its own lawyer grievance procedure. The First and Third Departments each have a single disciplinary committee covering the entire department. The Second and Fourth Departments have separate committees for each judicial district within their territories. Each of the state's various grievance committees has the authority to bring complaints against lawyers, to discipline lawyers in cases of minor misconduct by issuing letters of caution and admonition, and to recommend that the Appellate Division institute formal disciplinary proceedings in cases of serious misconduct.

17. The chief counsel of each committee is responsible for investigating and prosecuting alleged disciplinary violations and has authority to dismiss disciplinary charges against a lawyer. Collectively, the chief counsels of the committees are responsible for enforcing New York's disciplinary rules throughout the state.

**B.    The Amendments to New York's Disciplinary Rules Governing Lawyer Advertising**

18. The Disciplinary Rules of New York's Code of Professional Responsibility prohibit lawyers from disseminating false, deceptive, or misleading communications. 22 NYCRR § 1200.6(a).

19.     In October 2005, a New York State Bar Association committee on lawyer advertising completed a detailed study of lawyer advertising in the state. In the committee's report, all seventeen members unanimously concluded that the state should not adopt any new content-based restrictions on lawyer advertising. Noting that approximately one-third of a sample of randomly selected New York lawyer advertisements were facially noncompliant with existing rules, the report concluded that stricter reporting requirements and better enforcement, rather than more rules, was the proper way to address problems with advertising in the state.

20.     In June 2006, the presiding justices of each of the four departments of the Appellate Division approved for public comment proposed amendments to the disciplinary rules governing lawyer advertising. Contrary to the recommendations of the New York State Bar Association, the amended rules included sweeping new restrictions on the content of attorney advertising.

21.     On September 4, 2006, the Federal Trade Commission's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics submitted comments to the proposed rules advising that the rules may hurt consumers by inhibiting competition, frustrating consumer choice, and ultimately increasing prices while decreasing quality of service.

22.     On November 15, 2006, plaintiff Public Citizen submitted comments opposing the amendments on the grounds that they would constitute an unconstitutional restriction on commercial and noncommercial speech.

23.     On January 4, 2007, the presiding justices adopted a version of the amendments that differed from the version offered for public comment. The amendments include broad new prohibitions on communications by lawyers. The rules are scheduled to become effective on February 1, 2007.

24.     Section 1200.5-a of the disciplinary rules provides that the rules apply to out-of-state attorneys who are licensed in the state when the predominant effect of the lawyer's conduct is felt in New York.  Therefore, plaintiff Public Citizen's attorneys who are licensed in New York are subject to the rules to the extent their conduct has its predominant effect in the state.

25.     None of the amendments is supported by studies, factual findings, or other evidence demonstrating a public need or a state interest in adopting the amendments.  The amendments appear to be motivated solely by a general distaste for certain forms of lawyer advertising and by discrimination against a certain class of attorneys who assist injured consumers.

**C.      The Amendments' Effect on Truthful, Non-Misleading Commercial Speech**

26.     The amendments include a variety of new rules governing lawyer advertising that restrict truthful, non-misleading communications that the state has no legitimate interest in regulating.

27.     Section 1200.6(c)(3) of the new rules prohibits advertisements that "include the portrayal of a judge."  This rule will prohibit future use of a television commercial previously run by Alexander & Catalano that depicts a courtroom with a judge and jury.  The commercial illustrates the firm's willingness to go to court on its clients' behalf and states that the judge is there "to make sure [the trial] is fair."  The commercial does not state or imply that any judge can be unfairly influenced by the firm and is not deceptive or misleading in any way.  Alexander & Catalano will run this commercial, or a similar one, in the future if not prohibited from doing so by the rules.

28.     Section 1200.6(c)(5) prohibits advertisements that "rely on techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel,

including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence."

        a.    Alexander & Catalano's commercials often contain comical scenes. For example, the commercials portray lawyers Alexander and Catalano as giants towering above local buildings, running to a client's house so fast they appear as blurs, jumping onto rooftops, and providing legal assistance to aliens. Because these scenes might be considered "techniques to obtain attention," and because the fictional traits exhibited by the lawyers in these scenes do not appear to be relevant to the selection of counsel, Alexander & Catalano has been forced to alter its advertising campaign to stop running these advertisements. As a result, the firm's ability to market its services has been significantly impaired.

        b.    Section 1200.6(c)(5) is too vague to provide guidance as to what kinds of advertisements are prohibited and invites arbitrary and discriminatory enforcement. All of Alexander & Catalano's commercials include memorable jingles or special effects, such as wisps of smoke and blue electrical currents surrounding the firm's name. A disciplinary committee might determine that any of the techniques used by Alexander & Catalano are designed to "obtain attention" and do not obviously relate to selection of counsel or legal competence. Even a television commercial by the firm showing a list of charities to which the firm has donated may run afoul of the rule against attention-getting techniques because this advertisement brings attention to the firm and does not seem related to legal competence. Because of the extremely broad language of the rules, Alexander & Catalano has a reasonable fear that its remaining advertisements may subject the firm and its attorneys to professional discipline.

