UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES L. ALEXANDER, et al.,           )
                                      )
          Plaintiffs,                 )     Civil Action No. 5:07-cv-00117-FJS-GHL
                                      )
v.                                    )
                                      )
THOMAS J. CAHILL, et al.,             )
                                      )
          Defendants.                 )
_____       )

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
Gregory A. Beck
DC Bar No. 494479, *pro hac vice* pending
Brian Wolfman
DC Bar No. 427491, *pro hac vice* pending
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email: snelson@citizen.org
        gbeck@citizen.org
        brian@citizen.org

*Counsel for Plaintiffs*

Dated:  February 14, 2007

Dockets.Justia.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................iii

INTRODUCTION .......................................................................................................................1

BACKGROUND .........................................................................................................................1

I.      Plaintiffs James L. Alexander and Alexander & Catalano ...................................................1

II.     Plaintiff Public Citizen........................................................................................................4

ARGUMENT ..............................................................................................................................6

I.      The Amended Rules Unconstitutionally Restrict the Right of Lawyers to Advertise.........7

        A.      The Amendments Are Not Supported by Any Legitimate State Interest. ...............8

        B.      The Amendments Are Not Narrowly Drawn.........................................................12

        C.      The Amendments Are Not Supported by Any Evidence.......................................14

        D.      The Amendments Are Unconstitutionally Vague..................................................15

II.     The Amended Rules Unconstitutionally Restrict Access by New York Consumers to
Information About Their Legal Rights and Available Legal Services. ............................17

        A.      Consumers Are Injured By Restrictions on Lawyer Communications.................17

        B.      The Amendments Unconstitutionally Restrict Consumers' Access to
Commercial Communications. ............................................................................19

        C.      The Amendments Restrict Consumers' Access to Information About Their
Constitutional Rights by Restricting Noncommercial Communications...............21

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Bates v. State Bar of Arizona*,
433 U.S. 350 (1977)..................................................................................................7, 18, 19

*Carey v. Population Services, International*,
431 U.S. 678 (1977)..................................................................................................10

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
447 U.S. 557 (1980)..................................................................................................6, 7

*Chatin v. Coombe*,
186 F.3d 82 (2d Cir. 1999)........................................................................................15

*City of Lakewood v. Plain Dealer Publishing Co.*,
486 U.S. 750 (1988)..................................................................................................16

*Edenfield v. Fane*,
507 U.S. 761 (1993)..................................................................................................10, 14

*Ficker v. Curran*,
119 F.3d 1150 (4th Cir. 1994) ..................................................................................18, 21, 22, 23

*Florida Bar v. Went For It, Inc.*,
515 U.S. 618 (1995)..................................................................................................7, 12, 20

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)..................................................................................................15

*Green Party of New York  v. New  York State Board of Elections*,
389 F.3d 411 (2d Cir. 2004).......................................................................................6

*Grievance Committee v. Trantolo*,
470 A.2d 228 (Conn. 1984) ......................................................................................13

*Ibanez v. Florida Department of Business & Professional Regulation*,
512 U.S. 136 (1994)..................................................................................................7, 24

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996).........................................................................................6

*Kolender v. Lawson*,
461 U.S. 352 (1983)..................................................................................................15

*Mason v. Florida Bar*,
    208 F.3d 952 (11th Cir. 2000) ........................................................24

*NAACP v. Button*,
    371 U.S. 415 (1963)........................................................................23

*Ohralik v. Ohio State Bar Association*,
    436 U.S. 447 (1978)........................................................................21

*Peel v. Attorney Registration & Disciplinary Commission*,
    496 U.S. 91 (1990).........................................................7, 9, 13, 19

*In re Primus*,
    436 U.S. 412 (1978)....................................................................22, 23

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988)........................................................................25

*In re RMJ*,
    455 U.S. 191 (1982).....................................................................7, 13

*Schwartz v. Welch*,
    890 F. Supp. 565 (S.D. Miss. 1995).............................................18

*Shapero v. Kentucky Bar Association*,
    486 U.S. 466 (1988)........................................................................21

*In re Shapiro*,
    225 A.D.2d 215, 656 N.Y.S.2d 80 (4th Dept. 1996) .......................10

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)...................................................................17, 18

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)............................................................ *passim*

## STATUTES AND REGULATIONS

15 U.S.C. § 45(a)(2)...............................................................................9

N.Y. Judiciary Law § 90(2) ....................................................................1

22 NYCRR § 603.2..................................................................................1

22 NYCRR § 691.2..................................................................................1

22 NYCRR § 806.2 ....................................................................................................................1

22 NYCRR § 1022.17 ................................................................................................................1

22 NYCRR § 1200.1(k) ...........................................................................................................22

22 NYCRR § 1200.6(a) .............................................................................................................8

22 NYCRR § 1200.6(c)(3) ......................................................................................................3, 8

22 NYCRR § 1200.6(c)(5) ......................................................................................................2, 8

22 NYCRR § 1200.6(c)(7) ......................................................................................................3, 8

22 NYCRR § 1200.6(f) ..........................................................................................................6, 24

22 NYCRR § 1200.6(g)(1) .....................................................................................................5, 21

22 NYCRR § 1200.6(k) ..........................................................................................................5, 23

22 NYCRR § 1200.7(e) .......................................................................................................5, 6, 24

22 NYCRR § 1200.8(g) ..........................................................................................................5, 19

22 NYCRR § 1200.41-a .........................................................................................................5, 19

## MISCELLANEOUS

Comments of Eugene F. Pigott to Monroe County Bar Association (Aug. 17, 2006) ......10, 16, 17

Formal Ethics Opinion 661 (N.Y. Ethics Comm. 1994) ...............................................................13

Letter from the Federal Trade Commission's Office of Policy Planning, Bureau of
    Consumer Protection, and Bureau of Economics to Michael Colodner, Office of
    Court Administration (Sept. 14, 2006) ...........................................................9, 15, 18, 19

Model R. Prof'l Conduct 7.2 ......................................................................................................19

New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer
    Advertising* (Oct. 21, 2005) ........................................................................................14, 15

## INTRODUCTION

On February 1, 2007, new mandatory ethics rules governing lawyer advertising went into effect in New York.  The amended rules authorize the state's grievance committees to discipline lawyers for communicating truthful, non-misleading information about legal services to New York consumers—information that the state has no legitimate interest in regulating.  Plaintiffs seek a preliminary injunction against the amended rules on the grounds that they violate the First and Fourteenth Amendments of the United States Constitution.

