

**NYSBA**

## NEW YORK STATE BAR ASSOCIATION

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Report and Recommendations
of
Task Force on Lawyer Advertising**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Albany, New York
October 21, 2005**

---

This report was approved by the New York State Bar Association's House
of Delegates on January 27, 2006

---

Exhibit 3

Dockets.Justia.com

This report, which was issued in October 2005, was approved by the New York State Bar Association's House of Delegates on January 27, 2006. The final rules approved by the House of Delegates appear at Tab 1 of this report and reflect amendments made at its meeting on January 27.

**TABLE OF CONTENTS**

Page

I    SUMMARY OF RECOMMENDATIONS ............................................ 9

II.   BACKGROUND OF COMMITTEE MEMBERS ................................ 13

III.  SUMMARY OF LAW ON ATTORNEY ADVERTISING .................. 16

    A.  Constitutional Protection of Attorney Advertising and Limits on
       Regulation ................................................................................... 17

    B.  Disciplinary Rules and Ethical Guidelines on Lawyer Advertising
       in New York State Under the Code of Professional Responsibility ..... 21

        1.  Purpose of Lawyer Advertising and General Restrictions ......... 22

        2   Safe Harbor Categories ..................................................... 23

        3.  Client Testimonials ........................................................... 26

        4.  Special Requirements Relating to Fee Advertising .............. 27

        5.  Areas of Practice ............................................................... 28

        6   Identification of Lawyer, Group Advertising ...................... 29

        7.  Approval, Filing and Retention Requirements .................... 29

        8.  Solicitation ....................................................................... 30

        9.  Trade Names ..................................................................... 32

    C.  New York State Decisions on Attorney Advertising ..................... 33

    D.  Antitrust Concerns Regarding Regulation of Attorney Advertising ..... 35

    E.  Approaches of Other States Regarding Advertising or Peer Review ..... 41

        1.  Texas ................................................................................ 42

        2.  New Jersey ........................................................................ 42

        3.  Florida .............................................................................. 43

        4.  Kentucky ........................................................................... 44

        5.  New Mexico ....................................................................... 44

        6.  Monroe County Initiative ................................................... 45

    F.  Overriding Public Policy Concerns Regarding Attorney
       Advertising ................................................................................. 45

IV.  EMPIRICAL EVIDENCE OF ATTORNEY ADVERTISING
    GATHERED BY THE COMMITTEE .......................................... 46

V.   INTERNET ISSUES AND ATTORNEY ADVERTISING ................ 48

VI.  RULE 7.1: COMMUNICATIONS CONCERNING A LAWYER'S
    SERVICES .................................................................................. 55

**TABLE OF CONTENTS**
(continued)

Page

VII      Rule 7.2: PAYMENT FOR REFERRALS ............................................. 63

VIII.    Rule 7.3: DIRECT CONTACT WITH PROSPECTIVE CLIENTS ............ 63

IX       Rule 7.4: IDENTIFICATION OF PRACTICE AND SPECIALTY ............ 64

X.       Rule 7.5: FIRM NAMES AND LETTERHEADS ............................... 65

XI.      SELF ENFORCEMENT ............................................................ 65

     A.      STATES OUTSIDE NEW YORK ........................................... 66

     B.      STATE BAR COMMITTEE ON PROFESSIONAL ETHICS ............ 67

     C.      THE MONROE COUNTY BAR ASSOCIATION PROJECT .......... 68

         1.      History............................................................... 68

         2.      The Guidelines.................................................... 69

         3.      MCBA's Enforcement Plan.................................... 73

         4.      The Subcommittee's Conclusions ........................... 78

XII.     REPORT AND RECOMMENDATIONS SUBCOMMITTEE ON
     ENFORCEMENT OF ADVERTISING RULES ............................... 79

## PRELIMINARY REPORT
## OF THE NEW YORK STATE BAR ASSOCIATION
## TASK FORCE ON ATTORNEY ADVERTISING

The Task Force on Attorney Advertising (the "Committee") was created by

President A. Vincent Buzard in June 2005, as a result of increasing concern over lawyer

advertising as contributing to the lack of public understanding about lawyer marketing[1].

He has also expressed concern that the State Bar, as a voluntary organization of lawyers,

has a duty to protect the public and advance the legitimate interests of our profession

concerning the subject of lawyer advertising. The President asked the Committee to

recommend changes in the enforcement of the rules, changes in the rules as needed, and

development of programs for peer review[2].

One: the Committee has attempted to provide guidance in this subject area

because advertising not only directly affects the manner in which attorneys practice law

but also the public, which benefits from "the free flow of commercial information" and

needs truthful, non-misleading information in order to choose a lawyer[3]. The Committee

had thus, a dual concern here: to balance the legitimate interests of lawyers in informing

potential clients of the nature, benefits and costs of legal services and the qualifications of

lawyers to provide them with the protection of the public, by prohibiting advertising and

---

[1] President's Message, New York State Bar Association Journal, June/July 2005 at 6.
[2] Id. This is the third time since 1993 in which the State Bar has studied attorney advertising. In 1993, State Bar President John Bracken appointed the Special Committee on Lawyer Advertising and Lawyer Referral Service Regulation, chaired by Sharon Stern Gerstman, to monitor developments in lawyer advertising nationally and within the state and made recommendations concerning existing rules ("Gerstman Report"). Following approval by the House of Delegates, the Administrative Board made many changes to the Disciplinary Rules. In January 2003, the Committee on Standards of Attorney Conduct ("COSAC"), chaired by State Bar President Steven Krane, was formed in order to begin a comprehensive evaluation of the revised Model Rules of Professional Conduct, that the ABA had adopted that year. COSAC's comprehensive report was extraordinarily helpful in formulating the views of the Committee in this Report, for which we thank Mr. Krane and his Committee.
[3] Bates v. State of Arizona, 433 U.S. 350, 367-381 (1977), cited in R.G. Pearce and B Green, "The Ethics of Marketing Legal Services" from Effective Marketing for Lawyers, New York State Bar Association (1996) at 173

solicitation practices that disseminate false or misleading information, that approach prospective clients in circumstances where the client's capacity for rational decision in the selection and engagement of counsel is compromised, or that diminish the Bar's professionalism[4]. Of late there has been surge of broadcast media, billboard, internet, blogs, and other forms of electronic communications by lawyers aimed at reaching the consumer in new ways. These technological advances have caused us to question whether the existing rules and procedures are adequate to meet the public interest and ensure that consumers receive high-quality legal services[5]. The Committee was also cognizant that further content-based restrictions have the potential to run afoul of constitutional rights and we agreed at the outset to deal in practical solutions (i.e., generally strengthening existing disclaimers and requiring further disclosures) without adding content-based restrictions

Two: As the Committee began its work four months ago, Chief Judge Kaye formed a six-person Committee of the Administrative Board (the "Administrative Board") whose responsibility it is also to review the Disciplinary Rules regarding advertising and consider amending them[6]. As of this writing, the Administrative Board has met but not issued a formal report or recommendations. We are hopeful that the State Bar will be given an opportunity to review and comment on the work of the Courts and thus, collegially work effectively to find agreed upon rules and procedures in order to achieve the dual concerns.

---

[4] Statement by the Committee on Professional Ethics in the Gerstman Report dated January 5, 1996, pp. 1-2.

[5] Special thanks go to Sharon Stern Gerstman and her Committee whose report provided comprehensive research helpful to this Report.

[6] The Administrative Board Committee consists of one appointee from each of the four Appellate Divisions, one appointee by Chief Judge Kaye and one by Administrative Judge Jonathan Lippman

Three: There have been considerable changes in the legal profession since 1985, when the State Bar began consideration of the last significant wave of amendments to the New York Code. Over the past 20 years, membership in the bar has nearly doubled. New practice areas have emerged and others have faded. Multijurisdictional practice has become more commonplace. By this writing, the members of the House of Delegates have received the COSAC Report, a massive, two-volume work[7]. It now appears that the COSAC Report will be submitted to the House of Delegates for its consideration in 2006-2007. In anticipation of this, the Committee has reviewed those portions of the COSAC Report relevant to our study of attorney advertising. While the Committee generally agrees with the substantive comments of COSAC as they relate to attorney advertising, we have noted our limited points of departure and provided our thought processes along the way based upon research, our knowledge about the disciplinary process and our deliberations, so that a full consideration of the merits of the proposals as they relate to attorney advertising may occur.

Four: As part of the mission, the Committee recognizes the need for educating members of the profession about the rules and procedures concerning lawyer advertising as well as educating the public. Public perceptions of the legal profession can be negatively impacted by certain types of lawyer advertising. Educating the public on how best to select a lawyer may have an ameliorative effect on this disturbing trend. Past Committees and COSAC have noted that one of the problems with the present rules is simply that they are located in numerous Code provisions rather than consolidated for easy use; are not followed (particularly with respect to the filing requirements), and are

---

[7] COSAC "Proposed Rules for Professional Conduct" Volume I dated September 30, 2005 (hereinafter, "COSAC Proposal"), p.vii.

misunderstood. This suggests the need to create educational materials for the public and for attorneys on this subject in recognition of the unique role which the State Bar plays and should continue to play in education. The Committee believes that adopting the proposed rules and advertising review procedures set forth in this Report is critical in order to improve the truthful communication about lawyer services and practice of law, raise the public's view and understanding of lawyers in New York State, help attorneys market and communicate about their practices, and ensure a greater degree of certainty in the content of advertisements regarding the availability, cost and other incidents of legal services

The Work of the Committee

Weeks before the Task Force met, its seventeen members received and were asked to review a bibliography (set forth in the Appendix, Part 3) concerning the disciplinary rules and ethical considerations, recent law, articles and available surveys on attorney advertising. The bibliography was limited only to the extent it consisted of all relevant articles and other materials since the Bates decision.

Following an organizational meeting held in New York on July 29, 2005, at which President Buzard's mandate and issues related to attorney advertising were explored, the Committee was divided into five subcommittees. Subcommittee on Disciplinary Rules/COSAC Proposal is chaired by James F. Dwyer, of Syracuse; Subcommittee on Attorney Self-Regulation is chaired by James Gacioch, of Binghamton; Subcommittee on the Internet is chaired by Paul D. Rheingold of New York; Subcommittee on Enforcement is chaired by Barry Kamins of Brooklyn; and the Subcommittee on Education is chaired by Beverly Poppell of New York. The Committee

4

is honored to have Professor Stephen Gillers, Emily Kempin Professor of Law and an outstanding professor of ethics at New York University School of Law, as a consultant to the Committee[8]. Bernice K. Leber chairs the Committee. The seventeen members of the Committee were drawn from a broad range of practice areas and settings, and represented the entire state geographically. The members of the Committee have substantial experience in matters of constitutional law, legal ethics and professional responsibility, the media and internet, as well as attorney disciplinary experience[9].

The Committee engaged in extensive discussion regarding the current problems with attorney advertising in the State of New York, the best methods of addressing those problems, and the State Bar Association's role in this arena. The Committee identified a number of key issues and problems that exist under the current attorney advertising regime. These include:

- False, deceptive or misleading advertisements, in print, broadcast, and on-line advertisements;

- Lack of enforcement of advertising improprieties under the current system, whereby the disciplinary committees, occupied with investigating and prosecuting other ethical matters, operate reactively to filed complaints, rather than taking a proactive approach;

- The role of State and Local Bar Associations in combating or regulating abusive advertising, which are not presently empowered or equipped to do so;

- The failure of the current rules in addressing advertising over the Internet and other news media;

- With regard to on-line websites:
  o Ads that fail to state which lawyer or law firm is running the advertisement;
  o Websites run by non-lawyers who sell cases to attorneys; and

---

[8] Professor Gillers reviewed and commented on the report but was not a voting member of the Committee. We thank Professor Gillers for his invaluable imput. The views of the Committee are not necessarily those of Professor Gillers.

[9] Relevant portions of the biographies of the members of the Committee are included infra Part II at p. 13.

- o  Advertisements run by attorneys who will not handle the cases but refer them out to other attorneys

- Multi-state jurisdictional and enforcement problems that arise from on-line advertisements and websites that are viewable in any state;

- Public education, including both education of attorneys about ethical advertising, as well as education of the general public as to improper attorney advertising and lawyer retention; and

- The lack of resources available to the respective Departmental disciplinary committees in order to address attorney advertising abuses.

During August, each subcommittee in turn met, primarily by conference call and email, to discuss the subject areas of their charge. The subcommittees generally reviewed the current law on advertising, the current disciplinary rules and ethical considerations, the ABA Model Code of Professional Conduct adopted by the ABA House in 2003, the COSAC Proposals on advertising and solicitation, as well as a variety of recent state initiatives in the area of attorney advertising. It undertook a review of constitutional law regarding regulation of lawyer advertising and solicitation. The Committee put together a fifty state survey of the key advertising and solicitation provisions that is annexed to the Appendix, as well as a chart of states' solicitation black-out periods. The Committee gathered information from each of the four Departmental disciplinary committees, as well as reviewed randomly selected print, broadcast and internet advertising.[10] Members of the Committee studied approximately 120 print ads on file with the four Departmental disciplinary committees. In addition, the Internet Subcommittee, headed by Paul Rheingold, reviewed over 50 internet ads and websites

---

[10] Special thanks go to Bradley Carr for obtaining copies of the broadcast ads from around the State.

The Committee then reviewed 27 randomly selected broadcast media ads. These are included in the Appendix and summarized in the Report as well[11].

Draft outlines from each of the subcommittees and advertisements were in turn presented to and considered at the full Committee at two plenary sessions held on September 8, 2005, and September 28, 2005. On September 28, 2005, the Committee reviewed more detailed substantive drafts of the proposals, including proposed text of the rules, and discussed and reached consensus on the set of recommendations contained in this Report.

Following completion of the draft, comments were solicited from the following State Bar Committees and bar organizations.

Our recommendation is that the State Bar approve the changes in format and substance from the New York Lawyers' Code of Professional Responsibility to the New York Rules of Professional Conduct as they relate to attorney advertising, and that it ask the Courts of the State of New York, through the Administrative Board and the four departments of the Appellate Division of the Supreme Court, to adopt the Rules and Comments together with a formal biennial review of advertising, in the manner indicated in Appendix, Part 1. We note that, historically, the Appellate Division has only adopted the Disciplinary Rules as part of the New York Code. The Ethical Considerations have traditionally been adopted by the State Bar House of Delegates. We believe that the comments would be far more authoritative were they to be adopted by the Appellate Division, and therefore recommend, as COSAC has, that they do so. In addition, we ask that the House of Delegates approve in form the outlines of booklets proposed in the

---

[11] See infra, pp. 43-46, Appendix tabs 8-10.

7

Appendix, Part 2, with the substance of the booklets to be completed and reviewed in conformity with the outlines by the appropriate State Bar Committees.

Every member of the Committee agreed with every proposal contained in this Report, with only one limited exception, such that this report reflects a true consensus of the committee.[12] The Committee urges the State Bar House of Delegates, and then the Courts of the State of New York, to adopt the proposed New York Rules of Professional Conduct as they relate to attorney advertising, as being in the best interests of the lawyers, judges and the people of this State.

Structure of the Report

Each section of the Report contains an executive summary of each of the proposed rules and procedures. There follows a discussion about each of the rules with the arguments and debate previously considered in the Committee. Also referenced in the text of the Report are the rules themselves, followed with commentary. The commentaries are explanatory notes prepared by the Committee discussing the substance and wording of the proposed rules. This format tracks the COSAC Report because the Committee believes that that format is easy to use and will be under discussion in the near term with respect to all of the other disciplinary rules. The Committee wished to conform this Report in form and, where appropriate, also in substance, to the upcoming more inclusive COSAC proposals. Attached as Tab 1 of the Appendix is the exact text of the disciplinary rules and commentary, which the House of Delegates will be asked to consider and vote upon.

---

[12] Ellen Lieberman voted against adopting the limited 15 day black-out period for solicitation by attorneys

The text of the proposed disciplinary rules consists of a side-by-side presentation of the changes between the Committee's proposed Rules of Professional Conduct and the corresponding current New York Code provisions

In addition, we have provided a separate Appendix of resource materials. The resource materials contain, among other things, a review of all fifty states advertising rules, certain states which have adopted solicitation black-out periods in addition to the rules, the Monroe County Bar Association guidelines for attorney advertising, and the results of the empirical survey which the Committee conducted as part of the Report

This report, and the accompanying volume, are available on the Internet through the NYSBA web site (www.nysba.org).

## I. SUMMARY OF RECOMMENDATIONS

The Committee requests the House of Delegates to adopt the following:

- Changes to the Code of Professional Responsibility:

Rule 7.1, which concern false, deceptive or misleading communications about a lawyer or lawyer's services, amend DR 2-101(A) and provide a test of materiality.

