## Transcript of Comments of Presiding Justice Eugene F. Pigott to the Monroe County Bar Association

### Aug. 17, 2006

Tom Smith: Justice Pigott tell us how we got from the aspirational, uh uh, guidelines of the two bar associations to uh uh these new proposed rules.

Presiding Justice Pigott:  May I stand?

TS: Yes

P:      I use to have a friend of mine who's into politics, who's of even lesser stature than me.  He would always stand up and say I'll be short.  I'm darn close to that level, so uh,

TS:     You are standing.

P:      I am indeed.  One of my professors, one time said that my job is to talk to you and your job is to listen, and if you finish before I do just raise your hand. (LAUGHTER)
 Uh, I want to explain a little bit about the structure and then I will tell you how we got here and uh hopefully where we're going.  Much of what my

Exhibit 1

task is this afternoon, I hope, is to listen.  Because this is an important thing and we have never in the history of the Appellate Division, uh had a comment period on a disciplinary rule.  Generally speaking we impose them. Uh, and uh in this particular case, because of the nature and gravity of what we're about to do, we thought it would be great to hear from everyone, and uh we are hearing from everyone.  If you haven't gotten your mail or your letter in please do.  We are very glad to hear about it.  Uh, the structure is this, the uh people sometimes overlook this.  In the state of NY it is the presiding justices or the courts of the four departments that control attorney conduct.  It's not the administrative board, it's not the office of court administration, it's not the unified courts system, uh it's the courts and the four presiding justices acting in concert, uh on the advice and direction of their own courts, are the one's that determine  how lawyers are going to conduct themselves.  So it's in that context that these, uh rules are being enacted.  The administrative board has in the past passed rules for the administration of the courts and things like that.  That administrative board is the four PJ's, the chief judge of the court of appeals and our chief executive officer, of course is Jonathon Lippman, and uh we do all kinds of policy things, I'm sure you are aware of, but attorney discipline does not fall within that.  Uh, when we set about doing this, as both Vince and Mike have

indicated that there had already been a great deal of interest in it, and we thought that uh that it was time to take some action.  We are a profession (pause).  And that's very important to remember, and what we're doing is that we are representing people and these people have problems, and their hurt, and their in pain, and they are worried about their futures, and their worried about their jobs, and their worried about their families.  They don't need a circus monkey telling them I can do a better job than the last circus monkey you may have seen.  And, and our concern is that when advertising gets to the point where you are going to, where your choice is do I listen to this or do I listen to a used car salesman.  And I have nothing against used car salesman, I only buy used cars. (LAUGHTER)  But this is a very big deal to people, and when their in a crisis and when their in need of a lawyer they got to be able to contact you, and they ought to be able to contact you.  Either because they talked to somebody among their family and friends, or they did see and ad or an advertisement, of some sort, or some type of communication, but it shouldn't be because at eleven thirty at night when they couldn't sleep because of the very problem that they were seeing, it was somebody putting on a little show and saying that they are the best lawyer in town, or that they are this or that.  And a and so the more we saw, and the more we talked to you folks the more we talked to the lawyers in this

community, and lawyers across the state, we knew that it was time to act.

Generally speaking, it is very limited areas of practice. Real estate lawyers

don't seem to have the advertising problems that other areas have. We

nevertheless didn't target any particular uh area of the practice. Although

it's obvious to all of us the areas that seem to attract the most egregious ads.

But when we decided to do this we thought that we too, uh, should borrow

from what the state had done, borrow from what the Monroe County Bar

Association had done, uh and find out exactly what we should do, rather

than do what we sometimes do, which I like to call is ready, fire, aim.

(LAUGHTER) Uh, this time we would reorder that and uh see how uh we

would uh come about it. So we formed a small group, each one of the

presiding justices appointed a member of this little study group that we had.

