UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES L. ALEXANDER, et al.,          )
                                     )
          Plaintiffs,                )          Civil Action No. 5:07-cv-00117-FJS-GHL
                                     )
v.                                   )
                                     )
THOMAS J. CAHILL, et al.,            )
                                     )
          Defendants.                )
_____ )

---

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email:  gbeck@citizen.org
          brian@citizen.org
          snelson@citizen.org

*Counsel for Plaintiffs*

Dated:  April 3, 2007

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................................... iii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

I.  Defendants Have Failed to Satisfy Their Burden of Justifying the State's
    Restrictions on Speech. ................................................................................................... 1

   A.  Defendants Have Not Demonstrated a State Interest in Prohibiting
       the Targeted Forms of Speech. .......................................................................... 3

       1.  The Targeted Speech Is Not Inherently False Or Misleading ..................... 4

       2.  The State Has No Other Valid Interest. .................................................... 8

   B.  The State's Restrictions on Speech Are Not Reasonably Tailored to
       the Targeted Harms. ............................................................................................ 11

       1.  Defendants Have Not Shown that the Restrictions Advance
           the State's Purported Goals. ....................................................................... 11

       2.  The Restrictions Are Dramatically Overbroad. ......................................... 12

II.  Defendants Do Not Dispute That the Rules Are Unconstitutionally Vague
     and Thus Invite Arbitrary Enforcement. ........................................................................ 14

III.  Defendant Chief Counsels Are Charged with Investigating and Prosecuting
      Disciplinary Offenses and Are Therefore Proper Defendants. ...................................... 14

IV.  Plaintiff Public Citizen Has Capacity to Sue. ................................................................ 16

V.  Public Citizen Has Standing to Challenge New York's Rules on Behalf of
    Its Members. .................................................................................................................... 17

VI.  *Burford* Abstention Is Not Appropriate in This Case. ................................................... 19

CONCLUSION .......................................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir. 1985) ................................................. 2

*Alliance of American Insurers v. Cuomo*, 854 F.2d 591 (2d Cir. 1988) ....................................... 19

*American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) .................................... 15

*Anti-Defamation League of B'Nai B'Rith v. American Italian Anti-Defamation League, Inc.*, 283 N.Y.S.2d 828 (N.Y. Sup. Ct. 1967) ................................................. 16

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) .......................................... 4, 7, 14

*Bronx Household of Faith v. Board of Education*, 331 F.3d 342 (2d Cir. 2003) .......................... 2

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) ................................................. 19

*Capitol Broadcasting Company v. Mitchell*, 333 F. Supp. 582 (D.D.C. 1971) ............................ 9

*Capoccia v. Committee on Professional Standards, Third Judicial Department*, No. 89-866, 1990 WL 211189 (N.D.N.Y. Dec. 20, 1990) .................................... 5, 10

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) ................................................................. 19

*Edenfield v. Fane,* 507 U.S. 761 (1993) ................................................. 3, 4

*Eng v. Smith*, 849 F.2d 80 (2d Cir. 1988) ................................................. 2

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................. 15

*Felmeister v. Office of Attorney Ethics*, 856 F.2d 529 (3d Cir. 1988) ......................................... 19

*Ficker v. Curran*, 119 F.3d 1150 (4th Cir. 1997) ................................................. 19

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ............................................. 3, 19

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) .................................... 5

*Grievance Committee v. Trantolo*, 470 A.2d 228 (Conn. 1984)................................... 7, 10

*Haley v. Pataki*, 883 F. Supp. 816 (N.D.N.Y. 1995) ................................................. 1

*Ibanez v. Florida Department of Business & Professional Regulation*, 512 U.S. 136 (1994) ................................................................. 4

*In re Petition For Rule of Court Governing Lawyer Advertising*, 564 S.W.2d 638 (Tenn. 1978) ......................................................................................................... 10

*In re RMJ*, 455 U.S. 191 (1982)............................................................................. 4

*In re Shapiro*, 225 A.D.2d 215, 656 N.Y.S.2d 80 (4th Dept. 1996)............................. 10

*Jacobs v. The Florida Bar*, 50 F.3d 901 (11th Cir. 1995) ........................................ 19

*Linmark Associates, Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977) ............................ 6

*Lisle Mills v. Arkay Infants Wear*, 90 F. Supp. 676 (E.D.N.Y. 1950) ........................ 17

*Mathis v. Clerk of First Dept., Appellate Division*, 631 F. Supp. 232 (S.D.N.Y. 1986)........................................................................................................................ 15

*N.Y. State Association of Realtors, Inc. v. Shaffer*, 27 F.3d 834 (2d Cir. 1994).................... 3, 13

*Peel v. Attorney Registration & Disciplinary Commission*, 496 U.S. 91 (1990) .................. 3, 4, 8

*Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995) ................................ 10, 18, 19

*Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) ................................................ 13

*Tillman v. Miller*, 133 F.3d 1402 (11th Cir. 1998) ................................................ 6, 10

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) ............................................................................................ 17

*Uribe v. Merchants Bank*, 266 A.D.2d 21, 697 N.Y.S.2d 279 (1st Dept. 1999) ......................... 17

*Vicenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) ...................................................... 15

*Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F. Supp. 577 (E.D.N.Y. 1982) ................... 17

