UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JAMES L. ALEXANDER, et al.

                                    *Plaintiffs*,

        -against-                              07-CV-117

THOMAS J. CAHILL, et al.                       FJS/GHL

                        *Defendants*.

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


                              ANDREW M. CUOMO
                              Attorney General of the State of New York
                              Attorney for Defendants


Nelson R. Sheingold
Assistant Attorney General, of Counsel
Bar Roll No. 601895
Telephone: (518) 473-3682
Fax: (518) 402-2221 (Not for service of papers)          Date: May 11, 2007

Bridget E. Holohan
Assistant Attorney General
Bar Roll No. 510911
Telephone: (518) 473-3684

Dockets.Justia.com

**Table of Contents**

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

      NEW YORK MAY CONSTITUTIONALLY RESTRICT THE USE OF IRRELEVANT,
      UNVERIFIABLE, NON-INFORMATIONAL ATTORNEY ADVERTISING. . . . . . . . . 4

      A.    THE FIRST AMENDMENT DOES NOT PROTECT UNVERIFIABLE
          AND IRRELEVANT ATTORNEY ADVERTISING MATERIAL. . . . . . . . . . 4

      B.    THE REGULATIONS ARE VALID UNDER THE CENTRAL HUDSON
          TEST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

POINT II

      THE THIRTY-DAY MORATORIUM IS CONSTITUTIONAL. . . . . . . . . . . . . . . . . . 20

POINT III

      PUBLIC CITIZEN'S REMAINING CLAIMS ARE UNFOUNDED. . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Preliminary Statement

Plaintiffs bring the instant action pursuant to 42 U.S.C. § 1983 challenging New York's revised regulations governing attorney conduct, specifically the revised limitations on attorney advertising and solicitation. 22 N.Y.C.R.R. Part 1200. As the revised regulations strike an appropriate balance between the limited protection afforded attorney commercial speech and the public's need for access to relevant information regarding the selection of counsel, defendants are entitled to summary judgment and the action should be dismissed in its entirety.

## Statement of the Case

Effective February 1, 2007, the Presiding Justices of the Appellate Division of the New York State Supreme Court promulgated amendments to New York's attorney disciplinary regulations. The purpose of the revised regulations was to "help regulate lawyer advertising so that consumers are protected against inappropriate solicitations or potentially misleading ads, as well as overly aggressive marketing. The amended rules [] also benefit the bar by ensuring that the image of the legal profession is maintained at the highest possible level." Stmt of Chief Admin. Judge Lippman (McKinney's Practice Commentaries, DR 2-101 2006). In relevant part, the amended rules prohibit attorney advertisements which portray a Judge, fictional law firm members, or resemble legal documents. 22 N.Y.C.R.R. 1200.6(c)(3), (6). The rules further prohibit a lawyer or law firm from relying on "techniques to obtain the attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence." 22 N.Y.C.R.R. § 1200.6(c)(3). Moreover, attorneys may not use trade names, mottos, or monikers which imply an ability to obtain results in a matter. 22 N.Y.C.R.R. § 1200.6(c)(7). The regulations further require lawyers utilizing paid endorsements or actors to disclose the same. 22 N.Y.C.R.R. § 1200.6(c)(2), (4). Notably, the regulations expressly

permit advertisements to contain: (1) statements reasonably likely to convey the results the attorney can obtain; (2) comparisons with other counsel; (3) endorsements by clients; and (4) statements regarding the quality of the attorney's services. 22 N.Y.C.R.R. § 1200.6(d) (1)-(4). The only caveat to these permissible avenues of advertising is that the attorney's assertion be "factually supported by the lawyer or law firm as of the date on which the advertisement is published and disseminated; and it contain the disclaimer that: "prior results do not guarantee a similar outcome." 22 N.Y.C.R.R. § 1200.6(g)(1)-(3). Moreover, attorneys are expressly permitted to utilize telephone numbers, mottos, trade names, or monikers which do not violate the other enumerated disciplinary rules. 22 N.Y.C.R.R. § 1200.7(f). In regard to a very limited type of advertisement — ads that do not appear on television, radio or the press — the regulations require the lawyer or law firm to label their ad "Attorney Advertising" on the first page, home page, or e-mail subject line of their advertisement. 22 N.Y.C.R.R. § 1200.6(f).

The new regulations further account for changes in technology and include various restrictions on internet based advertising. Relevant to the instant matter, the regulations prohibit the use of "pop-up" or "pop under" advertisements other than on an attorney's own website and require the lawyer or law firm to disclose their true identify and contact information on the internet presence. 22 N.Y.C.R.R. § 1200.6(g). Notably, the rules allow an attorney to utilize a webpage and domain name which does not include the name of the lawyer or firm, so long as the attorney does not attempt to practice under the domain name, the name itself does not imply the ability to obtain results, and the actual name of the attorney or firm is clearly and conspicuously included on the website. 22 N.Y.C.R.R. § 1200.7(e).

In further relevant part, attorneys are forbidden from soliciting potential clients in matters involving a "specific incident involving potential claims for personal injury or wrongful death" within thirty days of the incident. 22 N.Y.C.R.R. § 1200.8(g). "Solicitation" for purposes of the 30 day moratorium is limited to unrequested advertisements targeted at specific recipients or their families "the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain." 22 N.Y.C.R.R. 1200.8(b).

Plaintiffs Alexander and Alexander and Catalano (hereinafter "Alexander and Catalano") are personal injury attorneys in central and Western New York who utilize advertisements, portions of which are prohibited or limited by the new regulations. Specifically, Alexander and Catalano have utilized television commercials containing a fictional Judge and have personally appeared in these ads exhibiting various "fictional traits" which they concede "do not appear to be relevant to the selection of counsel." Comp. ¶¶ 27, 28(a). They further utilize the nickname "the Heavy Hitters" which they posit somehow connotes "knowledge of the subject matter of their practice." Comp. ¶ 29(a).[1]

Plaintiff Public Citizen is a nonprofit group which, inter alia, contains a litigation group which provides pro bono representation within its area of experience. Public Citizen maintains that the new regulations implicate its noncommercial speech and that they should be exempt from the totality of the new guidelines.

