UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES L. ALEXANDER, et al.,            )
                                       )
            Plaintiffs,                )     Civil Action No. 5:07-cv-00117-FJS-GHL
                                       )
v.                                     )
                                       )
THOMAS J. CAHILL, et al.,              )
                                       )
            Defendants.                )
_____       )

_____

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**
_____

Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email:  gbeck@citizen.org
         brian@citizen.org
         snelson@citizen.org

*Counsel for Plaintiffs*

Dated:  May 11, 2007

Dockets.Justia.com

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.      The Rules Regulating Allegedly Misleading Advertisements Are
        Unconstitutional. ............................................................................................... 5

        A.      The Rules Are Not Supported by a Legitimate State Interest. ............... 6

        B.      The Rules Do Not Advance the State's Purported Interests. ................. 8

        C.      The Rules Are Not Narrowly Drawn. .................................................. 12

                1.      The Rules Are Vastly Overbroad. .......................................... 13

                2.      The State Has Ignored Readily Available Alternatives to Address
                        Its Alleged Interests. ............................................................. 14

                3.      The State Has Ignored the Impact of Its Policies on Consumers. ............. 16

        D.      The Rules Are Unconstitutionally Vague. ........................................... 17

II.     The State's Thirty-Day Ban on Communications to Prospective Clients Is
        Unconstitutional. ............................................................................................. 20

III.    The Rules' Restrictions on Nonprofit Communications Do Not Survive Strict
        Scrutiny. .......................................................................................................... 22

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### CASES

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ............................................................ 8

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ........................................................ 7, 8, 16, 17

*Bingham v. Hamilton*, 100 F. Supp. 2d 1233 (E.D. Ca. 2000) ........................................................ 9

*Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989) ........................ 16

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) ........................................................ 7

*Capoccia v. Committee on Professional Standards*, No. 89-866, 1990 WL 211189 (N.D.N.Y. Dec. 20, 1990) ........................................................................................................ 9

*Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980) .............................................................................................................................................. 3

*Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999) .............................................................................. 18

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ..................................... 17, 19

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ..................................... 18

*Cronin v. U.S. Department of Agriculture*, 919 F.2d 439 (7th Cir. 1990) ..................................... 4

*Edenfield v. Fane*, 507 U.S. 761 (1993) ............................................................................... 3, 7, 8

*Ficker v. Curran*, 119 F.3d 1150 (4th Cir. 1997) ....................................................... 7, 16, 22, 23

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ....................................................... 4, 20, 21

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ................................................................... 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................................... 18

*Grievance Committee v. Trantolo*, 470 A.2d 228 (Conn. 1984) ............................................ 10, 17

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) ....................................................... 12

*Ibanez v. Florida Department of Business & Professional Regulation*, 512 U.S. 136 (1994) ..................................................................................................................................... 8, 24

*In re Boston Beer Co.*, 198 F.3d 1370 (Fed. Cir. 1999) ................................................................ 11

*In re Primus*, 436 U.S. 412 (1978) .......................................................................... 4, 22, 23, 24

*In re RMJ*, 455 U.S. 191 (1982)......................................................................... 9, 13, 15

*In re Shapiro*, 225 A.D.2d 215, 656 N.Y.S.2d 80 (4th Dept. 1996)................................. 7

*Kolender v. Lawson*, 461 U.S. 352 (1983)............................................................... 18

*Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000).............................................. 9, 24

*NAACP v. Button*, 371 U.S. 415 (1963)................................................................... 24

*New York State Association of Realtors, Inc. v. Shaffer*, 27 F.3d 834 (2d Cir. 1994) ............. 9, 15

*Peel v. Attorney Registration & Disciplinary Commission*, 496 U.S. 91 (1990) ............... 9, 10, 17

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000)............................... 11, 12

*Reno v. Disciplinary Board of the Supreme Court of New Mexico*, 106 F.3d 929 (10th Cir. 1997) ...................................................................................................... 9

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) ........... 25

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) .................................................... 3

*Shapero v. Kentucky Bar Association*, 486 U.S. 466 (1988) ........................................... 12, 14, 22

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................... 6

*Thompson v. Western States Medical Center*, 535 U. S. 357 (2002)..................................... 13, 14

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).......................................................................................................... 7

*Whitney v. California*, 274 U.S. 357 (1927) ............................................................... 16

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ....................................... passim

## STATUTES AND RULES

15 U.S.C. § 45(a) ............................................................................................. 10

22 NYCRR § 1022.17........................................................................................ 19

22 NYCRR § 1200.1(k) ...................................................................................... 23

22 NYCRR § 1200.41-a....................................................................................... 20, 23

22 NYCRR § 1200.6(a) ...................................................................................... 14

22 NYCRR § 1200.6(c)(1)..................................................................................... 5

22 NYCRR § 1200.6(c)(3) ........................................................................................ 5

22 NYCRR § 1200.6(c)(5) ................................................................................. 5, 18

22 NYCRR § 1200.6(c)(7) ................................................................................. 5, 18

22 NYCRR § 1200.6(e) .......................................................................................... 15

22 NYCRR § 1200.6(f) ........................................................................................... 24

22 NYCRR § 1200.6(g)(1) ....................................................................................... 5

22 NYCRR § 1200.6(k) ........................................................................................... 24

22 NYCRR § 1200.7(e) ............................................................................................. 5

22 NYCRR § 1200.8(g) ........................................................................................... 20

22 NYCRR § 603.2 ................................................................................................. 19

22 NYCRR § 691.2 ................................................................................................. 19

22 NYCRR § 806.2 ................................................................................................. 19

N.Y. Judiciary Law § 90(2) .................................................................................... 19

## OTHER AUTHORITIES

Comments of Presiding Justice Eugene F. Pigott to Monroe County Bar Association
    (Aug. 17, 2006) ...................................................................... 6, 18, 19, 20

Formal Ethics Opinion 661 (N.Y. Ethics Comm. 1994) ........................................ 10

Letter from the FTC's Office of Policy Planning, Bureau of Consumer Protection, and
    Bureau of Economics to Michael Colodner, Office of Court Administration (Sept.
    14, 2006) ......................................................................................... 10, 16, 17

Model R. Prof'l Conduct 7.2, cmt. 1 ....................................................................... 17

New York Office of Court Administration, Press Release, *Significant Restrictions on
Lawyer Advertising To Be Adopted in New York*, June 15, 2006 ................................... 6, 8

