

UNITED STATES OF AMERICA
# FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Office of Policy Planning
Bureau of Consumer Protection
Bureau of Economic

September 14, 2006

Michael Colodner, Esq.
Counsel
Office of Court Administration
25 Beaver Street
New York, NY 10004

Re:   Proposed Restrictions to Attorney Advertising

Dear Mr. Colodner:

The staff of the Federal Trade Commission's ("FTC" or "Commission") Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics[1] is pleased to submit these comments on Proposed Amendments to Rules Governing Attorney Advertisement ("Proposed Amendments"),[2] which address many components of attorney advertisement and solicitation. This letter briefly summarizes the Commission's interest and experience in the regulation of attorney advertising and solicitation and provides the staff's opinion regarding the anticipated effects of the Proposed Amendments on consumers and competition. The FTC Staff believes that while deceptive advertising by lawyers should be prohibited, restrictions on advertising and solicitation should be specifically tailored to prevent deceptive claims and should not unnecessarily restrict the dissemination of truthful and non-misleading information. As to the proposed amendments, the FTC Staff is concerned that several provisions are overly broad, may restrict truthful advertising, and may adversely affect prices paid and services received by consumers. Moreover, the FTC Staff believes that New York can adequately protect consumers from false and misleading advertising by using less restrictive means such as requiring clear and prominent disclosure of certain information.

The FTC enforces laws prohibiting unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce, including primary responsibility for stopping

---

[1]   This letter expresses the views of the Federal Trade Commission's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics. The letter does not necessarily represent the views of the Federal Trade Commission or of any individual Commissioner. The Commission has, however, voted to authorize us to submit these comments.

[2]   The Proposed Amendments are available at www.nycourts.gov/rules/proposedamendments.shtml.

Exhibit 2

Michael Colodner
September 14, 2006
Page 2 of 7

deceptive and misleading advertising practices.[3] Pursuant to its statutory mandate, the Commission encourages competition in the licensed professions, including the legal profession, to the maximum extent compatible with other state and federal goals. In particular, the Commission seeks to identify and prevent, where possible, business practices and regulations that impede competition without offering countervailing benefits to consumers.[4] The Commission and its staff have had a long-standing interest in the effects on consumers and competition arising from the regulation of lawyer advertising.[5]

Debate about attorney advertising involves important policy concerns, such as preventing statements that would deceive or mislead lay people and thereby undermine public trust in lawyers and the legal system. The FTC Staff's view is that consumers are better off if concerns about potentially misleading advertising are addressed through the adoption of advertising restrictions that are narrowly tailored to prevent deceptive claims. By contrast, imposing overly broad restrictions that prevent the communication of truthful and non-misleading information that some consumers may value is likely to inhibit competition and frustrate informed consumer choice. In addition, research has indicated that overly broad restrictions on truthful advertising may adversely affect prices paid and services received by consumers.[6]

Some of the Proposed Amendments are related to the style and content of media advertising but do not necessarily target deception.[7] These include prohibiting voice-overs or

---

[3] Federal Trade Commission Act, 15 U.S.C. § 45.

[4] Specific statutory authority for the FTC's advocacy program is found in Section 6 of the FTC Act, under which Congress authorized the FTC "[t]o gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce," and "[t]o make public from time to time such portions of the information obtained by it hereunder as are in the public interest." *Id.* § 46(a), (f).

[5] *See, e.g.*, Letter from FTC Staff to Committee on Attorney Advertising, the Supreme Court of New Jersey (Mar. 1, 2006), *available at* http://www.ftc.gov/be/V060009.pdf; *see also, e.g.,* Letter from FTC Staff to Robert G. Esdale, Clerk of the Alabama Supreme Court (Sept. 30, 2002), *available at* http://www.ftc.gov/be/v020023.pdf. In addition, the staff has provided its comments on such proposals to, among other entities, the Supreme Court of Mississippi (Jan. 14, 1994); the State Bar of Arizona (Apr. 17, 1990); the Ohio State Bar Association (Nov. 3, 1989); the Florida Bar Board of Governors (July 17, 1989); and the State Bar of Georgia (Mar. 31, 1987). *See also* Submission of the Staff of the Federal Trade Commission to the American Bar Association Commission on Advertising (June 24, 1994) (available online as attachment to Sept. 30, 2002, Letter to Alabama Supreme Court, *supra*).

[6] *See, e.g.*, Submission of the Staff of the Federal Trade Commission to the American Bar Association Commission on Advertising , June 24, 1994, at 5-6 (available online as attachment to Sept. 30, 2002, Letter to Alabama Supreme Court, *supra*).