29.    Section 1200.6(c)(7) prohibits advertisements that "utilize a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter."

      a.    Alexander & Catalano identifies itself in the majority of its television and print advertising as the "heavy hitters."  Although Alexander & Catalano believes that the phrase "heavy hitters" implies only knowledge of the subject matter of its practice, the firm fears that disciplinary authorities may conclude that the phrase also "implies an ability to obtain results."  The firm has therefore been forced to remove this slogan from its advertising at significant expense and, as a result, will lose the benefit of widespread public recognition of its slogan.

      b.    The rules do not define or provide examples of what are deemed to be nicknames, monikers, mottos, and trade names, and invite arbitrary and discriminatory enforcement.  Alexander & Catalano commonly uses phrases like "think big" and "we'll give you a big helping hand" in its advertising.  The firm has a reasonable fear that disciplinary authorities might classify these statements as a nickname, moniker, motto, or trade name that implies an ability to obtain results and subject the firm and its attorneys to discipline.

    30.    The cumulative effect of the amendments is to prohibit a wide range of potentially interesting and informative commercial advertising by plaintiffs and by other lawyers and law firms that has no potential to confuse or deceive consumers.  These advertisements are especially relied on by consumers of moderate means who may not be experienced consumers of legal services and who are underserved by other attorneys.

    31.    Between 2001 and 2006, Alexander & Catalano received more than 42,000 incoming phone calls from potential clients.  Despite the large volume of calls, Alexander & Catalano has received fewer than ten complaints about the firm's advertisements over the past ten years.  No disciplinary actions have been brought against the firm based on its advertising, and, as far as plaintiffs are aware, only one complaint has ever been received by a state disciplinary committee.  That complaint involved a subject not covered by the amendments and

was closed by the disciplinary committee without any charges being filed against the firm or its attorneys.

33. The amendments cast doubt on the continued legality of many advertisements run by Alexander & Catalano and will force the firm to modify its existing advertising campaign and design new commercials at significant expense. As a result, it will suffer a loss of name recognition and goodwill based on its unique advertising campaign developed over the past ten years. The firm will also be hampered by the rules in its ability to communicate its message to consumers and will therefore have more difficulty locating potential clients.

**D.     The Amendments' Unconstitutional Restrictions on Noncommercial Speech**

33. The amendments change § 1200.1 of the Disciplinary Rules to define the word "advertising" as "any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the retention of the lawyer or law firm." The definition includes exceptions for "communications to existing clients or other lawyers," but contains no exception for noncommercial speech. *Id.*

   a. The plain language of the definition covers solicitation of potential clients for pro bono representation by Public Citizen received by potential clients in New York. The rules would apply even to the solicitation of clients to challenge the constitutionality of the disciplinary rules themselves.

   b. The rules will cover telephone, email, and written solicitations to consumers in New York. They will also cover web pages, press releases, and other materials distributed by Public Citizen in New York for the purpose of soliciting clients for pro bono representation.

    c.  All the restrictions on speech discussed in Section III.C, *supra*, would therefore apply equally to pro bono solicitations.

  34.  Sections 1200.6(d) and (e) require that statements in pro bono solicitations or other material meeting the definition of "advertising" about a lawyer's abilities and past successes, including statements of the quality of a lawyer's services, statements of comparative advertising, testimonials by clients, and "statements that are reasonably likely to create an expectation about results," be accompanied by the disclaimer: "Prior results do not guarantee a similar outcome." Public Citizen frequently makes statements about the quality of its services and past successes. Recipients of noncommercial speech and pro bono solicitations are not likely to be confused by these statements, and the state has no interest in regulating them as applied to noncommercial speech.

  35.  Section 1200.6(f) requires that the words "Attorney Advertising" appear in all written advertisements, including electronic communications. It further requires that the words "ATTORNEY ADVERTISING," in all capital letters, be included in the subject line of emailed advertisements. *Id.* By flagging these communications as advertising even though they are not designed to attract clients for pecuniary gain, the amendments dramatically increase the likelihood that the communications will not reach their intended recipients. For example, the recipient of a pro bono solicitation by Public Citizen would likely ignore or discard material labeled "Attorney Advertising." Similarly, email labeled "ATTORNEY ADVERTISING" in the subject line would likely be blocked by a spam filter or deleted by the recipient without being read.

  36.  Section 1200.6(k) requires lawyers and law firms to retain copies of all communications defined as advertisements for a period of one to three years. This rule would

-11-

require Public Citizen to save copies of all emailed solicitations for pro bono representation received by consumers in New York, including attachments and links related to the email. § 1200.6(k). Complying with this rule would involve an unjustified expense and would burden plaintiffs' ability to engage in noncommercial communication.