## BACKGROUND

In June 2006, the presiding justices of each of the four departments of the Appellate Division of the New York Supreme Court approved for public comment extensive amendments to the Disciplinary Rules of New York's Code of Professional Responsibility.  Plaintiff Public Citizen submitted comments opposing the amendments and advising that they would be an unconstitutional restriction on speech.  *See* Aff. of Brian Wolfman ¶ 5.  On January 4, 2007, the presiding justices adopted a version of the amendments that differs from the version offered for public comment but that still restricts a wide range of both commercial and noncommercial communications.  Lawyers who violate the rules are subject to discipline, including censure, suspension, or disbarment.  N.Y. Judiciary Law § 90(2); *see also* 22 NYCRR § 603.2 (1st Dept.); 22 NYCRR § 691.2 (2d Dept.); 22 NYCRR § 806.2 (3d Dept.); 22 NYCRR § 1022.17 (4th Dept.).  Defendants are the chief counsels of New York's disciplinary committees, who collectively are charged with enforcing the disciplinary rules throughout the state.

## I.     Plaintiffs James L. Alexander and Alexander & Catalano

James L. Alexander is a licensed attorney who has actively practiced in New York for the past twenty-three years.  Aff. of James L. Alexander ¶ 2.  He is the managing partner of the firm

Alexander & Catalano LLC, a New York law firm with offices in Syracuse and Rochester. *Id.* ¶¶ 1, 3. Alexander founded the firm in 1996 with his partner, Peter Catalano. *Id.* ¶ 3. The firm employs eight attorneys licensed in New York and other jurisdictions who represent clients in personal injury and wrongful death claims. *Id.*

Alexander & Catalano communicates its services to the public through broadcast media, print advertisements, and other forms of public media, including a website at http://www.alexanderandcatalano.com/. *Id.* ¶ 4. Over the past ten years, the firm has developed an advertising campaign that has brought substantial name recognition within the firm's market, and it now receives thousands of calls each year from potential clients. *Id.* ¶ 5. During that ten-year period, only approximately ten or fewer consumers have called Alexander & Catalano to complain about the tastefulness of the firm's advertisements and, as far as plaintiffs are aware, only one complaint has ever been received by a state disciplinary committee regarding the firm's advertising. *Id.* ¶¶ 5-6. That complaint involved a subject not covered by the amendments and was closed by the disciplinary committee without charges being filed against the firm or its lawyers. *Id.* ¶ 6.

The amended disciplinary rules include broad new content-based prohibitions on communications by lawyers that will seriously burden Alexander & Catalano's ability to advertise in the state. *Id.* ¶¶ 7-12. First, the rules prohibit any advertisement that relies on "techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence." 22 NYCRR § 1200.6(c)(5) (amended effective Feb. 1, 2007).[1] Alexander & Catalano commercials often contain comical scenes that, for example, depict

---

[1] For the Court's convenience, a copy of the relevant rules, in their amended form, is attached to this memorandum as Exhibit 1. A copy of the rules highlighting the amendments in red is attached as Exhibit 2. Unless otherwise noted, all citations are to the rules as amended.

lawyers Alexander and Catalano as giants towering above local buildings, running to a client's house so fast they appear as blurs, jumping onto rooftops, and providing legal assistance to space aliens. Alexander Aff. ¶ 7 & Exh. 1 (DVD of commercials). Because these scenes might be considered "techniques to obtain attention," and because the fictional traits exhibited by the lawyers in these scenes do not appear to be relevant to the selection of counsel, Alexander & Catalano has been forced to alter its advertising campaign to stop running these advertisements. *Id.* As a result, the firm's ability to market its services has been significantly impaired. *Id.*

The rules also prohibit advertisements that portray a judge, 22 NYCRR § 1200.6(c)(3), or that "utilize a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter," *id.* § 1200.6(c)(7). Alexander & Catalano has previously run an advertisement that depicts a judge in a courtroom and intends to run the advertisement again in the future if not restricted from doing so. Alexander Aff. ¶ 11. The commercial is designed to illustrate the firm's willingness to go to court on its clients' behalf and states that the judge is there "to make sure [the trial] is fair." *Id.* Although the commercial is in no way misleading, Alexander & Catalano is unable to run this advertisement under the amended rules. *Id.* Moreover, Alexander & Catalano includes its slogan "the heavy hitters" in most of its advertising. *Id.* ¶ 9. The firm believes that the phrase "heavy hitters" implies only knowledge of the subject matter of its practice, but fears that disciplinary authorities may conclude that the phrase also "implies an ability to obtain results." *Id.* It therefore has been forced to remove this slogan from its advertising at significant expense and, as a result, will lose the benefit of widespread public recognition of its slogan. *Id.*

Although Alexander & Catalano has altered many of its advertisements, it still fears that, given the broad language of the rules, its remaining advertisements may subject the firm and its

lawyers to professional discipline. *Id.* ¶¶ 8, 10, 12. All of the firm's remaining television advertisements include memorable jingles or special effects, such as wisps of smoke and blue electrical currents surrounding the firm's name. *Id.* ¶ 8. These commercials are not deceptive or misleading in any way, but because the rules do not make clear the limits of prohibited advertising, a disciplinary committee might determine that any of the techniques used by Alexander & Catalano are designed to "obtain attention" and do not relate to selection of counsel or legal competence. *Id.* Even a television commercial by the firm showing a list of charities to which the firm has donated may run afoul of the rule against attention-getting techniques because this advertisement brings attention to the firm and does not seem related to legal competence. *Id.* Moreover, the firm's advertisements often contain phrases that might be considered nicknames, monikers, or mottos by disciplinary authorities, such as "think big" and "we'll give you a big helping hand." *Id.* ¶ 10. Plaintiffs seek an injunction against enforcement of the amended rules so that Alexander & Catalano can resume its regular advertising campaign and continue to provide outreach to those who need legal assistance without fear of disciplinary action.