Rule 7.1 and its subparts further provide, for clarity and ease of understanding, all provisions concerning attorney advertising

Rule 7.1 should require retention of all advertisements for 4 years to mirror the requirements of MCLE records and coincide with the attorney biennial registration cycle, with the expectation that the attorney biennial registration form be amended to require the attorney to complete information about compliance with advertising rules and requirements so as to facilitate enforcement. [COSAC proposes a one year retention requirement].

Rule 7.1 should amend DR 2-101(F) to permit all advertisements to be retained in electronic form and filed in accordance with court rule at a central depository in order to make compliance simple and inexpensive, reduce storage difficulties and permit access for a random audit. DR 2-101(F) requires filing of only print advertisements and the

retention of broadcast advertising for one year, but does not cover internet or electronic communications.

Rule 7.1 should amend DR 2-101(K) to provide that advertisements contain the lawyer or law firm's name, address and telephone number including the address registered with OCA and all principal offices in New York, consonant with existing law on jurisdiction and choice of law rules set forth in DR 1-105(b), in order to provide disclosure to the public and facilitate enforcement of the rules. [COSAC supports this rule as well, set forth in a different rule, Rule 7.2].

Rule 7.1 states that advertising must contain appropriate disclosure if a non-employee spokesperson or actor is used, so as to be meaningful to the public and in the interests of clarity.

Rule 7.1 continues the requirement set forth in DR 2-101(G), (H) that fee information must be honored by the lawyer for a specific time period and extends the rule where fees are advertised in annual publications, requiring that they must be honored for one year following publication.

Rule 7.1 continues the requirement that advertisements relating to contingent fee matters contain required disclosure about calculation of expenses and the client's liability for expenses, as presently set forth in DR 2-101(L)

Rule 7.1 amends DR 2-103 to provide that the words "Attorney Advertisement" be visible at the top of any documents and envelope if utilized [as COSAC proposes];

Rule 7.1 provides that if a lawyer soliciting a client intends to refer the case to another unaffiliated lawyer, the communication must disclose that intention, with the name, address and telephone number of the lawyer, if known, to whom referral will be made [as COSAC proposes].

Rule 7.1 provides for a black-out period of fifteen days before permitting attorneys to mail solicitations to victims or their families following a personal injury or wrongful death.

Rule 7.2 prohibits, as DR 2-103(B) provides, that there continue to be a general prohibition on paying for referral of clients, and amends DR 2-103(B) so that the Rule permit a lawyer to enter into a reciprocal referral arrangement with other lawyers and nonlawyers, provided that the agreement to do so is non-exclusive and the client is informed of the existence and nature of the agreement [as COSAC recommends]

10

Rule 7.3 generally prohibits in-person and real-time electronic solicitation, with exceptions for family or persons with whom the lawyer has a close personal or a professional relationship, or if the person contacted is a lawyer [as COSAC recommends]

Rule 7.3(b) prohibits any written solicitation be sent by certified or registered mail or other method that may require the recipient to travel to a location other than that at which the recipient ordinarily receives business or personal mail [as COSAC recommends]

Rule 7.4 provides, as does current DR 2-105(a), that lawyers should not be permitted to state they are specialists or specialize in a particular field of law but make an exception, as also currently exists, for lawyers certified by an organization approved for that purpose by the ABA or as permitted under the laws of another state.

Rule 7.5 provides, as current DR 2-102(B), that trade names are prohibited, as well as the use of a non-lawyer (including a non-lawyer with whom the law firm is permitted to be and is affiliated) and the use of the name of a firm lawyer holding public office.

- Official Advertising Guidelines and Policy of State Bar

Adopt the recommendation that the Monroe County Bar Association guidelines regarding advertising as the official advertising guidelines and policy of the State Bar;

Adopt the recommendation that the guidelines for solicitation and supplemental guidelines for attorney advertising as the official advertising guidelines and policy of the State Bar;

Adopt the recommendation that the State Bar use the guidelines for public dissemination in a State Bar media program which will be designed to serve as a model for educating lawyers including but not limited to dissemination at the time of admission to the Bar;

Adopt the recommendation that the outline annexed to this Report be used to develop the content for the proposed booklet for attorney advertising;

Adopt the recommendation that the outline annexed to this Report be used to develop the proposed booklet for educating consumers about advertising.

- Enforcement of Advertising Rules

Approve the recommendation that all print, broadcast or unsolicited direct mail or e-mail advertising be electronically filed in a central location designated by the State.

Approve the recommendation that if the advertisement is in a language other than English, that it shall be filed with an English translation and a certification stating that the translation is accurate, and that the advertisement is in compliance with the rules to the best of the attorney's knowledge.

Approve the recommendation that random sampling of attorney advertisements filed at the central location.

Approve the recommendation that some entity, whose director shall be under the active supervision of the Administrative Board, shall review a random sample of advertisements and that the State Bar be authorized to work with the courts and devise an appropriate and cost efficient plan to implement this recommendation.

Approve the recommendation that should the entity review the sample and find an advertisement which is not in compliance, it shall refer the advertisement to the appropriate Disciplinary/Grievance Committee.

Approve the recommendation that referrals made by the entity to the Disciplinary/Grievance Committees be expedited to the extent practical.

## TASK FORCE ON ATTORNEY ADVERTISING

Bernice K. Leber, Chair
Eric Lent, Secretary

Subcommittee Chairs
James F. Dwyer
James C. Gacioch
Barry Kamins
Beverly M. Poppell
Paul D. Rheingold

Consultant
Prof. Stephen Gillers

Members

Edward C. Cosgrove
Rachel Kretser
Gerard M. LaRusso
Ellen Lieberman

Richard M. Maltz
Michael S. Ross
Robert J. Saltzman
Eric J. Stock
Michael R. Wolford

## NYSBA Staff

Kathleen R. Mulligan-Baxter

## II. BACKGROUND OF COMMITTEE MEMBERS

**Kathleen R. Mulligan-Baxter** (*NYSBA Staff*) – graduated summa cum laude from St. Joseph's University and with honors from Rutgers University School of Law. She was Law Secretary to Appellate Division Third Department Judge Robert G. Main (1985-1987) and has been Senior Director for Legal and Government Affairs of NYSBA (2003 to present), previously serving as Counsel and Staff Attorney (1987-2003).

**Edward C. Cosgrove** – graduated from the University of Notre Dame and Georgetown University Law Center. He was the District Attorney of Erie County (1974-1981) and served as a Member of the Advisory Committee on Civil Practice, Office of Court Administration for 23 years. He chaired the Trial Lawyers Section of the State Bar and has represented attorneys before the Grievance Committee in the Eighth Judicial District and has served as a hearing officer before the Judicial Conduct Commission. He is also practicing civil and criminal trial litigation in the firm of Edward C. Cosgrove.

**James F. Dwyer** - (*Chair, Disciplinary Rules Subcommittee*) – graduated from St. Bonaventure University and Syracuse Law School. Mr. Dwyer practices with the law firm of Green & Seifter, PLLC where he concentrates in real estate, real estate development, zoning and municipal law. He served as President of the Onondaga County Bar Association and was Vice President from the Fifth Judicial District to the State Bar (2000-2004). Mr. Dwyer has also served on the Departmental Disciplinary Committee for the Fifth Judicial District. He is Town Justice for the Town of Marcellus (1983-Present).

**James C. Gacioch** - (*Chair, Self Enforcement Subcommittee*) – graduated from Penn, has an MBA and J.D. from Cornell. He was Law Secretary to State Supreme Court Justice Robert E. Fisher. He is a litigation partner in the law firm of O'Connor, Gacioch, Leonard & Cummings, LLP in Binghamton. He served as President of the Broome County Bar Association, is the Vice President of the State Bar for the Sixth Judicial District.

13

**Barry Kamins** – (*Chair, Enforcement Subcommittee*) – graduated from Columbia College and Rutgers University School of Law. He served as Assistant District Attorney (1969-1973) and Deputy Chief District Attorney for Kings County (1972-1973). Since 1973, he has been a partner in Flamhaft Levy Kamins & Hirsch where he practices criminal law. In 1990, 1991, 1992, Mr. Kamins was appointed Special Prosecutor for Kings County. He is Chair of the Grievance Committees for the Second and Eleventh Judicial Districts (1994-1998), Chair of the Judiciary Committee of the City Bar (1998-2001), Chair of the Executive Committee of the City Bar (2004-2005), Chair of the Committee on Professional Discipline for the State Bar (1999-2004) and Adjunct Professor of Law at Fordham Law School (1994-Present) and Brooklyn Law School (1999-Present). He was also President of the Brooklyn Bar Association and Kings County Criminal Bar Association.

**Rachel L. Kretser** – graduated from the State University of New York at Albany where she also holds a B.S. degree in Business Administration and from Brooklyn Law School where she was Senior Editor of the Law Review. She was Bureau Chief of the Consumer Frauds Bureau for 13 years and is a member of Attorney General Spitzer's Executive Staff. Ms. Kretser is the Vice President of the State Bar from the Third Judicial District, Past President of the Women's Bar Association of the State of New York (1995-96), Past President of the Capital District Women's Bar Association (1991-92), a member of the Board of Directors of the Fund for Modern Courts. She has also served on the Third Department Judicial Screening Panels since 1996.

**Gerard M. LaRusso** – graduated from Rutgers and St. John's University School of Law and holds an LLM from New York University School of Law. He was Principal Counsel for the Grievance Committee for the Seventh Judicial District (1977-1989) and later became Chief Counsel for the Disciplinary Committees for the Fourth Judicial Department (1989-2002). He has chaired the Committee on Professional Discipline for the State Bar since 2004, having served as a member of Attorney Conduct and is currently in private practice.

**Bernice K. Leber** (*Chair*) – graduated with honors from Mt. Holyoke College and Columbia University Law School. She is a member of Arent Fox PLLC where she practices complex commercial litigation with an emphasis on securities, financial and intellectual property. She serves as Vice President of the State Bar from the First Judicial District, and chaired the Commercial & Federal Litigation Section, the Committee on Independence of the Judiciary and Grants Committee for the Bar Foundation. She has also represented lawyers before the Disciplinary Committee in the First Department.

**Eric S. Lent** (*Secretary*) – graduated from the University of Virginia and Georgetown University Law School. He is an Associate at Arent Fox PLLC where he practices litigation. Mr. Lent was a member of the Order of the Coif and the Georgetown Law Review.

**Ellen Lieberman** – graduated from Columbia University where she was elected to Phi Beta Kappa and cum laude from Pace University School of Law where she was the Case Note and Comment Editor of the Law Review. She presently is practicing blue sky law and Hart-Scott-Rodino antitrust compliance with Debevoise & Plimpton LLP. She chaired the Special Committee on Public Trust and Confidence in the Legal System for the State Bar (1999-2005), Co-Chaired the Special Committee to Review Mandatory CLE Proposal (1998-), and Bridge the Gap Program (1997) and chaired the Ad Hoc Committee of the Executive Committee for Bar Applicants With Learning Disabilities (1998-1999). She also chairs the ABA Committee on State Regulation of Securities of the Business Law Section.

**Richard M. Maltz** – graduated from the Benjamin Cardozo School of Law where he served as an Adjunct Professor of Law and is a member of its faculty on trail advocacy. He is in private practice where he concentrates in the representation of lawyers and law firms related to disciplinary defense, legal ethics, sanctions, admissions and litigation between lawyers and former clients. He was First Deputy Chief Counsel of the Departmental Disciplinary Committee for the First Department after holding the position of Deputy Chief Counsel (1998-2000). He chairs the Professional Responsibility Committee for the City Bar and is Co-Chair of the Westchester Bar Association's Ethics Committee.

**Beverly M. Poppell** (*Chair, Education Subcommittee*) – graduated with honors from New York University and Touro Law School, following a 20 year career in journalism where she was a reporter for the Bergen Evening Record and a Broadcast Journalist for several radio stations in the New York radio market. She was a member of the Cameras In The Courtroom Special Committee. She is an Administrative Law Judge for the City of New York in Labor Relations, and previously had her own law firm in general practice. She was Chair of the Committee in Public Relations for the State Bar.

**Paul D. Rheingold** (*Chair, Internet Subcommittee*) – graduated cum laude from Harvard Law School and has taught at Harvard Law School, among others. He was a visiting scholar at the Rand Institute and Stanford Law School, advisor on two ALI Restatements and Co-Chair of the Ephedra and PPA ATLA Litigation Groups. He is former National Secretary to the Association of Trial Attorneys. He practices and is a partner in Rheingold, Valet, Rheingold Shkolnik & McCartney LLP where he concentrates in prosecuting mass tort litigation including Albuterol, L-Tryptophan, Dalkon Shield, MER/24 and diet pills.

**Michael S. Ross** – is the principal in the Law Offices of Michael S. Ross where he practices in attorney ethics and criminal law. He graduated with honors from Rutgers University and was elected to Phi Beta Kappa and New York University Law School. He is a former Assistant U.S. Attorney in the criminal division of the Southern District of New York and Assistant District Attorney in Kings County. He has been an Adjunct Professor at the Benjamin N. Cardozo School of Law for 26 years where he has taught courses in Criminal and Civil Litigation, Appellate Advocacy, Judicial Administration and Professional Responsibility. He also currently teaches Professional Responsibility at

Brooklyn Law School. He has served and is serving on the Committee on Professional Discipline for the State Bar, the City Bar and the State Bar's Committee on Mass Disasters.

**Robert J. Saltzman** – is the Deputy Counsel to the Grievance Committee for the Second and Eleventh Judicial Districts where he previously served as an Associate Attorney (1984-2000). He also is an Adjunct Associate Professor at St. John's University 1989-2002. He was President of the National Organization of Bar Counsel, representing the interests of all lawyer disciplinary agencies in the U.S., Canada and Australia and coordinated lawyer disciplinary processes with the ABA, National Conference of Chief Judges, the Department of Justice and other state and federal agencies. He chaired the Committee on Mass Disaster Response for the State Bar after the September 11 terrorist attack and is a member of the Committee on Professional Discipline for the State Bar.

**Eric J. Stock** – graduated summa cum laude from the University of Pennsylvania where he was elected to Phi Beta Kappa and magna cum laude from Harvard Law School. He practices antitrust law at Hogan & Hartson LLP. He serves on the Executive Committee of the Antitrust Section of the State Bar. He was also Law Clerk to Judge Allen G. Schwartz of the Southern District of New York (1998-2000).

**Michael R. Wolford** – graduated from John Carroll University and holds dual MBA and JD degrees from the University of Buffalo. He was a member of Nixon Hargrave Devans & Doyle after serving as Assistant U.S. Attorney in charge of the Rochester office. He served as President to the Monroe County Bar Association (2004-2005). He practices civil and criminal litigation with Wolford & Leclair LLP, a firm which he founded. He is a Fellow of the American College of Trial Lawyers.

### III. SUMMARY OF LAW ON ATTORNEY ADVERTISING

The Committee's goal was to accept the law pertaining to attorney advertising as it presently exists and with a healthy respect for *stare decisis*. The Committee also recognizes that it cannot seek to regulate or adjudicate taste, and that the public's right to the free flow of information is a paramount public policy consideration stemming from the Supreme Court's decision in <u>Bates v. v. State Bar of Arizona</u>, 433 U.S. 350 (1977). Moreover, the Committee took a special look at those states from around the country that have adopted peer review, <u>see</u> <u>infra</u> Part II E, as this approach to the regulation of attorney advertising is a novel approach that warranted examination.

A.    Constitutional Protection of Attorney Advertising and Limits on Regulation

In 1977, the United States Supreme Court opened the door to attorney advertising with its decision in Bates v. State Bar of Arizona, 433 U.S. 350 (1977)  The Bates Court considered and applied the protections of the First Amendment to commercial speech (i.e., advertising) by lawyers  In Bates, two Arizona attorneys began running advertisements in their local daily newspaper, offering to provide various legal services for specified fees  The state bar determined that the advertisement was a violation of an Arizona disciplinary rule banning attorney advertisement, and the Arizona Supreme Court censured the lawyers for conduct that was in direct violation of Arizona's Code of Professional Responsibility  The Supreme Court reversed, holding that a blanket suppression of attorney advertising violated the First Amendment, and that attorney advertising deserved the same First Amendment protections as other forms of commercial speech  Id. at 364-65, 383

In subsequent cases, the Supreme Court has applied the so-called Central Hudson test for the regulation of commercial speech to attorney advertising and solicitation issues  Under the Central Hudson test, advertising that is misleading or concerns illegal activity may be banned outright  Otherwise, the restrictions must involve a substantial government interest, must directly and materially advance the governmental interest and must be narrowly tailored to achieve the desired objective  Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557 (1980); see also In re R.M.J., 455 U.S. 191 (1982), (new office announcements listing areas of practice were held improperly restricted by the State of Missouri); Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 627 (1985) (regulation of advertising, there an

17

illustration, that was not false or misleading was improper under the First Amendment).