They then borrowed liberally from the people that you've already from. Uh,

but it became readily apparent, this may help you if you want to make

comments about this, as to what they found. New York was behind the

times in terms of content management, uh disclosure requirements, waiting

periods for direct solicitation, way behind in internet advertising, and we are

of course on of the more progressive states. Uh a lot of comments have been

made about the waiting period and we will get into it a little bit more, but as

Tom pointed out the court, the United States Supreme Court has said that

waiting periods are constitutional.  Uh and uh with certain limitations, uh and that's why among other recommendations, that one's there.  But in this jurisdiction, in the fourth department, we have uh yellow page ads, with no notice to the client that they are required to pay the disbursement.  It just says, you know if you don't collect, you don't pay.  Well that's not true.  If you are going to incur court costs, you going to your client has to pay those.  If you pay them for them you have a problem with D and Drake, while he can't speak Russian, or there is some question whether he can't even speak English, (LAUGHTER).  No, that's not true.  We're the grievance committees.  So you have to be careful, but we, but there's a, there's an ethical consideration that says you are not supposed to use actors.  Know that's an ethical consideration, it's not mandatory.  Being ignored.  So when we look at our own rules, we realize that that even though we had the rules that we had, in these ethical considerations, that we'd thought and hoped all lawyers would read and take to heart, they weren't.  So many of the new rules that you see, if you look at the present ethical and considerations, that where they are, and we decided that we just have to make these much stronger and we have to make them more useful.  South Dakota for example, uh defines faults in misleading advertisements in 17 separate examples, and they define what permissible advertising is with 20, uh specific examples.

South Dakota! We are not even close to uh what they did. So what we did

with ours is that we uh determined what we thought were the proper

constitutional limitations on attorneys solicitations, we did not want to

violate the constitution, uh what the first amendment would permit, and what

it would permit us to limit, uh and we wanted to make sure that the

requirements, with respect to the mandatory content, uh that we were going

to impose was going to be done. Uh we looked at Florida, uh uh with the

respect to the uh client testimonial rules. Uh we did everything we could to

protect the public. To protect the profession, for the professional job that

you all do, and so that you could say to people, I am a really good lawyer, I

can represent you in this very serious matter. But at the same time we didn't

want the lawyers over run by people who with more money, or more jingles,

or more sense of the I want to make a lot of money in this profession, at any

cost, drowning out all of you who say, I want to represent people and I want

to do it well, and of course I want to make a reasonable living at it, but

you're not in it for the multi-million dollar retirement plans. So that's that

was our plan when we, when we set about this and our group of four people,

one appointed from each one, I appointed John Bernetti, Judge John Bernetti

from Syracuse, and they met at a, on a regular basis, sent us their findings,

uh we then reviewed them and commented on them, talked to our major bar

associations about them, and came up with what you know see, uh that Tom

and the Monroe County Bar has distributed, uh we then are waiting.  And we

don't know everything, uh all the impact on all of this.  For example, uh two

weeks ago, I was uh , I was uh uh, I met in New York, with one of the major

publication companies, the one that produces, I think the American Lawyer

magazine, the big thing, and they have the best lawyers in America, those I

think they have one of those.  They said we'll do whatever you suggest, but

let me show you, and they would have the ten best lawyers, do we have to

put lawyer advertisement on top of everyone of these obvious ads, in this

obvious directory of attorneys, who are of course trying to get business?  If

you tell us we do, we will, it's not a big deal.  Understand though that we

would expect that Martindale Hubbell would do the same thing.  I haven't

thought about that, I doubt that, we haven't met since, I doubt when I go

back and talk to my fellow presiding justices, that we had thought that

Martindale Hubbell has got to put attorney advertisement on top of each and

everyone of those pages.  So there are things that that uh have been brought

to our attention and we are going to listen and, and try to make uh

reasonable accommodation for.  I met with some of the big firms in New

York, who talk about uh their websites, and what they say on their websites,

and if they, as large firms, represent all of the major engineering firms

world-wide in thirty states, or thirty countries, do they have to put attorney

advertising, if they get uh, if they uh write to another client because one of

their clients says, talk to them because you did a great job for us, they've got

the same problem.  Do they have to put attorney solicitation on the letter?

We never thought about that. We're thinking about the ads that you and I see

at night.  So we're learning as we go along, and we're picking up a lot of

information.  Uh, I talked to a group of lawyers in New York who do a lot of

advertising on TV, and they said that the disclaimers eat up most of the

fifteen second ad that they do.  I said well I'm going to make the disclaimer

a little longer. (LAUGHTER AND APPLAUSE)  But, but we but seriously,

we do want to do the right thing, and we want to make it so when we're all

done that this profession acts professionally helping all of these people, the

way they should be helped, and we can be proud of what we see, when see

lawyers on the, on the tv, or in the newspaper, or anywhere else, saying this

is us, this is what we can do for you.  And so that's our goal, and as I have to

repeat my first statement, I'm here to listen, uh and any (inaudible) let it be

constructive criticism, any criticism you have would be greatly appreciated.

Uh, before I do sit down, I do want to thank the Monroe County Bar

Association for the usual great hospitality, for having me here.  Uh,

president Shultz, Tom and of course the state bar, has always been very

helpful to us.  And uh, I'm your servant, I'm a presiding justice of this court,

I go down to New York and I represent you in the uh, the when the pj's

meet, and when the administrative board meets.  So I'll be listening

attentively, and uh I very much want to hear what you have to say.  Thank

you so much.  Thank you Tom.  (APPLAUSE)