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ........................................................................................ 17, 18

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ....................................... passim

## STATUTES AND RULES

22 NYCRR § 1200.6(a) ......................................................................................... 11

22 NYCRR § 1200.6(e) ......................................................................................... 13

F.R.C.P. 17(b) ....................................................................................................... 17

N.Y. Bus. Corp. Law § 102(7) ............................................................................. 16

## OTHER AUTHORITIES

New York Bar's Ethics Committee, Formal Ethics Opinion 661 (N.Y. Ethics
    Comm. 1994) ............................................................................................................ 10

New York State Bar Ass'n, *Report and Recommendations of Task Force on
Lawyer Advertising* (Oct. 21, 2005) ..................................................................... 4, 11

*Regulating Lawyer Advertising:  Public Images and the Irresistible Aristotelian
Impulse*, 9 Geo J. Legal Ethics 325 (1996) ............................................................... 11

Richard J. Cebula, *Does Lawyer Advertising Adversely Influence the Image of
Lawyers in the United States?  An Alternative Perspective and New Empirical
Evidence*, 27 J. Legal Stud. 503 (1998) .................................................................... 12

## INTRODUCTION

A state seeking to justify restraints on commercial speech faces the heavy burden of demonstrating—with actual evidence—that the purported harms upon which it relies are real and that the restraints will in fact substantially alleviate those harms.  Defendants have failed to satisfy that burden.  Rather than submitting evidence, defendants speculate that *some* advertisements covered by the rules *may* be deceptive, an approach that the Supreme Court has firmly and repeatedly rejected.  Moreover, defendants have failed to respond to plaintiffs' argument that the rules are overly vague and risk arbitrary enforcement.  Instead, defendants raise various procedural and jurisdictional objections, none of which has merit.  Contrary to defendants' suggestions, defendant chief counsels are proper defendants because they are an essential part of the disciplinary process in New York.  Moreover, plaintiff Public Citizen has both the capacity and standing to bring this challenge in New York.  Finally, defendants' suggestion that this Court should abstain from deciding the constitutionality of the state's disciplinary rules is without support in the law.  Accordingly, plaintiffs' motion for a preliminary injunction should be granted, and the motion for summary judgment should be denied.[1]

## ARGUMENT

### I.     Defendants Have Failed to Satisfy Their Burden of Justifying the State's Restrictions on Speech.

As defendants note, irreparable harm "is the most significant requirement for issuance of a preliminary injunction."  Defs.' Resp. Mem. at 1 (citing *Haley v. Pataki*, 883 F. Supp. 816, 823 (N.D.N.Y. 1995)).  When, however, "a plaintiff alleges injury from a rule or regulation that

---

[1] Defendants characterize their motion as a request for an "Order dismissing the Complaint pursuant to FRCP 56."  Defs.' Notice of Cross Motion at 1.  Because defendants attached exhibits to their memorandum in support of the motion, plaintiffs assume that defendants intended to file a motion for summary judgment under Rule 56 rather than a motion to dismiss under Rule 12(b)(6).

directly limits speech, the irreparable nature of the harm may be presumed." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003).  In this case, plaintiffs James Alexander and his firm, Alexander & Catalano, have demonstrated that the amended rules directly limit their speech and that, as a result of the rules, they have been forced to alter their advertising campaign at significant expense.  *See* Pls.' Mem. at 1-4.  Moreover, plaintiff Public Citizen has shown that its members are prevented by the rules from receiving truthful information that they have an interest in receiving about legal services in New York.  *See id.* at 4-6.  The irreparable injury requirement is thus satisfied here.

The second requirement for a preliminary injunction—likely success on the merits—does not require a showing that "success is an absolute certainty."  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).  Rather, plaintiffs "need only make a showing that the probability of . . . prevailing is better than fifty percent."  *Id.*  "There may remain considerable room for doubt."  *Id.*  Although defendants correctly note that a "stricter standard" applies if the plaintiff is seeking a mandatory injunction or if the injunction will provide the plaintiff with substantially all the relief sought in the complaint, Defs.' Resp. Mem. at 2, defendants do not suggest that this case falls into either of these special categories, and it does not.  Plaintiffs' requested injunction seeks only a prohibition against enforcement of the amended rules and would thus be purely *prohibitory*, rather than mandatory, in nature.  *See Abdul Wali*, 754 F.2d at 1025-26 (noting that a prohibitory injunction seeks only to prohibit action on the part of the defendants).  Moreover, the requested preliminary injunction would not provide plaintiffs with all the relief they seek, but would "merely protect[] the rights of the plaintiff[s] until a final determination on the merits is reached."  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988).  This temporary relief would be "in no way . . . complete."  *Id.*

To the extent, however, that defendants are correct that plaintiffs face a high burden on a motion for a preliminary injunction, plaintiffs urge the Court to consolidate the motion with a decision on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).  If defendants had any evidence in support of the state's restrictions on speech, they would have presented it in response to plaintiffs' motion.  Given defendants' failure to do so, the record is now sufficient for the Court to decide the case on the merits.