As set forth in detail below, plaintiffs misconstrue both the level of protection afforded attorney commercial speech and the reach of the new regulations. Under the correct legal standard

---

[1] Defendants submit that this assertion strains credulity and confounds any normal use of the phrase in the English language.

and interpretation of the regulations, New York has appropriately restricted the introduction of irrelevant and unverifiable attorney advertising from the marketplace while respecting the protection afforded noncommercial speech.

**POINT I**

**NEW YORK MAY CONSTITUTIONALLY RESTRICT THE USE OF IRRELEVANT, UNVERIFIABLE, NON-INFORMATIONAL ATTORNEY ADVERTISING.**

**A.     THE FIRST AMENDMENT DOES NOT PROTECT UNVERIFIABLE AND IRRELEVANT ATTORNEY ADVERTISING MATERIAL.**

Plaintiffs' claims are founded upon the fallacious premise that the First Amendment protects the portions of attorney advertisement which do not convey verifiable, relevant information to its intended audience.  In fact, a review of relevant Supreme Court rulings reveals that the Court has been careful in its decisions to preserve the States' ability to prevent attorney advertising to devolve to irrelevant trivialities.

Preliminarily, plaintiffs Alexander and Catalano solely challenge alleged restrictions on their commercial speech.  "Unlike non-commercial speech, commercial speech is "linked inextricably" with the commercial arrangement that it proposes . . . so the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself."  Edenfield v. Bane, 507 U.S. 761, 767 (1993) (internal citations omitted; quoting Friedman v. Rodgers, 440 U.S. 1, 10 n. 9 (1979)).  The United States Supreme Court has repeatedly held that: "The States enjoy broad power to regulate 'the practice of professions within their boundaries,' and '[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'"""

4

In re Primus, 436 U.S. 412, 422 (1978) (quoting Goldfarb v. Virginia State Bar, 421 U.S. 773

(1975)); Florida Bar v. Went for It, Inc., 515 U.S. 618, 625, 635 (1995).[2]  Of course, a State's ability

to regulate attorneys is constrained by other protections afforded by the Constitution, such as the

First Amendment, but the Court has been careful to balance the State's ability to regulate attorneys

with the First Amendment function of commercial speech.  "For this reason, laws restricting

commercial speech, unlike laws burdening other forms of protected expression, need only be tailored

in a reasonable manner to serve a substantial state interest in order to survive First Amendment

scrutiny.  Edenfield v. Bane, 507 U.S. 761, 767 (1993).

　　　In Bates v. State Bar of Arizona, 433 U.S. 350 (1977), the Supreme Court invalidated then-

prevalent categorical prohibitions on attorney advertising as unconstitutional, but expressly did not

prohibit State regulation of attorney advertising.  To the contrary, the Supreme Court declared that

its decision was "a narrow one" and, explicitly excluded from its holding, "the peculiar problems

associated with advertising claims relating to the quality of legal services," as:

> Such claims are probably not susceptible of precise measurement or verification and,
> under some circumstances, might well be deceptive or misleading to the public, or
> even false.  Appellee does not suggest, nor do we perceive, that appellant's
> advertisement contained claims, extravagant or otherwise, as to the quality of
> services.  Accordingly, we leave that issue for another day.

Id. at 366.

　　　Accordingly, in rejecting the State's fears of the consequences to the profession of allowing

any attorney advertising, the Supreme Court stated: "We are not persuaded that **restrained**

---

[2]  "Particularly because the standards and conduct of state-licensed lawyers have traditionally been subject to extensive regulation by the States, it is all the more appropriate that we limit our scrutiny of state regulations to a level commensurate with the 'subordinate position' of commercial speech in the scale of First Amendment values.  Fox, 492 U.S., at 477, quoting Ohralik, 436 U.S., at 456, 98 S.Ct., at 1918-1919."

professional advertising by attorneys inevitably will be misleading." Id. at 372 (emphasis added).

Importantly, the Court justified protecting restrained advertising on the need for consumers to have

access to "at least some of the **relevant** information needed to reach an informed decision" and "in

assuring informed and reliable decisionmaking." on whether to seek representation. Id. at 364, 374

(emphasis added). Further elucidating the power remaining with the States, the Supreme Court listed

a non-exhaustive list of "clearly permissible" restrictions on attorney advertising and specifically

stated that they had "little worry that regulation to assure truthfulness will discourage protected

speech." Id. at 382. The Supreme Court held that the States may enact regulations with "strict

requirements for truthfulness" because, "the public and private benefits from commercial speech

derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading

expression that has been allowed in other contexts has little force in the commercial arena." Id. at

383. The Court further entrusted the States and the bar to ensure that "advertising by attorneys flows

both freely and cleanly." Id. at 384. Notably, the Supreme Court further held that attorney

advertising was particularly amenable to strict requirements of truthfulness "[b]ecause the public

lacks sophistication concerning legal services , misstatements that might be overlooked or deemed

unimportant in other advertising may be found quite inappropriate in legal advertising." In particular,

the Court noted that, "claims as to the quality of services . . . are not susceptible to measurement or

verification; accordingly, such claims may be so likely to be misleading as to warrant restriction."

Id. at 384.[3]

---

[3]  The Court further presciently held that "special problems" regarding advertising in the
electronic broadcast media will "warrant special consideration." Id. at 384.