New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer
Advertising* (Oct. 21, 2005) .................................................................. 9, 14, 15

William E. Hornsby, Jr., *Regulating Lawyer Advertising:  Public Images and the
Irresistible Aristotelian Impulse*, 9 Geo J. Legal Ethics 325 (1996) .................................. 8

## INTRODUCTION

A state seeking to justify restraints on speech faces the heavy burden of demonstrating—with actual evidence—that the purported harms it seeks to address are real and that its chosen restraints will in fact substantially alleviate those harms.  Now that the parties have stipulated to all the evidence in this case, *see* Joint Letter, April 27, 2007 (Doc. 27), it is clear that the state has failed to meet that burden.  Indeed, the state's articulated interests in its amendments to the New York Code of Professional Responsibility are precisely the interests that the Supreme Court has firmly and repeatedly rejected as valid bases on which to enact restrictions on speech.  Because the state has no valid interest in regulating the sorts of truthful, non-misleading information about legal services that are the subject of the amended disciplinary rules, the Court should grant summary judgment to the plaintiffs.

## BACKGROUND

On January 4, 2007, the presiding justices of the four departments of the Appellate Division of the New York Supreme Court adopted sweeping changes to the Disciplinary Rules of New York's Code of Professional Responsibility.  The amended rules restrict a wide range of commercial and noncommercial communications by New York attorneys.[1]

Plaintiff James L. Alexander is a licensed attorney who has actively practiced in New York for the past twenty-three years.  Stipulations ¶ 1.  He is the managing partner of the firm Alexander & Catalano LLC, a New York firm with offices in Syracuse and Rochester.  *Id.* ¶¶ 1-2.  Alexander & Catalano communicates its services to the public through broadcast media, print advertisements, and other forms of public media.  *Id.*  ¶ 3.  Over the past ten years, the firm has

---

[1] For the Court's convenience, a copy of the relevant rules, in their amended form, is attached to this memorandum as Exhibit 1.  A copy of the rules highlighting the changes from the previous version is attached as Exhibit 2.  Unless otherwise noted, all citations are to the rules as amended.

developed an advertising campaign that has brought substantial name recognition within its market, and the firm has received thousands of calls from potential clients. *Id.* ¶¶ 4-5. Before the amended rules went into effect, Alexander & Catalano advertisements usually contained the firm's motto, "the heavy hitters," as well as other phrases that might be considered nicknames, monikers, or mottos by disciplinary authorities, such as "think big." *Id.* ¶ 4. The firm's television commercials often included comical scenes that, for example, depicted lawyers Alexander and Catalano as giants towering above local buildings, running to a client's house so fast they appear as blurs, jumping onto rooftops, and providing legal assistance to space aliens. *Id.* ¶ 21 (DVD of ads). They also regularly included memorable jingles or special effects, such as wisps of smoke and blue electrical currents surrounding the firm's name. *Id.* ¶ 3. In response to the amended disciplinary rules, Alexander & Catalano has been forced to stop running many of its advertisements and to alter others. *Id.* ¶ 15. As a result, the firm's ability to market its services has been seriously impaired.

Public Citizen is a nonprofit consumer rights organization with approximately 100,000 members nationwide, including approximately 9,450 in New York. *Id.* ¶¶ 7-9. The state's restrictions on attorney advertising injure Public Citizen's New York members, who are consumers of legal services, by preventing them from receiving truthful information that they have an interest in receiving. *Id.* ¶ 9. As an organization devoted to defending the First Amendment and the rights of consumers, Public Citizen has an interest in ensuring that its members are not restricted from receiving communications regarding legal services. *Id.* ¶ 8. Public Citizen is particularly interested in the availability of truthful legal advertising because speech in this context not only encourages beneficial competition in the marketplace for legal services, but can also educate consumers about their rights, inform them when they may have a

legal claim, and enhance their access to the legal system.

On February 1, 2007, the same day that the rules went into effect, plaintiffs sued defendant chief counsels, who collectively are charged with enforcing the disciplinary rules throughout the state, Stipulations ¶ 14, and moved for a preliminary injunction against enforcement of the rules.  In its response to the preliminary injunction motion, the state argued generically that the targeted forms of advertising were false or deceptive, but presented no evidence in support of its views.  The Court reserved ruling on the preliminary injunction motion and scheduled an expedited trial on the merits.  Since then, the parties have agreed to stipulate to all relevant facts, *see* Joint Letter, April 27, 2007 (Doc. 27), and the state has again failed to present any evidence in support of its restrictions on speech.

<u>**ARGUMENT**</u>

"It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it."  *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (internal quotation marks and alteration omitted).  To withstand a motion for summary judgment, the state must "point to specific evidence in the record to carry its burden."  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  This burden is a heavy one that is "not satisfied by mere speculation or conjecture; rather, a government body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree."  *Edenfield*, 507 U.S. at 770-71.

To justify a restriction on commercial speech that is not false or deceptive, the state must meet the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).  As later summarized by the Supreme Court, *Central Hudson* requires the government to satisfy a three-part test:  "First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the

restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'" *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623-24 (1995) (internal quotation marks omitted).  To justify restrictions on *noncommercial* speech, the state must satisfy the exacting strict scrutiny standard, which requires it to demonstrate a *compelling* interest in the regulation and that its methods are narrowly tailored to serve that interest.  *In re Primus*, 436 U.S. 412, 432 (1978).

This Court directed the parties to address the challenged rules in three groupings:  (1) rules about allegedly misleading advertisements, (2) rules imposing blackout periods for contacting personal injury or wrongful death victims, and (3) rules applied to lawyers whose primary purpose is not pecuniary gain.  As to each of these groups, the state has presented no evidence that the restricted forms of speech are false or misleading or that it has any other legitimate interest in regulating these forms of speech.  Indeed, the rules appear to be intended less to protect the public from harm than to suppress certain forms of communication that state officials personally find to be distasteful.  The Supreme Court has stressed, however, that a state's general distaste for lawyer advertisements does not allow it to restrict truthful, non-misleading advertising to any greater extent than it can restrict similar advertising in other industries.  *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 646-47 (1985).  Therefore, summary judgment is warranted.[2]

---

[2] In its order reserving ruling on plaintiffs' motion for a preliminary injunction, the Court advised the parties to focus their presentations on whether plaintiffs can show a substantial likelihood of success on the merits.  That standard applies only to the motion for a preliminary injunction, and not to a decision on the merits.  *See Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990) (noting that, when a motion for a preliminary injunction is merged with a decision on the merits, "the only question is whether the plaintiff is entitled to an injunction, period").  In any case, because defendants have failed to present any evidence in support of its restrictions on speech, plaintiffs also satisfy the likelihood of success standard, however formulated.