[7] The Proposed Amendments require that advertising be "predominantly informational, and shall be designed to increase public awareness of situations in which the need for legal service might arise. . ." *See* § 1200.6(a). Consumers use many different forms of information (e.g., objective and subjective claims) to form views about price, quality, and other product attributes to help them make their purchasing decisions. It is not clear from the Proposed Amendments which types of advertising techniques or claims would be considered to be "predominantly informational" and which would not. The Proposed Amendments therefore may have the effect of prohibiting or

Michael Colodner
September 14, 2006
Page 3 of 7

images of non-attorney spokespersons recognizable to the public, depictions of courtrooms or courthouses, portrayals of judges and lawyers by non-lawyers, portrayals of clients by non-clients, re-enactments of events or scenes or persons that are not actual, and Internet pop-up advertisements.[8] Such techniques may be useful to consumers in identifying suitable providers of legal services. For example, dramatization may be an effective way of reaching consumers who do not know how legal terminology corresponds to their experiences and problems. The proposed constraints would prevent the use of common methods that advertising firms have used to make their messages memorable. These methods are unlikely to hoodwink unsuspecting consumers, because consumers are usually familiar with them. Any concern that the actors may be more poised or otherwise materially preferable to actual attorneys could be addressed through a less restrictive approach of requiring clear and prominent disclosure that the lawyers are portrayed by actors.

The Proposed Amendments prohibit comparative claims that have not been objectively verified.[9] Requiring that material claims be substantiated can, of course, serve consumers by helping to ensure that claims are not misleading. But if substantiation is demanded for representations that, although not misleading, concern subjective qualities that are not easy to measure and for which substantiation may not normally be expected, then messages that consumers may find useful may be barred. The broad prohibition might be based on a concern that unsubstantiated comparative claims could mislead consumers about the results lawyers can achieve. But if that is the concern, then it would be better addressed by a rule directed more narrowly to claims that could be construed as having some bearing on likely outcomes.[10]

Two other provisions would prohibit paid endorsements and testimonials, as well as endorsements from existing clients.[11] The Commission has recognized certain conditions under which paid endorsements may be deceptive. As explained in the FTC's Endorsement Guides, "When there exists a connection between the endorser and the seller of the advertised product which might materially affect the weight or credibility of the endorsement (i.e., the connection is

---

deterring some truthful, non-misleading advertising techniques or claims that consumers find beneficial in making decisions. To give further guidance, the Court may find it useful to clarify what types of advertising are not predominantly informational and explain why they would be harmful to consumers.

[8]   *See* §§ 1200.6(d)(3)-(6) and 1200.6(i)(1).

[9]   *See* § 1200.6(e)(2).

[10]  In addition, it is not entirely clear whether literally accurate superlative descriptions (such as advertising that an attorney is listed among *"Super Lawyers"* or *"America's Best Lawyers",* or that a lawyer has earned a "highest" "AV" ranking awarded by *Martindale-Hubbell*) would be barred either as improper comparisons or as descriptive monikers that imply an ability to obtain future results. *See* §§ 1200.6 (d)(8) and (e)(1). Such descriptions may benefit consumers so long as they are neither false nor misleading.

[11]  *See* §§ 1200.6(d)(1)-(2).

Michael Colodner
September 14, 2006
Page 4 of 7

not reasonably expected by the audience) such connection must be fully disclosed."[12] The Commission's approach of requiring disclosure rather than prohibiting such endorsements protects consumers while encouraging the truthful flow of information to consumers.

Advertisements that look like legal documents would also be prohibited by the Proposed Amendments.[13] Although some advertisements that appear to be legal documents, especially those delivered by mail or by hand, may deceive consumers, many other such advertisements are unlikely to be deceptive. The Commission has addressed the issue of deceptively formatted advertisements in the contexts of television infomercials and radio ads that appeared to be independent programs and mailings that appeared to be an independent book review torn from a magazine.[14] In these cases, the Commission sought and obtained clear and prominent disclosures that the materials at issue were paid advertisements. Such a narrowly tailored approach allows the use of an effective advertising technique while protecting consumers from deception.

Because the forms of advertising prohibited by § 1200.6 may be valuable to consumers and promote competition, the FTC Staff recommends that such advertising be prohibited only if a reasonable consumer would take away a false or misleading material claim from the advertisement, and then only if the deception would not be cured by a clear and conspicuous disclosure.[15]

In addition, the FTC Staff is concerned that the Proposed Amendments' requirement that copies of all advertisements and solicitations be placed on file with the Bar's Attorney Disciplinary Committee and made available for public scrutiny[16] will likely raise the cost of doing business for attorneys and thus likely raise prices for consumers. This is especially true given that advertisements and solicitations as defined would include not only any and all radio, television, magazine and newspaper ads, but also all web sites, mail correspondence, e-mails, speeches, web logs ("blogs"), and other public or private presentations given by an attorney wherein an attorney describes the nature of his or his law firm's practice.[17] The FTC Staff is

---

[12] *See* Federal Trade Commission Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 C.F.R. Part 255.5. This would include the fact that the endorser knew or had reason to believe that if the endorsement favored the advertiser some benefit would be extended to the endorser.