      37.    Section 1200.7(e) requires that all lawyers and law firms using an Internet website include the name of the lawyer or law firm in the website's address unless all pages of the website "clearly and conspicuously include the actual name of the lawyer or law firm" and unless the lawyer refrains from "engag[ing] in the practice of law using the domain name." *Id.* In addition, the rule prohibits lawyers and law firms from using domain names that "imply an ability to obtain results in a matter." *Id.*

      a.    The rule includes no requirement that the website be used for advertising purposes and therefore affects even web pages that are totally unrelated to the lawyer's practice of law. This rule will prohibit the use of domain names for noncommercial communications that the state has no interest in regulating and are outside of scope of the courts' authority to regulate attorney advertising.

      b.    PCLG operates several websites at http://www.citizen.org/litigation/, http://www.cyberslapp.org/, and http://www.clpblog.org/. None of these website addresses includes Public Citizen or PCLG's name in the website address. Public Citizen has solicited clients and communicated with clients in New York using one or more of these domain names and intends to continue doing so in the future.

      c.    Because brevity is important in the choice of a domain name, this restriction would impose serious and unnecessary burdens on Internet-based speech. The rules

will force lawyers with established domain names to relocate their websites to new domains at significant expense.

    d.  The state has no legitimate interest in prohibiting the practice of law using domain names that "imply an ability to obtain results."

  38.  Section 1200.41-a imposes a thirty-day waiting period on communications by lawyers and law firms to individuals and their family members and legal representatives in the event of an incident involving potential claims for personal injury or wrongful death. Under this rule, Public Citizen will be prohibited from communicating with injured citizens in New York to inform them of the availability of pro bono legal representation.

  39.  The cumulative effect of the amendments would be to chill noncommercial speech by Public Citizen and other nonprofit lawyers and organizations and would unreasonably burden the right of these lawyers and organizations to engage in noncommercial speech and free association.

**E.  Injury to New York Consumers**

  40.  The rules' burdensome prohibitions on speech, discussed in Section III.C & D, *supra*, will chill lawyers from engaging in advertising and other forms of communication and will therefore injure New York consumers, including New York members of Public Citizen, by preventing them from receiving truthful, non-misleading information about legal services and their legal rights. Consumers of moderate means who may not be sophisticated consumers of legal services will be among the most seriously affected by the chill on commercial speech, as will consumers who are illiterate, do not speak English, or, because of an injury or disability, cannot read or understand other sorts of advertisements.

41. Sections 1200.8(g) and 1200.41-a prohibit advertisements and solicitations regarding incidents involving potential claims for personal injury or wrongful death for a thirty-day period after the incident. These rules prohibit not only in-person, telephone, and direct mail solicitations, but also advertisements on radio, television, and the Internet that do not intrude on the privacy of consumers. As a result, New York members of Public Citizen will be blocked from receiving information about their rights relating to the incident, even if they actively seek this information on the Internet.

42. Section 1200.6(g) prohibits lawyers and law firms from using pop-up or pop-under Internet advertisements other than on the lawyer's or law firm's own website, regardless of whether these advertisements are deceptive or misleading. This section interferes with the ability of New York members of Public Citizen to learn about available legal services and their rights. There is no evidence that consumers are deceived or unduly influenced by pop-up or pop-under advertisements, which can be closed with a single click or eliminated with pop-up blocking software, and are therefore at least as easy to dispose of as mailed solicitations.

## IV. Claim for Relief

43. The amendments discussed above restrict and chill the exercise of the rights of commercial and noncommercial free speech and the right of association secured by the First Amendment of the U.S. Constitution, as applied to the states through the Fourteenth Amendment to the Constitution.

44. The amendments are vague and allow for arbitrary and discriminatory enforcement in violation of the First Amendment of the U.S. Constitution and the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, plaintiffs request that this Court:

1. Declare unconstitutional and issue a preliminary and permanent injunction against enforcement of §§ 1200.6(c)(1), (3), (5), (7), (g)(1), 1200.7(e), 1200.8(g), 1200.41-a, and the first clause of § 1200.6(c)(3) of the amendments to the Disciplinary Rules of the Code of Professional Responsibility that become effective on February 1, 2007.

2. Declare unconstitutional and issue a preliminary and permanent injunction against §§ 1200.6, 1200.7, and 1200.41-a of the rules as applied to communications where the lawyer's primary purpose is not pecuniary gain.

3. Award plaintiffs their costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

4. Grant any additional relief to which plaintiffs may be entitled.

Respectfully submitted,

/s Scott L. Nelson
Scott L. Nelson
N.D.N.Y Bar Roll No. 513515
Gregory A. Beck
DC Bar No. 494479, *pro hac vice* to be filed
Brian Wolfman
DC Bar No. 427491, *pro hac vice* to be filed
Public Citizen Litigation Group
1600 20th St., N.W.
Washington, D.C. 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email: snelson@citizen.org
          gbeck@citizen.org
          brian@citizen.org

*Counsel for Plaintiffs*