## II.     Plaintiff Public Citizen

Public Citizen is a nonprofit consumer rights organization with approximately 100,000 members nationwide, including approximately 9,450 in New York. Wolfman Aff. ¶ 2. As an organization devoted to defending the rights of consumers, Public Citizen has an interest in ensuring that its members are not restricted from receiving communications regarding the availability of legal services. *Id.* ¶ 6. Public Citizen is particularly interested in the availability of truthful legal advertising because speech in this context not only encourages beneficial competition in the marketplace for legal services, but can also educate consumers about their rights, inform them when they may have a legal claim, and enhance their access to the legal

system.  By unreasonably burdening speech by attorneys, the state's restrictions on attorney advertising will injure Public Citizen's New York members by preventing them from receiving truthful information that they have an interest in receiving.  *Id.* ¶ 6.

Sections 1200.8(g) and 1200.41-a of the rules impose a blackout on all communications by lawyers to consumers with personal injury or wrongful death claims for thirty days after the incident giving rise to the injury.  22 NYCRR §§ 1200.8(g) & 1200.41-a.  These rules prohibit not only in-person, telephone, and direct-mail solicitations, but also advertisements on radio, television, and the Internet that do not intrude on the privacy of consumers.  Moreover, section 1200.6(g)(1) of the rules prohibits lawyers and law firms from using pop-up or pop-under Internet advertisements other than on the lawyer's or law firm's own website, regardless of whether these advertisements are misleading.  *Id.* § 1200.6(g)(1).  These rules will unreasonably burden the ability of Public Citizen's members and other New York consumers to learn about their legal rights even if they actively seek out this information on the Internet.

The rules regulate not only commercial communications by attorneys, but also prohibit communications by nonprofit attorneys and legal groups offering to represent consumers with personal injury or wrongful death claims on a pro bono basis, including outreach using printed flyers and legal clinics targeted at those whose civil rights have been violated, such as, for example, those who have been injured by police officers at a political demonstration.  Moreover, the rules impose additional requirements that would unreasonably burden noncommercial communications.  Section 1200.6(k) of the amended rules would require nonprofit attorneys to retain copies of all pro bono solicitations for a period of one to three years.  22 NYCRR § 1200.6(k).  Section 1200.7(e) prohibits lawyers from using an Internet website that does not include the name of the lawyer or law firm in the website's address unless all pages of the

website "clearly and conspicuously include the actual name of the lawyer or law firm," the lawyer refrains from "engag[ing] in the practice of law using the domain name," and the domain name does not "imply the ability to obtain results in a matter." 22 NYCRR § 1200.7(e). Finally, section 1200.6(f) of the rules requires even nonprofit solicitations to be labeled "Attorney Advertising"—including, in all capital letters, in the subject line of emailed solicitations. 22 NYCRR § 1200.6(f). These restrictions burden noncommercial speech and will chill communications by nonprofit lawyers at the expense of the ability of Public Citizen's members to learn about their constitutional rights and the availability of pro bono representation.

## ARGUMENT

To obtain a preliminary injunction against government action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must show (1) a threat of irreparable harm absent the injunction and (2) a likelihood of success on the merits. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Because a violation of First Amendment rights always constitutes irreparable harm, the only question at issue in a First Amendment challenge to a state regulation is whether the plaintiff can show a likelihood of success on the merits. *Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). Here, the state action at issue restricts speech that the state has no legitimate interest in regulating. The state therefore cannot meet its burden of justifying restrictions on commercial advertising under the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Much less can the state satisfy the rigorous strict scrutiny standard required to justify restrictions on noncommercial speech such as communications offering pro bono representation. The plaintiffs can therefore show a strong likelihood of success on the merits, and the preliminary injunction should be granted.

**I.      The Amended Rules Unconstitutionally Restrict the Right of Lawyers to Advertise.**

Commercial lawyer advertising is a form of speech protected by the First Amendment.

*Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977).  Therefore, a state may not ban lawyer

advertising that is not actually or inherently misleading to consumers.  *Peel v. Attorney*

*Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990).  In some cases, a state may

impose restrictions on non-misleading commercial speech, but only if the state can satisfy the

test set forth by the Supreme Court in *Central Hudson*, 447 U.S. 557.  As later summarized by

the Supreme Court, the *Central Hudson* test requires the government to satisfy a three-part test:

"First, the government must assert a substantial interest in support of its regulation; second, the

government must demonstrate that the restriction on commercial speech directly and materially

advances that interest; and third, the regulation must be 'narrowly drawn.'"  *Fla. Bar v. Went For*

*It, Inc.*, 515 U.S. 618, 623-24 (1995) (quotation omitted).  The Supreme Court has repeatedly

subjected state justifications for restrictions on particular forms of lawyer advertising to rigorous

and skeptical scrutiny, and has, for the most part, rejected those claims.  *See Ibanez v. Fla. Dep't*

*of Bus. & Prof'l Reg.*, 512 U.S. 136, 143-45 (1994); *Peel*, 496 U.S. at 100-06; *Zauderer v. Office*

*of Disciplinary Counsel*, 471 U.S. 626, 639-49 (1985); *In re RMJ*, 455 U.S. 191, 203-05 (1982);

*Bates*, 433 U.S. at 381-82.

In this case, the state has not shown and cannot show that the restricted forms of speech

are false or misleading or that the state has any other legitimate interest in regulating these forms

of speech.  Indeed, the rules appear to be intended less to protect the public from harm than to

suppress certain forms of speech that state officials find to be distasteful.  The Supreme Court

has stressed, however, that a state's general distaste for lawyer advertisements does not allow it

to restrict truthful, non-misleading advertising to any greater extent than it can restrict similar

advertising in other industries. *See Zauderer*, 471 U.S. at 646-47. Moreover, the rules enacted by the state are overly broad, not supported by any evidence, and too vague to prevent arbitrary and discriminatory enforcement. For these reasons, the rules are an unconstitutional restriction on commercial speech.