In addition, the Supreme Court has held that solicitation by attorneys is a form of advertising protected by the First Amendment, see Shapero v. Kentucky Bar Ass'n, 486 U.S. 466 (1988) (permitting truthful, targeting direct mail solicitation by attorneys under the Central Hudson test), and allowed the use of the term "specialist" in a state that did not have a certification plan for specialization by attorneys. Peel v. Attorney Registration and Disciplinary Comm'n of Ill., 496 U.S. 466 (1988)

Two post-Bates Supreme Court cases have upheld restrictions on attorney advertising: Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447 (1978), and the landmark case of Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995). In Ohralik, an attorney was suspended for the in-person solicitation of a teenage accident victim and the post-hospital release of a second victim. In upholding the suspension, the Court distinguished in-person solicitation from other forms of advertising, noting that in-person solicitation posed a greater risk of overreaching, may put more pressure on the prospective client by demanding an immediate response without an opportunity for comparison or reflection, and actually could discourage persons for seeking legal counsel. Ohralik, 436 U.S. at 457.

In Florida Bar, the Court upheld Florida's 30-day blackout period after an accident during which lawyers may not, directly or indirectly, single out accident victims or their relatives in order to solicit their business. See Florida Bar, 515 U.S. at 634. In reaching its decision, the Court evaluated the Florida Bar rules by applying the Central Hudson test. The Court first examined the interests that the Florida Bar advanced in support of its rules. Florida Bar, 515 U.S. at 624. The Bar asserted the interest of

18

protecting the privacy and tranquility of personal injury victims and their loved ones, as well as protecting "the reputation of the legal profession in the eyes of Floridians." Id. at 624-25. The Court accepted the Bar's interests as substantial, and acknowledged that states may regulate the practice of professions within their boundaries to protect such interests as safety and public health. Id. at 625.

Turning to the second prong of the Central Hudson test, the Court stated the government must establish that the restriction on commercial speech directly and materially advances its substantial interest. Id. at 625-26. To meet this requirement, "[t]he Bar submitted a 106-page summary of its [two]-year study of lawyer advertising and solicitation." Id. at 626. The summary contained data supporting the Bar's contentions that the Florida public views direct-mail solicitation as "an intrusion on privacy that reflects poorly upon the [legal] profession." Id. Additionally, the Florida Bar submitted newspaper articles from Florida cities in support of the negative view Florida citizens had of lawyers. Id. at 627. Based on this evidence, the Court found that the Bar had satisfied its burden of proving its substantial interest was advanced by the restriction of commercial speech. Id. at 628. The Court also distinguished its holding in Shapero by noting that the advanced governmental interest there was an avoidance of the overreaching involved in targeted solicitation, and because Shapero "dealt with a broad ban on all direct-mail solicitations, whatever the time frame and whoever the recipient." Id. at 629. In contrast, the asserted governmental interest in Florida Bar was to protect the privacy rights of the public and to protect the image of Florida lawyers. Id. at 625. In addition, the Florida rules were for a limited duration and for the protection of a select number of potential recipients. Id. at 620-21.

19

Significantly, the Court also recognized that the Florida Bar was not merely concerned with the offense to its citizens, but with the detrimental effects that such an offense has on the reputation of the legal profession as a whole. Id. at 631. The Court determined that receipt of an offensive letter from an attorney days after an accident has a damaging effect on the reputation of the profession that cannot be remedied by simply throwing the letter away. Id.

Finally, the Court turned to the last step of the Central Hudson test and examined the relationship between the Florida Bar's interests and the means chosen to serve those interests. Id. at 632. The Court found that the thirty-day ban was reasonably tailored to serve the Bar's substantial interests. Id. at 633. The Court further noted that there were "ample alternative channels [for accident victims to receive] information about the availability of legal representation during the 30-day period following [their] accident." Id. at 634. Accordingly, the Court held that the Florida Bar rules satisfied the final step of the Central Hudson test and that the First Amendment is not violated by reasonable restrictions placed on targeted direct-mail solicitation by attorneys. Id.

The Florida Bar decision can be read narrowly as a continuation of prior Supreme Court doctrine. It applies the same Central Hudson test the Court had previously applied in the attorney advertising context, and did not overrule prior precedents. Rather, in light of both the particular regulation and the extensive evidence supporting it, the Court for the first time in recent years upheld a restriction on lawyer advertising.[13] Since Florida

---

[13] However, one could also read the opinion as the harbinger of a newer, more restrictive approach to lawyer advertising. Justice Kennedy, in dissent, stated that the decision was "a major retreat from the constitutional guarantees for commercial speech[.]" Florida Bar, 515 U.S. at 644.

<u>Bar</u>, there have been a number of states which have adopted similar solicitation black-out periods.[14]

B.    Disciplinary Rules and Ethical Guidelines on Lawyer Advertising in <u>New York State Under the Code of Professional Responsibility.</u>

Canon 2 of the New York Disciplinary Rules of the Code of Professional Responsibility addresses attorney advertising. The Disciplinary Rules have been promulgated as joint rules of the Appellate Division of the New York State Supreme Court and are set forth in Part 1200 of Title 22 of the New York Codes, Rules and Regulations. <u>See</u> N.Y. Comp. Codes R. & Regs. Tit. 22, §§ 1200.1, *et seq.* (2005). A violation of the Disciplinary Rules provides grounds for disciplinary action against a lawyer. The Ethical Considerations corresponding to the Disciplinary Rules were approved by the New York State Bar Association but not adopted by the Appellate Division. Although a violation of an Ethical Consideration is not a basis for disciplinary action, the Ethical Considerations set forth aspirational ethical guidelines and may provide interpretive guidance to attorneys and to an agency in its enforcement of the Disciplinary Rules. They also are often persuasive to the courts and disciplinary authorities. Disciplinary authorities themselves are generally reluctant to impose sanctions on lawyers who follow the advice of state and local ethics committees, even if the disciplinary authority later determines the ethics committee's advice to be erroneous.

In addition to the disciplinary rules and ethical considerations, attorneys are also

---

[14] These include Colorado, Louisiana, Georgia, Maryland, Tennessee, Arizona, Missouri, and Connecticut. There is no evidence that any of these states completed a national survey on the effect of lawyer advertising on the public, as Florida did as part of its case in support of its solicitation ban. The Court in <u>Florida Bar</u>, expressly stated that "we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information." <u>Florida Bar</u>, 515 U.S. at 628. Significantly, there have been no constitutional challenges to any state subsequently adopting a similar rule, with the sole exception of Maryland on grounds not applicable here. <u>See</u> Chart "Solicitation Black-Out Periods" Appendix Tab 7 and case cited therein.

subject to New York's consumer protection statutes. See N.Y. Gen. Bus. Law §§ 349-350 (McKinney 2005). A lawyer who advertises is subject to the requirements of those statutes. Aponte v. Raychuk, 172 A.D.2d 280 (1st Dept 1988), aff'd., 78 N.Y.2d 992 (1991). Although in theory anyone can file a complaint regarding attorney advertising under the consumer protection statutes, because consumers have a private right of action against anyone engaging in deceptive business practices or false advertising, these provisions are rarely invoked by the public. Moreover, they are also rarely pursued by the Attorney General's office, which selects cases for prosecution based on the number of people harmed by an advertisement or widespread violations,[15] and is unlikely to bring cases against single incidents involving attorneys. Because of this, New York's consumer protection laws have not been a viable avenue for enforcement of attorney advertising abuses. The Committee considered this situation in making its recommendations, which include more enforcement in the area of advertisement filing, random sampling, and consumer education to inform consumers who might otherwise be reluctant to exercise their right of action.

1.    Purpose of Lawyer Advertising and General Restrictions

The ethical rationale and purpose of lawyer advertising is to educate the public to an awareness of legal needs and to provide information relevant to the selection of the most appropriate counsel. DR 2-101(D).[16] The major restriction imposed by the Code on

---

[15] See Law Offices of Andrew F. Capoccia LLC v. Spitzer, 270 A.D.2d 643 (3d Dep't 2000) (Attorney General brought action against law firm pursuant to General Business Law §§ 349 and 350 to enjoin certain activities based on alleged fraudulent, deceptive and illegal business practices in relation to the provision of debt reduction services to financially distressed individuals)

[16] See EC 2-1 (important functions of the legal profession include education of people to recognize their problems and facilitation of the process of intelligent selection of lawyers); EC 2-10 (lawyer should ensure the published advertising is disseminated in an objective and understandable fashion and would facilitate the prospective client's ability to select a lawyer).

22

lawyer advertising is that such advertising not be false, deceptive or misleading. See DR 2-101(A). Disciplinary Rule 2-101(A) prohibits lawyer advertising that contains false, deceptive or misleading statements or claims. Similarly, the Code explicitly permits a lawyer to use professional cards, signs, letterhead and other professional devices which are in accordance with DR 2-101 if they do not violate any statute or court rule. DR 2-102(A).

> 2.    Safe Harbor Categories

The Code lists certain safe harbor categories of information which may be included in lawyer advertising if not in violation of DR 2-101(A), and also lists safe harbor categories of information which may be used on letterhead and other professional devices if not in violation of DR 2-101 or any statute or court rule. The safe harbor categories are not intended to be exclusive. Information which does not otherwise violate DR 2-101 and is consistent with the ethically accepted purpose of lawyer advertising may be disseminated and will not be deemed to violate DR 2-103 (restrictions on solicitation), even if not included in a safe harbor category. DR-2-101(D); DR 2-103(F).

The safe harbor categories of information which may be used in advertising, if not in violation of DR 2-101(A) are:

- professional and educational distinctions and achievements; [17]
- dates of admission to any bar;

----

[17] This category includes, education, degrees and other scholastic distinctions, dates of bar admission, public offices, teaching positions, professional organization memberships, committees and offices, and foreign language fluency. See N.Y. State 494 (1978) (letterhead may state lawyer is licensed as a C.P.A.); N.Y. State 105(a) (1969) (lawyer may show earned law degrees on letterhead and may use title "Doctor" if earned law degree is a J.D. or other legal doctorate; J.D. may be treated as an earned degree where awarded retroactively in place of an earned degree LL.B. degree); but see N.Y. State 488 (1978) (lawyer may not publicize both J.D. and LL.B degrees since only one such degree was earned); compare N.Y. State 637 (1992) (letterhead may state judicial office from which lawyer retired before returning to private practice) with N.Y. State 164 (1970) (improper for lawyer who also holds public office to show public office on letterhead of private law practice

- public offices and teaching positions held; names of clients regularly represented; [18]

- bank references, credit arrangements accepted[19] and prepaid or group legal services programs in which the attorney or firm participates;

- fee information; and

- areas of legal practice.[20] DR 2-101(C).

The safe harbor categories of information which may be used on letterhead or other professional devices, if not in violation of DR 2-101 or any statute or court rule, are as follows:

- on the letterhead: name, address[21] and telephone number of the law firm, name of the lawyer and that he or she is a lawyer, information as to areas of practice (as permitted under DR 2-105), names of members[22] and associates, names and dates of deceased

---

[18] The client must give prior written consent to such use. DR 2-101 (C) (2).

[19] See N.Y. State 362 (1974) (not improper to accept credit card for payment of legal fees with proper safeguards); see also N.Y. State 399 (not per se improper for lawyer to use credit card plan which assesses interest charges against delinquent accounts).

[20] A written statement must be available to the public free of charge describing the scope of each advertised service. DR 2-101 (C) (4). The lawyer may not charge more than the advertised fee for such services. DR 2-101(G).

[21] See N.Y. State 546 (1982) (law firm may list branch office on letterhead but appropriate disclaimer required if branch office provides only limited hours of operation); N.Y. State 352 (1974) (address of office of out-of-state partner may be on letterhead; if lawyer is member of two different firms, improper for both firms names and addresses to be on same letterhead.

[22] A lawyer may not hold himself or herself out as having a partnership with other lawyers unless they are in fact partners. DR 2-102 (c). See N.Y. State 658 (1994) (partnership with Swedish firm proper if legal and if ability to uphold ethical standards won't be compromised); N.Y. State 646 (1993) (comparable opinion as to partnership with Japanese firm); N.Y. State 344 (1974) (out-of-state lawyer may be partner in New York law firm and also in separate out-of-state law firms); N.Y. State 144 (1970) (improper for firm to list on letterhead as associate lawyer practicing with unaffiliated out-of-state law firm; however, partnership may be formed between lawyers admitted to practice in different states if it does not constitute a misleading representation as to members not locally admitted to practice); N.Y. State 15 (1965) (improper for attorneys sharing suite of offices to hold selves out as a partnership when they are not partners)

24

or retired members, designation of lawyers who are "Of Counsel"[23] names and dates of predecessor firms in a continuing line of succession; jurisdictional limitations on members and associates not licensed to practice in all jurisdictions listed on the firm's letterhead must be made clear on the letterhead;[24]

- on a professional card: name, address and telephone number of the law firm, name of the lawyer, names of members and associates (as permitted under DR 2-105);

- on an announcement card: new or changed associations, addresses or firm name, biographical data, names of members and associates, names and dates of predecessor firms in which a continuing line of succession and information as to areas of practice (as permitted under DR-2-105)  DR2-102 (A), (D)

- on an identifying sign near the office of in the building directory: identification of the law office and information as to areas of

---

[23] A lawyer may be designated "Of Counsel" if there is a continuing relationship with a lawyer or law firm other than as a partner or associate  A lawyer or law firm who devotes a substantial amount of professional time in the representation of a client may be designated as "General Counsel" or a similar reference on the client's stationery. DR 2-102 (A) (4).  Compare N.Y. State 262 (1972) (law firm may not be listed as "Of Counsel" to another law firm or lawyer; foreign law firm or lawyer may not be listed as correspondent to another law firm or lawyer; generally not proper for lawyer to be designated on a letterhead "Of Counsel" to more than one lawyer or law firm); with N.Y. State 231 (1972) (lawyer may be partner in two distinct law firms) and N.Y. State 388 (1975) (not improper for partner to also practice in individual capacity); but see N.Y. State 538 (1981) (improper for firm to list foreign correspondent firm on its letterhead)  See also N.Y.C.L.A. Op. 727 (1999) (Law firm may indicate lawyers' former judicial positions on letterhead).

[24] See N.Y. State 704 (1998) (Letterhead and business cards of multi-state law firm and affiliated lawyers must fairly disclose jurisdictional limitations on practice of named individual attorneys); N.Y. State 637 (1992) (lawyer may indicate on letterhead the other jurisdictions in which individual lawyers in the firm are licensed to practice); N.Y. State 542 (1982) (British law firm with office in New York managed by solicitor admitted to practice in New York should apply same standards to letterhead as apply to American firms with multi-state operations); N.Y. State 434 (1976) (law firms with offices in two states may show on letterhead both addresses and that certain attorneys are admitted in New York or the other state or both; bar admissions may be listed even if the firm maintains no office in that jurisdiction); N.Y. State 359 (1974) (lawyer admitted only in foreign country may be listed as associate on letterhead of New York law firm if appropriate indication that admitted solely in the foreign country); N.Y. State 355 (1974) (letterhead may list associate admitted to practice in another state who moved to New York intending to be admitted in New York and whether or not law firm has an office in the state in which the associate is admitted; listing must show the jurisdictional limits on the associate's right to practice and the associate may not practice in New York until admitted); N.Y. State 127 (1970) (law firm may mail announcement to lawyers, clients, former clients and friends indicating that member of firm is also a member of the bar of other jurisdictions); see also N.Y.C. Ethics Op. 1996-2 (1996) (law firm may issue an announcement regarding its employment of a law student or other non-lawyer provided the announcement makes clear the fact that the person is not a lawyer and is working in a non-lawyer capacity); N.Y. State 640 (1992) (titles of paralegals may not be false or misleading); N.Y. State 557 (1984) (attorney and accountant may not share stationary that identifies their respective professions since deceptive in suggesting they practice together, rather than independently as required by other Code provisions); N.Y. State 500 (1978) (letterhead may list non-lawyer employees if relevant to selection of counsel and provided they are clearly identified as non-lawyers.

practice (as permitted under DR 2-105) DR 2-102(A), (D).