### A.   Defendants Have Not Demonstrated Any State Interest in Prohibiting the Targeted Forms of Speech.

The most fundamental reason why the new rules cannot survive constitutional scrutiny is that defendants have failed to identify *any* legitimate state interest served by the rules, let alone one that is substantial.  The Supreme Court has repeatedly held that a state must provide tangible evidence of actual, serious abuse to justify restrictions on commercial speech.  *See, e.g.*, *Fla. Bar v. Went For It*, *Inc.*, 515 U.S. 618, 625-26 (1995); *Edenfield v. Fane,* 507 U.S. 761, 771 (1993); *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 106, 111 (1990); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 648 (1985).  The state's burden is a heavy one that is "not satisfied by mere speculation or conjecture; rather, a government body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71; *see N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 842 (2d Cir. 1994) (holding that a state's failure to "provide direct and concrete evidence that the evil that the restriction purportedly aims to eliminate does, in fact, exist will doom the . . . regulation").

Contrary to defendants' assertions, the Supreme Court has never "presumptively" upheld restrictions on speech "where advertising is conducted under particularly sensitive and unduly influential circumstances."  Defs.' Resp. Mem. at 5-6.  There is no such presumption in favor of

restrictions on speech.  As the Supreme Court has noted, if restrictions were upheld in the absence of studies or other evidence showing the restrictions to be justified, "the protection afforded commercial speech would be reduced almost to nothing; comprehensive bans on certain categories of commercial speech would be permitted as a matter of course."  *Edenfield*, 507 U.S. at 777.

#### 1.    The Targeted Speech Is Not Inherently False Or Misleading.

Defendants primarily attempt to justify the state's restrictions on speech in precisely the way the Supreme Court has prohibited—by speculating, without the benefit of any evidence, that the prohibited forms of advertising might "mislead the uninformed public."  Defs.' Resp. Mem. at 7.  Although prohibiting false or misleading advertising is a legitimate state interest, the Supreme Court has emphasized that courts "cannot allow rote invocation of the words 'potentially misleading' to supplant the . . . state's burden."  *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994).  In almost every lawyer advertising case, defendants have asserted the same argument made by defendants here—that restraints may be imposed to protect against potentially misleading speech—and the Supreme Court has consistently rejected it.  *See id.*; *Peel*; 496 U.S. at 106; *Zauderer*, 471 U.S. at 648-49; *In re RMJ*, 455 U.S. 191, 205 (1982); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 382 (1977).

Defendants have produced no disciplinary records, studies, surveys, or empirical research of any kind suggesting that the rules address anything but non-existent problems.  Defendants have no excuse for this failure to present evidence.  The presiding justices adopted the rules after the New York State Bar Association had completed a detailed study on attorney advertising—the third bar study of lawyer advertising in the state since 1993.  *See* New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer Advertising* (Oct. 21, 2005) ("Task

Force Report") (Alexander Aff. Exh. 3).  If there is any evidence that the restrictions on speech were necessary, the state has had every opportunity to discover it.  The absence of any evidence in support of the state's interest itself compels the rules' invalidation.  *See Capoccia v. Comm. on Prof'l Standards, Third Judicial Dep't*, No. 89-866, 1990 WL 211189, at *6 (N.D.N.Y. Dec. 20, 1990) (striking down restriction on attorney advertising where the defendants had failed to sustain their burden of demonstrating a valid state interest and instead "maintain[ed], in conclusory manner, that the statements in question [were], indeed, false, deceptive and misleading") (unpublished decision, attached as Exh. 1).

Defendants assert that Alexander & Catalano's advertisements contain "patent falsities" because "there is little likelihood that [Alexander and Catalano] were retained by aliens, have the ability to leap tall buildings in a single bound, or have stomped around downtown Syracuse, Godzilla-style."  Defs.' Resp. Mem. at 6.  The flaw in this argument is that it assumes that all fictional depictions are misleading to consumers.  A fictional scene is not misleading, however, if reasonable consumers are unlikely to be misled by it.  *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (noting that an advertisement is deceptive under the Federal Trade Commission Act only "if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect").  Consumers are accustomed to seeing fictional characters and scenes in commercials, and there is virtually no possibility that *any* consumers—much less consumers acting reasonably under the circumstances—would be fooled into believing that the scenes depicted in Alexander & Catalano's commercials are literally true.[2]

---

[2] Aliens have been featured in a multitude of television advertisements, including recent ads for Energizer and Budweiser.  *See* http://www.youtube.com/watch?v=APjIS0LOgN4 (last visited April 3, 2007); http://www.youtube.com/watch?v=LC_3kr4OhDs (last visited April 3, 2007).  The federally sponsored Cattlemen's Beef Board also recently ran an advertisement showing a steak with the slogan "Why Space Aliens Steal Our Cows."  *See* http://www.beefusa.org/NEWSPopularBeefAdCampaigntobeFeaturedAgain3985.aspx (last

Defendants do not even attempt to explain how, apart from their obvious fictional elements, the majority of Alexander & Catalano's advertisements are deceptive. Instead, defendants single out Alexander & Catalano's alien advertisement for discussion, arguing that it implies that an insurance company can be compelled to pay damages "without any indication of legal liability." Defs.' Resp. Mem. at 7. But consumers are aware that each legal claim has its own individual facts and are unlikely to suffer from the misunderstanding that they will be able to recover money without proving their case or that, because fictional aliens were entitled to recovery from their "space vehicle insurance company," Defs.' Resp. Mem. at 7, they will be, too. Any consumer who did hold such a ridiculous notion would be quickly disabused of it upon seeking legal advice. Alexander & Catalano, like most plaintiffs' firms, is retained on a contingency basis and receives payment when a claim succeeds. It therefore has no economic incentive to solicit or undertake meritless cases. *See Zauderer*, 471 U.S. at 645 n.12 (rejecting the "suggestion that even completely accurate advice regarding the legal rights of the advertiser's audience may lead some members of the audience to initiate meritless litigation against innocent defendants"). A state's assumption that consumers will "act irrationally" does not justify suppression of speech. *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 96 (1977).