In <u>In re R.M.J.</u>, 455 U.S. 191 (1982), the Supreme Court reiterated its recognition of the "special possibilities for deception presented by advertising for professional services. The public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the "product" renders advertising for professional services especially susceptible to abuses that the States have a legitimate interest in controlling." <u>Id.</u> at 202. Balancing the State's interest in protecting the public from abuses in attorney advertising campaigns, the Supreme Court held that specific information may not be prohibited from attorney advertisements "if the information also may be presented in a way that is not deceptive." <u>Id.</u>  The Court held that it is only when a communication is demonstrated to cross this threshold that the test set forth in <u>Central Hudson Gas & Elec. Corp. v. Public Serv. Comm.</u>, 447 U.S. 557 (1980) applies. <u>Id.</u> at 203-04.[4]

In <u>Zauderer v. Office of the Disciplinary Counsel of the Supreme Court of Ohio</u>, 471 U.S. 626 (1985), the Court confronted a State's blanket ban on illustrations in attorney advertising.  In invalidating the State's disciplinary determination, the Court relied upon the fact that the illustration at issue conveyed factually accurate relevant information in contrast to the type of "information" which plaintiffs' seek to disseminate in the matter at bar:

> Although our decisions have left open the possibility that States may prevent attorneys from making nonverifiable claims regarding the quality of their services . . . they do not permit an attorney from making accurate statements of fact regarding the nature of his practice because it is possible that some readers will infer that he has some experience in those areas.

---

[4] Application of the <u>Central Hudson</u> test is discussed in detail below.  <u>See</u> Point I(B).

Id. at 640 n. 9.(emphasis added). Concomitantly, the Court repeated that the protections on attorney commercial speech were "justified principally by the value to consumers of the information such speech provides." Id. at 651.

In Shapero v. Kentucky Bar Assoc., 486 U.S. 466 (1988), the Court echoed that the Central Hudson test only applied in the context of analyzing attorney advertisements when such were "truthful and non-deceptive." Id. at 479. Despite plaintiffs' instant claims, the Court unambiguously held: "To be sure, a letter may be misleading if it unduly emphasizes trivial or relatively uninformative fact[s], . . . or offers overblown assurances of client satisfaction.'" Id. at 479-80 (internal citations omitted).

Finally, in Peel v. Attorney Registration and Disciplinary Comm. of Illinois, 496 U.S. 91 (1990), the Supreme Court in a plurality decision overturned a State's ban on an attorney's advertisement stating that the attorney was a "certified trial specialist." In ruling that plaintiff's claim of certification was protected, consistent with its earlier holdings, the Supreme Court relied on the fact that the attorney's claim was "true and verifiable." Id. at 100. The Supreme Court went on to discuss the linchpin of First Amendment protection afforded attorney commercial speech:

> This analysis confuses the distinction between statements of opinion or quality and statements of objective facts that may support an inference of quality. A lawyer's certification by NBTA is a verifiable fact, as are the predicate requirements for that certification. Measures of trial experience and hours of continuing education, like information about what schools the lawyer attended or his or her bar activities, are facts about a lawyer's training and practice. A claim of certification is not an unverifiable opinion of the ultimate quality of a lawyer's work or a promise of success, cf. In re R.M.J., 455 U.S., at 201, n. 14, 102 S.Ct., at 936, n. 14, but is simply a fact, albeit one with multiple predicates, from which a consumer may or may not draw an inference of the likely quality of an attorney's work in a given area of practice.

Id. at 100.[5]  Moreover, to the contrary of extending First Amendment protection to unverifiable, irrelevant attorney advertising gloss, the Supreme Court unambiguously ruled:

> The [State's] authority is necessarily constrained by the First Amendment to the Federal Constitution, and specifically by the principle that disclosure of **truthful, relevant information** is more likely to make a positive contribution to decisionmaking than is concealment of such information.  Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976); Central Hudson Gas & Electric Corp., 447 U.S., at 562, 100 S.Ct., at 2349. Even if we assume that petitioner's letterhead may be potentially misleading to some consumers, that potential does not satisfy the State's heavy burden of justifying a categorical prohibition against the dissemination of **accurate factual information** to the public.  In re R.M.J., 455 U.S., at 203, 102 S.Ct., at 937.

Id. at 108-09.(emphasis added); see also id. at 112 ("The Court has also suggested that commercial speech that is devoid of intrinsic meaning may be inherently misleading, especially if such speech has historically been used to deceive the public . . . The statement about petitioner's NBTA certification does not fit this category, as it does impart some information and as the State has made no showing that similar claims have been used to deceive.") (Marshall, J. concurring).[6]

In subsequent decisions the Supreme Court has repeated that protected commercial speech includes "truthful, verifiable and nonmisleading factual information" and "truthful, unadorned, informative" speech.  Rubin v. Coors Brewing Co., 514 U.S. 476, 483 (1995)).  Specifically, in regard to attorney commercial speech, the Supreme Court recently reaffirmed that the First Amendment protection afforded attorney commercial speech is justified by the fact that "disclosure

---

[5]  The Court further explained that if the "certification" had actually been issued but issued by an organization that "made no inquiry" whatsoever into an attorney's qualification, although facially truthful, this claim would be misleading.  Id.

[6]  In their dissent, three Justices repeated the Supreme Court's prior holding that "[i]f the information cannot be presented in a way that is not deceptive, even statements that are merely potentially misleading may be regulated with an absolute prohibition."  Id at 125.

9

of truthful, **relevant** information is more likely to make a positive contribution to decisionmaking than is concealment of such information . . . only false, deceptive, or misleading commercial speech may be banned" Ibanez v. Florida Dep't of Business and Professional Regulation, 512 U.S. 136, 142 (1994) (emphasis added) (internal citations omitted); see also Friedman v. Rogers, 440 U.S. 1, 11.[7]

Simply stated, the Supreme Court has never extended constitutional protection to attorney commercial speech which is purely theatrical, irrelevant, or unverifiable. In fact, even in the non-professional context, the Court has held that the First Amendment does not protect the "packaging" of information, but, rather, only the pertinent information itself. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496-97 (1982).[8]

Under the actual standard articulated by the Supreme Court, the Courts that have analyzed regulations significantly more restrictive than New York's revised regulations have determined such to be a lawful exercise of the State's regulatory over attorneys. Recently, in Florida Bar v. Pape, 918 So.2d 240 (Fla. 2005); cert. den. _ U.S. _ , 126 S. Ct. 1632 (2006), the Supreme Court of Florida examined Florida's much more wide-ranging restrictions on attorney advertising in the context where an attorney was disciplined for advertising himself as a "pit bull" complete with pit bull logo

---

[7] "Here, we are concerned with a form of commercial speech that has no intrinsic meaning. A trade name conveys no information about the price and nature of the services offered by an optometrist until it acquires meaning over a period of time by associations formed in the minds of the public between the name and some standard of price or quality. Because these ill-defined associations of trade names with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public."