## I.      The Rules Regulating Allegedly Misleading Advertisements Are Unconstitutional.

The amended disciplinary rules contain sweeping new restrictions on certain techniques in attorney advertising that the state has argued are false or misleading.  First, the amended rules include a broad prohibition on advertisements that "rely on techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence."  22 NYCRR § 1200.6(c)(5).  Other amendments forbid the use of "a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter," portrayal of a judge, and endorsements or testimonials by clients with regard to matters that are still pending.  *Id.* § 1200.6(c)(1), (3), (7).  Section 1200.7(e) of the rules prohibits lawyers from using an Internet website that does not include the name of the lawyer or law firm in the website's address unless all pages of the website "clearly and conspicuously include the actual name of the lawyer or law firm," the lawyer refrains from "engag[ing] in the practice of law using the domain name," and the domain name does not "imply the ability to obtain results in a matter."  *Id.* § 1200.7(e).  Moreover, § 1200.6(g) of the rules bans Internet pop-up and pop-under advertising by lawyers, regardless of whether these advertisements are deceptive or misleading.  *Id.* § 1200.6(g)(1).

The common thread among these provisions is that they prohibit harmless techniques frequently used by lawyers and others in effective advertising.  The state has not shown, however, that any of these techniques are false or misleading, or that it has any other legitimate interest in regulating them.  Moreover, the state has no evidence that its chosen restrictions are an effective way of combating the perceived harms or that less restrictive alternatives would be ineffective.  Finally, the rules are too vague to provide guidance to attorneys and to prevent arbitrary and discriminatory enforcement.  For these reasons, the rules are unconstitutional.

A.     **The Rules Are Not Supported by a Legitimate State Interest.**

"If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Here, despite the state's claim that it intended to target false and misleading speech, Defs.' Resp. Mem. to Mot. for Prelim. Inj., Mar. 27, 2007 (Doc. 21), at 9, the record demonstrates that its true interest was restricting television advertising that regulators consider to be in poor taste and undignified to the profession. In his public comments regarding the draft version of the amendments, former Presiding Justice Eugene F. Pigott, one of the four justices responsible for enacting the rules, equated the lawyers targeted by the rules with "circus monkey[s]" and "used car salesmen," and stated that he hoped the rules would ensure that the "profession acts professionally" and that "we can be proud of what we see, when we see lawyers on the TV, or in the newspaper, or anywhere else." Comments of Presiding Justice Eugene F. Pigott to Monroe County Bar Association (Aug. 17, 2006), at 29:50, 37:25 ("Comments of Justice Pigott") (Stipulations ¶ 22). According to Justice Pigott, consumers should not be subjected to "somebody putting on a little show and saying that they are the best lawyer in town, or that they are this or that." *Id.* at 30:30. Moreover, Chief Administrative Judge Jonathan Lippman, in explaining the purposes for the rules, noted that they would "benefit the bar by ensuring that the image of the legal profession is maintained at the highest possible level." New York Office of Court Administration, Press Release, *Significant Restrictions on Lawyer Advertising To Be Adopted in New York*, June 15, 2006 ("N.Y. Courts Press Release") (Stipulations ¶ 20).

A state cannot restrict lawyer advertising merely because it finds it distasteful. *Zauderer*, 471 U.S. at 647-48. The Supreme Court has consistently held that attorneys have a First

Amendment right to advertise even if the advertisements are "embarrassing or offensive" to some members of the public or "beneath [the] dignity" of some members of the bar. *Id.* Even if the state considers information conveyed by an advertisement to be "of slight worth," it is for "the speaker and the audience, not the government, [to] assess the value of the information presented." *Edenfield*, 507 U.S. at 767.[3]

In this case, the state created no record of the interests that led it to enact the amended rules, and its unsubstantiated position in this litigation that its true interest in banning the targeted forms of advertising was preventing consumers from being deceived by images of giants and aliens is simply not believable. Defs.' Resp. Mem. to Mot. for Prelim. Inj., Mar. 27, 2007 (Doc. 21), at 6-7. When, as here, "it appears that the stated interests are not the actual interests served by the restriction," the Court is not required to blindly accept the state's assertions. *Edenfield*, 507 U.S. at 768. The state's transparent attempt to ban certain forms of speech that its regulators personally find offensive is therefore unconstitutional.[4]

---

[3] *See also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 (1983) ("[W]e have consistently held that the fact that protected speech may be offensive to some does not justify its suppression.") (quotation omitted); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 368 (1977) (rejecting the bar's argument that attorney advertising would hurt the profession by "undermin[ing] the attorney's sense of dignity and self-worth"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) ("Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price."); *Ficker v. Curran*, 119 F.3d 1150, 1154 (4th Cir. 1997) ("[T]he Supreme Court forbids us from banning speech merely because some subset of the public or the bar finds it embarrassing, offensive, or undignified."); *In re Shapiro*, 225 A.D.2d 215, 216, 656 N.Y.S.2d 80 (4th Dept. 1996) (declining to discipline a lawyer for an advertisement that, while "extremely offensive and degrading to the legal profession, [was] nonetheless constitutionally protected hyperbole").