[13] *See* § 1200.6(d)(7).

[14] *See, e.g.*, *Bogdana Corp.*, 126 F.T.C. 37 (1998) (consent agreement); *National Media Corp.*, 116 F.T.C. 549 (1993) (consent agreement); and *Georgetown Publ'g House Ltd. P'ship*, 122 F.T.C. 392 (1996) (consent agreement).

[15] Indeed, the Proposed Amendments at §§1200.6(g)-(h) already require such clear and conspicuous disclosures on many forms of attorney advertising.

[16] *See* § 1200.6(o).

[17] Section 1200.1(k) defines an "advertisement" as "any public communication made by or on behalf of a lawyer or law firm about a lawyer or law firm, or the lawyer or law firm's services." Section 1200.1(l) defines "solicitation" to mean any advertisement or other communication directed or targeted to a specific recipient or group of recipients. It is unclear from the Proposed Amendments if the definitions and requirements include

Michael Colodner
September 14, 2006
Page 5 of 7

concerned that any potential benefits from such extensive filing and disclosure requirements would be outweighed by the detrimental effect that such a burdensome regulatory obligation might have upon competition.[18]

The FTC is staff is also concerned that, under the Proposed Amendments, law firms and attorneys apparently would be required to disclose in every e-mail, web log, web site or page, and other computer-accessed communication a listing of all office locations and jurisdictions in which the attorney and firm members are licensed.[19]  Even if such information is beneficial to consumers, such disclosure requirements may impose unnecessary burdens on law firms and attorneys in conveying that information to them.  To avoid imposing unnecessary burdens, the Court may wish to consult FTC guidance concerning how to disclose clearly and conspicuously information in the on-line context.[20]

Lastly, § 1200.8 of the Proposed Amendments relating to attorney use of computer contact for solicitation and which, among other things, regulates the use of attorney referral programs, may deter New York lawyers from participating in all but a limited set of programs to the exclusion of other programs that may have pro-consumer benefit.[21]  For example, many consumers and attorneys nationally have begun to participate in online services that provide Internet-based attorney/client matching platforms.[22]  Unlike a traditional referral service, online matching programs do not designate one particular attorney, but invite many attorneys to respond to a consumer inquiry.  To achieve this, online matching services recruit licensed attorneys who typically pay an application fee and a regular subscription fee to participate in the program.[23]  A potential client who visits the matching service's web site can review the material about attorneys, how they are recruited, and how the matching service works.  Clients may then post a listing with the service describing their legal needs, which the service sends to all applicable attorneys.  Interested attorneys may then send, through the service, a response to the client, the substance of which would contain information such as fees, experience, and other qualifications

---

communications containing confidential material protected by attorney-client privilege.

[18]    Indeed, given the broad reach claimed by § 1200.5(a), the Proposed Amendments may impose burdens on non-New York lawyers who seek to represent New Yorkers outside the state.

[19]    *See* § 1200.6(k).

[20]    *See generally,* Federal Trade Commission, Dot Com Disclosures: Information about Online Advertising (May 2000); *available at* http://www.ftc.gov/bcp/conline/pubs/buspubs/dotcom/index.pdf.

[21]    *See, e.g,.,* Letter from the Federal Trade Commission to the Professional Ethics Committee of the Texas State Bar, May 2006;  http://www.ftc.gov/os/2006/05/V060017CommentsonaRequestforAnEthicsOpinionImage.pdf.

[22]    Although not all services are identical, many share the same general business model.  *See, e.g*, LexisNexis/Martindale Hubbel's Attorney Match (http://www.lawyers.com/find_a_lawyer/am/am_aop_list.php); Casepost (http://www.casepost.com); LegalConnection (FindLaw) (http://www.legalconnection.com); LegalMatch (www.legalmatch.com); and Legal Fish (www.legalfish.com.).

[23]    We understand that in some of these programs member attorneys may prepare a web page that may disclose preferred areas of practice, years of experience, bar affiliations, and any other pertinent information.

Michael Colodner
September 14, 2006
Page 6 of 7

that may inform the client when selecting counsel. With this information, the client determines which attorneys – if any – to contact, and initiates the contact. In some instances, the client's application may invite an attorney to contact a client directly.