      **A.     The Amendments Are Not Supported by Any Legitimate State Interest.**

      Prior to the amendments at issue here, New York's disciplinary rules prohibited advertisements that were "false, deceptive, or misleading." 22 NYCRR § 1200.6(a). Section 1200.6(a) serves New York's important interest in protecting consumers and, because false and misleading speech is not protected by the First Amendment, is consistent with constitutional requirements. *See Zauderer*, 471 U.S. at 638. The amendments to the rules, however, do nothing to prohibit deceptive advertisements beyond what was already prohibited by this provision. Instead, the rules impose a range of new restrictions on commercial speech that is not deceptive and that the state has no legitimate interest in regulating.

      The amended rules include a broad new prohibition on advertisements that "rely on techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence." *Id.* § 1200.6(c)(5). The rules also forbid the portrayal of a judge and the use of "a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter." *Id.* § 1200.6(c)(3), (7). The common thread among these provisions is that they prohibit harmless techniques frequently used by lawyers and others in effective advertising. Musical jingles, special effects, photographs of the lawyer, portrayals of fictional scenes, comic relief, and even interesting designs, logos, and color schemes appear to be covered by section 1200.6(c)(5)'s plain language. Each of these forms of advertising is a "technique" that is

designed to "obtain attention" and that does not seem relevant to selection of counsel. Indeed, the provision on its face could apply to nearly *any* advertising technique that goes beyond a dry factual recitation of the lawyers' relevant qualifications. Moreover, many lawyers, including Alexander & Catalano, portray judges in their commercials, and many others use trade names or mottos that might be said to imply an ability to achieve results, such as Alexander & Catalano's slogan "the heavy hitters" and other slogans like "The Dream Team" and "The Ticket Doctor."

There is nothing actually or inherently misleading, however, about any of these advertising techniques. Consumers are accustomed to the notion that attention-getting techniques, actors, and mottos appear in commercials, and it defies common sense to believe that consumers would be misled by these devices. Indeed, the Supreme Court has recognized that consumers are not so easily misled, rejecting "the paternalistic assumption" that consumers of legal services "are no more discriminating than the audience for children's television." *Peel*, 496 U.S. at 105. Similarly, the Federal Trade Commission's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics, in their comments on the draft version of the rules released by the presiding justices for public comment, noted that depictions of a judge, dramatizations of scenes, and other "common methods that advertising firms have used to make their messages memorable . . . are unlikely to hoodwink unsuspecting consumers, because consumers are usually familiar with them." *See* Letter from the FTC's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics to Michael Colodner, Office of Court Administration (Sept. 14, 2006) ("FTC Letter"), at 3 (Alexander Aff. Exh. 2). None of the techniques targeted by the rules is prohibited by FTC advertising regulations and, given the agency's congressionally mandated duty of protecting consumers from deceptive and misleading advertising, 15 U.S.C. § 45(a)(2), its views on the effect of the regulations should be

given significant weight.

Rather than targeting deceptive advertisements, the rules appear to be aimed at restricting advertising that regulators consider to be in poor taste. In his public comments regarding the draft version of the amendments, Presiding Justice Eugene F. Pigott, one of the four presiding justices responsible for enacting the rules, equated the lawyers targeted by the rules with "circus monkeys" and "used car salesmen," and stated that he hoped to ensure that the "profession acts professionally" and that "we can be proud of what we see, when we see lawyers on the TV, or in the newspaper, or anywhere else." Comments of Eugene F. Pigott to Monroe County Bar Association, at 3, 8 (Aug. 17, 2006) (Aff. of Peter Catalano Exh. 1). According to Justice Pigott, consumers should not be subjected to "somebody putting on a little show and saying that they are the best lawyer in town, or that they are this or that." *Id.* at 3.

The state, however, has no legitimate interest in regulating speech on grounds of taste. The Supreme Court in *Zauderer* held that attorneys have a First Amendment right to advertise even if the advertisements are "embarrassing or offensive" to some members of the public or "beneath [the] dignity" of some members of the bar. *Zauderer*, 471 U.S. at 648; *see also Carey v. Population Servs., Int'l*, 431 U.S. 678, 701 (1977) ("[W]e have consistently held that the fact that protected speech may be offensive to some does not justify its suppression."); *In re Shapiro*, 225 A.D.2d 215, 216, 656 N.Y.S.2d 80 (4th Dept. 1996) (declining to discipline a lawyer for an advertisement that, while "extremely offensive and degrading to the legal profession, [was] nonetheless constitutionally protected hyperbole"). The Supreme Court has been clear that, even if the state considers information conveyed by an advertisement to be "of slight worth," it is for "the speaker and the audience, not the government, [to] assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (holding unconstitutional a state ban on

-10-

in-person solicitation by accountants).

A state's general distaste for lawyer advertisements does not allow it to restrict truthful, non-misleading advertising to any greater extent than it can restrict similar advertising in other industries. *Zauderer*, 471 U.S. at 646-47 ("Prophylactic restraints that would be unacceptable as applied to commercial advertising generally are [] equally unacceptable as applied to [lawyer] advertising."). To the contrary, as the Supreme Court observed in *Zauderer*, "[b]ecause it is probably rare that decisions regarding consumption of legal services are based on a consumer's assumptions about qualities of the product that can be represented visually, illustrations in lawyer's advertisements will probably be less likely to lend themselves to material misrepresentations than illustrations in other forms of advertising." *Id.* at 648-49. Yet, the restrictions on attention-getting techniques, use of actors, and use of mottos that imply the ability to obtain results would be unthinkable in other fields of commerce, where such techniques are the norm.