### 3    Client Testimonials

DR 2-101(C) (2) permits lawyers to advertise the names of clients whom they regularly represent if the clients give their prior written consent  This safe harbor category of information may be used in advertising if not in violation of DR 2-101(A), which in general terms provides that the advertising not be false, deceptive or misleading. Ethics opinions have expanded on this safe harbor by sanctioning the use of both actual client testimonials and dramatizations in advertising, so long as the advertising is not false, misleading or deceptive, such as by creating unjustified expectations or containing insufficient information to make the advertisement not misleading.[25]

Dramatized versions of actual client testimonials are proper only if: (1) the client authorizes use of the testimonial; (2) appropriate disclosure is used to correct any misleading information or imagery as to the identity of the clients; and (3) reasonable disclaimers are expressed as to any statements or results the lawyer has achieved.  N.Y. State 661 (1994).  It also is proper to advertise using fictional situations and characters without client "testimonials" though it is improper to advertise fictional client "testimonials."  Id.  From a policy perspective, the problem with testimonials, whether by actual clients or actors, is that they can be inherently misleading because testimonials

---

[25] See N.Y. State 771 (2003) (website advertisement that uses client testimonials or reports of past results prohibited under DR 2-101(A) if creates unjustified expectations, contains insufficient information, or is otherwise false, deceptive or misleading  If client testimonials or reports of past results are not false, deceptive or misleading, a lawyer need not post a disclaimer that past results do not guarantee similar outcomes in future cases  However, if the advertisement is false or deceptive, a disclaimer cannot cure the false or deceptive nature of the advertisement. If client testimonials or reports of past results are misleading, an appropriate disclaimer may be sufficient to correct the misleading nature of the advertisement if the disclaimer is prominently placed in the website such that a lawyer reasonably would expect that any prospective client who reads the advertisement will read the disclaimer); N.Y. State 661 (1994) (lawyer may advertise dramatized versions of actual client testimonials with reasonable disclaimers and appropriate disclosure, but may not advertise fictional client testimonials)

suggest that past results are indications of future performance. This may be misleading to the general public, and the Committee suggests strengthening the rules governing testimonials to prohibit the use of an actor or spokesperson who is not a member or employee of the advertising lawyer or law firm absent disclosure thereof. The Committee, however, feels that it would be an improper restriction on a client's free speech rights to prohibit client testimonials outright.

4       Special Requirements Relating to Fee Advertising

DR 2-101(C)(4) creates and advertising safe harbor for dissemination of certain information relating to legal fees,[26] in particular, fees for initial consultations, hourly rates,[27] fixed fees,[28] range of fees[29] and contingent fees in civil matters. When advertising contingent fee rates, the advertisement must include a statement disclosing whether percentages are computed before or after deduction of litigation expenses and that the client remains liable for those expenses if there is not recovery. DR 2-101(L). Unless the advertisement specifies otherwise, a lawyer is bound by published fee information as follows:

- if the publication is published more often than once a month, then the lawyer is bound for at least 30 days;

---

[26] See N.Y. State 563 (1984) (not improper per se for lawyer to advertise discount from customary fees to members of civic organization or to general public for limited period of time if customary fees are readily ascertainable); N.Y. State 441 (1976) (lawyer may give fee schedule brochure to client or prospective clients visiting his office).

[27] The lawyer may not charge more than the advertised fee. DR 2-101 (G).

[28] Under the Code, the lawyer must make available to the public and deliver to the client a written statement describing the scope of each advertised service. The advertised service must include all services recognized as reasonable and necessary under local custom in the area of practice in the community where the services are performed. DR 2-101(E). Unless the client agrees in writing to a different fee and the services are not those in the advertisement, the lawyer may not charge more than the advertised fee. DR 2-101 (G).

[29] A written statement must be available to the public free of charge describing the scope of each advertised service. DR 2-101 (C) (4). The lawyer may not charge more than the advertised fee for such services. DR 2-101(G).

- if the publication is published once a month or less often, then the lawyer is bound until the next issue is published;

- if the publication has no fixed date for the next issue, then the lawyer is bound for a reasonable period after publication but at least 90 days; and

- if the information is broadcast, then the lawyer is bound for at least 30 days after broadcast. DR 2-101(H), (I).

     5.    Areas of Practice

Lawyers and law firms may advertise areas of law in which their practice is limited. DR 2-105(A). However, the Code does not permit lawyers to call themselves specialist in any area of practice, except in the case of an attorneys admitted to practice before the United States Patent and Trademark Office (who then may be referenced as a "Patent Attorney" or some similar designation) or in accordance with rules for the certification of specialists. Those rules require certification as a specialist by a private organization approved for that purpose by the American Bar Association; the lawyer may state that she is so certified only if the name of the certifying organization is given, along with a specific disclaimer.[30] DR 2-105.

In <u>Peel v. Attorney Registration and Disciplinary Com'n of Ill.</u>, 496 U.S. 91 (1990), the Supreme Court held that an attorney had the First Amendment right, under standards applicable to commercial speech, to advertise certification as trial specialist by

---

[30] The disclaimer must read: "The [name of the private certifying organization] is not affiliated with any governmental authority. Certification is not a requirement for the practice of law in the State of New York and does not necessarily indicate a greater competence than other attorneys experienced in this field of law." DR 2-105(C)(1). A lawyer certified as a specialist in a particular area of law by an authority having jurisdiction over specialization under the laws of another state must disclaim as follows: "Certification granted by the [identify state or territory] is not recognized by any governmental authority within the State of New York. Certification is not a requirement for the practice of law in the State of New York and does not necessarily indicate a greater competence than other attorneys experienced in this field of law." DR 2-105(c)(2). See N.Y. State 722 (1999) (A lawyer's letterhead may refer to membership in a professional organization, but if such membership implies certification in a legal field, the reference must comply with DR 2-105(C)); N.Y. State 757 (2002) (professional announcements of certification as a specialist that are distributed to members of the bar or mailed to present and former clients are ""public" communications and should include the disclaimer set forth in DR 2-105(C)).

National Board of Trial Advocacy. As discussed above, New York allows specialization claims with the appropriate disclaimer, although the significance of the using the word "specialist" as opposed to other words of similar import, is dubious at best. The general idea is that New York may not want attorneys making arbitrary claims about their qualifications which the Committee considered in its deliberations.

6. Identification of Lawyer, Group Advertising

The Code requires all advertisements (printed and broadcast) to include the name, office address and telephone number of the attorney or law firm whose services are being offered. DR 2-101 (K) [31] Ethics opinions have interpreted this provision to permit group or generic advertising if the attorney identification is made in the advertisement in a meaningful fashion so that the potential client knows the identity of the lawyer to whom his call will be referred and there is no discretion in referrals on the part of an advertising agent.[32]

7. Approval, Filing and Retention Requirements

Advertisements distributed by a lawyer or law firm with a New York office must be filed at the time of initial distribution with the appropriate Departmental disciplinary committee and are open to public inspection. The following advertisements are exempt

---

[31] See N.Y. State 756 (2002) (Legal services advertisement may not list Web site or e-mail address as sole address, but must also include street address of lawyer's office)

[32] See N.Y. State 597 (1989) (lawyer may use advertising service to prepare and place ads if the name, address and telephone number of the lawyer or law firm is presented in a meaningful fashion; lawyer may participate in group or generic advertising if lawyer name, address and telephone number and geographic area assigned to lawyer are identified in meaningful fashion so client will know identity of lawyer to whom call will be referred, advertising agent has no discretion in referring calls and advertising service does not act as lawyer referral service; listed telephone number may be that of advertising agent or answering service if not misleading); see also N.Y. State 664 (1994) (lawyer who advertises legal advise by means of a 900 number but expects to refer a significant number of cases to another attorney, may violate DR 2-101(K) which requires advertisement to include name, address and telephone number of lawyer whose services are being offered; N.Y. State 678 (1996) (lawyer may not participate in a divorce mediation referral service that is not operated, sponsored or approved by a bar association)

from this filing requirement: advertisements that are broadcast, professional notices, letterheads and announcement cards. DR 2-101(F). Advertisements which must be filed (for example, mailed advertisements and advertisements displayed on buses and trains) may not refer to the filing, and the lawyer or law firm must retain for at least one year after the last distribution a list of names and address of persons to whom the advertisement was sent. DR 2-101(F).

A broadcast advertisement need not be filed but must be prerecorded or taped and must be approved for broadcast by the lawyer. The lawyer must then retain a copy for at least one year after transmissions. DR 2-101(F). There are no rules governing the filing of websites or Internet advertisements. The current rules, therefore, fail to require any filing of print or broadcast advertisements with a central State authority that can examine, audit, or review those advertisements. The disciplinary committees lack the resources necessary to devote to any meaningful enforcement of advertising improprieties, and in any case only operate reactively to file complaints. To expect the disciplinary committees to proactively seek out advertisements (which are not currently required to be filed) without further resources would be an ineffective means of enforcement no better than the current system. The Committee, therefore, has made significant recommendations regarding new filing, retention, and audit requirements to help solve the current enforcement problems (See Part IX, infra, for detailed discussion).

8.    Solicitation

New York's solicitation provisions are somewhat confusing. A lawyer must look to several Disciplinary Rules and statutory sections to get a complete handle on the applicable rules. The applicable provisions are DR 2-103 and Judiciary Law § 479. On its face, DR 2-103 appears not only to prohibit in-person and telephone solicitation, but

also marketing techniques such as print and broadcast advertising that are constitutionally protected. See DR 2-103(A). The provision later, however, makes clear that 2-103 should not be construed to limit attorney advertising. See DR 2-103(F).

A lawyer generally may not pay someone to recommend his or her professional employment.[33] The Code does not permit a lawyer to give anything of value to anyone for recommending or obtaining his or her employment,[34] with certain exceptions. The exceptions permit a lawyer to pay organizations listed in DR 2-103(D) which include lawyer referral services operated, sponsored or approved by a bar association and certain bona fide organizations which pay for legal services of their members. DR 2-103(B). A lawyer may not give anything of value to a media representative for professional publicity in a news item.[35]

New York has also adopted § 479 of the Judiciary Law which states: "It shall be unlawful for any person or his agent, employee or any person acting on his behalf, to solicit or procure through solicitation either directly or indirectly legal business, or to

---

[33] See In re Rapport, 186 A.D.2d 344 (3d Dep't 1992) (censuring attorney attorneys who employed an agent to solicit clients for cases involving L-tryptophan poisoning); In re Von Wiegen, 146 A.D.2d 901 (3d Dep't 1989) (suspending attorney who employed agent to solicit accident victims); In re Kronenberg, 136 A.D.2d 264 (2d Dep't 1988) (suspending attorney who hired civilian employee of police department to refer cases); In re Mandell, 103 A.D.2d 193 (2d Dep't 1984) (suspending lawyer who solicited employee of charitable organization to funnel potential clients from those allegedly injured by other employees of the organization).

[34] See N.Y. State 727 (2000) (attorney may not accept referral from accounting firm in return for agreement to share contingent fees with accounting firm on personal injury matter); N.Y. State 741 (2001) (attorney may not participate in a business network that requires reciprocal referrals).

[35] See N.Y. State 565 (1984) (improper for attorney to employ and compensate public relations and marketing firm to solicit clients, including by means of in-person solicitation); N.Y. 505 (1979) (lawyer may encourage newspaper to publish article about opening of his office if nothing of value is given to promote its publication); but see N.Y.C.L.A. Eth. Op. 720 (1997) (attorney may hire a non-lawyer consultant to oversee the non-professional relationship between the law firm and clients obtained as a result of advertising, but his or her non-lawyer consultant should not contact non-responding solicitation recipients by telephone); N.Y. State 597 (1989) (lawyer may use advertising service to prepare and place ads; lawyer may participate in group or generic advertising through advertising service if advertising agent has no discretion in referring calls and advertising service does not act as lawyer referral service).

31

solict or procure through solicitation a retainer, written or oral, or any agreement authorizing an attorney to perform or render legal services, or to make it a business so to solicit or procure such business, retainers or agreements." N.Y. Judic. Law § 479 (McKinney 2005). Like other marketers of services, Judiciary Law § 478 applies to attorneys who solicit business.[36]

### 9.    Trade Names

Generally, the Code prohibits a lawyer in private practice from practicing under a trade name, a name that is misleading as to the identity of the lawyers practicing under the name, or a firm name containing names other than those of one or more of the lawyers in the firm.[37] DR 2-102(B). In addition, attorneys may not alter their name when placing an advertisement in the yellow pages by using the firm name "A," or inserting the letter "A" before the firm name, in order to insure favorable placement.[38]

---

[36] Greene v. Grievance Committee for Ninth Judicial Dist., 54 N.Y.2d 118 (1981) (Attorney's direct mail advertising addressed to real estate brokers was direct solicitation of brokers to refer client to attorney and thus indirect solicitation of clients by attorney and violated §479).

[37] If otherwise lawful, a firm name may use as or include in its name the names of deceased or retired partners or the name of a predecessor firm in a continuing line of succession. The Code prohibits a firm using as or including in its name the name of a lawyer who assumes a government position during any significant period in which he is not regularly practicing law as a member of firm. A firm other than a qualified legal assistance organization may not include "legal aid," "legal service office," "legal assistance office," defender office" or a similar term in its name. "Legal clinic" may be used in a firm name if the name also includes the name of a participating lawyer or firm. DR 2-102(B). See N.Y. State 622 (1991) (one of two law firms, but not both, resulting from law firm dissolution may use in its name the name of a deceased founding partner of predecessor firm); N.Y. State 495 (1978) (law firm may not operate a branch office using the name of a lawyer-employee who is an associate rather than a partner); N.Y. State 445 (1976) (use of name "Community Law Office" by private practice improper); N.Y. State 381 (1975) (name of professional corporation may not include former partner who is practicing law or "Of Counsel" lawyer); N.Y. State 334 (1974) improper to continue to use in firm name the name of a partner suspended from practice during period of suspension); N.Y. State 321 (1973) (improper to use in firm name the name of former partner who becomes full time public official); N.Y. State 279 (1973) (proper to continue to use name of deceased partners in firm name of bona fide successor firm); N.Y. State 266 (1972) (proper to continue to use retired partner's name in firm name); N.Y. State 175 (1971) (out-of state member may be included in firm name if not misleading and the local lawyer is a true partner, but name may not be franchised); N.Y. State 148 (1970) (improper for associate to continue to use firm name consisting of names of deceased partners only); N.Y. State 45 (1967) (if lawful, not improper to continue to use deceased partner's name in firm name even if other names in firm name change).

[38] N.Y. State 740 (2001).

However, a law firm may use a domain name that does not include or embody the firm's name or that of any individual lawyer, under certain conditions: the web site bearing the domain name must clearly and conspicuously identify the actual law firm name; the domain name must not be false, deceptive or misleading; the name must not imply any special expertise or competence, or suggest a particular result; and, it must not be used in advertising as a substitute identifier of the firm [39]

    C.    New York State Decisions on Attorney Advertising

New York has not sought to impose the most restrictive standards for the regulation of attorney advertising. Koffler v. Joint Bar Ass'n, 51 N.Y.2d 140 (1980) holds that neither Judiciary Law section 479 nor the Code of Professional Responsibility can constitutionally prohibit direct mail advertising addressed to potential clients; such direct mail can advertise both availability and cost of legal services. Matter of von Weigen, 63 N.Y.2d 163 (1984), upheld discipline of an attorney whose direct mail solicitation of mass disaster victims was expressly found to be false and misleading. Except to that extent, the State attempt to justify a ban on direct mail solicitation of the accident victims failed the Central Hudson test as applied by the New York Court of Appeals. Id.

New York cases expressly prohibit the direct or indirect third-party solicitation of legal business, see Green v. Grievance Cmte. for the Ninth Judicial Dist., 54 N.Y.2d 118 (1981) (direct mail third-party solicitation through real estate brokers improper); Matter of Alessi, 60 N.Y.2d 229 (1983) (same). In In re Rapport, 186 A.D.2d 344 (3d Dep't 1992), the Court upheld censure of attorneys who compensated an unsupervised non-

---

[39] See N.Y.C. Eth. Op. 2003-01 (2004).

lawyer consultant for recommending and promoting the use of the lawyers' services. <u>See</u> <u>also</u> <u>In re Setareh</u>, 264 A.D.2d 146 (1st Dep't 2000) (attorney's misconduct in compensating a third party on two occasions for referring personal injury clients to him warranted public censure); <u>In re Ehrlich</u>, 252 A.D.2d 73 (1st Dep't 1998) (sanctioning attorney for paying hospital employee to solicit clients for attorney over course of two-year period). Moreover, New York courts have upheld and enforced the rule against an attorney's solicitation of clients at a time when the attorney knows or should know that the person is unlikely to be able to exercise reasonable judgment in retaining an attorney. <u>See</u> <u>In re Shapiro</u>, 7 A.D.3d 120 (4th Dep't 2004) (letter sent by attorney to hospitalized victim three days after accident was warranted sanction; rule prohibiting solicitation from vulnerable prospective client not unconstitutionally overbroad or vague); <u>In re Meaden</u>, 263 A.D.2d 67 (1st Dep't 1999) (sanctioning attorney for initiation of personal contact with two victims of gas line explosion at apartment complex in attempt to solicit them as clients soon after event when attorney knew they were vulnerable).