Moreover, it is unrealistic to expect attorneys to respond to the hypothetical risk that a few unreasonable consumers will be confused by including analysis of complex legal principles of liability and comparative fault within the confines of a fifteen- or thirty-second television commercial. *See Tillman v. Miller*, 133 F.3d 1402, 1403 (11th Cir. 1998) (holding that the state "is not justified in placing, on a television advertiser, the burden of the cost of educating the

---

visited April 3, 2007). Nobody could reasonably contend that these advertisements are deceptive, and the Supreme Court has stressed that a state's general distaste for lawyer advertisements does not allow it to restrict lawyer advertising to any greater extent than it can restrict similar advertising in other industries. *See Zauderer*, 471 U.S. at 646-47.

public" to avoid the speculative problem of the filing of meritless claims).  Consumers are

unlikely to believe that a short television ad contains an exhaustive description of their legal

rights.  The Supreme Court in *Bates* specifically rejected the notion that "the public is not

sophisticated enough to realize the limitations of advertising" and is "better kept in ignorance

than trusted with correct but incomplete information."  *Bates*, 433 U.S. at 374; *see Grievance*

*Comm. v. Trantolo*, 470 A.2d 228, 15 n.1, 27 (Conn. 1984) (holding that a humorous television

advertisement that stated "[w]hen financial tragedy strikes you, you don't have to lose

everything," and lacking detailed information on bankruptcy eligibility, was "informative and in

no way misleading or deceptive").[3]

Nor does use of the slogan "the heavy hitters" make the alien advertisement deceptive.

Defendants define "heavy hitter" as "a baseball player who makes many extra base hits [or] a

very important or influential person," and suggest that use of this phrase implies that Alexander

& Catalano can "bring to bear certain powers or influence that have no relationship to their

knowledge or the facts of the case at hand."  Defs.' Resp. Mem. at 7.  The analogy to a skilled

baseball player, however, does not imply any sort of improper influence; it merely implies that

Alexander and Catalano are experienced and skilled lawyers.  Indeed, Justice Pigott's public

comments about the rules make clear that the "heavy hitters" phrase was not targeted for

restriction because it implies improper influence, but because, in his view, it "diminishes the

profession."  *See* Aff. of Patrick F. MacRae Exh. 1 (DVD of Justice Pigott forum), at 50:10–

51:22.  In any event, the possibility that one slogan might be misleading does not justify a

blanket ban on *all* slogans.

---

[3] At most, defendants' argument amounts to a claim that *some* of the targeted advertising techniques have the *potential* to be misleading.  As explained in Part II, below, the state could address this concern by either enforcing its existing rules against false and misleading advertisements or by imposing a reasonable disclaimer requirement.

In sum, defendants' claim that Alexander & Catalano's advertisements are misleading is based on their belief that the public is incapable of understanding common advertising techniques. The Supreme Court has rejected "the paternalistic assumption that the recipients [of advertising] are no more discriminating than the audience for children's television." *Peel*, 496 U.S. at 105. Defendants here seek to treat consumers as if they were even *less* intelligent than children, unable to distinguish fiction from reality. That does not constitute a valid state interest.

### 2.    The State Has No Other Valid Interest.

As explained in plaintiffs' opening memorandum, considerations of taste and the dignity of the profession have long been discredited as valid state interests on which restrictions of commercial speech can be based. Pls.' Mem. at 10-11. Because defendants expressly disclaim any reliance on these grounds, Defs.' Resp. Mem. at 9, plaintiffs will not discuss them further here.[4]

Defendants suggest, however, that other interests may justify restricting speech, even if it is not false or misleading. First, they suggest that "special problems" of television and radio advertising justify restrictions on those forms of communication. Defs.' Resp. Mem. at 4-5. This argument, however, does not support the challenged restrictions, which prohibit use of the proscribed advertising methods in *any* form of media, including websites, email, business cards, billboards, and yellow pages. Moreover, defendants provide no evidence that broadcast

---

[4] Plaintiffs' argument that the rules were based on considerations of taste, however, was far from "baseless," as defendants contend. Defs.' Resp. Mem. at 9. As plaintiffs noted in their opening memorandum, Justice Pigott invoked grounds of taste as the justification for the rules in a public forum on the subject. Pls.' Mem. at 10. Defendants' counsel asserts in an affidavit that plaintiffs' transcript of Justice Pigott's speech contains inaccuracies, but does not identify any inaccuracies or explain how they are material to plaintiffs' claims. Plaintiffs' counsel has reviewed the video provided by defendants and has confirmed that, with the possible exception of minor and immaterial discrepancies, the transcription accurately reflects Justice Pigott's comments. In any case, defendants have now submitted a DVD of the forum to the Court, so the Court can rely on that directly.