[8] "[I]nsofar as any commercial speech interest is implicated here, it is only the attenuated interest in displaying and marketing merchandise in the manner that the retailer desires. We doubt that the village's restriction on the manner of marketing appreciably limits Flipside's communication of information."

and 1-800-PIT-BULL telephone number.  Id. at 242.[9]  In rejecting plaintiff's First Amendment claims, the Supreme Court of Florida held that "[l]awyer advertising enjoys First Amendment protection only to the extent that it provides accurate factual information that can be objectively verified.  This thread runs throughout the pertinent United States Supreme Court precedent."  Id. at 247.  Since plaintiff's pit bull motif failed to convey "objectively relevant information about the attorney's practice" it fell outside the purview of the First Amendment entirely.  Id. at 249.  Likewise, in Farrin v. Thigpen, 173 F. Supp.2d 427 (M.D.N.C. 2001), a  District Court in North Carolina analyzed a prohibition on a marketing campaign by attorneys featuring a fictional "strategy session" in an insurance company portraying the respect, if not outright fear, supposedly inspired in the insurance industry by advertising counsel.  In rejecting plaintiff's First Amendment claim, the Court held that the fictional session "does not involve commercial speech protected by the First Amendment because the vignette is fictional and does not contain truthful statements.  As repeatedly stated by the Supreme Court, false or misleading speech is not commercial speech protected by the First Amendment."  Id. at 438.

Indeed, examination of this issue may be foreclosed by Comm. on Prof. Ethics v. Humphrey, 355 N.W. 565 (Iowa 1984); vacated 472 U.S. 1004 (1985); on remand 377 N.W.2d 643; appeal dismissed for want of a substantial federal question, 475 U.S. 1114 (1986).  In its original decision, the Supreme Court of Iowa upheld a First Amendment challenge to its complete ban on television

---

[9]  While not binding on a federal court, the decisions of the highest court of a State are persuasive authority entitled to great deference.  Industrial Consultants, Inc. v. H. S. Equities, Inc., 646 F.2d 746, 749 (2d Cir. 1981).

advertisements with dramatic effects or "self-laudatory statements." Humphrey, 355 N.W. 565.[10] In so holding, the high Court of Iowa found that the First Amendment protections afforded attorney advertising did not extend to "irrelevant information" that "makes no contribution to informed decision making." Id. at 570-71. The Court further found that the particular medium utilized, television advertising, presented special problems and was particularly suitable to restrictions. Id. at 569-70. The United States Supreme Court granted certiorari but remanded the matter back to the Iowa Courts for review under its concurrent decision in Zauderer. 472 U.S. at 1004. Upon remand, the Iowa Court adhered to its earlier ruling that electronic advertising of this sort was particularly pernicious and not within the rubric of protected attorney commercial speech which did not extend to "image building" and "crass personal promotion." Humphrey, 377 N.W.2d at 646-47. The United States Supreme Court subsequently dismissed the appeal of this ruling for want of a substantial federal question. Humphrey, 475 U.S. 1114.

A dismissal of an appeal for want of a substantial federal question is a decision on the merits of a matter by the United States Supreme Court. Hicks v. Miranda, 422 U.S. 332, 344 (1975). As such, the holding is binding on all lower courts and "unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise [and] that the lower courts are bound by summary decisions by this [the Supreme Court] until such time as the Court informs (them) that (they) are not." Hicks, 422 U.S. 332, 344-45 (internal quotations omitted) (citing Port Authority Bondholders Protective Committee v. Port of New York

---

[10]  In contrast, New York does not categorically prohibit dramatic advertisement or self-laudation so long as the fictional aspect of the vignette is disclosed and there is a factual basis for the attorney's claims.

Authority, 387 F.2d 259, 263 n. 3 (2d Cir 1967); Doe v. Hodgson, 478 F.2d 537, 539, cert. denied, sub nom. Doe v. Brennan, 414 U.S. 1096 (1973)); see also League of Women Voters of Nassau County v. Nassau County Bd. of Sup'rs, 737 F.2d 155, 171-72 (2d Cir. 1984). As discussed above, the Supreme Court has not either directly or indirectly undermined the holding of Humphrey; therefore, this holding bears precedential weight and plaintiffs' commercial speech claims must be dismissed. Agostini v. Felton, 521 U.S. 203, 207 (1997) ("The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent."); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decision.").

Plaintiffs concede that their so-called "comical" antics contained in their commercials are irrelevant to the informed selection of counsel. Comp. ¶¶ 28(a). A consumer further cannot verify whether an attorney is a "heavy hitter" as, at best, this slogan is devoid of relevant meaning and, at worse (and more realistically), attempts to portray plaintiffs as significantly more potent than the "lesser-hitters" in the lineup of available attorneys. Plaintiffs further cannot credibly claim that the usage of fictional devices themselves provide truthful, relevant information to the public regarding the selection of counsel.[11] Therefore, Alexander and Catalano have failed to allege and cannot prove that their First Amendment rights are implicated by the revised regulations in the first instance.

---

[11] Of course, under the regulations, attorneys are free to accurately state the Judge's role in the legal process but are merely restricted from utilizing an actor playing the role of a Judge with the attendant potential that consumers will believe that the firm or the advertisement have somehow received the imprimatur of the Court.