[4] Even if the state did have a valid interest in protecting the image of lawyers, it has no evidence that lawyer advertising in general, and the targeted forms of advertising in particular, have a negative impact on the image of the bar. As the Supreme Court wrote in *Bates*, other professions such as bankers and engineers advertise (often using methods similar to those used by lawyers), "and yet these professions are not regarded as undignified." 433 U.S. 369-70. If anything, "stylish" ads, of the sort that consumers are used to seeing, are likely to give

-7-

### B.       The Rules Do Not Advance the State's Purported Interests.

Even if the Court credits the state's unsupported assertion that it enacted the rules to

prevent deceptive advertising, the state must still "bear[] the burden of showing not merely that

its regulation will advance its interest, but also that it will do so to a material degree." *44

Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).  Although preventing false and

misleading advertising is undoubtedly a valid state interest, state regulations cannot advance that

interest when they target advertising techniques that are neither false nor misleading. *Edenfield*,

507 U.S. at 770-71.

Here, instead of presenting actual evidence that its broad restrictions on speech are an

effective means of resolving its alleged concerns about false and misleading advertising, the state

has attempted to justify the need for the rules in precisely the way the Supreme Court has

prohibited—by speculating, without the benefit of any evidence—that the prohibited forms of

advertising are "potentially misleading." *See* New York Courts Press Release.  In almost every

lawyer advertising case, defendants have made the same argument, and the Supreme Court has

consistently rejected it. *See, e.g.*, *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146

(1994) (holding that courts "cannot allow rote invocation of the words 'potentially misleading' to

supplant the [state's] burden").  Instead, the Supreme Court requires tangible evidence of actual,

serious abuse to justify a restriction on speech. *See id.* at 145 n.10 (noting that the state

presented no "evidence that any member of the public has been misled").  A state's failure to

"provide direct and concrete evidence that the evil that the restriction purportedly aims to

consumers a better impression of lawyers than the bland "talking heads" ads of the sort required
by restrictive state ethics rules.  William E. Hornsby, Jr., *Regulating Lawyer Advertising:  Public
Images and the Irresistible Aristotelian Impulse*, 9 Geo J. Legal Ethics 325, 350-56 (1996).
Indeed, as the Court noted in *Bates*, the failure of lawyers to advertise may create public
disillusionment with the profession, because "[t]he absence of advertising may be seen to reflect
the profession's failure to reach out and serve the community." *Bates*, 433 U.S. at 370-71.

eliminate does, in fact, exist will doom the . . . regulation." *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 842 (2d Cir. 1994).[5]

      The state has produced no disciplinary records, studies, surveys, or empirical research of any kind suggesting that its amended rules address anything but non-existent problems.  Indeed, the publicly available evidence at the time the presiding justices were considering the rules weighs against the state's purported interest in the amendments.  The presiding justices adopted the rules after the New York State Bar Association had completed a detailed study on attorney advertising—the third bar study of lawyer advertising in the state since 1993.  *See* New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer Advertising* (Oct. 21, 2005) ("Task Force Report") (Stipulations ¶ 16).  In its report, the seventeen-member committee unanimously concluded that the state should not adopt new content-based restrictions on lawyer advertising.  *Id.* at 2.  Noting that about one-third of a sample of randomly selected New York lawyer advertisements would violate the state's existing prohibition on false and misleading advertising, the committee concluded that stricter reporting requirements and better enforcement, rather than more rules, were the proper ways to address any problems with advertising in the state.  *Id.* at 2, 16, 79-81.

---

     [5] *See also Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 106 (1990) (noting the "complete absence of any evidence of deception"); *In re RMJ*, 455 U.S. 191, 205-06 (1982) (noting that there was no evidence in the record indicating that the targeted speech was misleading); *Mason v. Fla. Bar*, 208 F.3d 952, 957 (11th Cir. 2000) (holding that the bar's reliance on "common sense" that an advertisement was misleading was insufficient to satisfy the state's burden); *Reno v. Disciplinary Bd. of the Supreme Court of N.M.*, 106 F.3d 929 (10th Cir. 1997) ("The Board offers no evidence that anyone was actually deceived."); *Bingham v. Hamilton*, 100 F. Supp. 2d 1233, 1240 (E.D. Ca. 2000) ("The only evidence that the [state] offers that the advertising . . . would be misleading is conclusory, anecdotal, and speculative.  The [state] has not offered any empirical evidence—in the form of studies or surveys . . . ."); *Capoccia v. Comm. on Prof'l Standards*, No. 89-866, 1990 WL 211189, at *6 (N.D.N.Y. Dec. 20, 1990) (unpublished decision, attached as Exh. 3) (striking down restriction on attorney advertising where the defendants had failed to sustain their burden of demonstrating a valid state interest and instead "maintain[ed], in conclusory manner, that the statements in question [were], indeed, false, deceptive and misleading").

Even leaving aside the absence of evidence supporting the restrictions, it defies belief that consumers could be deceived by the sorts of stock advertising devices targeted by the rules, such as attention-getting techniques, actors portraying judges, testimonials, endorsements, and mottos. Indeed, the Supreme Court has recognized that consumers are not so easily misled, rejecting "the paternalistic assumption" that consumers of legal services "are no more discriminating than the audience for children's television." *Peel*, 496 U.S. at 105. Similarly, the Federal Trade Commission staff, in their comments on the draft version of the rules, noted that depictions of a judge, dramatizations of scenes, and other "common methods that advertising firms have used to make their messages memorable . . . are unlikely to hoodwink unsuspecting consumers, because consumers are usually familiar with them." *See* Letter from the FTC's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics to Michael Colodner, Office of Court Administration (Sept. 14, 2006) ("FTC Letter"), at 3 (Stipulations ¶ 17).[6]

In a similar context, the Supreme Court in *Zauderer* struck down rules restricting the use of illustrations or pictures in attorney advertisements, noting that these devices serve the "important communicative functions" of "attract[ing] the attention of the audience to the advertiser's message" and, often, of "impart[ing] information directly." *Zauderer*, 471 U.S. at 647. The New York Bar's Ethics Committee reached the same conclusion in considering the use of dramatizations, noting that dramatizations are "not per se false or misleading merely because the particular circumstances did not occur, the services were not actually performed by the lawyer and the persons portrayed (as well as the actors) are not past or present clients of the lawyer." Formal Ethics Opinion 661 (N.Y. Ethics Comm. 1994); *see also Grievance Comm. v. Trantolo*, 470 A.2d 228, 234 (Conn. 1984) (holding that television advertisements depicting

---

[6] Given the agency's congressionally mandated duty of protecting consumers from deceptive and misleading advertising, 15 U.S.C. § 45(a), the FTC's views on the effect of the regulations should be given significant weight.

humorous fictional scenes were informative and neither false nor misleading).

Like illustrations and dramatizations, attention-getting techniques are frequently used in advertising to communicate ideas in an easy-to-understand form, to attract viewer interest, to give emphasis, and to make information more memorable. Thus, although large physical size is not a characteristic related to a lawyer's competence, Alexander & Catalano's television commercial depicting its attorneys as the size of giants illustrates its slogan "think big" in a memorable way, and the firm's commercial depicting a judge illustrates the firm's willingness to go to court on its clients' behalf and that the judge is there "to make sure [the trial] is fair." Stipulations ¶ 21 (DVD of ads). The use of such devices is not deceptive because no reasonable consumer would believe that Alexander & Catalano's lawyers are actually extremely large or that the actor is a real judge; nor would these facts be material to a consumer's selection of an attorney even if believed. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (noting that an advertisement is deceptive under the Federal Trade Commission Act only "if it is likely to mislead consumers, acting reasonably under the circumstances, in a material respect").