Online legal matching services have the potential to reduce consumers' costs for finding legal representation, which would likely increase competition among attorneys to provide legal services. When consumers face large costs to obtain information about marketplace prices and quality, businesses have less incentive to compete.[24] A large amount of empirical research has found that restrictions on advertising in professions leads to higher prices and either a negative or no effect on quality.[25] In the same way that advertising has been shown to benefit consumers of professional legal services, online legal matching services are likely to make it less expensive for consumers to evaluate providers of legal services.[26]

To the extent that the Proposed Amendments may deter attorneys from participating in attorney online legal matching services, they are likely to harm consumers. For example, the Proposed Amendments forbid a lawyer from engaging in solicitation "by real time or interactive computer-accessed communication unless the recipient is a close friend, relative, former client or current client"[27] and specify that attorneys may only participate if such is operated by a legal aid office or a military legal assistance office, or is a service operated, sponsored, or approved by a bar association or authorized by law or Court rule.[28] Because there is uncertainty as to whether communication through the service would constitute prohibited online communications, or even if the Court would view an online legal matching service as a prohibited "referral" program, the

---

[24] Several economists have developed models that predict firms will be able to charge higher prices when consumers face high costs of obtaining marketplace information. *See*, *e.g.*, Dale O. Stahl, *Oligopolistic Pricing with Sequential Consumer Search*, 79 AM. ECON. REV. 700 (1989); Kenneth Burdett & Kenneth L. Judd, *Equilibrium Price Dispersion*, 51 ECONOMETRICA 955 (1983); John Carlson & R. Preston McAfee, *Discrete Equilibrium Price Dispersion*, 91 J. POL. ECON. 480 (1983); Steven C. Salop & Joseph E. Stiglitz, *Bargains and Ripoffs: A Model of Monopolistically Competitive Price Dispersion*, 44 REV. ECON. STUDIES 293 (1977). Using these models as a theoretical framework, several authors have found evidence that the Internet has led to lower prices by reducing consumers' costs of comparing prices. *See*, *e.g.*, Jeffrey R. Brown & Austan Goolsbee, *Does the Internet Make Markets More Competitive? Evidence from the Life Insurance Industry*, 110 J. POL. ECON. 481 (2002); Erik Brynjolfsson & Michael D. Smith, *Frictionless Commerce? A Comparison of Internet and Conventional Retailers*, 49 MGM'T SCIENCE 563 (2000); James C. Cooper, *Price Levels and Dispersion in Online and Offline Markets for Contact Lenses*, FTC Bureau of Economics Working Paper (2006), *at* http://www.ftc.gov/be/workpapers/wp283.pdf.

[25] *See* Timothy J. Muris, *California Dental Association v. Federal Trade Commission: The Return of Footnote 17,* 8 Sup. Ct. Econ. Rev. 265, 293-304 (2000) (collecting citations to empirical literature on the effect of advertising restrictions in the professions); *In the Matter of Polygram Holdings, Inc., et al.*, FTC Docket No. 9298 (F.T.C. 2003), at 38 n.52 (same).

[26] Studies have found, for example, that the use of online consumer-to-vendor matching services in the retail auto industry have reduced prices to consumers by approximately 2 percent. *See* Fiona Scott Morton *et al.*, *Internet Car Retailing*, 49 J. INDUS. ECON. 501 (2001); Florian Zettelmeyer *et al.*, *Cowboys or Cowards: Why Are Internet Car Prices Lower?* (2005), *at* http://flomac.haas.berkeley.edu/~florian/ Papers/selection.pdf.

[27] *See* § 1200.8(a)(1).

[28] *See* § 1200.8(d).

Michael Colodner
September 14, 2006
Page 7 of 7

rule may have the effect of deterring a New York lawyer from participating in such an online legal service that could otherwise benefit New York consumers.

We recommend that any limitations in this regard be narrowly tailored and specifically defined so as to prohibit conduct that has resulted in demonstrated consumer harm. Indeed, unless such harm has been shown from legal matching and referral services, the FTC Staff recommends that the Court consider revising § 1200.8 so as to allow attorneys to participate in services that promote competition by reducing the cost to consumers of finding legal representation. If the Court is concerned that consumers may be misled with respect to the pool of attorneys to which their requests are sent, there are less restrictive alternatives than effectively barring such types of legal matching programs. For example, a legal matching service working with New York attorneys could be required to disclose to consumers the number of attorneys and firms that participate in the program, the number to whom the consumer's request was sent, and how the service generated the list of attorneys to whom the request was sent; in addition, the service could be required to explain how, if at all, it limited attorney participation.

In conclusion, the FTC Staff believes that, while deceptive and misleading advertising by lawyers should be prohibited, restrictions on advertising that are specifically tailored to prevent deceptive claims provide the optimal level of protection for consumers. Consumers benefit from robust competition among attorneys and from important price and quality information that advertising and solicitation can provide. Rules that unnecessarily restrict the dissemination of truthful and non-misleading information are likely to limit competition and harm consumers of legal services in the New York State.

Respectfully submitted,


Maureen K. Ohlhausen, Director
Office of Policy Planning



Lydia B. Parnes, Director
Bureau of Consumer Protection



Michael A. Salinger, Director
Bureau of Economics