In this case, the public has responded favorably to Alexander & Catalano's advertising. Alexander Aff. ¶ 5. Although the advertisements may sometimes seem silly, they have been successful in bringing clients to the firm. *Id.* ¶ 5; *see id.* Exh. 1 (DVD of commercials). If any consumers *were* offended by the ads, they would have been free to take their business elsewhere, and attorneys concerned about the dignity of the bar would have been free to advertise in a way that appealed to these consumers. In more than ten years of advertising, however, Alexander & Catalano has received only a handful of complaints about its advertisements on grounds of taste, *id.*, and, in any case, the state has no legitimate interest in overriding the preferences of consumers with its own subjective standards of taste. The rules therefore cannot survive the first prong of the *Central Hudson* test.

**B.    The Amendments Are Not Narrowly Drawn.**

Even if the Supreme Court had not firmly rejected the state's justification for the rules, the state would still fail to satisfy its burden of demonstrating the constitutionality of the amendments because they are not narrowly drawn.  *See Went For It*, 515 U.S. at 623-24.  The rules do not merely prohibit communications that are in poor taste or would be degrading to the profession; they prohibit *any* attention-getting technique not relevant to the selection of counsel or unrelated to legal competence, a restriction that sweeps up a diverse spectrum of advertising that no reasonable person would consider offensive or degrading.  Indeed, there are very few—if any—advertisements that do not attempt to grab the viewer's attention in some way and would avoid falling within the rule's prohibition.  Attention-getting techniques are frequently used in advertising to communicate ideas in an easy-to-understand form, to attract viewer interest, to give emphasis, and to make information more memorable.  For example, although an extremely large size is not a characteristic related to legal competence, Alexander & Catalano's television commercial depicting its attorneys as the size of giants illustrates its slogan "think big" in an easy-to-understand and memorable way.  Moreover, lawyer advertisements, for better or worse, have to compete in a marketplace of ideas where rival messages will inevitably use the sort of techniques prohibited by the rules.  In television advertising, especially, lawyers will have a difficult time getting their message heard when they have to compete with a wide range of other commercial advertising that is not similarly restricted.

In a similar context, the Supreme Court in *Zauderer* struck down rules restricting the use of illustrations in attorney advertisements.  *Zauderer*, 471 U.S. at 647-49.  The Court wrote:

> The use of illustrations or pictures in advertisements serves important communicative functions:  it attracts the attention of the audience to the advertiser's message, and it may also serve to impart information directly. Accordingly, commercial illustrations are entitled to the First Amendment

protections afforded verbal commercial speech . . . .

*Id.* at 647.  The New York Bar's Ethics Committee reached the same conclusion in considering

the use of dramatizations in lawyer advertising:

> Dramatizations of fictional events can be used in a radio or television
> advertisement in much the same way as a drawing or photograph can be used in a
> print medium to illustrate a situation to the viewer, provided the dramatization is
> done in a way that is not false or misleading.  Dramatization of an event that
> reasonably could occur . . . is not per se false or misleading merely because the
> particular circumstances did not occur, the services were not actually performed
> by the lawyer and the persons portrayed (as well as the actors) are not past or
> present clients of the lawyer.

Formal Ethics Opinion 661 (N.Y. Ethics Comm. 1994); *see also Grievance Comm. v. Trantolo*,

470 A.2d 228, 234 (Conn. 1984) (holding that television advertisements depicting humorous

fictional scenes were informative and neither false nor misleading).

Like illustrations and dramatizations, the techniques prohibited by New York's amended

rules convey a range of information that may be explicit or implicit, accurate or misleading.

Even advertising techniques that are not literally true are often not misleading to consumers.  No

reasonable consumer, for example, would believe after watching Alexander & Catalano's

commercials, that its lawyers are actually capable of running at super speed or are taller than

local buildings.  The state, however, cannot ban an entire category of speech because *some* of the

targeted speech has the potential to mislead.  *Peel*, 496 U.S. at 109.  Moreover, for those

particular forms of commercial speech that the state can show to be misleading, the state could

impose a disclaimer requirement instead of prohibiting the speech entirely.  *See In re RMJ*, 455

U.S. at 203 ("[T]he States may not place an absolute prohibition on certain types of potentially

misleading information . . . if the information may be presented in a way that is not deceptive.").

That disclaimers for many advertisements prohibited by the rules would be absurd—for example,

a disclaimer that "attorneys pictured are not actually giants," or that "musical jingles should not

influence the choice of an attorney"—simply underscores that the rules in these applications do not protect consumers.

### C.    The Amendments Are Not Supported by Any Evidence.

"It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield*, 507 U.S. at 770 (quotation and alteration omitted). The state's evidentiary burden requires it to show not only that "the harms it recites are real," but also that "its restriction will in fact alleviate them to a material degree." *Id.* at 770-71. Moreover, in the absence of actual evidence in support of its policy, the state may not rely on "[m]ere speculation and conjecture." *Id.*  In this case, the presiding justices who adopted the amendments provided no record, such as factual findings, studies, or other evidence, demonstrating a state interest in the amendments.  Nor are plaintiffs aware of any evidence that would support the conclusion that the prohibited practices are harmful or that the broad restrictions in the amendments are an effective means of attacking any problems they may pose.

Indeed, the publicly available evidence at the time the presiding justices were considering the rules weighs against the state's interest in the amendments.  Prior to adoption of the rules, a New York State Bar Association committee on lawyer advertising completed a detailed study of lawyer advertising in the state.  *See* New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer Advertising* (Oct. 21, 2005) ("Task Force Report") (Alexander Aff. Exh. 3).  In its report, the seventeen-member committee unanimously concluded that the state should not adopt new content-based restrictions on lawyer advertising.  *Id.* at 2.  Noting that about one-third of a sample of randomly selected New York lawyer advertisements would violate the state's existing prohibition on false and misleading advertising, the committee concluded that stricter reporting requirements and better enforcement, rather than more rules, were the proper

ways to address any problems with advertising in the state. *Id.* at 2, 16, 53, 46, 47, 79-81. Similarly, in its written comments to the draft rules, the FTC recommended against techniques that "are related to the style and content of media advertising but do not necessarily target deception" and noted that descriptive monikers that imply an ability to obtain future results "may benefit consumers so long as they are neither false nor misleading." *See* FTC Letter at 2-3 & 3 n.10. In disregarding these recommendations, the state failed to produce countervailing evidence demonstrating its interest in restricting speech and, for this independent reason, the amendments are unconstitutional.