New York cases also do not tolerate false or misleading attorney communications. In <u>In re Shepard</u>, 92 A.D.2d 978 (3d Dep't 1983) the Court held the use of a trade name misleading, and in <u>Anonymous v. Grievance Cmte.</u>, 136 A.D.2d 344 (2d Dep't 1988), the Court upheld the rule requiring attorney advertising to contain the attorney's name, address and phone number. <u>See</u> <u>also</u> <u>In re Power</u>, 3 A.D.3d 21 (1st Dep't 2003) (reciprocally sanctioning attorney who violated New Jersey advertising rules with misleading advertisement); <u>see</u> <u>also</u> <u>In re Shapiro</u>, 7 A.D.3d 120 (4th Dep't 2004) (sanctioning attorney for airing television ads that contained false and misleading statements where attorney claimed to practice law in state but has continuously resided

out of state); In re Balacacer, 293 A.D.2d 107 (1st Dep't 2002) (sanctioning attorney for

false and misleading advertisement that falsely stated firm's attorneys' size, specialty,

race, religion and specialty); In re Shapiro, 225 A.D.2d 215 (4th Dep't 1996) (offensive

and degrading television advertisement was constitutionally protected hyperbole, but

telephone directory listing of "Accident Legal Clinic of Shapiro and Shapiro" misleading

and warranted censure). Generally, New York case law is consistent with the application

of standards laid down by the U.S. Supreme Court.

     D.    Antitrust Concerns Regarding Regulation of Attorney Advertising

In completing its work, the Committee was mindful that restrictions on

professional advertising raise issues under the antitrust laws. As the Federal Trade

Commission has emphasized, "[a]dvertising informs consumers of options available in

the marketplace and encourages competition among firms seeking to meet consumer

needs." See Submission of the Staff of the Federal Trade Commission to the American

Bar Association Commission On Advertising (June 24, 1994) at 2-3. While restrictions

on false or misleading advertising are easier to justify, "[r]estraints on truthful advertising

can restrain competition and deprive consumers of the benefits of a competitive

marketplace and of information they may find useful and valuable in making decisions."

Id. at 3. The antitrust cases dealing with restrictions on professional advertising also

reflect a concern that trade or professional groups which agree to restrict advertising may

be attempting to maintain high price levels by reducing competition, or to favor

entrenched interests at the expense of new, potentially lower cost, competitors.

Indeed, the U.S. antitrust agencies have taken action against professional

associations that have agreed upon and enforced advertising bans that include limits on

truthful advertising. In the late 1970s, the Department of Justice ("DOJ") initiated an

antitrust action against the American Bar Association ("ABA") in connection with the ABA's broad restrictions on lawyer advertising in effect at the time. The DOJ voluntarily dismissed the action after a number of developments – the most important being the Supreme Court's decision in <u>Bates v. State Bar of Arizona</u>, 433 U.S. 350 (1977) – resulted in the large-scale dismantling of many of the restrictions on lawyer advertising.

While advertising restrictions enacted by a state entity are generally immune from antitrust challenge under the "state action" doctrine of <u>Parker v. Brown</u>, 317 U.S. 341 (1943), restrictions by a private entity such as the State Bar will be protected only where they are: (1) undertaken pursuant to "clearly-articulated and affirmatively expressed" state policy; and (2) under the close and active supervision of a state entity. <u>See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 105 (1980) ("<u>Midcal</u>"). This will often be a fact-intensive inquiry.

In <u>Bates</u>, the Supreme Court held that the Arizona State Bar's activities in enforcing disciplinary rules relating to lawyer advertising (<u>e.g.</u>, identifying and investigating a violation) were not subject to antitrust challenge. The Arizona Supreme Court had adopted the restrictions at issue, and although the State Bar was involved in the enforcement, the court was "the ultimate trier of fact and law in the enforcement process." 433 U.S. at 361. Since the State Bar was essentially acting as an agent of, and under the direct supervision of, the Arizona Supreme Court, the Court held that the conduct was immunized from the antitrust laws (it went on, however, to hold that most of the advertising restrictions under review violated the First Amendment). However, in <u>Goldfarb v. Virginia State Bar</u>, 421 U.S. 773 (1975), the Court refused to immunize the

36

Virginia State Bar against an antitrust lawsuit challenging the association's enforcement of minimum fee schedules. The minimum fee schedules were promulgated by a local bar association, and the State Bar issued reports and ethical opinions stating that the fee schedules could not be ignored. Although the Virginia Supreme Court had empowered the State Bar to regulate the practice of law, it had not specifically authorized it to promote and enforce minimum fee schedules. Absent this "clear articulation" of state policy to restrict competition, the Court held that the State Bar was not entitled to "state action" immunity.

In light of Goldfarb and other precedents, the Committee remained cognizant of the antitrust risk inherent in forging ahead on rules or guidelines restricting lawyer advertising without explicit authorization and supervision by the appropriate New York courts or authorities. The Committee also had the benefit of prior research in this area in the form of a legal memorandum by the law firm of Davis Polk & Wardwell to undertake a detailed antitrust analysis of its proposals relating to lawyer advertising and related issues raised in the Gerstman Report (the "Davis Polk Memo"). The Davis Polk Memo ultimately concluded that (1) the "Commission On Advertising" proposed by Gerstman Report would not be immune from antitrust liability under the state action doctrine, but (2) the contemplated activities of this non-governmental entity were not likely to violate the antitrust laws so long as they did not exceed the carefully structured charge that was set forth in the Gerstman Report.

The Gerstman Committee proposed that a Commission on Advertising was to be composed of lawyer and non-lawyers, and supervised only by the State Bar - not any governmental entity. The Davis Polk Memo recognized that most cases had held private

37

bar associations to be immune from antitrust attack in connection with their role in the disciplinary process, but only because the associations had been interpreting or enforcing disciplinary rules that had been endorsed by the state, and acting under the close supervision of the appropriate state body. See Bates; Hoover v. Ronwin, 466 U.S. 558 (1984) (state action doctrine shielded private committee determining passing and failing scores on Arizona bar exam from antitrust liability where committee was acting pursuant to Arizona state rules and where the Arizona Supreme Court retained strict supervisory powers and ultimate full authority over committee's actions). However, because the proposed Commission on Advertising would have had no direct governmental oversight, the Davis Polk Memo recognized that the proposed Commission's activities would not be insulated from the antitrust laws by the state action doctrine.

The Davis Polk Memo went to scrutinize carefully the proposed conduct of the contemplated Commission. Because such conduct was limited to public education, providing advisory opinions to lawyers on proposed advertising, reviewing advertising, and making referrals to disciplinary committees, the Davis Polk Memo concluded that the activities of the proposed Commission were unlikely to raise any significant issues under the antitrust laws. See Davis Polk Memo at 3-4. In making this conclusion, however, the Davis Polk Memo placed great weight on the fact that the proposed Commission would have "no disciplinary, enforcement, or rule-making powers." Id. at 3-4, 41-42. Additionally, the Davis Polk Memo cautioned that some antitrust issues could be raised by the proposed Commission's activities if the Commission exceeded its contemplated role by (1) attempting to directly "coerce" attorneys into altering their conduct, or (2) referring advertising to the disciplinary committee for reasons other than the reasonable

belief that the challenged advertising was false and misleading and in violation of mandatory rules enacted by state authorities. See Davis Polk Memo at 45-47.

Since the drafting of the Davis Polk Memo in January 1996, the antitrust concerns associated with restricting lawyer advertising have not decreased. The law on the state action doctrine has not changed, and private associations remain vulnerable to antitrust attack in attempting to restrict advertising. Indeed, the antitrust agencies have continued to view restrictions on truthful advertising by professionals with skepticism. In December 2002, for example, the FTC investigated and entered into a consent order with the National Academy of Arbitrators ("NAA"), an association of labor management attorneys. See National Academy of Arbitrators, FTC File No. 011-0242 (Dec. 3, 2002) (analysis to aid public comment). The consent order required the NAA to change its Code of Responsibility, which had greatly restricted members from engaging in certain forms of solicitation and advertising, to eliminate restrictions that inhibited the provision of truthful information by means of advertising and solicitation.

The Federal Trade Commission also recently reiterated its views that restrictions on truthful lawyer advertising raise significant antitrust concerns. In September 30, 2002, FTC staff responded to a request by the Supreme Court of Alabama for guidance on proposed revisions to the Alabama Rules of Professional Conduct relating to lawyer advertising. See Letter from J. Howard Beales III, Director, FTC Bureau of Consumer Protection, et al. to Robert G. Esdale, Clerk of Court, Supreme Court of Alabama (Sept. 30, 2002) ("FTC Letter"). The FTC staff noted that:

> it is best for consumers if concerns about misleading advertising are addressed by restrictions on advertising that are tailored to prevent unfair or deceptive acts or practices. By contrast, imposing overly broad restrictions that prevent

the communication of truthful and nondeceptive
information is likely to inhibit competition and to frustrate
informed consumer choice.

FTC Letter at 1-2. Referring to proposed Alabama rule changes that would have banned

references to "past successes or results," "testimonials," and "descriptions of quality," the

FTC staff reiterated objections it had noted in its 1994 comments to the ABA  See

Submission of the Staff of the Federal Trade Commission to the American Bar

Association Commission On Advertising (June 24, 1994).[40]  The FTC staff explained that

"banning all assertions that are self-laudatory or that relate to the quality of services

offered may be unnecessarily broad and thus prohibit messages that consumers find

useful in choosing a lawyer." FTC Letter at 2  The FTC Letter also strongly questioned

the rationale for restricting supposedly "undignified" advertising, suggesting that some

consumers of legal services might be best reached by advertising that some might

consider undignified.  See FTC Letter at 2-3.

The Committee therefore recognizes that it is operating in an environment where

antitrust issues could be raised by any non-governmental entity that has the enforcement

power to restrict truthful, non-deceptive professional advertising by lawyers.  This is

particularly true where the private entity is enforcing rules or guidelines that have not

been specifically endorsed by the state, or not acting under the direct supervision of a

state entity.  In this regard, the Committee remains cognizant of the fact that some of the

advertising restrictions that the Committee has been considering – e.g., the proposed

fifteen day moratorium on soliciting disaster victims – are not solely based on concerns

of prohibiting false and misleading statements.

---

[40] In its current formulation, Alabama has dropped the ban on testimonials, but retained bans on past results
and descriptions of quality, leading the Committee to question the relative effect of FTC's pronouncements

Related policy concerns strengthened the Committee's natural inclination to avoid recommendations that were content-based and therefore close to the antitrust (and First Amendment) line. Thus, while the Committee recognized that even anticompetitive restrictions on advertising would not violate the antitrust laws if they were enacted by a New York State governmental body, the Committee endeavored to avoid recommending restrictions on advertising that would harm, not encourage, healthy and meaningful competition between lawyers. Mindful, among other things, of the comments of the Federal Trade Commission and of the policies of the First Amendment, the Committee erred on the side of permitting truthful advertising, except where powerful countervailing policy concerns over the public and lawyers' respective rights were present. Similarly, while the Committee recognized that private committees, if actively supervised by a state entity, could share an enforcement role with state disciplinary bodies and still remain insulated from antitrust scrutiny, the Committee was aware that even in such circumstances there was a risk that aggrieved attorneys would allege that such committees had exceeded the scope of their authority unless proper supervision by a state authority were included. The risk of antitrust scrutiny would be particularly notable if the relevant committee were a local one whose members are competitors of the aggrieved attorney. The potential effect, in terms of distraction and cost, of even a frivolous treble damage action under such circumstances, could not be ignored without proper precautions being taken, which the Committee's recommendations reflect.

E.     Approaches of Other States Regarding Advertising or Peer Review

States outside of New York have approached regulation of attorney advertising in a variety of ways. Attached as Part 6 of the Appendix to this Report is a nationwide

survey of the law governing attorney advertising in chart format. The chart covers all fifty states and the District of Columbia.

Of special note are five states that have created and empowered a special commission or review committee of their (integrated) State Bar to help regulate attorney advertising. The Supreme Courts of Kentucky, New Mexico, Texas, Florida, and New Jersey have adopted rules giving these committees their charge. As a result, the antitrust concerns detailed in this Report are inapplicable. A more in-depth look at each of these states methods follows.

### 1. *Texas*

The Texas Lawyer Advertising and Solicitation Review Committee is responsible for reviewing lawyer advertisements and written solicitations, as required by the Texas Disciplinary Rules of Professional Conduct. The Review Committee manages the filing and review process for attorneys that market their services to the public to ensure that lawyers are complying with established ethical requirements. See Tex. Disciplinary R. Prof. Conduct 7.07. Texas also requires the filing of firm websites, which may be submitted for pre-approval to the Department. See Tex. Disciplinary R. Prof. Conduct 7.07(c). In Texans Against Censorship, Inc. v. State Bar of Texas, the U.S. District Court for the Eastern District of Texas upheld the Review Committee's powers (as well as many of the state's other advertising regulations) against First Amendment constitutional challenges. 888 F. Supp. 1328 (E.D. Tex. 1995).

### 2. *New Jersey*

Rule 1:19A of the New Jersey State Court Rules gives the State Committee on Attorney Advertising exclusive authority to issue advisory opinions upon request and to consider ethical grievances for advertising improprieties. The Committee can institute

ethical grievances and proceedings against an attorney with or without a complaint being filed by an outside party. See N.J. Court Rule 1:19A-4. The Advertising Committee is also empowered to adopt guidelines, which are approved by New Jersey's Supreme Court, to give further clarification and guidance to the state's ethical rules governing attorney advertising. See N.J. Court Rule 1:19A-2(c). Further, the Committee pre-screens advertisements and gives its approval or disapproval, and may suggest voluntary modification of the advertisement by the attorney. See N.J. Court Rule 1:19A-3. The Committee is very active and deals with a high volume of advertisements. To date, there have been no constitutional challenges to the authority of the New Jersey's State Committee on Attorney Advertising.

    3.    *Florida*

The Florida Bar Standing Committee on Advertising issues advisory opinions, establishes guidelines for attorney advertising and reviews attorney advertisements. Florida requires that all attorney advertisements be filed with the Committee. See Fl. R. Prof. Conduct 4-7.7. Florida considers websites to be information requested by client (not advertising), and thus websites are exempt from the advertisement filing requirements with the Standing Committee. See Fl. R. Prof. Conduct 4-7.8(g). Even without website filing, however, the Standing Committee reviews a high volume of advertisements. Florida is also notable in that it imposes a 30-day waiting period for written communications involving personal injury or wrongful death relating to an accident or other disaster, see Fl. R. Prof. Conduct 4-7.4(b)(1), and that rule was upheld by the U.S. Supreme Court in the Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995).

4.    *Kentucky*

The Attorneys' Advertising Committee of the Kentucky Bar Association is a nine-member commission that meets every 25 days in three-member panels to review all attorney advertisements, including websites (advertisements and websites must be filed with the Committee). See Ky. State Court R. 3.130 (7.03)(1); (7). The members are volunteers appointed by the Board of Governors. Ky. State Court R. 3.130 (7.03)(2). The Committee can issue approvals or disapprovals, and can refer improper ads to their disciplinary committees. See Ky. State Court R. 3.130 (7.03)(5). There is also an informal process where advertising problems can be worked out voluntarily if they concern lesser violations. There has been no constitutional challenges to the Kentucky system, although according to the Committee's staff, some concern regard did exist in that regard until the advertising rules were changed to eliminate pre-approval of advertisements. Now, under the current rules, advertisements are simultaneously published and filed; there is no requirement that the advertisement be filed and approved beforehand publication, eliminating the First Amendment concerns.

5.    *New Mexico*

In 1992, the New Mexico Supreme Court adopted rules governing legal advertising and established the Legal Advertising Committee of the Disciplinary Board. The Committee's intended role was to provide guidance to New Mexico attorneys with respect to the new rules.

In 1998, a Federal court in New Mexico upheld that state's Legal Advertising Committee against a First Amendment challenge. See Bell v. Legal Advertising Committee, 998 F. Supp. 1231 (D.N.M. 1998). Similar to the current Kentucky system, New Mexico had required submission of advertisements concurrent with (not prior to

publication) their publication  The <u>Bell</u> court found that no First Amendment rights were being violated under this procedure. <u>Id.</u> at 1238-39

In 2002, the New Mexico Supreme Court subsequently withdrew the two rules that created the Legal Advertising Committee, such that New Mexico lawyers are no longer required to seek approval of proposed lawyer advertisements. The Committee was eliminated because, after ten years, the Supreme Court decided that the transition to the new rules was complete and the Committee disbanded because it was not contemplated that it would continue indefinitely. The Supreme Court Disciplinary Board continues to handle complaints concerning lawyer advertisements that may not comply with the ethical code.

### 6.    *Monroe County Initiative*

There has also been an initiative by the Monroe County (New York) Bar Association with regard to peer review. That effort is detailed below in Part VII, <u>infra</u>, pp. 65-70 as part of the Self-Regulation section of this Report.