advertising is particularly harmful, and their fears appear to be seriously overblown. After sixty years of acculturation to television advertising, it is unbelievable that consumers are so susceptible to the medium that they are unable to resist common advertising techniques merely because they are presented as moving images on a screen. The Supreme Court rejected a similar argument in *Zauderer*, where the state contended that "use of illustrations in advertising by attorneys . . . creates unacceptable risks that the public will be misled, manipulated, or confused." 471 U.S. at 648. As the Court noted, "because it is probably rare that decisions regarding consumption of legal services are based on a consumer's assumptions about qualities of the product that can be represented visually, illustrations in lawyer's advertisements will probably be less likely to lend themselves to material misrepresentations than illustrations in other forms of advertising." *Id.* at 649.[5]

Unlike face-to-face solicitations, television commercials do not pressure consumers to make on-the-spot decisions, and viewers can take all the time they need in the privacy of their own homes to reflect on the message of these commercials before deciding whether to contact the attorney. Moreover, if consumers encounter a commercial they deem objectionable, they are free to change the channel or turn off the television. For these reasons, this Court in *Capoccia* rejected the state's identical argument, holding that it "simply [could not] see the risk of overreaching or undue influence that defendants [sought] to attribute to plaintiff and to his

---

[5] Defendants' citation to *Capitol Broadcasting Co. v. Mitchell*, 333 F. Supp. 582 (D.D.C. 1971), is inapposite. That case was decided prior to the Supreme Court's recognition of a First Amendment right to commercial speech and was brought by broadcasters, rather than advertisers, who the court characterized as "hav[ing] only lost an ability to collect revenue from others for broadcasting their commercial messages." *Id.* at 584. Because the court recognized no First Amendment interests at stake, and based on the "substantial evidence" that cigarette advertising was particularly effective at "reaching a very large audience of young people" and that previous labeling efforts had been unsuccessful, the Court held that the government had a rational basis to distinguish television from other forms of advertising media. *Id.* at 585-86. Of course, lawyer advertising is not aimed at children. Nor does it cause dangerous diseases or any comparable harm, and defendants do not contend otherwise.

advertisement as a result of his resort to the medium of television." 1990 WL 211189, at *7.

Both the Appellate Division of the New York Supreme Court and the New York State Bar

Association have also held that television advertising is not inherently misleading and is a

permissible form of advertising for attorneys in the state. *In re Shapiro*, 225 A.D.2d 215, 216,

656 N.Y.S.2d 80 (4th Dept. 1996); New York Bar's Ethics Committee, Formal Ethics Opinion

661 (N.Y. Ethics Comm. 1994).[6]

 Finally, defendants attempt to support the rules by relying on advisory ethical canons in

the state's Code of Professional Responsibility. Defs.' Resp. Mem. at 7-9. The state, however,

cannot save one portion of the rules by citing to another. If the rules are unconstitutional, they

must fall regardless of what other sections of the rules may say. In any case, the canons cited by

defendants do not justify prohibiting the sorts of speech covered by the amended rules. First,

they are purely "aspirational in character" and thus do not prohibit *any* forms of speech. *Id.* at 8.

Moreover, although the canons state that certain forms of speech are *likely* to be misleading in

some circumstances, they do not seek to regulate speech that is in fact truthful or otherwise non-

misleading. *See id.* at 8-9. And the state's paternalistic view that consumers are incapable of

understanding common, non-deceptive advertising techniques is hardly consistent with the

canons' recognition of the "dignity of the individual and his capacity through reason for

enlightened self-government." *Id.* at 7.

---

 [6] *See also Tillman v. Miller*, 133 F.3d 1402 (11th Cir. 1998) (holding that state had failed to meet its burden of justifying restrictions on television advertisements); *Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995) (striking down restrictions on a variety of common television advertising techniques); *Trantolo*, 470 A.2d 228 (holding that television advertisements depicting humorous fictional scenes were informative and neither false nor misleading); *In re Petition For Rule of Court Governing Lawyer Advert.*, 564 S.W.2d 638, 643 (Tenn. 1978) ("Advertising is advertising irrespective of the device or instrumentality employed").

B.     **The State's Restrictions on Speech Are Not Reasonably Tailored to the Targeted Harms.**

1.     **Defendants Have Not Shown that the Restrictions Advance the State's Purported Goals.**

Even if the state did have a valid interest in restricting some forms of advertising targeted by the new rules, it has not even attempted to show that its chosen restrictions directly advance that interest.  Most importantly, defendants fail to acknowledge that the harm that the state claims results from the restricted ads—false and misleading speech—was *already prohibited* prior to adoption of the amendments.  *See* 22 NYCRR § 1200.6(a).  The New York State Bar's report on attorney advertising shows that this existing rule has not been consistently enforced.  *See* Task Force Report at 46-48 (noting that about one-third of a sample of randomly selected New York lawyer advertisements would violate the state's existing prohibition on false and misleading advertising).  Defendants have not shown that tougher enforcement of the existing rule would be inadequate to protect the citizens of New York from deceptive advertising by lawyers.  The state may not broadly suppress truthful advertising "merely to spare itself the trouble of distinguishing such advertising from false or deceptive advertising." *Zauderer*, 471 U.S. at 646.  "[T]he free flow of commercial speech is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false." *Id.*  Indeed, if the state really had reason to believe that plaintiffs' advertisements posed any threat to the public, it could have taken action against them under the prior version of the rules; yet it never initiated such an action.[7]