13

## B.     THE REGULATIONS ARE VALID UNDER THE <u>CENTRAL HUDSON</u> TEST.

As set forth above, plaintiffs Alexander and Catalano's purported "speech" is not protected under the First Amendment.  Regardless, New York State's regulations equally pass constitutional scrutiny under the <u>Central Hudson</u> test.  Under <u>Central Hudson</u>:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

<u>Id.</u> at 566.

The State has a substantial interest in encouraging the clean flow of truthful, helpful, relevant, verifiable information about attorney services and, conversely, restricting the introduction of non-truthful, unhelpful, irrelevant material.  <u>Mason v. Florida Bar</u>, 208 F.3d 952 (11th Cir. 2000)[12]; <u>see also Falanga v. State Bar of Ga.</u>, 150 F.3d 1333, 1345-46 (11th Cir 1998); <u>Texans Against Censorship, Inc. v. State Bar of Texas</u>, 888 F. Supp. 1328, 13248 (E.D.Tex. 1995); aff'd 100 F.3d 953 (5th Cir. 1996) (Table); <u>The Florida Bar v. Gold</u>, 937 So.2d 652, 656 (Fl. 2006); <u>Comm. On Prof. Ethics v. Humphrey</u>, 355 N.W. 565, 571; <u>see also Petition of Felmeister & Isaacs</u>, 104 N.J. 515 (N.J. 1986.).  Additionally, despite plaintiff's denigration of such concerns (and their related efforts impugning Associate Court of Appeals Judge Pigott's opinions about the detrimental effect of their advertising campaigns), the United States Supreme Court has not discounted the State's substantial interest in maintaining attorney professionalism and respect for members of the State's bar.  <u>Florida</u>

---

[12] "[T]here is little question that the state, as part of its duty to regulate attorneys, has an interest in ensuring and encouraging the flow of helpful, relevant information about attorneys" and that this interest is "substantial."

Bar v. Went For It, Inc., 515 U.S. at 631.[13]  Additionally, plaintiffs cannot contest that the State has a substantial interest in regulating clearly irrelevant and unverifiable attorney advertising due to its potential impact on an audience with a comparative lack of knowledge and "sophistication" in the market for legal representation.  Bates, 433 U.S. 350, 384.  Indeed, plaintiffs unabashedly concede in their Complaint that their bloated advertisements are "especially relied upon by consumers of moderate means who may not be experienced consumers of legal services," the very audience the Supreme Court has found to justify State restrictions on attorney advertising.  Comp. ¶ 30.

Nor can plaintiffs support their claim that the regulations are more extensive than is necessary to serve the State's interest.  Initially, each State need not conduct an empirical study to determine that clearly and intentionally irrelevant or unverifiable material can be restricted.  Indeed, the Supreme Court has deferred to "the accumulated, common-sense judgments of local lawmakers" in arenas traditionally within their sphere of authority, such as regulation of professionals, even if their judgment is purely subjective.  Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 509 (1981); see also Auburn Police Union v. Carpenter, 8 F.3d 886, 900-01 (1st Cir. 1993) (empirical evidence not required to support restriction on speech).  Specifically regarding restrictions on attorney speech, the Supreme Court has held that:

> [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, see City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50-51, 106 S.Ct. 925, 930-931, 89 L.Ed.2d 29 (1986); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 584-585, 111 S.Ct. 2456, 2469-2470, 115 L.Ed.2d 504 (1991) (SOUTER, J., concurring in judgment), or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and

---

[13]  "The purpose of the 30-day targeted direct-mail ban is to forestall the outrage and irritation with the state-licensed legal profession that the practice of direct solicitation only days after accidents has engendered.  The Bar is concerned not with citizens' "offense" in the abstract . . . but with the demonstrable detrimental effects that such "offense" has on the profession it regulates."

'simple common sense,' <u>Burson v. Freeman</u>, 504 U.S. 191, 211, 112 S.Ct. 1846, 1858, 119 L.Ed.2d 5 (1992).

<u>Went for It</u>, 515 U.S. at 628; <u>see also</u> <u>Mainstream Marketing Services, Inc. v. F.T.C.</u>, 358 F.3d 1228 (10th Cir. 2004).[14]  Indeed, the State may rely upon the extant regulations and empirical findings of other states and the rulings of other courts that have reviewed similar guidelines.  <u>Falanga</u>, 150 F.3d 1341.  Additionally, the State need not demonstrate that any individual was actually deceived to support its regulations as mere potential danger of being misleading is sufficient to support a restriction on commercial speech.  <u>In re Primus</u>, 436 U.S. at 434.

In analyzing the final <u>Central Hudson</u> factor, the "fit" between the regulations and the government's interest need only be reasonable and not perfect.  <u>Board of Trustees of State Univ. of New York v. Fox</u>, 492 U.S. 469, 480-81 (1989).  The State is not required to employ the least restrictive means imaginable, and is afforded great latitude in determining what is "reasonable" in relation to regulating the professionals that operate within its boundaries.  <u>Id.</u>[15]  Succinctly, the State need not employ "the single best disposition but one whose scope is 'in proportion to the interest served,' . . . that employs not necessarily the least restrictive means but, as we have put it in the other

---

[14]  "The government bears the burden of asserting one or more substantial governmental interests and demonstrating a reasonable fit between those interests and the challenged regulation. <u>Utah Licensed Beverage Ass'n v. Leavitt</u>, 256 F.3d 1061, 1069 (10th Cir.2001).  The government is not limited in the evidence it may use to meet its burden.  For example, a commercial speech regulation may be justified by anecdotes, history, consensus, or simple common sense.  <u>Went For It</u>, 515 U.S. at 628, 115 S.Ct. 2371. Yet we may not take it upon ourselves to supplant the interests put forward by the state with our own ideas of what goals the challenged laws might serve.  <u>Edenfield v. Fane</u>, 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)."

[15]  "By declining to impose, in addition, a least-restrictive-means requirement, we take account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires, and provide the Legislative and Executive Branches needed leeway in a field (commercial speech) 'traditionally subject to governmental regulation.'" (quoting <u>Ohralik v. Ohio State Bar Ass'n.</u>, 436 U.S., at 455-456).

contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." Id. at 480 (quoting In re R.M.J., 455 U.S. at 203).