Similarly, consumers do not believe that mottos asserting the quality of a product or service are always literally true. Numerous courts have recognized that advertising is not misleading to consumers just because it contains "exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying" or "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000) (holding that that Pizza Hut's slogan "Better Ingredients. Better Pizza" was not actionable as false advertising); *see also In re Boston Beer Co.*, 198 F.3d 1370 (Fed. Cir. 1999) (noting that the slogan "The Best Beer in America" was mere "trade puffery"); *see also Groden*

-11-

*v. Random House, Inc.*, 61 F.3d 1045, 1051-52 (2d Cir. 1995) (holding that statements of opinion are generally not actionable as false advertising). If puffery and statements of opinion were considered inherently misleading, "the advertising industry would have to be liquidated in short order." *Pizza Hut*, 227 F.3d at 499 (internal quotation marks omitted).

The remaining rules are equally unjustified. There is no evidence that consumers are deceived when a lawyer's website domain name does not contain the lawyer's name, yet this rule will force lawyers with established domain names to relocate their websites to new domains at significant expense to continue practicing law using the Internet. Moreover, because brevity is important in the choice of a domain name, forcing attorneys to use their whole names or the names of their firms would impose unnecessary burdens on Internet-based speech. The state's restriction on pop-up and pop-under advertising is presumably based on the assumption that these forms of advertising are intrusive, but defendants have no evidence that Internet consumers are deceived or unduly influenced by pop-up ads. It seems likely that consumers have now become familiar with this form of advertising, which, although sometimes annoying, can be closed with a single click (or eliminated with pop-up blocking software that comes with virtually every web browser) and is therefore at least as easy to dispose of as mailed solicitations. *See Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) (holding that the state could not constitutionally restrict direct-mail solicitations). Indeed, these provisions seem entirely motivated by distaste for these particular forms of advertising. As already discussed, however, a state may not prohibit speech on grounds of taste. *See Zauderer*, 471 U.S. at 647-48. These provisions are therefore also unconstitutional.

### C. The Rules Are Not Narrowly Drawn.

In addition to the state's failure to show the effectiveness of its rules, it has also failed to show that its chosen restrictions are narrowly drawn, or that other less restrictive alternatives to

accomplish its goals are unavailable.  As the Supreme Court has emphasized, "[i]f the First

Amendment means anything, it means that regulating speech must be a last—not first—resort."

*Thompson v. W. States Med. Ctr.*, 535 U. S. 357, 373 (2002).  The state here, however, appears

to have adopted its chosen regulations as a *first* resort, without even considering readily available

alternatives that were recommended by the state bar.

1.  **The Rules Are Vastly Overbroad.**

To survive the final prong of the *Central Hudson* test, a restriction on allegedly deceptive

speech must not be "broader than reasonably necessary to prevent the deception."  *RMJ*, 455

U.S. at 203.  The amended rules, however, sweep in many forms of advertising that are not false

or misleading, nor even likely to be distasteful to any consumer.  Although broad prophylactic

rules may be easier to administer than narrowly tailored ones, the state may not broadly suppress

truthful advertising "merely to spare itself the trouble of distinguishing such advertising from

false or deceptive advertising."  *Zauderer*, 471 U.S. at 646.

Given that the purpose of advertising is to grab the viewer's attention, the ban on

"attention getting techniques" would essentially outlaw all of the most common methods of

advertising and would effectively limit advertisements to information that might appear in an

attorney's resume.  Musical jingles, special effects, photographs of the lawyer, portrayals of

fictional scenes, comic relief, and even interesting designs, logos, and color schemes appear to be

covered by section 1200.6(c)(5)'s plain language.  Each of these forms of advertising is a

"technique" that is designed to "obtain attention" and that does not seem relevant to selection of

counsel.  Moreover, many lawyers, including Alexander & Catalano, include portrayals of judges

in their commercials.  Others use trade names or mottos that might be said to imply an ability to

achieve results, such as Alexander & Catalano's slogan "the heavy hitters" and other slogans like

"The Dream Team" and "The Ticket Doctor."

The Supreme Court has rejected the idea that a state may prohibit an advertising device just because it is designed to "catch the recipient's attention" or limit lawyer advertising to "a bland statement of purely objective facts." *Shapero*, 486 U.S. at 479. Lawyer advertisements must compete in a marketplace of ideas where rival messages for other goods and services will inevitably use the sort of techniques prohibited by the rules, and lawyers will have a difficult time getting their message heard when they have to compete with other commercial advertising that is not similarly restricted. Compliance with these rules would result in advertising so tedious and sterile that few lawyers would want to run it.

> **2.     The State Has Ignored Readily Available Alternatives to Address Its Alleged Interests.**

"[I]f the government [can] achieve its interests in a manner that does not restrict speech or that restricts speech less, it must do so." *Thompson*, 535 U. S. at 371. In this case, the state failed to recognize that the harm it claims results from the restricted ads—false and misleading speech—was *already prohibited* prior to adoption of the amendments. *See* 22 NYCRR § 1200.6(a). The amendments to the rules do nothing to prohibit deceptive advertisements beyond what was already prohibited by this provision. Yet, the New York State Bar's report on attorney advertising shows that this existing rule has not been consistently enforced. *See* Task Force Report at 46-48 (noting that about one-third of a sample of randomly selected New York lawyer advertisements would violate the state's existing prohibition on false and misleading advertising). For this reason, the report recommended tougher enforcement of existing rules, rather than new mandatory restrictions on the content of attorney advertising. Task Force Report at 2, 16, 79-81. Defendants have not shown that the bar's proposed solution would be inadequate to protect the citizens of New York from deceptive advertising by lawyers. Indeed, if the state had reason to believe that plaintiffs' advertisements posed any threat to the public, it

could have taken action against them under the prior version of the rules; yet it never initiated such an action.  Stipulations ¶ 6.