**D.      The Amendments Are Unconstitutionally Vague.**

The amended rules on attorney advertising are not only unsupported by any legitimate state interest, they are also unconstitutionally vague. Due process prohibits vague regulations for two interrelated reasons: (1) to provide fair notice so that individuals may steer clear of unlawful conduct, and (2) to provide explicit standards to authorities to prevent arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Kolender v. Lawson*, 461 U.S. 352 (1983); *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999). When a regulation implicates the interest in free expression, special regulatory precision is required to ensure "that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation." *Grayned*, 408 U.S. at 109 n.5.

The rules adopted by the state in this case do not provide clear guidelines for lawyers attempting to avoid professional discipline. The rules do not define a "technique[] to obtain attention" or explain what sorts of techniques are "relevan[t] to the selection of counsel." Nor do they provide any guidance as to what lawyer characteristics are deemed to be "unrelated to legal competence." Moreover, the rules do not define the terms "nickname, moniker, motto or trade

name," or explain what sorts of statements "impl[y] an ability to obtain results in a matter."
Read literally, the rules seem to cover almost *any* technique a lawyer could include in an
advertisement, including harmless techniques like jingles and pictures of the attorney.
Disciplinary action against these forms of advertising is not far-fetched—Justice Pigott in his
public comments about the rules specifically identified jingles as a problem justifying the need
for the rules, Catalano Aff. Exh. 1, at 6—and there is no discernible dividing line between jingles
and other forms of common, non-deceptive commercial advertising.

     Even if the disciplinary committees never enforce the rules in these wide-ranging
contexts, the mere *potential* application of the rules creates self-censorship on the part of lawyers
and a resulting chill on speech.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,
757 (1988).  Given the vagueness of the rules, lawyers who advertise in the state will face an
unacceptable dilemma:  either comply with the literal language of the rules or risk the possibility
of professional discipline, including a possible loss of the lawyers' profession and livelihood.  As
a result of the rules, Alexander & Catalano has already been forced to curtail advertisements that
show its lawyers in humorous situations or that use the slogan "the heavy hitters."  Alexander
Aff. ¶¶ 7-12.  The firm also has a fear of prosecution based on its continued use of its other
advertisements, which contain techniques like special effects and jingles, and slogans like "think
big" and "we'll give you a big helping hand."  *Id.* at ¶¶ 8, 10.

     Moreover, the rules' vagueness raises the risk of arbitrary and discriminatory
enforcement against lawyers who are unpopular with state disciplinary authorities.  For example,
disciplinary committees may apply the rules strictly against personal injury lawyers and other
lawyers who advertise on television while ignoring attention-getting devices such as graphics,
photographs, or flashy design schemes on the web pages of major law firms.  *See, e.g.*,

http://www.skadden.com/ (displaying a dramatic red design scheme, photographs, and animation); http://www.sullcrom.com/ (featuring a picture of a mountain); http://www.dpw.com/ (featuring depictions of moving people as blurs); http://www.blankrome.com/ (displaying flashing photographs suggesting competence, including gymnasts flying through the air, chess pawns, and a $5,000 bill).  Indeed, Justice Pigott, in his public comments about the rules, acknowledged that the presiding justices had not considered how some of the rules would be applied to "the big firms in New York," noting that "[w]e're thinking about the ads that you and I see at night."  Catalano Aff. Exh. 1, at 7-8.  Although Justice Pigott claimed that the rules do not "target any area of practice," he admitted that it was only "very limited areas of practice" that he was concerned with in adopting the amendments and that it was "obvious to all of us the areas that seem to attract the most egregious ads."  *Id.* at 4.  He also made light of lawyers who complained that the required disclaimers would eat up most of their time in a fifteen-second television advertisement, joking that, in response, he was "going to make the disclaimer a little longer."  *Id.* at 8.  In sum, rather than targeting speech harmful to New York consumers, the rules apply to speech and to particular attorneys that disciplinary authorities, in their unregulated discretion, personally dislike.

## II.   The Amended Rules Unconstitutionally Restrict Access by New York Consumers to Information About Their Legal Rights and Available Legal Services.

### A.   Consumers Are Injured By Restrictions on Lawyer Communications.

Just as advertisers have a First Amendment right to distribute advertising, consumers have a "reciprocal right to receive the advertising."  *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976).  This right to receive information extends to both commercial advertising and to outreach by noncommercial attorneys to consumers whose rights have been violated.  The Court in *Virginia Board of Pharmacy* recognized the strong

interest that consumers have in receiving advertising information, noting that a consumer's interest in this information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.* at 763. Similarly, the Court in *Zauderer*, in upholding the First Amendment right of attorneys to truthfully advertise their services, noted that "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides." *Zauderer*, 471 U.S. at 651. For this reason, the court in *Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995), relying on *Zauderer*, held that Public Citizen had standing to contest restrictions on lawyer advertising rules on behalf of its Mississippi members. Likewise, Public Citizen has an interest in protecting its approximately 9,450 members in New York, who will be injured if they are denied access to truthful, non-misleading information about available legal services that would be relevant to their selection of a lawyer. Wolfman Aff. ¶ 6.

As the FTC recognized in its comments to the draft version of the rules, prohibitions against common advertising techniques harm consumers of legal services by reducing competition, frustrating consumer choice, and ultimately increasing prices while decreasing quality of service. FTC Letter at 1-2. Restrictions on advertising act "as a barrier to professional entry" and thereby "skew[] the market . . . in favor of established attorneys who are already known by word of mouth." *Ficker v. Curran*, 119 F.3d 1150, 1153 (4th Cir. 1994); *see also Bates*, 433 U.S. at 378. In a less competitive environment, attorneys have less incentive to price competitively and prices therefore increase. *See Bates*, 433 U.S. at 377-78.