### F.    Overriding Public Policy Concerns Regarding Attorney Advertising

The Committee was heavily cognizant of the Supreme Court's direction in <u>Bates v. State Bar of Arizona</u> that the public's right to information is a paramount priority when considering regulation in the attorney advertising arena. <u>See</u> <u>Bates v. State Bar of Arizona</u>, 433 U.S. 350 (1977). Commercial speech such as attorney advertising can have a significant impact on the public as a "listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." <u>Id.</u> at 364. Moreover, "commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system."

45

_Id._ Specifically with regard to attorney advertising, the Committee was mindful that, as the Supreme Court has held, attorney advertising may offer benefits to the administration of justice, _id._ at 376, help lower costs for consumers, _id._ at 378, and even increase the quality of legal services in the marketplace. _Id._ at 379  In making its study and recommendations for regulating attorney advertising in New York, the Committee sought to put the public and its interests first.

### IV. EMPIRICAL EVIDENCE OF ATTORNEY ADVERTISING GATHERED BY THE COMMITTEE

To be as thorough and objective as possible in considering attorney advertising in New York, the Committee examined over 100 print advertisements randomly selected by the respective Departmental disciplinary committees (approximately 25 from each of the four Departments), as well as 27 television and radio advertisements, provided by the New York State Bar Association's Media Services and Public Affairs Division and 54 Internet advertisements including websites. The advertisers ran the gamut from large, national law firms to local solo practitioners. Committee members then completed a checklist of questions regarding each advertisement's compliance with the current disciplinary rules. These advertisements, with the completed checklist for each, are attached in the Appendix to this Report. The Committee also collected attorney advertisements in foreign newspapers, and these are also attached as part of the Appendix. In an effort to avoid any local biases or influence, the Committee endeavored to have advertisements provided by upstate Departmental disciplinary committees reviewed by Committee members from downstate areas, and vice-versa. The results of the review were tabulated in a checklist mirroring the one used by Committee members

in reviewing the advertisements, and is at the front of the sample advertisement section of the Appendix.

Several patterns and conclusions can be readily drawn from the advertisements.

First, although a very small minority of advertisements could be categorized as false or deceptive on their face, about a third of them (34 out of 119) were found to be deceptive. See generally DR 2-101(A). Notably, Committee members often found it difficult to determine whether an ad was misleading or not on its face without further information about the claims made in the ad; it was also impossible to decipher what information might have been omitted from the advertisement that would alter its import. This caused the Committee to discuss the fact that Departmental disciplinary committee counsels lacks the necessary information and resources to identify misleading advertising on their face. Discussions with counsel to the Second and Eleventh Judicial Departments as well as the Third and Fourth Departments confirm this observation.

Second, in those advertisements that referenced contingent fee arrangements, there was a striking lack of inclusion of the required disclaimers. Only two of the twenty-six advertisements containing contingent fee information contained the necessary disclaimers.[41] Similarly, in those advertisements (8) where a lawyer claimed to be a "specialist," the advertisers all failed to include the pertinent disclaimer in that regard as

---

[41] The disclaimers presently include disclosing whether the lawyer's percentage fee is computed before or after deduction of costs, disbursements and other expenses, and that if there is no recovery, the client is liable for expenses, including court costs and disbursements. See DR 2-101(L).

well  See DR 2-105(C).[42]  Interestingly, the review revealed that in approximately 75% of the advertisements the lawyer or law firm identified the areas of its practice(s), but stopped short of claiming to be a "specialist" and thereby avoided the need to include a disclaimer, leading to the conclusion that lawyers generally understood and follow the rule and was one of the reasons the Committee voted not to change it. On the other hand, the Committee recognized that the difference in the import or meaning of an ad using the word "specialist" as opposed to other similar words (e.g. "expert," "focus," etc.) is questionable.

Finally, perhaps the most widespread impropriety of the advertisements reviewed was the lack of inclusion of the firm's name, address, and telephone number. See DR 2-101(K). More than half of the advertisements examined failed at some level in this regard. The Committee's review of advertisements from around the State provided it insight into the nature and extent of attorney advertising. While a comprehensive review of all attorney advertising in New York would of course be logistically impossible for the Committee, the Committee nonetheless wanted to have some representative sampling of advertising to help inform its work and recommendations. The above-described empirical survey provided the Committee valuable insight.

## V. INTERNET ISSUES AND ATTORNEY ADVERTISTING

Lawyer advertising on the Internet is extensive. This advertising takes a variety

---

[42] An advertisement stating a lawyer is a "specialist" must also contain the following statement: "The [name of the private certifying organization] is not affiliated with any governmental authority. Certification is not a requirement for the practice of law in the State of New York and does not necessarily indicate greater competence than other attorneys experienced in this field of law." If certified as a specialist under the law of another state, the advertisement must identify the certifying state and disclaim as follows: "Certification granted by the [identify state or territory] is not recognized by any governmental authority within the State of New York. Certification is not a requirement for the practice of law in the State of New York and does not necessarily indicate greater competence than other attorneys experienced in this field of law."

of forms, including the following:

- A lawyer or law firm's website, ranging from a simple presentation to a complex interactive site;

- a site narrowly focused on one special topic, such as a particular product-induced injury (e.g., mesothelioma from asbestos), or a particular problem (e.g., drunk driving charges);

- a "find-a-lawyer" site run commercially in which the users find lawyers in their region (e.g., the Bronx) or their field of interest (e.g., injuries from a pharmaceutical). These sometimes take on a deceptive appearance of being a non-profit advisory group;

- a blog (weblog);

- a "webinar" (a web based seminar) where a law firm provides a program on-line (interactive or non-interactive).

The Committee considered all of these types of on-line sites to be lawyer advertising. Even the plainest sites list what the firm specializes in and gives contact information.

While the work of the Committee involved examination of all of the above types of sites, the effort was to limit it to New York law firms or New York based services. This is a much more difficult task than making an examination of print or even radio/TV ads, since a viewer can find legal websites from all around the country from any location. Many sites do not state where they are based.

We have limited our analysis to New York law firms who are advertising on the web for two reasons. First, the law (as specifically provided in Gen. Bus. Law §§ 349, 350) prohibits false and deceptive business practices by firms which do or transact business in New York; as stated earlier in this Report, this includes false and deceptive advertising. See Mountz v. Global Vision Products, Inc., 770 N.Y.S.2d 603 (Sup. Ct. N.Y. Co 2003) (to state claim under New York consumer protection statutes prohibiting

deceptive trade practices and false advertising, plaintiff must allege consumer action or contact occurring within New York State); cf. Petitt v. Celebrity Cruises, Inc., 153 F. Supp. 2d 240 (S.D.N.Y. 2001) (non-New York cruise ship company could not be held liable for violation of New York consumer protection statute, despite allegation that company solicited business in state and made false representations to residents there, where neither named plaintiff was resident or domiciliary of New York, and they did not allege that they either read allegedly false promotional material in New York or purchased their cruise tickets in that state).

Second, such an analysis would require the Committee to undertake a study of multi-jurisdictional practice and the unauthorized practice of law, including but not limited to interstate communications and choice of law rules, passive websites and personal jurisdiction over non-residents, and other states' disciplinary rules, all of which are beyond the scope of this study. Specifically, it is questionable which state has jurisdiction to discipline an out-of-state attorney having no office in New York who is running a website or on-line advertisement, and how much control any New York disciplinary body could exercise over such a person or law firm based outside of New York. Of course, if a law firm has a home-base elsewhere and a branch office in New York, especially if that New York connection is mentioned in the advertisement, the ad falls within our scope of interest and within New York's Disciplinary Rules, if that is where the attorneys at issue principally practice or their conduct has a predominant effect here and the Committee considered this group of lawyers. *See* DR 1-105(B)(2)(b) [43]

---

[43] It provides: "If the lawyer is licensed to practice in this state and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices; provided, however, that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct."

Findings and Recommendations

1.    In virtually all important respects, the content of the Internet advertising run by New York law firms does not differ from similar types of advertising in print, radio or on television. Therefore, for the most part, the types of reforms and new regulation discussed more broadly in this Report applies to, and will deal with, the problems raised by attorney advertising via the Internet. New York's disciplinary rules do not specifically address the Internet but they should make clear as our recommendation provides that internet advertising is included. This is similar to most states, but a few have promulgated special internet rules (e.g. Iowa, Texas and Florida, among others). The Committee is aware of only a few decisions by New York bar associations at any level dealing specifically with internet advertising, and none of these are of any sort of general or comprehensive nature. See N.Y. State Bar Op. No. 709 (1998) (attorney may operate and advertise a trademark practice over the Internet as long as attorney complies with rules regarding conflict checks, posts a statement of client rights and responsibilities, ensures that client confidences are protected and not breached by e-mail, and complies with state attorney advertising rules); N.Y.C. Ethics Op No. 2000-1 (lawyers may respond to invitation to bid on legal projects through internet website where client's invitation is not initiated by lawyer, only client is charged a fee, no legal services are shared with a service provider, and responding lawyers are not pre-screened, approved, or otherwise regulated); Nassau County Bar Ass'n Comm. on Prof'l Ethics, Op. 99-3 (1999) (A lawyer may advertise as a "Sponsor" on internet legal information and advertising service, provided that: (1) service does not suggest that information is prepared or compiled by "Sponsoring" attorney, (2) format does not

suggest that attorney is being recommended or endorsed by the service, (3) the internet service makes clear that the attorney's name appears as an advertisement, and (4) the link provided by the service directs to Sponser's website and does not create a real-time dialogue with the Sponsor. Internet service highlighting attorneys who pay a premium advertising fee as "Lead Counsel" is misleading and improper because susceptible of being understood to mean that Lead Counsel are superior to other attorney).

    2.    Certain readily identifiable issues with on-line attorney advertising and websites include the failure of a web page or advertisement to state the name, address, and telephone number of the law firm. Although such failures may arise out simple unawareness of current DR 2-101(K), which requires such information be provided on all advertisements, whether intentional or not, there may be a deceptive effect on the public if a firm website fails to list the firm's location; for one thing, the viewer cannot know how local the lawyer or firm is.

A requirement that lawyers and law firms disclose the following information on their home page would deal with this problem satisfactorily:

- Name of the sponsoring law firm;
- Address of the home office of the firm;
- Address of all offices within New York state; and
- Telephone number of all such offices.

    3.    Finding a website on Google or Yahoo! and other search engines is not random. Sites come to the top of the list in various ways, including:

- Paying off on top (sometimes paying per click);
- Paying to run a banner or an ad off to one side; and
- Embedding key word, hyperlinks, or other tactics.

    4.    The issue is whether there is any violation of ethics or disciplinary rules here, e.g., a possible analogy to paying a chaser. The experience which the Second

Department disciplinary committee has had in this area with print advertising illustrates the magnitude of the problem. There, non-lawyers found to be practicing law or making referrals are, at random, sometimes made the subject of criminal prosecution and where the attorneys to whom these referrals are made can be found, subject to disciplinary proceedings. The Committee proposes a random review of Internet ads, as specified in the Enforcement portion of this Report, on a periodic basis for this purpose.

     5. Certain website URLs are unprofessional and distasteful, (e.g. "Vioxxattorney.com"), but taste is not perceived as a problem that can be regulated except to the extent that such a domain name violates the New York disciplinary rule against the use of trade names and should be prevented. See DR 2-102(B). The only practical means of finding such advertising, especially on the world-wide web, is to require filing and auditing.

     6. Many websites offer "free legal advice" and include an interactive feature, allowing a person to post the facts of their case and supposedly get a prompt response from a lawyer. The Committee concluded that per se this does not violate any rules, or at least can be governed by the more general rules being evaluated, so long as proper safeguards are present. See N.Y. State Bar Op. No. 709 (1998) (attorney may operate and advertise a trademark practice over the Internet as long as attorney complies with rules regarding conflict checks, posts a statement of client rights and responsibilities, ensures that client confidences are protected and not breached by e-mail, and complies with state attorney advertising rules). The posting in a website of general legal information not targeted to a specific potential individual, does not invoke any disciplinary rule.

7.    There is no current requirement in the New York rules that an attorney behind a website retain let alone file a copy of his site   Compare DR 2-101(F) (retention and filing of broadcast advertisements).   As detailed in the Rule Change and Enforcement sections of this Report, the Committee recommends the adoption of rules requiring the retention of all attorney advertisements, including websites, for a period of four years   In addition, the Committee recommends the electronic filing of all unsolicited e-mail communications by attorneys in a central location designated by the State.  Because it would be difficult from a logistical perspective to rule require the filing of all websites because some sites change almost daily, the Committee suggests only material changes to a lawyer or law firm's website would spur the need for new filing/retention.

8    As detailed in the Enforcement section of the Committee's Report, the Committee recommends the creation of a body to audit advertising statewide, including those found on the Internet, and subsequent recommendation to the respective disciplinary committees.  Of course, the general public and other attorneys are still being free to initiate ethical complaints for Internet advertising improprieties

9.    The basic rules against false and misleading attorney advertising apply in full to websites and on-line advertisements.  The Committee's review of about fifty such advertisements mirrored the problems in print and broadcast advertising mentioned above.  They contain a lot of puffery, and misstatements which are facially undetectable but might be unsubstantiated (e.g., ads claiming "we have obtained over $500 million in verdicts and settlements for our clients")   In any event, on-line advertisements and websites are not materially different than typical Yellow Pages advertisements in this regard.  As further discussed in the Education section of this Report, educating the bar in

a way that encourages responsible advertising that does not degrade the profession in the
eyes of the public is important, and applies equally to on-line advertisements and
websites as to more traditional advertising.

## VI.

## RULE 7.1: COMMUNICATIONS CONCERNING A LAWYER'S SERVICES

### General Comments

In evaluating the ethical rules that should guide attorney advertising, the
Committee considered both form and substance  We undertook a review of the existing
New York State Code of Professional Conduct (Code) with its black letter Disciplinary
Rules (DRs) and aspirational Ethical Considerations (ECs), which was heavily revised in
1996 at the suggestion of the Gerstman Committee together with a great deal of input
from the then-existing COSAC, which coincidentally at that time was reviewing and
proposing revisions in the Code)  We also considered the proposed new New York Rules
of Professional Conduct, which has just been released for comment and consideration by
the COSAC Committee  In addition, we reviewed various position papers, cases, articles,
summaries of the attorney advertising/solicitation ethical rules in all of the states

Generally, we also considered the need to include and reference all forms of
electronic communications as falling within the scope of the Rules, recognizing that the
internet has become a formidable marketing tool for lawyers, much like broadcast
advertising.

The Committee took the present state of constitutional limitations on advertising
as a given.

Format: Code vs. Model Rules. In terms of format and substance we determined
to follow COSAC's new New York Rules of Professional Conduct and proposed changes

55

and deviations from that text where we thought it appropriate and preferable. COSAC's proposal is based upon the Model Rules of Professional Conduct updated and revised by the American Bar Association's Ethics 2000 Commission and adopted by the ABA House of Delegates. Some form of the Model Rules has been adopted by all but two states, and New York will soon be the sole holdout in retaining the Model Code format. We considered it likely that the New York State Bar Association and, in turn, the New York courts, would adopt a Model Rule format because the Model Rules provide more uniformity in an era of multijurisdictional practice, and cover issues and topics that the older Code does not, are considered more and more easily comprehensible to lawyers in both language and organization. The comprehension factor, of course, is of particular importance since violation of DRs can lead to disciplinary action. Not only is the structure of the Model Rules more easily followed but the existing DRs, Judiciary Law, and ECs have evolved into a confusion of disparate standards, nonbinding aspirations, commentary and requirements that may or may not be binding and can too easily lead a lawyer astray. Some of the Model Rule concepts have already seeped into our existing Code in interim Code revisions and those who have taken the New York bar exam in the past 13 years have studied the Model Rules – not the Code - to pass the Multistate Professional Responsibility Examination. In short, we thought the Model Rules was the wave of the future in New York and began with the COSAC proposal.

Rule 7.1

False, Deceptive and Misleading. The committee began with the text of COSAC's proposed Rule 7.1, Communications Concerning a Lawyer's Services, which sets out the general prohibition on a lawyer's making any false, deceptive or misleading

56

communication about the lawyer or the lawyer's services. A test of materiality (of content or by omission) measures whether a communication is false, deceptive or misleading. The committee approved the concept of defining false, deceptive or misleading to provide direction and clarity to guide lawyers' conduct as well as to guide disciplinary authorities. Although we considered whether the definition should omit the materiality standard, we concluded otherwise. The test is similar to the test that has worked well in the field of securities law for seven decades. Further, consumers of legal services should not be harmed by immaterial misrepresentations or omissions, and attorneys should not be subject to discipline for immaterial violations.

Filing and Retention. We agreed with COSAC's requirement in Rule 7.1 that copies of all advertisements be retained by the lawyer but extended COSAC's retention requirement from one year to four years to mirror the requirements for retention of MCLE records and to coincide more closely with the attorney biennial registration cycle with the expectation, as discussed elsewhere in this report, that the attorney biennial registration form would be amended to require the attorney to complete information about compliance with the advertising rules and requirements. The Committee amended the Commentary to permit advertisements to be retained in electronic form.