---

[7] As previously discussed, defendants do not attempt to justify the ethics rules on grounds of taste or dignity of the profession.  Although some attorneys may instinctively believe that attorney advertising reflects poorly on the profession, empirical evidence tends to show the opposite.  For example, an American Bar Association study found that commercials have no effect on the public's attitude toward lawyers in general and that print advertising is not inherently more dignified than television advertising.  *See* William E. Hornsby, Jr., *Regulating*

Moreover, defendants lump together the various restrictions on speech included in the new rules and fail to explain separately how attention-getting techniques, depictions of judges, and the use of nicknames and monikers are inherently or even potentially misleading.  They also have not explained how the state has any interest in prohibiting noncommercial communications by attorneys, such as offers of pro bono representation, or in imposing disclosure requirements on these communications.  Defendants attempt to defend the thirty-day ban on solicitations under §§ 1200.8(g) and 1200.41(a) of the new rules, but only by asserting that the restrictions are "utterly indistinguishable from a similar regulation upheld by the Supreme Court in *Florida Bar v. Went For It.*"  Defs.' Resp. Mem. at 10.  As explained in plaintiffs' opening memorandum, New York's thirty-day blackout period is far broader than the blackout period upheld by the Supreme Court in *Went For It*, affecting not just the targeted mailings at issue in that case but also any other form of communication, including broadcast, print, and Internet advertisements that in no way invade the privacy of consumers.  Pls.' Mem. at 19-21.  Furthermore, defendants have presented no empirical evidence of the sort the Court relied on in *Went For It*.

## 2.    The Restrictions Are Dramatically Overbroad.

The present rules sweep within them many forms of advertising that are not false or misleading, nor even likely to be distasteful to any consumer.  Given that the purpose of advertising is to grab the viewer's attention, the ban on "attention getting techniques" would

---

*Lawyer Advertising:  Public Images and the Irresistible Aristotelian Impulse*, 9 Geo J. Legal Ethics 325, 350-56 (1996) (summarizing the study).  To the contrary, the study found that "stylish" ads, of the sort that consumers are used to seeing, are likely to give consumers the impression that the featured lawyers are intelligent, while bland "talking heads" ads of the sort required by some states' ethics rules are more likely to give consumers the impression that the lawyers are dishonest.  *Id.* at 353.  Other evidence suggests that lawyer advertising improves the public's view of lawyers by making legal services more accessible to lower- and middle-income consumers who would otherwise view attorneys as elitist and inaccessible.  Richard J. Cebula, *Does Lawyer Advertising Adversely Influence the Image of Lawyers in the United States?  An Alternative Perspective and New Empirical Evidence*, 27 J. Legal Stud. 503 (1998).

essentially outlaw all of the most common advertising methods and would effectively limit advertisements to information that might appear in an attorney's resume.  Compliance with these rules would result in advertising so tedious and sterile that few lawyers would want to run it.  A state, however, may not constitutionally limit lawyer advertising to "a bland statement of purely objective facts."  *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 479 (1988) (striking down a state restriction on elements of attorney letters designed to "catch the recipient's attention").

Nor have defendants shown that other regulations short of a complete ban would fail to accomplish the state's goals.  *See Shaffer*, 27 F.3d at 844 (striking down a restriction on commercial speech in light of the state's "failure to determine empirically whether less restrictive measures . . . would provide an alternative means for effectively combating" the purported harm).  For example, the state could impose filing requirements that would allow it to review individual advertisements for false and misleading statements.  Alternatively, if the state could show that certain forms of speech are particularly likely to mislead consumers, it could impose disclosure or disclaimer requirements to prevent the risk of consumer confusion.  Indeed, the state has already imposed rules requiring disclaimers that plaintiffs have not challenged, including a disclaimer that "[p]rior results do not guarantee a similar outcome." 22 NYCRR § 1200.6(e).  This disclaimer in itself may be enough to resolve the state's unrealistic concern that Alexander & Catalano's alien advertisement implies the ability to obtain a result even in the absence of a legal claim.  Plaintiffs do not believe that disclaimers are necessary in this context or have been justified by the state, but they would at least be superior to an outright ban on speech.

Even better, the state could conduct its own outreach efforts to educate consumers about the factors on which they should rely in selecting an attorney.  A basic tenet of our First

Amendment is that allegedly distasteful speech is best dealt with in the marketplace of ideas, through *more* speech aimed at providing a better or more balanced point of view.  As the Supreme Court wrote in *Bates*, "[i]f the naivete of the public will cause advertising by attorneys to be misleading, then it is the bar's role to assure that the populace is sufficiently informed as to enable it to place advertising in its proper perspective."  *Bates*, 433 U.S. at 374.  In this way, the state could address its purported concern without the need to restrict speech.