The amended New York State regulations do not prevent an attorney or law firm from imparting relevant, verifiable information to its audience. Nor do the regulations impose any blanket bans on the manner in which such relevant information may be imparted. Rather, the regulations merely constrain attorneys to refrain from advertisements that are "clearly and intentionally" unrelated to the selection of counsel and from asserting claims that are either unverifiable or cannot be supported by facts. In this regard, plaintiffs' citations to non-attorney advertising cases are unavailing. "Commercial speech by members of the learned professions, because it poses special problems, may justify more restrictions than would be appropriate for other commercial speech [and] [a]dvertising by the legal profession may warrant even more restrictions than advertising by those of other learned professions." Iowa Supreme Court Board of Professional Ethics & Conduct v. Wherry, 569 N.W.2d 822, 825 (Iowa 1997) (citing In re R.M.J., 455 U.S. 191, 202; Edenfield v. Fane, 507 U.S. 761, 775, 113 S.Ct. 1792, 1802-03(1993)). Indeed, attorneys need not (and should not) be held to the same standard used to judge the techniques of car salesmen and beer purveyors:

> Thus, attorneys attempting to produce advertisements that are neither false nor misleading should keep in mind that the sale and use of legal services is fundamentally different than the sale and use of ordinary consumer products. See Felmeister & Isaacs, 104 N.J. at 537, 518 A.2d at 199. It matters less which brand of beer or soap consumers choose than what kind of lawyer they choose. Legal representation may affect the consumer's basic rights and may have long-term consequences; consumers easily can discard a disappointing beer or bar of soap and try a different brand next time. Furthermore, consumers are less likely to be "taken in" by advertisements for consumer products than by advertisements for legal services. People usually have much more experience with consumer products than they have with legal services. Consequently, the Rules of Professional Conduct do

17

not tolerate the same sort of sales pitch for legal services that the Federal Trade Commission tolerates for most consumer products.

Matter of Zang, 154 Ariz. 134, 279-80 (Ariz. 1987).

When read in conjunction with the actual contents of the revised regulations, plaintiffs Alexander and Catalano's true claim is not that the regulations suppress any useful, truthful, relevant information from the marketplace for attorney services; but rather, that divesting their advertisements of clearly and intentionally irrelevant bells-and-whistles and unsupportable assertions will hamper their ability to reach clients who they claim are particularly susceptible to these frivolities.  This argument is unavailing as "the First Amendment does not guarantee that speech will be profitable to the speaker or desirable to its intended audience."  Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 47-48 (1st Cir. 2005) (citing Cable Ltd. v. Cablevision of Conn. Ltd. P'ship, 6 F.3d 867, 871 (2d Cir.1993);[16] Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 78 (1976) (Powell, J., concurring)).  Plaintiff's related claim that altering their advertisements in order to be compliant with the new regulations will be expensive similarly lacks relevance, as "[b]y the same token, the First Amendment does not safeguard against changes in commercial regulation that render previously profitable information valueless.  That is a commonplace occurrence in today's fast-moving world (an example would be the closing of a tax loophole that renders a previously profitable tax shelter worthless)."  Wine and Spirits, 418 F.3d 36, 47.

Plaintiffs' claims that the disclaimer requirements of the regulations are unconstitutional can be summarily disregarded.  The Supreme Court has emphatically upheld such minimal and truthful

---

[16] "AMSAT proceeds on the erroneous premise that it has a constitutional right not only to speak, but to speak profitably . . . Ending AMSAT's monopoly control over cable service in buildings it now serves may drive AMSAT out of business. But this does not give rise to a First Amendment claim."

disclaimer requirements aid in accurately informing the public.  <u>Bates</u>, 433 U.S. 350, 374-75; <u>In Re R.M.J.</u>, 455 U.S. 191, 201; <u>Zauderer</u>, 471 U.S. 626, 650-51 ("appellants constitutionally protected interest in not providing any particular factual information in his advertising is minimal."); <u>Peel</u>, 496 U.S. 91, 110, 116-117.  Likewise, plaintiffs' claims regarding prohibitions on trade names and the use of domain names are meritless.  The United States Supreme Court rejected this argument decades ago and held that regulated professions can be severely restricted in their use of trade names. <u>Friedman</u>, 440 U.S. at 16.[17]  In fact, plaintiffs' use of the heavy hitter moniker epitomizes the rationale underpinning the Supreme Court's holding in <u>Friedman</u>.  Far from being a idiosyncratic, defining name conveying relevant information, the "Heavy Hitter" scheme can be purchased as part of a pre-packaged marketing campaign that has been utilized by attorneys across the country and is simply meaningless in any relevant context except to portray a false or unverifiable sense of potency. See <u>www.groupmatrix.com.</u>

---

[17]  "We emphasize, in so holding, that the restriction on the use of trade names has only the most incidental effect on the content of the commercial speech of Texas optometrists. As noted above, a trade name conveys information only because of the associations that grow up over time between the name and a certain level of price and quality of service. Moreover, the information associated with a trade name is largely factual, concerning the kind and price of the services offered for sale. Since the Act does not prohibit or limit the type of informational advertising held to be protected in <u>Virginia Pharmacy</u> and <u>Bates</u>, the factual information associated with trade names may be communicated freely and explicitly to the public. An optometrist may advertise the type of service he offers, the prices he charges, and whether he practices as a partner, associate, or employee with other optometrists.  Rather than stifling commercial speech, § 5.13(d) ensures that information regarding optometrical services will be communicated more fully and accurately to consumers than it had been in the past when optometrists were allowed to convey the information through unstated and ambiguous associations with a trade name. In sum, Texas has done no more than require that commercial information about optometrical services "appear in such a form . . . as [is] necessary to prevent its being deceptive." <u>Virginia Pharmacy</u>, 425 U.S., at 772 n. 24, 96 S.Ct., at 1830 n. 24.