Nor have defendants shown that other regulations short of a complete ban would fail to accomplish the state's goals.  *See Shaffer*, 27 F.3d at 844 (striking down a restriction on commercial speech in light of the state's "failure to determine empirically whether less restrictive measures . . . would provide an alternative means for effectively combating" the purported harm).  For example, the state bar's advertising task force suggested that the state could impose filing requirements that would allow it to review individual advertisements for false and misleading statements.  Task Force Report at 79-81.  Alternatively, if the state could show that certain forms of speech are particularly likely to mislead consumers, it could impose disclosure or disclaimer requirements to prevent the risk of consumer confusion instead of prohibiting the speech entirely, another alternative suggested by the task force.  *Id.* at 2; *see RMJ*, 455 U.S. at 203 ("[T]he States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information may be presented in a way that is not deceptive.").  Indeed, the state has already imposed disclaimer requirements, including a disclaimer that "[p]rior results do not guarantee a similar outcome." 22 NYCRR § 1200.6(e). That disclaimers for many advertisements prohibited by the rules would be absurd—for example, a disclaimer that "attorneys pictured are not actually giants," or that "musical jingles should not influence the choice of an attorney"—simply underscores that there is nothing misleading about such advertising techniques, and that the rules in these applications do not protect consumers.[7]

Even better, the state could conduct its own outreach efforts to educate consumers about

---

[7] To be clear, though disclaimers are a less restrictive alternative than an outright ban and plaintiffs have not challenged the disclaimers in this case as applied to for-profit advertisements, plaintiffs do not believe that mandatory disclaimer rules are constitutional with respect to most attorney advertisements, including those at issue here.  See *infra* at 24-25.

the factors on which they should rely in selecting an attorney.  A basic tenet of our First

Amendment is that allegedly distasteful speech is best dealt with in the marketplace of ideas,

through *more* speech aimed at providing a better or more balanced point of view.  *Whitney v.*

*California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).  As the Supreme Court wrote in

*Bates*, "[i]f the naivete of the public will cause advertising by attorneys to be misleading, then it

is the bar's role to assure that the populace is sufficiently informed as to enable it to place

advertising in its proper perspective."  *Bates*, 433 U.S. at 375.

### 3.    The State Has Ignored the Impact of Its Policies on Consumers.

Finally, the rules must be set aside because the state disregarded a key component of the

constitutional calculus—an assessment of the impact that the new rules are likely to have on

consumers.  The Supreme Court has long held that a state may not adopt a restriction on speech

"without reference to whether it does so at inordinate costs."  *Bd. of Trs. of State Univ. of N.Y. v.*

*Fox*, 492 U.S. 469, 480 (1989).  Rather, the costs must be "carefully calculated."  *Id.*

"[T]he extension of First Amendment protection to commercial speech is justified

principally by the value to consumers of the information such speech provides . . . ."  *Zauderer*,

471 U.S. at 651.  As the FTC recognized in its comments to the draft version of the rules,

prohibitions against common advertising techniques harm consumers of by reducing

competition, frustrating consumer choice, and ultimately increasing prices while decreasing

quality of service.  FTC Letter at 1-2.  Moreover, restrictions on advertising act "as a barrier to

professional entry" and thereby "skew[] the market . . . in favor of established attorneys who are

already known by word of mouth."  *Ficker*, 119 F.3d at 1153; *see also Bates*, 433 U.S. at 378.  In

a less competitive environment, attorneys have less incentive to price competitively and prices

therefore increase.  *See id.* at 377-78.  For this reason, the FTC recommended against techniques

that "are related to the style and content of media advertising but do not necessarily target

deception." *See* FTC Letter at 2-3 & 3 n.10.

Restrictions on the content of lawyer advertising also disproportionately harm those who

are poor, illiterate, injured, disabled, or who do not speak English, and who are therefore

especially likely to rely on broadcast and illustrative advertisements to inform them of available

legal services. *See Trantolo*, 470 A.2d at 234 ("[T]elevision and radio are the informational

media of choice for many, and of necessity for others."); *see also Peel*, 496 U.S. at 110

(recognizing that advertising "facilitates the consumer's access to legal services and thus better

serves the administration of justice"). The Supreme Court in *Bates* noted that many legal needs

of those of moderate means go unmet because consumers fear the perceived costs of legal

services or do not know how to locate a competent attorney. *Bates*, 433 U.S. at 376-77.

Similarly, the American Bar Association, in formulating its Model Rules of Professional

Conduct, recognized that the public's reliance on advertising to learn about legal services is

"particularly acute in the case of persons of moderate means who have not made extensive use of

legal services." Model R. Prof'l Conduct 7.2, cmt. 1. The sorts of common advertising

techniques prohibited by the rules can "be an effective way of reaching consumers who do not

know how legal terminology corresponds to their experiences and problems," and can therefore

be "useful to consumers in identifying suitable providers of legal services." FTC Letter at 3.

The state therefore "has not 'carefully calculated' the costs and benefits associated with

the burden on speech imposed by its prohibition." *City of Cincinnati v. Discovery Network, Inc.*,

507 U.S. 410, 417 (1993). For this independent reason, the rules are unconstitutional.

**D.      The Rules Are Unconstitutionally Vague.**

The amended rules on attorney advertising are not only unsupported by any legitimate

state interest, they are also unconstitutionally vague.  Due process prohibits vague regulations for

two interrelated reasons:  (1) to provide fair notice so that people may steer clear of unlawful

conduct, and (2) to provide explicit standards to authorities to prevent arbitrary and

discriminatory enforcement.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see

also Kolender v. Lawson*, 461 U.S. 352 (1983); *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.

1999).

The rules adopted by the state in this case do not provide clear guidelines for lawyers

attempting to avoid professional discipline.  The rules do not define a "technique[] to obtain

attention" or explain what sorts of techniques are "relevan[t] to the selection of counsel."  22

NYCRR § 1200.6(c)(5).  Nor do they provide any guidance as to what lawyer characteristics are

deemed to be "unrelated to legal competence."  *Id.*  Moreover, the rules do not define the terms

"nickname, moniker, motto or trade name," or explain what sorts of statements "impl[y] an

ability to obtain results in a matter."  *Id.* § 1200.6(c)(7).  Read literally, the rules seem to cover

almost *any* technique a lawyer could include in an advertisement, including harmless techniques

like jingles and pictures of the attorney.  Disciplinary action against these forms of advertising is

not far-fetched—Justice Pigott in his public comments about the rules specifically identified

jingles as a problem justifying the need for the rules—and there is no discernible dividing line

between jingles and other forms of common, non-deceptive commercial advertising.  *See

Comments of Justice Pigott, at 34:25.