Advertising restrictions also inhibit consumers' access to the justice system and disproportionately harm those who are poor, illiterate, injured, disabled, or who do not speak English, and who are therefore especially likely to rely on broadcast and illustrative

advertisements to inform them of available legal services.  *See Peel*, 496 U.S. at 110

(recognizing that advertising "facilitates the consumer's access to legal services and thus better

serves the administration of justice").  The Supreme Court in *Bates* noted that many legal needs

of those of moderate means go unmet because consumers fear the perceived costs of legal

services or do not know how to locate a competent attorney.  *Bates*, 433 U.S. at 376-77.

Similarly, the American Bar Association, in formulating its Model Rules of Professional

Conduct, recognized that the public's reliance on advertising to learn about legal services is

"particularly acute in the case of persons of moderate means who have not made extensive use of

legal services."  Model R. Prof'l Conduct 7.2, cmt. 1.  The sorts of common advertising

techniques prohibited by the rules can "be an effective way of reaching consumers who do not

know how legal terminology corresponds to their experiences and problems," and can therefore

be "useful to consumers in identifying suitable providers of legal services."  FTC Letter at 3.

**B.**      **The Amendments Unconstitutionally Restrict Consumers' Access to Commercial Communications.**

The amended rules impose restrictions on communications that particularly affect the

ability of New York consumers to receive valuable information.  First, sections 1200.8(g) and

1200.41-a of the amended rules prohibit advertisements and solicitations regarding incidents

involving potential claims for personal injury or wrongful death for a thirty-day period after the

incident.  22 NYCRR §§ 1200.8(g) & 1200.41-a.  Under these rules, lawyers will be prohibited

from communicating by any means with injured consumers in New York to inform them of their

legal rights or the availability of legal representation.

Although the Supreme Court has upheld a thirty-day restriction on direct-mail

solicitations to injured consumers, the Court relied heavily on the strength of extensive evidence

accumulated by the state of Florida showing that consumers there viewed direct-mail

solicitations following an injury to be an egregious violation of their privacy and an invasion into the sanctity of the home. *Went For It*, 515 U.S. at 625. Not only are the rules here unsupported by similar evidence, but the Supreme Court's decision to uphold restrictions on targeted mailings in *Went For It* cannot possibly justify New York's broad ban on broadcast, print, and Internet advertisements that in no way invade the privacy of consumers. The Court in *Went For It* emphasized the "other ways for injured Floridians to learn about the availability of legal representation" during the thirty-day blackout period. *Id.* at 633. Here, however, the rules restrict even alternative sources of information, leaving attorneys completely unable to inform consumers about their rights relating to a specific incident even if the consumers specifically seek out this information on the Internet. For example, a law firm that wishes to set up a web page stating its willingness to assist consumers injured by a particular product would be blocked from doing so during the thirty-day period. And if different people are injured by a product at different times, a website addressed to those injured consumers would never be allowable because it could always be viewed by an injured person within thirty days of that person's injury.

Unlike direct-mail advertisements, untargeted advertisements "involve[] no willful or knowing affront to or invasion of the tranquility of bereaved or injured individuals" and prohibiting this form of advertising therefore serves no state interest other than an illegitimate and paternalistic interest in protecting consumers from being offended. *Id.* at 630; *see also id.* at 632 n.2 ("There is an obvious difference between situations in which the government acts in its own interests, or on behalf of entities it regulates, and situations in which the government is motivated primarily by paternalism."). Even if considered by some consumers to be in poor taste, these sorts of ads "can hardly be said to have invaded the privacy of those who [receive them]." *Zauderer*, 471 U.S. at 642. Those who do disapprove of the ads can "effectively avoid

further bombardment of [their] sensibilities simply by averting [their] eyes," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 465 n.25 (1978) (quotation omitted), or, in the case of television ads, by changing the channel. Moreover, any consumers who may be offended are just as likely to be offended on the thirty-first day after their injury as they will be on the thirtieth. *See Ficker*, 119 F.3d at 1154.

The rules also completely ban Internet pop-up and pop-under advertising by lawyers, regardless of whether these advertisements are deceptive or misleading. 22 NYCRR § 1200.6(g)(1). Like the thirty-day ban on solicitations, the ban on pop-up advertisements interferes with the ability of Public Citizen's New York members and other consumers to learn about their rights and available legal services. Presumably this amendment is based on the assumption that pop-up advertisements are an intrusive form of advertising, but plaintiffs are not aware of any evidence that Internet consumers are deceived or unduly influenced by pop-up ads. It seems likely that consumers have now become familiar with this form of advertising, which, although sometimes annoying, can be closed with a single click (or eliminated with pop-up blocking software) and is therefore at least as easy to dispose of as mailed solicitations. *See Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) (holding that the state could not constitutionally restrict direct-mail solicitations). Indeed, this provision seems entirely motivated by distaste for this particular form of advertisement. As already discussed, however, a state may not prohibit speech on grounds of taste. *See Zauderer*, 471 U.S. at 648. This provision is therefore also unconstitutional.

### C. The Amendments Restrict Consumers' Access to Information About Their Constitutional Rights by Restricting Noncommercial Communications.

The Supreme Court has recognized that solicitation of pro bono legal services by nonprofit political organizations is not commercial speech, but rather core political speech for

which regulations are subject to strict scrutiny under the First Amendment. *In re Primus*, 436 U.S. 412, 428 (1978). In *Primus*, an ACLU cooperating lawyer offered free legal services to a woman challenging a state's requirement of sterilization as a condition of receiving public medical assistance. *Id.* at 415-16. The Supreme Court reversed the state supreme court's decision to sanction the lawyer, holding that the lawyer's solicitation was protected political speech and association under the First Amendment. *Id.* at 428. The Court recognized that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" and thus "must withstand the exacting scrutiny applicable to limitations on core First Amendment rights." *Id.* Under this standard of review, a state regulation survives scrutiny only if the state has a compelling interest in the regulation and its methods are narrowly tailored to serve that interest. *Id.* at 426, 432-33.