Although COSAC was silent on the point, we inserted a requirement that all advertising be filed in accordance with court rule. We envisioned the courts adopting a central electronic filing system that would make compliance simple and inexpensive for attorneys, impose few storage difficulties, and permit ready access for review of advertising by disciplinary authorities and their designees. In addition, the Committee consulted with staff attorneys of the Grievance Committees of the Second and Eleventh

Judicial Districts of the Second Department, and the Third and Fourth Department, who expressed the view that the filing requirements for print advertisements but not internet or broadcast advertisements exclude certain forms advertising for no rational reason, and make the review and enforcement of advertising particularly cumbersome and difficult. For instance, the absence of filed ads means that staff members do not consistently review all forms of advertising; a communication is required to the attorney to obtain copies, and the ads themselves are not routinely maintained in a readily accessible format or place where they may be obtained and compared.[44]

Although the Committee considered (and rejected) several definitions of advertising, and debated whether certain categories should be omitted from the advertising filing requirements, for example, law firm web sites, the conclusion was to cast the net widely. Simplified electronic filing should not present an undue burden (if a lawyer is electronically sophisticated enough to have a web site, the lawyer should have the sophistication to make an electronic filing of its contents). Further, web sites have the capacity to be false, deceptive and misleading and to cause harm particularly to unsophisticated consumers of legal services. The Committee realizes that some lawyers and law firms change their websites daily and that to require filing every change to a website would not only be burdensome but also unmanageable. For that reason, lawyers and law firms are required to file only material changes they make to the websites.

Content of Attorney Advertising. COSAC did not address the specific contents of advertising in Rule 7.1. The Committee agrees that the content should not be regulated

---

[44] In the Third Department, for instance, when a particular advertisement is reviewed, even where a complaint is filed, upon resolution, the advertising is not maintained for more than a year, making a comparison of subsequent advertising (should another complaint arise) impossible. Other Departments do retain advertisements that staff reviews (such as the Second Department) but that practice is not uniform.

While COSAC did include some related provisions in other Rules or in Commentary to the Rules, the Committee determined that, in some instances, these should more appropriately be placed in Rule 7.1. For some of the provisions, consumer protection seemed to mandate moving Commentary to black letter Rules. For other provisions, Rule 7.1 seemed to be the more logical location where an attorney, trying to comply, would expect to find information relating to advertising, thus providing ease of reference and less likelihood of trapping the unwary practitioner.

The current DRs have a requirement that advertisements contain the lawyer or law firm's name, address and telephone number. COSAC inserted this requirement in its Rule 7.2, Payment for Referrals. The Committee moved this provision to Rule 7.1, Communications Concerning a Lawyer's Services, as a more logical location. The Committee also specified the address be that of the lawyer or law firm's office as registered with the OCA and principal offices in New York. The Committee believes that this is consistent with the law on jurisdiction and choice of law principals over attorney conduct, as currently provided in DR 1-105 and which COSAC adopts in its identical from in Rule 8.5.

COSAC's Commentary to Rule 7.1, borrowing from the current ECs, states that use of an actor may be false, deceptive or misleading without meaningful disclosure The Committee determined that the risk of misleading potential consumers of legal services warranted making it a black letter requirement. Thus, the Committee set out in Rule 7.1 that an advertisement must contain appropriate disclosure if a non-employee spokesperson or actor is used. The Committee also expanded the Commentary to Rule 7.1, to emphasize that required disclosure and disclaimers must be visible so they can be

seen in a meaningful fashion.

COSAC's Commentary to Rule 7.1 states that advertised fee information must be honored by the lawyer for a reasonable period of time and specifies some minimum time frames as being reasonable. The current Code, on the other hand, spells out in the DRs specific time periods during which the lawyer is bound by the advertised fees (DR 2-101(H), (I)). Concerned with consumer protection, the Committee determined to follow the Code 2-101(H) by spelling out stricter, more specific time periods, and specified that fees advertised in annual publications must be honored for one year following publication, not 30 days, and made these into black letter requirements within Rule 7.1. The Committee also added a new black letter requirement within Rule 7.1 that did not appear in COSAC's proposal, that advertisements relating to contingent fee matters contain required disclosure about calculation of expenses and the client's liability for expenses, as presently set forth in DR 2-101(L).

Following the Model Rules, COSAC's proposed Rule 7.3, Direct Contact with Prospective Clients, required that certain written and electronic communications from a lawyer soliciting employment be labeled as advertising. The Committee instead put a provision to that effect in Rule 7.1, Communications Concerning a Lawyer's Services, as a location where an attorney would more likely expect to find such a requirement. Thus, the Committee added to Rule 7.1 the requirement that any advertisement sent by direct or electronic mail must have "Attorney Advertisement" visible at the top of any document and envelope. The Committee concluded that such a provision was not necessary for television and radio advertisements, as their character would be obvious, and inserted a statement in the Commentary that the Rule did not apply to television and radio.

Following language in the Code, COSAC's proposed Rule 7.3 contains the requirement that, if a lawyer soliciting a client intends to refer the case to another (unaffiliated) lawyer, the communication must disclose that intention. The Committee inserted a similar provision into Rule 7.1, Communications Concerning a Lawyer's Services, and also required that the advertisement include the name, address and telephone number of the lawyer to whom referral will be made if known.

COSAC, after consideration, determined not to require a cooling off period before permitting attorneys to mail solicitations following a mass disaster. Such provisions are in place in Florida and Florida's 30 day black-out period was upheld by the Supreme Court in <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618 (1995). Our Committee came to a different conclusion, based upon a study of eight states that have adopted that rule since the Supreme Court's decision, without facing constitutional challenges. The Committee has added to Rule 7.1 a broader requirement, not limited to mass disasters, that advertising not be directed to a victim of a personal injury or wrongful death (or the victim's family) for fifteen days after the occurrence.

Besides the states which have adopted a black-out rule, the federal government, in 1996, did as well with respect to aviation disasters. Following the crash of TWA flight 800 Congress enacted the "Aviation Disaster Family Assistance Act, 49 U.S.C. 1136. The "Act" is a comprehensive statute mandating assistance to air disaster victims and their families following an aviation accident. With respect to solicitation, the act provides:

> (g) Prohibited Actions
>
> 2. Unsolicited Communications—In the event of an accident involving an air carrier. no unsolicited communication concerning a potential action for

personal injury or wrongful death may be made by an attorney, representative of an attorney, insurance company, or air carrier litigation representative to an individual injured in the accident, or to a relative of an individual injured in the accident before the 30th* day following the date of the accident.

The Congressional report cited paramount concerns with overzealous attorneys "who relentlessly pursued grieving relatives of crash victims" following the May 1996 Valujet disaster in Florida. It therefore prohibited any unsolicited communication, including direct mail, with victims or their families, for a period of forty-five days by lawyers, insurance adjusters or airline litigation representatives.

In addition to the federal prohibition and the Florida rule upheld in the <u>Went for It</u> case, the Committee is aware that at least eight other jurisdictions (Arizona, Georgia, Florida, Louisiana, Tennessee, Maryland, Connecticut and Missouri) have adopted rules prohibiting targeted mail solicitation of accident victims for specific periods of time. In none of those states was there a successful constitutional challenge to a similar restriction.

Some consideration was given to the possibility that the New York State Insurance Department might consider adopting a comparable black-out period for insurance companies. The Committee recommends that such a request be made. The Committee considered whether this provision would be harmful to victims in the event there continues to be no comparable bar on settlement solicitation by insurance adjusters. The Committee concluded, however, that, because there is a minimum period of thirty days for filing claims, a fifteen day cooling-off period would not be harmful to victims. Further, the Committee believed the cooling off requirement would be beneficial in removing a source of annoyance and offense to those already troubled by an accident or

---

\* The 30-day rule was subsequently modified to 45 days.

similar occurrence, and would not preclude victims from seeking legal advice on their own initiative. To provide additional guidance, the Committee determined to expand the Commentary to discuss the history of the federal statute.

The text of Proposed Rule 7.1 is attached to the Appendix.

### VII. RULE 7.2: PAYMENT FOR REFERRALS

COSAC's Rule 7.2, Payments for Referrals, contains a general prohibition on paying for referrals of clients. Paying for permitted advertising is not a violation of the Rule. The Rule also permits payments to a qualified legal assistance organization (as defined in the Rules), referral fees to another lawyer, and payment for the practice of a deceased, disabled, disappeared or retiring lawyer as otherwise permitted. Lawyers may also enter into a nonexclusive reciprocal referral arrangement with other lawyers and with nonlawyers under certain circumstances. The Committee accepted COSAC's proposed Rule 7.2 without change except for moving a provision about advertisements including a lawyer's name, address and telephone number to Rule 7.1 as a more logical location.

### VIII. RULE 7.3: DIRECT CONTACT WITH PROSPECTIVE CLIENTS

COSAC's Rule 7.3, Direct Contact with Prospective Clients, generally prohibits in-person and real-time electronic solicitation. Exceptions are made for family or persons with whom the lawyer has a close personal or a professional relationship, or if the person contacted is a lawyer. All solicitations, in-person as well as written and electronic, are prohibited if the communication is misleading or involves coercion, duress or harassment, if the recipient has indicated a desire not to be solicited, or if the lawyer knows or should know that the recipient will not be able to exercise reasonable judgment in retaining an attorney.

Rule 7.3 also prohibits a lawyer's sending written solicitations that the recipient

would have to pick up at a remote location.

Rule 7.3 permits lawyers to cooperate with qualified legal assistance organizations, including legal aid offices; military legal assistance offices; bar association lawyer referral services; and prepaid group legal service plans but prohibits lawyers from owning or directing such plans.

The Committee accepted COSAC's proposed Rule 7.3 without change except for moving to Rule 7.1 the requirement that written and electronic communications be labeled as advertising. The Committee also inserted at Rule 7.1 a provision comparable to that in Rule 7.3 requiring disclosure if a lawyer intends to refer a case to another (unaffiliated) lawyer.

### IX. RULE 7.4: IDENTIFICATION OF PRACTICE AND SPECIALTY

COSAC's Rule 7.4, Identification of Practice and Specialty Rule, would have allowed lawyers to state the areas of law in which they practice and also to state that they are specialists or specialize in a particular field of law. COSAC's proposal would have allowed disclosure of certification only if certification is by an organization approved for that purpose by the ABA and provided the name of the certifying organization is disclosed.

The Committee disagreed with COSAC's proposal. The Committee concluded, based in part upon the empirical survey, that lawyers should not be permitted to state they are specialists or specializes in a particular field of law, since such terms have heightened meaning and may be misleading to consumers of legal services. Thus, the Committee instead reverted to the current DRs, which prohibit lawyers from stating they are specialists or specialize in a particular field of law but make an exception for lawyers certified by an organization approved for that purpose by the ABA or (unlike the COSAC

proposal) as permitted under the laws of another state. Disclosure of certification would

be limited by the Committee to the specific detailed language required by the current

DRs

## X. RULE 7.5: FIRM NAMES AND LETTERHEADS

COSAC's Rule 7.5, Firm Names and Letterheads, deals with law firm names and

related matters. A law firm's name and related designation is subject to the prohibition in

Rule 7.1 on false, deceptive or misleading.

Rule 7.5 prohibits trade names entirely. With certain exceptions, a law firm's

name must consist of the names of one or more lawyers in the firm, deceased or retired

firm members, and may include the words "legal clinic," but not other descriptive terms

such as "legal aid" and the like, which are reserved for qualified legal assistance

organizations. The Committee endorsed COSAC's continuation of the ban on use of

trade names, which is also in the current DRs, believing that trade names are far too

likely to be false, deceptive and misleading to consumers of legal services.

The Rule also prohibits use of the name of a non-lawyer (including a non-lawyer

with whom the law firm is permitted to be and is affiliated), and use of the name of a firm

lawyer holding public office. Multi-jurisdictional firms can use the same name in various

jurisdictions, but must disclose the licensure limits of those lawyers who are not licensed

in the jurisdiction where any office is located. No partnership may be stated or implied if

it does not exist.

The Committee accepted COSAC's proposed Rule 7.5 without change.

## XI. SELF ENFORCEMENT

The Committee studied numerous existing and newer methods of self

enforcement by local, regional and/or State bar associations in order to provide a

comprehensive overview of the current state of peer review, with the initial view that this was preferable to having guidelines and an enforcement structure imposed from without.

Scope of Inquiry

Each of the subcommittee members believed that, because of the advertising excesses recently seen and reported, especially in the Second, Third and Fourth Departments, the profession itself should address the problem and not wait until a regulatory scheme is developed which, by its universality, might not address regional problems or, alternatively, over-address them. The scope of its review was to look at regulatory schemes adopted within and without the State, analyze them in light of the needs and peculiarities of New York, and develop a self regulatory system – either based at the local or state bar level – to implement existing disciplinary rules, suggest modifications and improvements of them and aid in the education of advertising attorneys, new admittees and the public at large.

A.    STATES OUTSIDE NEW YORK

As indicated earlier in this Report (supra, Part III E), five states created a special commission or review committee to review advertising. In every state, the Supreme Courts empowered the commission and its rules, thereby rendering it part of and integral to the court system. In Texas, there was a First Amendment constitutional challenge to the system, but the United States District Court for the Eastern District of Texas upheld the review committee's power to review lawyer advertising (888 F.Supp. 1328 (E.D.Tex. 1995), while in New Mexico, the federal district court upheld that state's Legal Advertising Committee against a First Amendment challenge (998 F.Supp. 1231 (D.N.M

66

1998)[45]  In each of the states, the commissions are empowered to review ads which had been or simultaneously were being published  The four extant commissions also have the power to discipline attorneys.

### B.    STATE BAR COMMITTEE ON PROFESSIONAL ETHICS

In New York State, the Committee on Professional Ethics of the State Bar of New York, has the function of pre-publication review of advertising for compliance with the Code's provision's regulating advertising.  Since <u>Bates v. State Bar</u>, 433 U.S. 350 (1977) and the 1978 amendments to the Code of Professional Responsibility to conform to that decision, this Committee has responded to inquiries from lawyers asking whether their proposed advertisements would conform to the Code.  In 1978, the Committee published four formal opinions to provide guidance to the bar on the then-new subject of advertising by lawyers and it continues to publish opinions on what advertising by lawyers is and is not permitted under the Code[46]  In addition to publishing formal opinions where the Committee on Professional Ethics believes that the answer to a lawyer's inquiry would be instructive to a broad segment of the bar, the Committee also more frequently issues unpublished letter responses to lawyers who ask the Committee to review particular proposed advertisements or to answer questions about what is ethically permissible.

In its review of existing state mechanisms for reviewing published advertisements, this Committee was cognizant of and took into consideration the prior comment by the Committee on Professional Ethics that it was opposed to reviewing

---

[45] New Mexico has since disbanded the Advertising Commission, ten years after its adoption, when the Supreme Court believed that the state's advertising rules were generally understood by the bar.
[46] Letter dated January 5, 1996, Committee on Professional Ethics, commenting on the Gerstman Report at 10.  The Commission on Advertising was not approved by the House of Delegates

advertisements because of the impracticability in separating out its function from other ethics inquiries, and the problems with shared jurisdiction and conflicting decisions by two organs of the State Bar (the Committee on Professional Ethics and the then proposed Commission on Advertising)[47].

The Committee is not proposing that the State Bar establish a Commission on Advertising for reasons set forth below but another alternative, expressed in Part V of this Report.

### C    THE MONROE COUNTY BAR ASSOCIATION PROJECT

#### 1.    History

Facing a rising tide of attorney advertising in the Fourth Department deemed at least deceptive, if not blatantly false, and dissatisfied with the apparent degree of enforcement from the Fourth Department Grievance Committee (hereinafter "DGC"), the Monroe County Bar Association (hereinafter "MCBA") commissioned an Advertising Task Force in late 2004 to confront the problem. The Task Force recommended a three part program which was approved by the MCBA Board of Trustees "to improve the level of advertising and to assist the public in choosing an attorney", per a MCBA press release issued May 9, 2005 by this subcommittee member, (then MCBA president) Michael R. Wolford, Esq. of Rochester. The three prong approach envisioned education of the public in selecting counsel; aiding practitioners to communicate to the public about their services in compliance with the applicable Disciplinary Rule (DR 2-101) and Ethical Considerations (EC 2-9 through EC 2-16); and reviewing complaints of actual violation of the Guidelines adopted.

---

[47] Id. at 12.