## II.    Defendants Do Not Dispute That the Rules Are Unconstitutionally Vague and Thus Invite Arbitrary Enforcement.

Defendants do not respond to plaintiffs' argument that the rules are too vague to give adequate guidance to those seeking to avoid discipline and to prevent arbitrary enforcement.  *See* Pls.' Mem. at 15-17.  As explained in plaintiffs' opening memorandum, the rules do not define a "technique[] to obtain attention" or explain what sorts of techniques are "relevan[t] to the selection of counsel."  *Id.*  Nor do they provide any guidance as to what lawyer characteristics are deemed to be "unrelated to legal competence" or what sorts of statements "impl[y] an ability to obtain results in a matter."  The vagueness of the rules creates a risk of self-censorship and arbitrary enforcement that cannot be tolerated under the First Amendment.  *Id.*  For this independent reason, the validity of which defendants effectively acknowledge, the amended rules are unconstitutional.

## III.    Defendant Chief Counsels Are Charged with Investigating and Prosecuting Disciplinary Offenses and Are Therefore Proper Defendants.

Defendants claim that, because they do not have authority to make actual decisions about whether to impose discipline in particular cases, they are not "parties in interest" and are thus improper defendants.  Defs.' Resp. Mem. at 11.  Defendants concede, however, that they are charged with investigating and prosecuting disciplinary violations.  *Id.* at 12-14.  An injunction

-14-

against the defendants would prevent them from continuing to perform this function with regard

to the challenged rules, and the disciplinary committees and the courts would therefore have no

charges on which to act, no evidence on which to decide a case, and no advocate for the state's

position.  In short, the state would not be able to enforce its amended rules.[8]

Defendants note that "the Appellate Division of the Supreme Court in each Department"

has the ultimate authority to impose discipline.  Defs.' Resp. Mem. at 11.  Plaintiffs, however,

cannot directly sue the appellate division, which is an arm of the state that is immune from suit

under the Eleventh Amendment.  *See Mathis v. Clerk of First Dept., Appellate Div.*, 631 F. Supp.

232, 235 (S.D.N.Y. 1986).  Because of the Eleventh Amendment barrier, the normal course of

action in a § 1983 case challenging an unconstitutional statute or regulation is to sue the

prosecuting authority to prevent enforcement of the law.  *See Ex Parte Young*, 209 U.S. 123,

159-160 (1908).  In *Ex Parte Young*—the seminal case recognizing the legitimacy of suits for

injunctive relief against state officials—the plaintiff sued a state Attorney General who, although

responsible for enforcing the challenged law, could not be said to have the "ultimate authority to

impose discipline" any more than the chief counsels in this case.  *Id.* at 157 (holding that "[t]he

fact that the state officer, by virtue of his office, has some connection with the enforcement of

the act, is the important and material fact").  Countless § 1983 cases since *Ex Parte Young*

similarly involve actions against prosecuting or enforcing authorities.  *See, e.g.*, *Vicenty v.*

*Bloomberg*, 476 F.3d 74 (2d Cir. 2007) (suit against mayor to prohibit enforcement of

unconstitutional statute); *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) (suit

against governor, attorney general, and state's attorneys to prohibit enforcement of

_____

[8] Even if the disciplinary committees *were* capable of carrying on disciplinary enforcement in the absence of chief counsel, they would not, as defendants suggest, Defs.' Resp. Mem. at 15, be bound to continue doing so in the face of an order of this Court declaring the rules unconstitutional.  The Supremacy Clause requires state officials to obey and enforce the U.S. Constitution when confronted with contrary state laws.

unconstitutional ordinance). Defendants cite no cases suggesting that these defendants were not proper parties in interest because they were not responsible for making the ultimate determination of guilt or innocence, or that plaintiffs should instead have filed suit against the court or judge that was responsible for making that determination.

At most, defendants' argument amounts to a claim that plaintiffs could have also joined *other* defendants to the complaint *in addition* to the chief counsels. This contention, however, has nothing to do with whether plaintiffs' chosen defendants are also proper parties. To be sure, plaintiffs could have joined the individual members of the disciplinary committees and every justice of the appellate divisions to the complaint, but, other than adding perhaps one hundred nominal defendants to the case (most of whom are volunteer public servants), such a course of action would make no practical difference to the litigation.

## IV.     Plaintiff Public Citizen Has Capacity to Sue.

Defendants argue that Public Citizen is a foreign corporation doing business in the state without authorization and, therefore, lacks capacity to sue under New York Business Corporation Law § 1312. Defs.' Resp. Mem. at 11-15. This contention is flawed for several reasons. First, the statute on which defendants rely defines a "foreign corporation" as "a corporation *for profit* formed under laws other than the statutes of [the] state." N.Y. Bus. Corp. Law § 102(7) (emphasis added). Public Citizen, as a *nonprofit* corporation, is therefore not subject to the statute. *See Anti-Defamation League of B'Nai B'Rith v. Am. Italian Anti-Defamation League, Inc.*, 283 N.Y.S.2d 828, 831-32 (N.Y. Sup. Ct. 1967) (holding that a nonprofit group was not subject to the statute). Public Citizen has filed all paperwork and paid all fees required for it to operate as a nonprofit charity in the state. *See* Aff. of Kristin Adams ¶ 4.