Plaintiffs' vagueness challenge is further unavailing. "Vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." Mason, 208 F.3d at 958. The language of the regulations adequately evince the nature of the limitations. In this regard, it is relevant that these regulations are directed at attorneys. As such they have a special expertise in determining what conduct is permissible and impermissible. See Howell v. State Bar of Texas, 843 F.2d 205, 206, 208 (5th Cir.), cert. denied, 488 U.S. 982 (1988). Licensed attorneys cannot claim to be confused by such terms as "clear and intentional" and "lack of relevance" as such terminology permeates the practice of law. In fact, plaintiffs allege in their Complaint that their advertisements contain unverifiable information and employ techniques which are clearly and intentionally irrelevant to the selection of counsel. Indeed, much less certain terms have been upheld as not vague in the attorney advertising context. Mason, 208 F3d. at 958-59 ("self laudatory" not unconstitutionally vague); Texans Against Censorship, 888 F. Supp. at 1369-70 ("advertisement in the public media," "written solicitation communication," "unfair statement," and "the kind of information that has traditionally been included in legal directories and legal newspapers" not unconstitutionally vague). Additionally, lawyers and law firms will have the benefit of the Ethical Considerations, which are being developed by the New York State Bar Association, and will provide more insight on what is permissible. See, e.g., Mason, 208 F.3d at 954 n. 1.

## POINT II

## THE THIRTY-DAY MORATORIUM IS CONSTITUTIONAL.

In Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995), the Supreme Court upheld a State's ban on personal injury lawyers from sending targeted direct-mail solicitations to victims and their

relatives for 30 days following an accident or disaster. New York was not obligated to conduct its own studies and was permitted to utilize Florida's findings as upheld by the Supreme Court as the basis of its rule. <u>Falanga</u>, 150 F3d 1333, 1342. New York was further permitted to rely upon history and consensus and the fact that many States have adopted the Supreme Court's ruling. <u>Id.</u> at 1341-42.[18] Indeed, in Kentucky, violation of the thirty-day moratorium is a criminal offense and this penal statute has been upheld by the federal courts. <u>Chambers v. Stengel</u>, 256 F.3d 397 (6th Cir. 2001). Moreover, the New York State moratorium is legally indistinguishable from the federal ban on contacting victims of air carrier accidents by attorneys for forty-five days following the date of the incident. 49 U.S.C. § 1136(g)(2).

Plaintiff Public Citizen's challenge to the thirty-day moratorium is specious, as this regulation on its face does not apply to them. Pointedly, plaintiffs ignore the unequivocal language of 22 N.Y.C.R.R. 1200.8(b) which specifically limits "solicitation" to lawyers and law firms contacting potential personal injury clients "the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain," thus excluding Public Citizen in its pro bono consumer advocacy role.[19] It is not coincidental that the language of this section corresponds to the Supreme Courts' discussion in <u>In Re Primus</u>, 436 U.S. at 422-23, and

---

[18] <u>See</u> <i>inter alia</i> Ala. Rules of Prof'l Conduct R. 7.3(b)(1)(i); Colo. Rules of Prof'l Conduct R. 7.3(c); Conn. Rules of Prof'l Conduct R. 7.3(b)(5); Fla. Rules of Prof'l Conduct R. 4-7.4(b)(1)(a); Ga. Code of Prof'l Responsibility DR 2-101(C)(4)(d); Idaho Rules of Prof'l Conduct R. 7.3(c)(1); La. Rules of Prof'l Conduct R. 7.2(b)(iii)(C); Md. Code Ann., Bus. Occ. & Prof. §10- 605.1(b) (2000); Mo. Rules of Prof'l Conduct R. 4-7.3(c)(1); Nev. Rules of Prof'l Conduct R. 197(4); N.J. Rules of Prof'l Conduct R. 7.3(b)(4); S.C. Rules of Prof'l Conduct R. 7.3(b)(3); Tenn. Code of Prof'l Responsibility DR 2-104; Wyo. Rules of Prof'l Conduct R. 7.3(c) ; Tex. Penal Code Ann. §38.12(d)(2)(A) (Vernon Supp. 2000); Wyo. Rules Prof'l Conduct R. 7.3.

[19] Section 1200.41-a repeats the pronouncements of 1200.8(b) and merely extends the moratorium to defense counsel.

Public Citizen's concerns about application of this provision in its advocacy role is unfounded.[20]
Furthermore, plaintiffs' claims that these sections will somehow block Public Citizen's members
from receiving information "even if they actively seek" such, similarly ignores the plain language
of the regulation which only applies to "unsolicited" contact.  Comp. ¶ 41.  Neither section
encumbers or affects the right of a potential client or member to contact any counsel, pro bono or
for-profit, or any attorney from responding to a potential client's query.  Moreover, plaintiffs ignore
the fact that the rules allow a vast range of advertising and publicity within the thirty-day moratorium
for attorneys seeking pecuniary gain.  Neither provision precludes attorneys from advertising on
radio, television and the internet touting their area of expertise which may attract victims of a
particular incident so long as they do not "target" these victims.

**POINT III**

**PUBLIC CITIZEN'S REMAINING CLAIMS ARE UNFOUNDED.**

Plaintiff Public Citizen further challenges the advertising restrictions claiming that "the plain
language of the definition [of "advertising"] covers solicitation of potential clients for pro bono
representation by Public Citizen received by potential clients in New York.  Comp. ¶ 33(a).  As set
forth above, this claim ignores the actual definition of "solicitation" provided for in the regulations
which purposefully excludes such pro bono efforts.  22 N.Y.C.R.R. 1200.8(b).[21]

---

[20]  Notably, even if the regulations could be read to disallow uninvited contact with these victims
from all attorneys, the invasion of the privacy of these victims is no more or less severe whether the attorney
initiating contact has a profit motive.

[21]  As only plaintiff Public Citizen challenges the prohibition of pop-up and pop-under
advertisements and these and the other "advertising" provisions do not apply to non-commercial speech, no
particular discussion of these regulations is required.