Even if the disciplinary committees never enforce the rules in these wide-ranging

contexts, the mere *potential* application of the rules creates self-censorship on the part of lawyers

and a resulting chill on speech.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750,

757 (1988).  Lawyers who violate the rules are subject to discipline, including censure,

-18-

suspension, or disbarment.  N.Y. Judiciary Law § 90(2); *see also* 22 NYCRR § 603.2 (1st Dept.);

22 NYCRR § 691.2 (2d Dept.); 22 NYCRR § 806.2 (3d Dept.); 22 NYCRR § 1022.17.  Given

the vagueness of the rules, lawyers who advertise in the state will face an unacceptable dilemma:

Either comply with the literal language of the rules or risk the possibility of professional

discipline, including a possible loss of the lawyers' profession and livelihood.

Moreover, the rules' vagueness raises the risk of arbitrary and discriminatory

enforcement against lawyers who are unpopular with state disciplinary authorities.  *See*

*Discovery Network*, 507 U.S. at 423 n.19 (noting the "potential for invidious discrimination of

disfavored subjects" in vague regulations).  For example, disciplinary committees may apply the

rules strictly against personal injury lawyers and other lawyers who advertise on television while

ignoring attention-getting devices such as graphics, photographs, or flashy design schemes on the

web pages of major law firms.  *See, e.g.*, http://www.skadden.com/ (displaying a dramatic red

design scheme, photographs, and animation); http://www.sullcrom.com/ (featuring a picture of a

mountain); http://www.dpw.com/ (featuring depictions of moving people as blurs);

http://www.blankrome.com/ (displaying flashing photographs suggesting competence, including

gymnasts flying through the air, chess pawns, and a $5,000 bill).

Indeed, Justice Pigott, in his public comments about the rules, acknowledged that the

presiding justices had not considered how they would be applied to "the big firms in New York,"

noting that "[w]e're thinking about the ads that you and I see every night."  *See* Comments of

Justice Pigott, at 36:25.  Although Justice Pigott claimed that the rules do not "target any area of

practice," he admitted that it was only "very limited areas of practice" that he was concerned

with in adopting the amendments and that it was "obvious to all of us the areas that seem to

attract the most egregious ads."  *Id.* at 30:50.  He also made light of lawyers who complained

that the required disclaimers would eat up most of their time in a fifteen-second television advertisement, joking that, in response, "we'll make the disclaimer a little longer." *Id.* at 37:08. In sum, there is a substantial risk that, rather than targeting speech harmful to New York consumers, disciplinary authorities will apply the rules to speech and to attorneys that these authorities, in their unregulated discretion, personally dislike.

## II.     The State's Thirty-Day Ban on Communications to Prospective Clients Is Unconstitutional.

Sections 1200.8(g) and 1200.41-a of the rules impose a blackout on all communications by lawyers to consumers with personal injury or wrongful death claims for thirty days after the incident giving rise to the injury.  22 NYCRR §§ 1200.8(g) & 1200.41-a .  Under these rules, lawyers will be prohibited from communicating by any means with injured consumers in New York to inform them of their legal rights or the availability of legal representation, including not only in-person, telephone, and direct-mail solicitations, but also advertisements on radio, television, and the Internet that do not intrude on the privacy of consumers.  These rules will unreasonably burden the ability of Public Citizen's members and other New York consumers to learn about their legal rights even if they actively seek out this information on the Internet.

Although the Supreme Court in *Went For It* upheld a thirty-day restriction on direct-mail solicitations to injured consumers, the Court relied on the strength of extensive evidence accumulated by the state of Florida showing that consumers there viewed direct-mail solicitations following an injury to be an egregious violation of their privacy and an invasion into the sanctity of the home.  *Went For It*, 515 U.S. at 625.  The Court pointedly contrasted the state's evidence with the situation in *Edenfield*, where the Court struck down regulations that were supported by "no studies."  *Id.* at 626.  Unlike the Florida bar in *Went For It*, the state here has submitted no evidence in support of its rules.  Moreover, the state cannot rely on the record

in *Went For It* to justify its rules because the state did not rely on it in promulgating the rules, it is not in the record here, and, in any case, it is more than a decade old and involves consumers in another state. The *Went For It* study does not reflect consumers' growing familiarity with lawyer advertising over the past ten years.

Moreover, the Supreme Court's decision to uphold restrictions on targeted mailings in *Went For It* cannot possibly justify New York's broad ban on broadcast, print, and Internet advertisements that in no way invade the privacy of consumers. The Court in *Went For It* narrowly limited its holding to "targeted direct-mail solicitations to victims and their relatives," and emphasized the "other ways for injured Floridians to learn about the availability of legal representation" during the thirty-day blackout period. *Id.* at 620, 633. Here, however, the rules restrict even alternative sources of information—the "other ways" referred to in *Went For It*—leaving consumers completely unable to learn about their rights relating to a specific incident even if they specifically seek out this information. For example, a law firm that wished to set up a web page stating its willingness to assist consumers injured by a product would be blocked from doing so during the thirty-day period, as would lawyers advertising on television, on billboards, or in the yellow pages. And if different people were injured by a product at different times, an advertisement addressed to those injured consumers would never be allowable because it could always be viewed by an injured person within thirty days of that person's injury.

Unlike direct-mail advertisements, untargeted advertisements "involve[] no willful or knowing affront to or invasion of the tranquility of bereaved or injured individuals," and prohibiting this form of advertising therefore serves no state interest other than an illegitimate and paternalistic interest in protecting consumers from being offended. *Id.* at 630; *see also id.* at 631 n.2 ("There is an obvious difference between situations in which the government acts in its

own interests, or on behalf of entities it regulates, and situations in which the government is

motivated primarily by paternalism."). Even if considered by some consumers to be in poor

taste, these sorts of ads "can hardly be said to have invaded the privacy of those who [receive

them]." *Zauderer*, 471 U.S. at 642. Those who do disapprove of the ads can "effectively avoid

further bombardment of [their] sensibilities simply by averting [their] eyes," *Shapero*, 486 U.S.

at 475-76 (internal quotation marks omitted), or, in the case of television ads, by changing the

channel. Moreover, any consumers who may be offended are just as likely to be offended on the

thirty-first day after their injury as they will be on the thirtieth. *See Ficker*, 119 F.3d at 1154.