The amendments change section 1200.1 of the Disciplinary Rules to define the word "advertising" as "any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the retention of the lawyer or law firm." 22 NYCRR § 1200.1(k). The new rules provide no exception for nonprofit legal organizations that do not charge clients for their services. Thus, an offer by Public Citizen or another nonprofit group to represent a New York consumer pro bono in a constitutional challenge against the state would fall squarely within the scope of the rules and would be subject to the same restrictions that are unconstitutional even in the context of commercial speech. However, when "solicitation is by a non-profit organization, [] the danger of undue influence is minimized and outweighed by the value of the information and the right to free speech." *Ficker*, 119 F.3d at 1152. For this reason, *none* of the amendments satisfies the strict scrutiny test when applied to noncommercial communications.

The thirty-day restriction on solicitation applies to noncommercial as well as commercial speech and is thus an unconstitutional restriction on political speech and free association. Under the amended rules, for example, a nonprofit organization that employs lawyers will be prohibited from communicating in any manner with individuals physically injured by police officers at a political demonstration to inform those individuals of the availability of pro bono legal representation. Consumers in these situations may not know that their constitutional rights were violated and may benefit from immediate contact by an attorney. In analogous circumstances, the Fourth Circuit struck down a thirty-day ban on attorney communications to criminal and traffic defendants, noting that, "[w]hile a criminal or traffic defendant may be shaken by his arrest, what he needs is representation, not time to grieve." *Id.* at 1155.

The amended rules will also impose other restrictions on noncommercial communications that, even if they can be constitutionally applied to commercial communications, are unjustified and overly burdensome when applied to noncommercial speech and will chill pro bono offers to represent New York consumers. For example, section 1200.6(k) requires lawyers and law firms to retain copies of all communications defined as advertisements for a period of one to three years and would thus require nonprofit groups to save copies of all communications offering pro bono services, including email. 22 NYCRR § 1200.6(k). Complying with this rule would involve an unjustified expense and would burden the ability of nonprofit groups to engage in noncommercial communications. Moreover, the purpose of this rule is apparently to allow the state to review past solicitations upon request to look for disciplinary violations, and the state's intrusion into these communications may reveal embarrassing or private information about the solicited consumers and would unacceptably chill the right of association between nonprofit lawyers and their clients. *See Primus*, 436 U.S. at 426; *Button*, 371 U.S. at 430-33.

Section 1200.7(e) of the amended rules requires that all lawyers and law firms using an Internet website include the name of the lawyer or law firm in the website's address unless all pages of the website "clearly and conspicuously include the actual name of the lawyer or law firm" and unless the lawyer refrains from "engag[ing] in the practice of law using the domain name."  22 NYCRR § 1200.7(e).  In addition, the rule prohibits lawyers and law firms from using domain names that "imply an ability to obtain results in a matter."  *Id.*  This rule will force nonprofit lawyers with established domain names to relocate their websites to new domains at significant expense to continue practicing law using the Internet.  Many nonprofit legal groups, such as Public Citizen Litigation Group, are part of broader organizations, so the name of the law group is unlikely to appear on all web pages on the group's site.  Moreover, because brevity is important in the choice of a domain name, forcing nonprofit attorneys to use their whole names or the whole names of their firms would impose unnecessary burdens on Internet-based speech.

Finally, the rules require that the words "Attorney Advertising" appear in all written advertisements by attorneys, including, in all capital letters, in the subject line of emailed communications.  22 NYCRR § 1200.6(f).  Although disclosure requirements are usually preferable to an outright ban, the Supreme Court in *Zauderer* recognized that unjustified or overly burdensome disclosure requirements can chill speech and thereby themselves violate the First Amendment.  471 U.S. at 651.  Thus, even in the commercial context, the First Amendment does not permit a disclaimer requirement in the absence of evidence that the regulated form of speech is misleading.  *Ibanez*, 512 U.S. at 146-47; *see also Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000) (noting that a state "is not relieved of its burden to identify a genuine threat of danger simply because it requires a disclaimer, rather than a complete ban on . . . speech").  Moreover, when a restriction affects *noncommercial* speech, the state must satisfy the strict

scrutiny test by showing that the rule is supported by a compelling state interest and is narrowly tailored toward that interest.  *See Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988).  Here, there is no evidence of a widespread problem with pro bono lawyers disguising their solicitations in some difficult-to-recognize form.  Indeed, if anything, consumers would be misled by noncommercial solicitations labeled as "advertising."  By flagging email and other forms of noncommercial communications as advertising, even though they are not designed to attract clients for pecuniary gain, the amendments dramatically increase the likelihood that the communications will be blocked by a spam filter or discarded by the recipient without being read, thus preventing consumers from reading communications that they may have a strong interest in receiving.

For all these reasons, the state cannot show the compelling interest and narrow tailoring toward that interest necessary to satisfy strict scrutiny.  None of the applications of the rules relates in any way to the state's interest in protecting consumers of legal services from false advertising.  Moreover, far from being narrowly tailored, the rules would apply to a wide range of speech that the state has no interest in regulating.  The rules would thus unconstitutionally burden the public's interest in receiving important noncommercial communications.

## CONCLUSION

The amended rules are an unconstitutional curtailment of both commercial and noncommercial speech.  This Court should issue the requested preliminary injunction to prohibit enforcement of the amended rules until the case can be finally decided on the merits.

Respectfully submitted,


  /s/ Scott L. Nelson                                        
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
Gregory A. Beck
DC Bar No. 494479, *pro hac vice* pending
Brian Wolfman
DC Bar No. 427491, *pro hac vice* pending
Public Citizen Litigation Group
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email: snelson@citizen.org
       gbeck@citizen.org
       brian@citizen.org

*Counsel for Plaintiffs*

Dated:  February 14, 2007