The Guidelines themselves were not intended to break new ground; they are a plain language, straightforward articulation of the Code of Professional Responsibility (hereinafter "CPR") provisions on advertising. Their introduction acknowledges commercial free speech within the limits of fair and non misleading communication. It specifically acknowledges that the MCBA was not intending to "prescribe or enforce the disciplinary rules governing attorneys... not to "alter the effect or applicability of DR 2-101 or any other aspect of the disciplinary rules, which prescribe the minimum level of conduct for lawyers..." As appears below, the Guidelines address broad principals, each with a gloss providing examples of appropriate and inappropriate advertising. The language throughout is aspirational ("should") rather than mandatory.

      2.    The Guidelines

The Committee, upon careful review, found the Guidelines to be a clear, concise and "user friendly" interpretation of the applicable CPR provisions, simple enough for public dissemination for educational purposes, yet "meaty" enough to provide the advertising lawyer with a roadmap to truthful and helpful communication. The Subcommittee recommended, and the Special Committee adopted, them without modification.

<u>MCBA Guidelines</u>

Lawyer advertising should be:

TRUE

Lawyer advertising should be entirely truthful, both literally and in the impression it gives, especially to those with little experience or sophistication in legal matters. Statements that are false, misleading, or unfair should not be used. For example:

Advertising should not falsely claim or exaggerate any credentials, experience or

69

expertise in a legal specialty.

In naming or picturing a particular lawyer, advertising should not mislead prospective clients about how actively that lawyer will participate in any matter, or who will actually perform the advertised services.

ACCURATE

All information would be factually accurate and objectively verifiable throughout the life of the advertisement and for thirty days thereafter. All claims should be properly substantiated in writing prior to release, and such substantiation should be retained for at least two [four][48] years after the advertisement's last publication.

CLEAR

The language used and manner of expression should be clear, unambiguous, and understandable to the lay audience. Qualifiers, disclaimers, and explanatory notes should be of such type size and prominence as to be readily noticed, read, and understood by the lay audience.

FAIR

Advertising that recreates, dramatizes or simulates situations or persons should fairly represent the underlying facts and properly disclose that they have been staged.

RELEVANT

All information should be relevant to the thoughtful selection of counsel, and devices such as puffery, that are likely to hinder this process, should be minimized.

RATIONAL

Pictures and other stylistic elements should be used to reinforce traditional

---

[48] To conform to COSAC provisions finally adopted.

considerations, and should not unduly frighten, inflame or otherwise manipulate viewers into ignoring rational considerations. Lawyer advertising should not be likely to shock or offend a substantial segment of the community or to foster disrespect for the law, the legal profession or the judicial system.

### JURISDICTIONALLY PROPER

A lawyer or law firm should direct advertising only into jurisdictions where authorized to practice, and not other jurisdictions except with a clear indication of such jurisdictional restriction. This should not prevent advertising in national or regional media, so long as the public is not misled as to the lawyer's or firm's jurisdictional authorization.

### Supplemental Guidelines For Attorney Advertising

Following the full committee's approval of COSAC provisions as amended and supplemented at its meeting of September 28, 2005, the MCBA guidelines are supplemented as follows:

Lawyer advertising should be:

### IDENTIFIED

Ads in direct mail and e-mail should say "Attorney Advertisement" on the top of each piece and on any envelope, if used. An advertising lawyer or firm should include in every ad the name, address and telephone numbers of each principal office in New York If the advertising lawyer or firm intends to refer the legal matter to another attorney or firm, the ad should reveal it and the name, address and telephone number of that attorney or firm.

71

FAIR

Advertising that recreates, dramatizes or simulates situations or persons should fairly represent the underlying facts and properly disclose that they have been staged. An advertising lawyer or firm should not use an actor or spokesperson not a firm employee or member unless this is disclosed in the ad. The public has the right to know if a person speaking on behalf of a firm or lawyer or endorsing the services is an actor.

ACCURATE (to replace the language under this subtitle in the MCBA)

A lawyer or firm advertising a specific fee or range of fees on a service should accept the fee quoted for thirty days, unless the ad says a shorter period. Fee quotes in annual ads, like those in the yellow pages, should be honored for a year after publication. If the ad suggests a contingency fee for services (a percentage of the recovery), the lawyer or firm should say whether the percentage is computed before or after the litigation expenses are deducted and, if there is no recovery, that the client must pay the litigation expenses, fees and disbursements.

FILED

Every lawyer advertisement in any media should be filed electronically where it will be retained for four years after the last distribution, and the advertising lawyer or firm should keep any mailing or distribution list for four years.

### New Guidelines For Attorney Solicitation

A lawyer unknown to a potential client should not approach or communicate with him/her to offer services:

AFTER AN ACCIDENT OR DISASTER:

If directly to a victim or a member of a victim's family, until fifteen days have passed following the accident or disaster.

IN AN INAPPROPRIATE PLACE OR TIME:

To a family member of a deceased person or the victim, at the accident scene, in the emergency room or hospital, at the wake, funeral or graveside. Such communication is not respectful of the victim's grief or loss, and the family's disability or anxiety makes it difficult to make an important decision like hiring an attorney.

It should be noted that promulgating voluntary guidelines on lawyer advertising in addition to those contained in the proposed Rules was one of the possible roles of the State Bar endorsed by the Committee on Professional Ethics in 1996[49].

      3.    MCBA's Enforcement Plan

As indicated, the scheme for enforcement envisioned public education (accomplished by press releases to announce the program and broadly disseminate the Guidelines); lawyer behavior modification (MCBA established a standing committee, whose chair is James Moore, Esq., a former president of this Association, to review advertisements voluntarily submitted by firms and individual lawyers and to issue advisory opinions regarding compliance); and to "review complaints of advertisements... allegedly in violation of the MCBA Advertising Guidelines..." (MCBA Press Release, supra). Upon the committee's determination of a violation of the Guidelines, the offending attorney or firm would be asked to modify the ad, and upon refusal, the committee could recommend that the MCBA Board make its adverse opinion public (MCBA Press Release, supra).

---

[49]Id. at 12

The enforcement plan of the MCBA appealed to the Subcommittee because of its outreach to the public, who could easily understand the guidelines and the deceptive advertising they were meant to discourage. The attempt to educate and counsel practitioners about the bounds of appropriate advertising was just the type of support self regulation envisioned, and the peer review of offending ads with some teeth provided by publication of the committee's opinion appealed to its members.

However, the Committee noted potential problems. Enforcement on a county by county basis encouraged parochialism and uneven standards statewide. At the local bar association level, the possibility that an individual attorney, firm or group thereof could hijack the process and use it as a barrier to competition or to single out objectionable individuals was too great. Obviously, an enforcement scheme within the profession, while laudatory, even at the state level, did not have the benefit of governmental sanction, for purposes of enforcement to be sure. More importantly, lack of "official" adoption, regardless of due process standards built in, would most certainly invite antitrust scrutiny, without the cloak of immunity governmental adoption would provide.

The Committee was particularly concerned that the cloud of antitrust issues would prevent effective enforcement by local bar associations. To be sure, the Committee believes that the proposed advertising guidelines clearly promote, rather than restrict, effective competition between attorneys. In particular, virtually all, if not all of the guidelines, solely restrict misleading or deceptive advertising. As the Federal Trade Commission concluded in American Medical Ass'n, 94 F.T.C. 701 (1979), professional associations' restrictions on advertising may be anticompetitive in certain circumstances,

74

but efforts to curb deceptive advertising serve to promote, not discourage, healthy competition.

However, regardless of the intended effect of the Guidelines and rule changes recommended herein, the Committee also recognized that aggrieved attorneys might allege in specific cases that the rules are being applied against them in a discriminatory and/or anticompetitive fashion. In those cases, the Committee notes that there is some risk that private bar associations enforcing restrictions on advertising would not be immunized from antitrust lawsuits because they are not government actors. See, e.g., Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975) (refusing to immunize the Virginia State Bar against a lawsuit alleging that the association's minimum fee schedules were anticompetitive). This would be a particularly high risk if the Guidelines or rules being enforced by a private association went beyond what has been enacted into the Code of Professional Responsibility. The Committee therefore urges the House of Delegates to adopt the Guidelines at the same time as the proposed Rules and similarly request that the Administrative Board do so.

The Committee also recognized that at least one of the recommendations set forth herein – the 15 day moratorium on advertising to disaster victims – is based on policy concerns that are not exclusively related to preventing deceptive and misleading advertising. While the policy goals behind such moratorium are worthy and important, the Committee also recognizes that the Federal Trade Commission has made statements that suggest that restrictions on attorney advertising that ban more than deceptive and misleading advertising are subject to some antitrust risk. See, e.g., Submission of the Staff of the Federal Trade Commission to the American Bar Association Commission On

75

Advertising (June 24, 1994). While the Committee weighed this antitrust risk, we concluded that the public interest in being protected from solicitations at a time of extreme trauma, emotional upheaval and stress outweighs this hypothetical concern.

Therefore, even though the Committee believes that a system that made use of some enforcement by private bar associations would likely function with no, or minimal, likelihood of anticompetitive conduct, the Committee still concluded that the threat of an antitrust treble damages action was too serious, and the likely effects of even a frivolous action too great in terms of distraction and cost, to make enforcement by private bar associations an optimal enforcement choice. Furthermore, as a practical matter, the sole realistic enforcement weapon for private bar associations given the antitrust and other concerns is publication of the committee's opinion of non-compliance. This option, however, in addition to having the potential to become expensive, is unlikely to deter the most persistent offenders, and could also result in a defamation action.

The Committee did, however, conclude that the House of Delegates should adopt the Guidelines as non-binding and precatory statements. Such statements are not likely to subject the State Bar to significant antitrust risk since objecting attorneys are free to disregard the Guidelines absent their adoption by the state. See, e.g., Lawline v. American Bar Ass'n, 956 F.2d 1378 (7th Cir. 1992) (local bar association's publication of its views on violations of disciplinary rules did not violate the antitrust laws because it was the decision of the disciplinary committee, not the opinion of the bar association, that has an actual effect on competition). In addition, so long as the suggested voluntary 15 day moratorium on advertising to accident victims is not likely to impact on the ability of any person to obtain full information about and access to his or her preferred legal

services provider in a timely manner, customers of legal services should have no reason to object to such provision on antitrust grounds.

By leaving the final enforcement of the proposals set forth herein to state bodies and personnel, full enforcement can take place without fear of antitrust lawsuits due to the "state action" exemption. See Parker v. Brown, 317 U.S. 341 (1943). Under Parker, as noted above, state bodies (such as the disciplinary committees) are exempt from antitrust scrutiny. Moreover, to the extent that other quasi-governmental bodies monitoring attorney advertising are acting pursuant to clearly articulated state policy and under the specific direction and close supervision of a state body, such bodies should also be exempted from antitrust scrutiny. The Committee recommends that any such quasi-governmental body be specifically authorized by the appropriate state entity to undertake its work, consist of government employees or appointees (discussed in greater detail in Part V Enforcement below), have an appropriate member of state government at its head, have no final enforcement power, and be closely and actively supervised by the appropriate state authorities.

Finally, as the MCBA itself experienced, the committee's expressed intent to "review complaints" of violations (MCBA press release, supra) ran afoul of the Fourth Department Grievance Committee, whose established jurisdiction included review of complaints involving attorneys. A cautionary letter to the MCBA was issued and Justice Pigott, the chair of that Grievance Committee, and his administrative staff met with the MCBA to try and tailor the association's program around the Grievance Committee's broad mandate. At this writing, no rewrite of the enforcement scheme satisfactory to the Fourth Department Disciplinary Committee has been accomplished, leaving the MCBA

solely with its adopted guidelines and community and practitioner outreach.

        4     The Subcommittee's Conclusions

The Committee's collaboration resulted in a revised working premise:

> Self regulation is preferable to having standards imposed from without, but governmental adoption insulates against successful antitrust and defamation challenges.

Willing to sacrifice self enforcement for the insulation of government involvement, the

Committee recommends:

1. The adoption of the MCBA guidelines regarding advertising verbatim, to be amended or supplemented depending upon and to track COSAC provisions adopted by the committee as a whole.

2. The creation of guidelines for solicitation, again depending upon the COSAC provisions to be adopted.

3. The recommendation that the House of Delegates approve both guidelines as policy of the State Bar.

4. The use of the guidelines approved for public dissemination in a State Bar media program to educate on choosing a lawyer and understanding which solicitation circumstances are violative of the guidelines

5. The use of the guidelines as approved to educate new attorneys about their responsibilities to the public and their fellow attorneys, and provide educational materials to the public as well. The proposed outlines for such educational booklets are attached in the Appendix.

## XII. REPORT AND RECOMMENDATIONS SUBCOMMITTEE ON ENFORCEMENT OF ADVERTISING RULES

Currently, enforcement of the existing advertising rules is ineffective. There is no formal mechanism in place, in any of the Four Departments, to methodically examine lawyer advertisements for compliance with Disciplinary Rule 2-101 *et seq.* of the Lawyer's Code of Professional Responsibility [22 NYCRR 1200.6 *et seq.*]. There is no consistency in the review process in the Four Departments, particularly with respect to broadcast advertising and directories (Yellow Pages). Moreover, except in a few instances see, e.g., Matter of Shapiro, 7 AD3d 120 (4th Dept., 2004), sanctions imposed by Grievance Committees for advertising infractions, such as Admonitions or Letters of Caution/Education are confidential, and thus not available to members of the bar or public. This significantly adds to the perception that there is no enforcement whatsoever.

The Special Committee on Attorney Advertising makes the following recommendations regarding enforcement procedures:

> 1. **All print, broadcast, or unsolicited direct mail or e-mail advertising shall be electronically filed in a central location designated by the State. If the advertisement is in a language other than English, it shall be filed with an English translation and a certification stating that the translation is accurate, and that the advertisement is in compliance with the rules to the best of the attorney's knowledge.**

*Comment*: A statewide system of filing is preferable to the current system where advertisements are filed in one of eight Grievance/Disciplinary Committees throughout the state. Statewide filing, electronically will reduce space requirements and will make review of the filed advertisements less cumbersome. Finally, requiring an English translation will go a long way in reducing some observed abuses in foreign language advertisements. To aid in enforcement, a companion requirement on the attorney

79

biennial registration should mandate that the attorney has complied with the advertising rules and regulations, under penalty of perjury

### 2. **There should be random sampling of attorney advertisements filed at the central location.**

*Comment*: By adopting a centralized filing requirement, logically a system of random sampling is needed to assure compliance with the advertising regulations.

### 3. **Some entity, whose director shall be under the active supervision of the Administrative Board, shall review a random sample of advertisements.**

*Comment*: To avoid anti-trust implications, the reviewing entity should be under the supervision of a governmental authority. Additional resources to enable the review of advertising must be found considering the fact that there are potentially some 160,000 attorneys who are admitted to practice in the State and who would file. A variety of alternative enforcement devices, and make-up of the audit committee were considered. The State Bar and local bar associations may offer assistance to the disciplinary committee by appointment by each of the Presiding Justices, from a list of qualified applicants in there respective Departments. There is, alternatively, a referral system currently in place in twelve counties (Kings, Dutchess, Erie, Nassau, Orange, Putnam, Richmond, Rockland, Suffolk, Westchester) and in the First District, the City Bar, the New York County Lawyers' Association and Bronx County Bar Association which could be called upon to review sample advertising. Alternatively, a commission of pro bono attorneys appointed by the Chief Judge, representing qualified lawyers who could audit ads statewide on a sample basis, is also possible. Finally, these additional responsibilities may be placed at the Grievance Committees but this would require additional funding given their full dockets and limited resources at present. In attempting to find the most

expeditious and practical way of implementing the sample review process, the Committee

recommends that the House authorize the State Bar to work with the courts and devise an

appropriate and cost efficient plan

> **4. Should the entity review the sample and find an advertisement which is not in compliance, it shall refer the advertisement to the appropriate Disciplinary/Grievance Committee.**

> **5. Referrals made by the entity to the Disciplinary/Grievance Committees shall be expedited to the extent practical.**

*Comment*: It is the opinion of the Committee that advertising violations are relatively

uncomplicated matters, and where possible, an expedited resolution by the disciplinary

system would afford a lawyer or law firm the opportunity to promptly bring their

advertisement into compliance  It is, however, necessary to remain mindful that the

disciplinary system has limited resources, and any additional responsibilities to handle

this additional case load would require additional funding.

Respectfully submitted,

## TASK FORCE ON ATTORNEY ADVERTISING

Bernice K. Leber, Chair
Eric Lent, Secretary

Subcommittee Chairs
James F. Dwyer
James C. Gacioch
Barry Kamins
Beverly M. Poppell
Paul D. Rheingold

Consultant
Prof. Stephen Gillers

Members

Edward C. Cosgrove
Rachel Kretser
Gerard M. LaRusso
Ellen Lieberman

Richard M. Maltz
Michael S. Ross
Robert J. Saltzman
Eric J. Stock
Michael R. Wolford

NYSBA Staff

Kathleen R. Mulligan-Baxter