More fundamentally, § 1312 applies only to lawsuits filed in New York *state* court and,

by extension, to actions in New York's federal district courts filed under the courts' diversity jurisdiction (which adopt the law of the forum state). *See Virgilio Flores, S.A. v. Jerome Radelman, Inc.*, 567 F. Supp. 577, 579 (E.D.N.Y. 1982) ("This provision is applicable to a federal court action in New York when the federal jurisdictional basis is diversity of citizenship."). In cases invoking the court's *federal question* jurisdiction, however, federal law, rather than state law, applies. *See Lisle Mills v. Arkay Infants Wear*, 90 F. Supp. 676, 677 (E.D.N.Y. 1950) (noting that, in a federal question case, a state has no power to prohibit a corporation from suing to enforce its federal rights in federal court). In federal question cases, the rules of civil procedure provide that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." F.R.C.P. 17(b). Thus, because Public Citizen is authorized to conduct business and to file suit in the District of Columbia, where it is organized, Adams Aff. ¶ 2, it may also sue in federal court in New York.[9]

## V.    Public Citizen Has Standing to Challenge New York's Rules on Behalf of Its Members.

An organization can sue based either on injury to itself or on injury to its members. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996). The plaintiffs in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the first Supreme Court case to recognize the right to commercial free speech, for example, were not pharmacists who had been denied the right to advertise, but consumer groups representing their members' right to receive commercial drug advertisements. 425 U.S. 748, 754 n.10 (1976). The Court held the consumer groups had standing to oppose the advertising

---

[9] Even if Public Citizen were in violation of the rule, it would not justify dismissing the lawsuit. Courts in New York have repeatedly held that failure to obtain authorization to sue can be cured during the course of litigation and that violation of the statute therefore does not justify dismissal on summary judgment. *See, e.g.*, *Uribe v. Merchants Bank*, 266 A.D.2d 21, 22, 697 N.Y.S.2d 279, 279 (1st Dept. 1999).

restrictions, writing that, "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these [plaintiffs]." *Id.* at 757. As explained in plaintiffs' opening memorandum, Public Citizen has more than nine thousand members in New York whose ability to receive commercial and noncommercial attorney communications would be harmed by the rules. Pls.' Mem. at 17-19. It therefore has standing.

Defendants appear to challenge Public Citizen's associational standing on the ground that its members, like members of almost all organizations, receive various publications as a benefit of membership. Defs.' Resp. Mem. at 17-18. Defendants' contention that membership in Public Citizen is "merely equivalent to payment for subscription services," however, is unfounded. *Id.* at 18. As is evident from the portions of Public Citizen's website cited by defendants, Public Citizen is a "nonprofit consumer advocacy organization founded in 1971 to represent consumer interests in Congress, the executive branch, and the courts." Defs.' Resp. Mem. Exh. 1. Membership fees to Public Citizen do not merely pay for subscription services, they support Public Citizen's mission, which includes protecting consumers' right to information and to free speech. *See* http://www.citizen.org/litigation/about/. On this ground, numerous courts have recognized Public Citizen's standing to litigate on behalf of its members, including the court in *Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995), which held that Public Citizen had standing to contest restrictions on lawyer advertising rules on behalf of its Mississippi members. Aside from the fact that Public Citizen has many more members in New York than it does in Mississippi, nothing distinguishes *Schwartz* from this case.[10]

---

[10] Importantly, defendants do not contest the standing of James Alexander or Alexander & Catalano to challenge the advertising restrictions.

**VI.    *Burford* Abstention Is Not Appropriate in This Case.**

Defendants' final argument is that this Court should abstain because plaintiffs could make their constitutional arguments in state-court disciplinary proceedings, citing *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  As later summarized by the Supreme Court, the rule established in *Burford* holds that abstention is proper in a dispute involving complex issues of state law for which the state has specialized knowledge and a centralized system for judicial review, and where resolution of the issue would be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814-16 (1976).  The only federal appellate court to examine the issue has held that a constitutional challenge to state lawyer disciplinary rules is not the sort of complex area of specialized state knowledge that justifies withholding federal jurisdiction under the *Burford* doctrine.  *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 531 (3d Cir. 1988). Federal courts routinely examine the constitutionality of lawyer disciplinary rules.  *See, e.g.*, *Went For It*, 515 U.S. 618 (on petition for certiorari to the Eleventh Circuit); *Jacobs v. The Fla. Bar*, 50 F.3d 901 (11th Cir. 1995); *Ficker v. Curran*, 119 F.3d 1150 (4th Cir. 1997); *Schwartz*, 890 F. Supp. 565.  Such an attack on the constitutionality of a state regulation is "a controversy federal courts are particularly suited to adjudicate."  *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir. 1988).  Thus, *Burford* abstention is inapposite.

## CONCLUSION

This Court should issue the requested preliminary injunction to prohibit enforcement of the amended rules until the case can be finally decided on the merits.  In the alternative, the Court should consolidate the preliminary injunction motion with the merits under Federal Rule of Civil Procedure 65(a)(2) and grant judgment for the plaintiffs.

Respectfully submitted,


  /s/ Gregory A. Beck
Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email: gbeck@citizen.org
          brian@citizen.org
          snelson@citizen.org

*Counsel for Plaintiffs*

Dated:  April 3, 2007