Similarly, Public Citizen's claim that the general advertising provisions apply to their pro bono non-commercial associational speech is predicated upon a purely conjectural and unnatural application of the regulations. The Supreme Court has squarely held that facial invalidation of state enactments on First Amendment grounds is "strong medicine" and that such should not be granted "when a limiting construction has been or could be placed on the challenged statute." Broadrick v. Oklahoma, 413 U.S. 601, 613-614 (1973). Accordingly, it is well-settled that "[i]n the absence of state interpretation, federal courts will presume any narrowing construction or practice to which the law is fairly susceptible.'" Field Day, LLC v. County of Suffolk, 463 F.3d 167, 176-77 (2d Cir.2006) (internal quotations omitted).[22] Moreover, the Court must further be mindful of the fact that only the New York State Appellate Division may discipline an attorney for violating the rules and "presumption that state courts function quickly enough, and with enough solicitude for the First Amendment rights" of allegedly affected parties "to avoid the unconstitutional suppression of speech that arises from undue delay in judicial review." Dream Palace v. County of Maricopa, 384 F.3d 990, 1004 (9th Cir 2004).

When read as a gestalt, the definition of "advertisement" is readily susceptible to an interpretation that only encompasses commercial speech. Initially, Plaintiffs cannot demonstrate that such a reading would contradict the intent of the authors of the regulations. In fact, the Presiding Justices were undoubtedly cognizant of the relevant distinctions between commercial and non-

---

[22] "Statutory construction ... is a holistic endeavor." Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir.2002) (internal quotation marks omitted; alteration in original). In interpreting statutes, this Court reads statutory language in light of the surrounding language and framework of the statute. Id. " '[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems,' we may 'construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the Legislature].'" Empire HealthChoice Assur., Inc. v. McVeigh, 396 F.3d 136, 144 (2d Cir.2005) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988))." Id. at 177.

23

commercial speech and the holding of In Re Primus as they specifically exempted non-commercial speech from the ambit of the rules when such could be implicated, limitations on solicitation. Moreover, the rules themselves, when read as a whole, can reasonably be construed to exclude purely non-commercial speech.   Indeed, it strains credulity to contemplate the NAACP producing commercials  "the primary purpose of which is the retention of the lawyer or law firm" — as opposed to utilizing litigation as one of several tools the primary purpose of which is to challenge perceived societal wrongs — containing clearly and intentionally irrelevant techniques to obtain attention or utilizing monikers or catch-phrases conveying their ability to obtain results, or comparisons with other attorneys.  In fact, plaintiffs' claims are self-defeating in that it is evident from the publicity surrounding the regulations, most notably the comments of Justice Pigott which they rely upon, that these rules were never intended to apply to non-commercial pursuits.  In sum, the regulations, in context, can rationally be construed to exclude protected speech and should be read in such a manner.

Public Citizen further challenges section 1200.7(e), which relates to a lawyer or law firm's use of a domain name for its website.  Contrary to plaintiffs' rendition of the regulation, law firms are specifically permitted to utilize domain names which do not contain the actual name of the form or attorney; the only caveat is that when a lawyer or law firm uses a domain name for a website that does not include the name of the lawyer or law firm, the domain name utilized must not imply an ability to obtain results, the lawyer or law firm must not use the domain name itself in the practice of law, and all pages of the website must clearly and conspicuously include the actual name of the lawyer or law firm.  22 N.Y.C.R.R. § 1200.7(e).  Public Citizen's contention that this regulation improperly interferes with noncommercial speech to the extent it requires the disclosure of the

24

lawyer's or law firm's name on web pages that have nothing to do with the practice of law reads these subsections out of context and warps the meaning of the section. 22 N.Y.C.R.R. 1200.7, the section including the domain name regulations, is entitled "Professional notices, letterheads, and signs" and exclusively governs the manner in which attorneys and forms may present their services to the public. There is simply no indication that these rules apply to attorneys in their private capacities or when they are speaking as citizens or acting in any other manner than promoting their services, and plaintiffs' strained interpretation of this section should be rejected. The remaining restrictions merely modernize the Supreme Court's holding in <u>Friedman</u> to apply to domain names, the trade names of the twenty-first century. Moreover, Public Citizen's claim that they will be forced to change their domain name is belied by both the actual language of the section and the facts as alleged in the Complaint.[23]

## CONCLUSION

**FOR THE REASONS SET FORTH ABOVE, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGEMENT AND THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY.**

---

[23]   In fact, the limited scope of this regulation is demonstrated by the three examples provided by Public Citizen in the complaint. Public Citizen alleges that it operates websites at www.citizen.org/litigation, www.cyberslapp.org and www.clpblog.org. <u>See</u> Compl., ¶ 37b. Public Citizen alleges that it has "solicited clients and communicated with clients in New York using one or more of these domain names...." <u>Id.</u> Nevertheless, a review of these websites demonstrates that, to the extent the regulation is even applicable, the websites do not violate the regulation. For example, at www.citizen.org, the name of Public Citizen is prominently displayed on all pages of the website. Further, the domain name of "citizen" clearly does not imply an ability to get results. Similarly, both www.cyberslapp.org and www.clpblogg.org are nothing more than informational websites. As they are not used in the practice of law, the regulation does not pertain to these websites.

Dated: Albany, N.Y.
May 11, 2007

                         ANDREW M. CUOMO
                         Attorney General of the State of New York
                         Attorney for Defendants
                         By: *s/ Nelson R. Sheingold*
                         Nelson R. Sheingold
                         Assistant Attorney General, of Counsel
                         Bar Roll No. 601895
                         Telephone:  (518) 473-3682
                         Fax:  (518) 402-2221 (Not for service of papers)
                         Email: Nelson.Sheingold@oag.state.ny.us

                         Bridget E. Holohan
                         Assistant Attorney General
                         Bar Roll No. 510911
                         Telephone: (518) 473-3684
                         Email: Bridget.Holohan@oag.state.ny.us