For all these reasons, the state's thirty-day ban on lawyer communications to prospective clients

is unconstitutional.

### III.    The Rules' Restrictions on Nonprofit Communications Do Not Survive Strict Scrutiny.

The Supreme Court has recognized that solicitation of pro bono legal services by

nonprofit political and social organizations is not commercial speech, but rather core political

speech for which regulations are subject to strict scrutiny under the First Amendment. *In re

Primus*, 436 U.S. 412, 428 (1978). In *Primus*, an ACLU cooperating lawyer offered free legal

services to a woman challenging a state's requirement of sterilization as a condition of receiving

public medical assistance. *Id.* at 415-16. The Supreme Court reversed the state supreme court's

decision to sanction the lawyer, holding that the lawyer's solicitation was protected political

speech and association under the First Amendment. *Id.* at 428. The Court recognized that

"collective activity undertaken to obtain meaningful access to the courts is a fundamental right

within the protection of the First Amendment" and thus "must withstand the exacting scrutiny

applicable to limitations on core First Amendment rights." *Id.* Under this standard of review, a

state regulation survives scrutiny only if the state has a compelling interest in the regulation and

its methods are narrowly tailored to serve that interest. *Id.* at 426, 432-33.

The amendments change section 1200.1 of the Disciplinary Rules to define the word "advertising" as "any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the retention of the lawyer or law firm." 22 NYCRR § 1200.1(k). The new rules provide no exception for nonprofit legal organizations that do not charge clients for their services. Thus, an offer by the New York Civil Liberties Union to represent a New York consumer pro bono in a constitutional challenge against the state would fall squarely within the scope of the rules and would be subject to all the restrictions on the content of advertisements discussed in Section I, above, which are unconstitutional even in the context of commercial speech.

The thirty-day restriction on solicitation also applies to noncommercial speech. 22 NYCRR § 1200.41-a. Under the rules, for example, a nonprofit organization that employs lawyers will be prohibited from communicating with people who have been physically injured by police officers at a political demonstration to inform them of the availability of free legal representation. Prospective clients in these situations may not know that their constitutional rights were violated and may benefit from immediate contact by an attorney. The state has no valid interest in prohibiting offers of representation by nonprofit attorneys or organizations in such situations, where "the danger of undue influence is minimized and outweighed by the value of the information and the right to free speech." *Ficker*, 119 F.3d at 1152. In analogous circumstances, the Fourth Circuit struck down a thirty-day ban on attorney communications to criminal and traffic defendants, noting that, "[w]hile a criminal or traffic defendant may be shaken by his arrest, what he needs is representation, not time to grieve." *Id.* at 1155.

Moreover, the amended rules impose a variety of other restrictions on noncommercial

communications that, even if they can be constitutionally applied to commercial communications, are unjustified and overly burdensome when applied to noncommercial speech and will chill pro bono offers to represent New York consumers.  For example, section 1200.6(k) requires lawyers and law firms to retain copies of all communications defined as advertisements for a period of one to three years and would thus require nonprofit groups to save copies of all communications offering pro bono services, including email.  22 NYCRR § 1200.6(k).  Complying with this rule would involve an unjustified expense and would burden the ability of nonprofit groups to engage in noncommercial communications.  Moreover, the purpose of this rule is apparently to allow the state to review past solicitations upon request to look for disciplinary violations, and the state's intrusion into these communications may reveal embarrassing or private information about the solicited consumers and would unacceptably chill the right of association between nonprofit lawyers and their clients.  *See Primus*, 436 U.S. at 426; *NAACP v. Button*, 371 U.S. 415, 430-33 (1963).

The rules also require that the words "Attorney Advertising" appear in all written advertisements by attorneys, including, in all capital letters, in the subject line of emailed communications.  22 NYCRR § 1200.6(f).  Although disclosure requirements are usually preferable to an outright ban, the Supreme Court in *Zauderer* recognized that unjustified or overly burdensome disclosure requirements can chill speech and thereby themselves violate the First Amendment.  471 U.S. at 651.  Thus, even in the commercial context, the First Amendment does not permit a disclaimer requirement in the absence of evidence that the regulated form of speech is misleading.  *Ibanez*, 512 U.S. at 146-47; *see also Mason*, 208 F.3d at 958 (noting that a state "is not relieved of its burden to identify a genuine threat of danger simply because it requires a disclaimer, rather than a complete ban on . . . speech").  Moreover, when a restriction

affects *noncommercial* speech, the state must satisfy the strict scrutiny test by showing that the rule is supported by a compelling state interest and is narrowly tailored toward that interest. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988). Here, there is no evidence of a widespread problem with pro bono lawyers disguising their solicitations in some difficult-to-recognize form. Indeed, if anything, consumers would be misled by noncommercial solicitations labeled as "advertising." By flagging email and other forms of noncommercial communications as advertising, even though they are not designed to attract clients for pecuniary gain, the amendments dramatically increase the likelihood that the communications will be blocked by a spam filter or discarded by the recipient without being read, thus preventing consumers from reading communications that they may have a strong interest in receiving.

Because the state has the burden of showing a compelling interest and narrow tailoring toward that interest to satisfy the strict scrutiny test, plaintiffs need not catalog the impact that each of the rules' provisions will impose on noncommercial speech. In short, *none* of the rules as applied to noncommercial speech relates in any way to the state's interest in protecting consumers of legal services from false advertising. For this reason, none of the amendments satisfies the strict scrutiny test when applied to noncommercial communications.

## **CONCLUSION**

The amended rules are an unconstitutional curtailment of both commercial and noncommercial speech and the Court should grant summary judgment for the plaintiffs. The Court should declare unconstitutional and permanently enjoin enforcement of §§ 1200.6(c)(1), (5), (7), (g)(1), 1200.7(e), 1200.8(g), 1200.41-a, and the first clause of § 1200.6(c)(3) of the amendments to the Disciplinary Rules of the Code of Professional Responsibility that became effective on February 1, 2007, as well as §§ 1200.6, 1200.7, and 1200.41-a of the rules as applied to communications where the lawyer's primary purpose is not pecuniary gain.

-25-

Respectfully submitted,


  /s/ Gregory A. Beck
Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax: (202) 588-7795
Email: gbeck@citizen.org
         brian@citizen.org
         snelson@citizen.org

*Counsel for Plaintiffs*

Dated:  May 11, 2007