**PUBLIC CITIZEN LITIGATION GROUP**
1600 TWENTIETH STREET, NW
WASHINGTON, DC  20009
(202) 588-1000
(202) 588-7795 (fax)

**AMERICAN CIVIL LIBERTIES UNION**
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
(212) 549-2500
(212) 549-2648 (fax)

**NEW YORK CIVIL LIBERTIES UNION**
125 BROAD STREET, 18TH FLOOR
NEW YORK, NY 10004
(212) 607-3300
(212) 344-3329 (fax)

_____

**Comments of Public Citizen Litigation Group,
American Civil Liberties Union, and New York Civil Liberties Union
on the Proposed Amendments to Rules Governing Lawyer Advertising**

**November 15, 2006**

Public Citizen Litigation Group ("PCLG"), the American Civil Liberties Union

("ACLU"), and the New York Civil Liberties Union ("NYCLU," and, together with

PCLG and ACLU, the "Commenters") are filing these comments on the proposed

amendments to the rules governing lawyer advertising drafted by the Presiding Justices of

the Appellate Division and scheduled to become effective on January 15, 2007.  The

proposed amendments would prohibit the communication of truthful, non-misleading

information about legal services to New York consumers—regardless of whether the

Dockets.Justia.com

communication is commercial or noncommercial in nature—and would impose

unprecedented restrictions on Internet communications.  The Commenters strongly

oppose the amendments, which would be both unworkable in practice and would violate

the First Amendment of the U.S. Constitution.  We urge that the proposed amendments be

withdrawn.

### Interest of the Commenters

**Public Citizen Litigation Group**

PCLG is a nonprofit public interest organization located in Washington, D.C.  It is

a division of Public Citizen, a nonprofit advocacy organization with approximately

100,000 members nationwide, 9,442 of whom live in New York.  Of PCLG's eight full-

time attorneys, one is currently licensed to practice law in New York and one is in the

process of applying for admission there.  PCLG has solicited clients in New York for

representation on a pro bono basis and has represented clients before state and federal

courts in New York.  PCLG will therefore be directly affected by the proposed

amendments.  Moreover, Public Citizen has an interest in protecting its New York

members, who would be deprived of information about their legal rights and available

legal services under the proposed amendments.

As an organization devoted to defending the rights of consumers, Public Citizen

has frequently opposed false and misleading advertising, while at the same time

defending the First Amendment right of speakers to engage in truthful, non-misleading

commercial speech.  Among other cases, PCLG attorneys argued and won *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), in which the Supreme Court for the first time recognized a First Amendment right to commercial speech, and *Edenfield v. Fane*, 507 U.S. 761 (1993), in which the Supreme Court struck down a ban on in-person solicitation by certified public accountants. PCLG's support for free speech in the commercial context is based in part on the recognition that truthful commercial speech enhances competition and ensures that consumers will be provided with information that may be useful to them—such as information on pricing and alternative products and services.  As the Supreme Court noted in *Virginia State Board of Pharmacy*, a "consumer's interest in the free flow of commercial information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate."  *Id.* at 763.

PCLG is particularly interested in the right to engage in truthful legal advertising because commercial speech in this context not only encourages beneficial competition in the marketplace for legal services, but can also educate consumers about their rights, inform them when they may have a legal claim, and enhance their access to the legal system.  *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 646-47 (1985).  In the past, PCLG has commented on proposed revisions to lawyer advertising rules and litigated cases where these rules have unjustifiably restricted the right to commercial free speech.  In *Zauderer*, PCLG successfully challenged the decision of the Ohio Supreme

Court to discipline a lawyer for taking out ads informing women about his legal services in connection with Dalkon Shield litigation. *Id.* Public Citizen was among the plaintiffs who successfully challenged Mississippi's restrictive advertising rules in *Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995). And PCLG has also challenged other anticompetitive bar rules that harm consumers. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975), for example, PCLG attorneys successfully argued that a bar's minimum fee schedule violated the Sherman Act.

**American Civil Liberties Union and New York Civil Liberties Union**

The American Civil Liberties Union is a nonprofit, nonpartisan organization, with more than 500,000 members nationwide, devoted since the 1920s to protecting the civil liberties guaranteed under the U.S. Constitution. The New York Civil Liberties Union, the New York local affiliate of the ACLU, is a nonprofit, nonpartisan organization, with nearly 50,000 members and six chapters in New York State, devoted since 1951 to protecting the civil liberties guaranteed under the United States Constitution to residents of New York.

A primary component of the ACLU's and NYCLU's activities is sponsoring litigation to advance and protect civil liberties. These activities are conducted by the ACLU through the American Civil Liberties Union Foundation, a New York not-for-profit corporation with its main offices in New York City, New York, and by NYCLU through the New York Civil Liberties Union Foundation, also a New York not-for-profit

corporation with offices in New York City, New York. Both the ACLU and NYCLU employ staff lawyers in New York who have provided pro bono representation to New York clients on civil liberties matters before state and federal courts. In addition, both ACLU and NYCLU conduct broad public education outreach efforts regarding civil liberties issues.

As nonprofit organizations dedicated to promoting civil liberties, the ACLU and NYCLU will be directly affected by the proposed amendments, as will the New York staff lawyers employed by both organizations. Furthermore, both the ACLU and NYCLU have an interest in protecting the nearly 50,000 ACLU/NYCLU members in New York, who would be deprived of information about their legal rights and available legal services under the proposed amendments.

Since its founding in 1920, the ACLU has vigorously defended the principle of free speech and its lawyers have appeared before the United States Supreme Court and the New York Court of Appeals in numerous free speech cases, including *In re Primus,* 436 U.S. 412 (1978), discussed more fully below. In *Primus,* the United States Supreme Court held that South Carolina violated the First and Fourteenth amendments when it applied its disciplinary rules to reprimand a South Carolina attorney who was a cooperating lawyer with the South Carolina branch of the ACLU, after she advised a group of women who had been sterilized as a condition of receiving public medical

assistance of their legal rights and informed one of the women that the ACLU could provide her with free legal assistance.

*     *     *

The Commenters thus have significant experience with the subject matter of the proposed amendments.  For the reasons outlined below, we believe that the amendments are motivated by an illegitimate purpose and, if adopted, would face a successful First Amendment challenge.

### Analysis

The proposed rules violate the First Amendment both because they restrict noncommercial speech at the core of the First Amendment and because they propose restrictions on commercial speech that is neither false nor misleading.  Furthermore, the proposed amendments would impose onerous and unworkable burdens on Internet speech that, independent of the rules' other problems, would violate the First Amendment. Because the rules appear to be motivated by a general distaste for lawyer advertising—a consideration that the U.S. Supreme Court has specifically held not to be a legitimate state interest sufficient to support rules against attorney advertising, *see Zauderer*, 471 U.S. at 647-48—we do not believe that mere amendments to the proposed rules would remedy their serious constitutional deficiencies.  We therefore urge that the proposed rules be withdrawn in their entirety.

I.      **The Amendments Unconstitutionally Restrict Noncommercial Speech**.

The proposed rules prohibit advertising and solicitation regardless of whether the speech at issue is commercial or noncommercial.  They would thus apply to advertising and solicitation by both commercial law firms and nonprofit organizations like PCLG, ACLU, and NYCLU.  The Supreme Court has recognized, however, that solicitation of no-fee legal services by nonprofit political organizations is *not* commercial speech, but rather core *political* speech for which regulations are subject to strict scrutiny under the First Amendment.  *Primus*, 436 U.S. at 428.

In *Primus*, an ACLU cooperating attorney offered free legal services to a woman challenging a state's requirement of sterilization as a condition of receiving public medical assistance.  *Id.* at 415-16.  The Supreme Court reversed the state supreme court's decision to sanction the attorney, holding that the attorney's solicitation was protected political speech and association under the First Amendment.  *Id.* at 428.  The Court recognized that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" with which a state may interfere only if it has a compelling interest and its methods are narrowly tailored toward that interest.  *Id.* at 426, 432-33 (quotation omitted).  In their present form, the proposed rules, like the rules in *Primus*, lack an exception for noncommercial speech and are not narrowly tailored toward a compelling state interest.  As examined in Parts II and III below, the rules would impose onerous restrictions on attorney speech, including

restrictions on advertising and Internet communications.  As applied to noncommercial

speech, these restrictions could not withstand First Amendment scrutiny.

      *A.     The Definition of Solicitation is Unconstitutionally Overbroad.*

      As currently formulated, the proposed amendments would impose an

unconstitutional burden on the rights of nonprofit legal organizations to solicit clients and

on lawyers working for nonprofit organizations.  The rules define "solicitation" broadly

as any "communication . . . concerning the availability for professional employment of a

lawyer or law firm."  § 1200.1(l).  Thus, an offer by a lawyer who works for any one of

the Commenters to represent a New York citizen pro bono in a constitutional challenge

against the state would fall squarely within the scope of the proposed rules and would be

subject to all the restrictions on commercial speech outlined in the following sections.

When applied to noncommercial speech, however, these restrictions—such as the

limitation on particular forms of communication in attorney advertising—would be

blatantly unconstitutional under *Primus*.

      Moreover, the language sweeps far beyond solicitations targeted at

consumers—the only possible beneficiaries of the rule—to include even communications

where there is no reasonable possibility of fraud or overreaching.  The definition applies

to communications targeted to *any* "specific recipient or group of recipients," including,

but not limited to, prospective clients and their families and legal representatives.  *Id*.

Thus, an email from a lawyer at PCLG to another lawyer at the ACLU requesting a

referral, stating a willingness to write a brief amicus curae, or even mentioning that the lawyer is currently looking to take on more cases, would fall within the definition's plain language. These common informal communications between lawyers at nonprofit legal advocacy organizations would, under the proposed rules, be subject to all the onerous restrictions against attorney solicitation.

None of these applications of the rules relates in any way to their presumed goal—to protect consumers of legal services from false and misleading advertising. Far from being narrowly tailored, the proposed rules would apply to a wide range of protected speech that the state has *no* interest in regulating.

B.      *The Definition of Advertisement is Also Unconstitutional.*

The proposed rules' definition of "advertisement" is even more fraught with problems. The amendments define the term as "any public communication made by or on behalf of a lawyer or law firm about a lawyer or law firm, or about a lawyer's or law firm's services." § 1200.1(k). The rules require no nexus between the communication and commercial activities, or even matters related to the lawyer's practice of law.

By its terms, this definition would cover press releases or educational materials distributed by nonprofit organizations that include information about the authoring organization or lawyer. It would also cover educational seminars given by a lawyer and published articles in journals or law reviews that contain either a brief biography or information about a lawyer's practice. And because the rules now explicitly apply to

"computer-accessed communications," § 1200.1(m), the rule would also cover an attorney's web site or the web site of a nonprofit organization that employs attorneys, regardless of whether the web site is devoted to public education and information about developments in the law or to the selling of legal services.

Even such fundamental examples of political speech as, for example, a lawyer's letter to the editor of the *New York Times* criticizing Attorney General Alberto Gonzalez (a lawyer), or a lawyer candidate's statement in a televised debate of his qualifications for office would be covered by the plain language of the proposed rules. These forms of communication are made "by . . . a lawyer . . . about a lawyer" and thus fall within the rules' explicit scope. Although we acknowledge that the rules would not likely be applied in circumstances so far removed from their motivating purpose, the vagueness and uncertainly surrounding the limits of these definitions illustrate the extent to which they trespass in the realm of core First Amendment speech. Even the *potential* application of the rule in such wide-ranging contexts risks a chill on protected political speech. *See NAACP v. Button*, 371 U.S. 415, 432-33 (1963); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Attorneys subject to the amended rules will face an unacceptable dilemma: either comply with the rules or risk the possibility of professional discipline. Under these circumstances, many lawyers will have no choice but to forego speech in questionable cases. Moreover, the vagueness of the rules raises the risk of arbitrary and discriminatory enforcement. *See City of Lakewood*, 486 U.S. at 757.

At a minimum, the definitions of "solicitation" and "advertisement" should be revised to narrow their scope to communications directed at potential clients for the purpose of persuading the client to retain the attorney's services for a fee.  One way to do this for the definition of solicitation would be to adopt the formulation in the American Bar Association's Model Rules of Professional Conduct, which limits the definition of solicitation to cases where an attorney seeks to "solicit professional employment from a prospective client" and "a significant motive" for the solicitation "is the lawyer's pecuniary gain."  Model Rules of Professional Conduct 7.3(a).  The amended rule should also follow the lead of the model rules by excluding communications made to another lawyer, a family member, or someone with a close personal or prior professional relationship with the lawyer.  *Id.*

In the case of advertising, an additional difficulty arises in that many communications are made with dual motives.  For example, a lawyer may write an article for a bar journal primarily for educational purposes, but also with the hope that it may lead to future employment.  To avoid restraining protected speech, special care should be taken to avoid subjecting these mixed-motive communications to unwarranted restrictions.  Thus, at the least, the rule should define advertisement as a communication where the lawyer's *primary* motive is pecuniary gain.

For the reasons spelled out in Part II below, we do not believe these suggested changes would be sufficient to make the rules constitutional, but they would at least

remedy the most egregious potential applications of the rules to noncommercial speech that is at the core of the First Amendment's protection.

C.    *The Thirty-Day Waiting Period is Unconstitutional as Applied to Nonprofit Organizations.*

The rules imposing a thirty-day waiting period on communications by attorneys to individuals and their family members and legal representatives in the event of an incident involving potential claims for personal injury or wrongful death, § 1200.41-a, and on advertisements or solicitations relating to a specific incident involving potential claims for personal injury or wrongful death, § 1200.8(e), are unconstitutional restrictions on political speech as applied to nonprofit organizations under *Primus.* These prohibitions, which are intended to protect presumably vulnerable individuals and their family members from being contacted by supposedly aggressive lawyers interested in pecuniary gain, are unconstitutionally overbroad in their reach. Under these rules, a nonprofit organization that employs lawyers would be prohibited from communicating with individuals physically injured by police officers at a political demonstration (and also barred from contacting their family members and legal representatives) in order to inform those individuals or their family members or legal representatives of the availability of pro bono legal representation. As an organization with a keen interest in preserving the right of New Yorkers to participate in political protest without undue government interference, including excessive force, this rule would have a significant and

unconstitutional impact on NYCLU's activities and the people whose constitutional rights NYCLU serves to protect.

## II.     The Proposed Restrictions on Lawyer Advertising Are Unconstitutional Even as Applied to Commercial Speech.

The current version of the attorney advertising rules fully vindicate the state's legitimate interest in protecting consumers by prohibiting lawyer advertising that is false, deceptive, or misleading.  § 1200.6(b)(1).[1]  The proposed rules would leave this basic requirement in place, but would add a litany of hypertechnical restrictions that neither benefit consumers nor advance any legitimate state goal.  Indeed, the amendments appear to be intended less to prevent fraud than to prohibit the most effective forms of lawyer advertising and to impede competition for legal services.  Even if limited to commercial speech, these amendments are therefore unjustified and unconstitutional.

---

[1]We note, however, that the prohibition on false, deceptive, or misleading advertising does not exclude non-material misrepresentations.  *But see* Model Rules of Professional Conduct Rule 7.1 ("A communication is false or misleading if it . . . contains a *material* misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not *materially* misleading . . . ." (emphasis added)).  This problem exists in the current version of the rules and is not created by the proposed amendments.  However, the lack of a non-materiality exception potentially restricts some of the same material that is the subject of the amendments—such as a generic courtroom scene that, although not literally true, is not likely to mislead any consumers.  Although the requirement of materiality might be implied in the rule as presently formulated, we urge that the rule be amended to explicitly cover only *material* misrepresentations.

A.     *The Rules' Restrictions on Common Techniques of Effective Advertising Are an Unconstitutional Restriction on Commercial Speech.*

The U.S. Supreme Court has long held that commercial attorney advertising is protected by the First Amendment. *Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977). A state ordinarily may only ban commercial speech only if it is actually or inherently false. *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 110 (1990). "Commercial speech that is not false, deceptive, or misleading can be restricted, but only if the State shows that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 142 (1994). Importantly, a state's assertion that speech is misleading is not enough to justify banning it. *Id.* at 146. Rather, the state must meet its burden of "demonstrat[ing] that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Id.* (quotation omitted). The Supreme Court has repeatedly subjected claims by bar authorities that particular forms of attorney advertising are misleading to rigorous and skeptical scrutiny, and has, for the most part, rejected those claims. *See, e.g.*, *id.* at 143-45; *Peel*, 496 U.S. at 101-10; *Zauderer*, 471 U.S. at 639-49, *In re RMJ*, 455 U.S. 191, 203 (1982); *Bates*, 433 U.S. at 381-82.

The proposed amendments would ban a wide range of statements by attorneys that are not actually or, in most cases, even potentially misleading. First, § 1200.6(a) of the

proposed amendments provides that "[t]he content of advertising and solicitation shall be predominantly informational, and shall be designed to increase public awareness of situations in which the need for legal services might arise and shall be presented in a manner that provides information relevant to the selection of an appropriate lawyer or law firm to provide such services." § 1200.6(a). Under its plain language, this provision would appear to prohibit some of the most common and least offensive forms of advertising. For example, a business card or telephone-book listing with only the lawyer's name, phone number, and office address is not "designed to increase public awareness of situations in which the need for legal services might arise" and would thus seem to be prohibited under the proposed rule. There is no reason to believe, however, that advertisements that are not "predominantly informational" or "designed to increase public awareness" are in any way misleading to consumers.

The proposed amendments would also prohibit a variety of common advertising techniques that are unlikely to mislead any consumers. Thus, the rules would bar using courtrooms or courthouses as props and using actors to portray clients and judges. § 1200.6(d)(3)-(5). They would prohibit the use of non-lawyer actors to portray lawyers and the use of non-lawyers as celebrity spokespeople—although, without explanation, this rule would not prohibit a lawyer from hiring an actor or celebrity spokesperson who

also happens to be a lawyer.  § 1200.6(d)(3)-(4).[2]  The rules would also forbid the use of

"a nickname, moniker, motto or trade name that implies an ability to obtain results in a

matter," a provision that is apparently intended to prohibit slogans like "super lawyers" or

"heavy hitters."  § 1200.6(d)(8).  Moreover, the rules would prohibit "reenactment of any

events or scenes or pictures or persons that are not actual or authentic," a provision that

appears to be targeted at dramatizations such as the staging of a generic car accident

scene to illustrate the sort of services provided by a firm.  § 1200.6(d)(6).[3]

The common thread among these proposed amendments is that they appear to be

targeted at basic techniques used in effective advertisements.  There is nothing actually or

inherently misleading, however, about any of these techniques.  Consumers are

accustomed to the notion that actors, mottos, and dramatized scenes appear in

commercials, and are unlikely to make the assumption that everyone and everything they

see in a commercial is literally real.  Depictions of a generic attorney or judge in a

courtroom scene, or a generic client in a depiction of a car accident, are not likely to fool

any consumers into believing that actual events occurred exactly as depicted; nor could

---

[2] The rules also prohibit "the portrayal of a law firm as a fictitious entity," but it is not clear what this provision is intended to mean or the harm it is intended to prevent. § 1200.6(d)(4).

[3] This provision is ambiguous, however, because it is unclear whether the rule is targeted only at fictional events (which is suggested by the words "not actual or authentic"), or whether it is instead meant to prohibit reenactment of events that actually occurred (which would explain the use of the word "reenactment").  Most likely, the rule was intended to cover either case, but this is not apparent from the rule's plain language.

this belief, even if held, possibly be material to the consumer's decision about whether to hire the attorney.  Indeed, the Supreme Court observed in *Zauderer* that "because it is probably rare that decisions regarding consumption of legal services are based on a consumer's assumptions about qualities of the product that can be represented visually, illustrations in lawyer's advertisements will probably be less likely to lend themselves to material misrepresentations than illustrations in other forms of advertising." *Zauderer*, 471 U.S. at 648-49.[4]  Similarly, if consumers saw Andy Griffith endorsing a law firm as the TV character "Matlock," they would be capable of understanding that Griffith is a paid celebrity endorser.  And a consumer seeing a law firm advertised as "heavy hitters" or "super lawyers" would not believe that the lawyers would automatically be superior to other lawyers, much less that the lawyers actually possess superhuman powers.

---

[4] The New York Bar's Ethics Committee reached the same conclusion in considering dramatizations in lawyer advertising:

> Dramatizations of fictional events can be used in a radio or television advertisement in much the same way as a drawing or photograph can be used in a print medium to illustrate a situation to the viewer, provided the dramatization is done in a way that is not false or misleading. Dramatization of an event that reasonably could occur . . . is not *per se* false or misleading merely because the particular circumstances did not occur, the services were not actually performed by the lawyer and the persons portrayed (as well as the actors) are not past or present clients of the lawyer.

*Formal Ethics Opinion 661* (N.Y. Ethics Comm. 1994).

Moreover, we are not aware of any body of evidence that would support the conclusion that the prohibited practices are misleading or that the broad restrictions in the proposed amendments are an effective means of attacking any problems they may pose. Restrictions on commercial speech cannot be upheld on the basis of "little more than unsupported assertions" without "evidence or authority of any kind." *Zauderer*, 471 U.S. at 648. Rather, the state must be prepared to "back up its alleged concern" that particular statements "would mislead rather than inform." *Ibanez*, 512 U.S. at 147. Nor is there any evidence that the targeted forms of communication could not be remedied without prohibiting the speech entirely, such as by requiring a disclaimer in certain cases. *In re RMJ*, 455 U.S. at 203 ("[T]he States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information may be presented in a way that is not deceptive.").

The Supreme Court has emphasized that the First Amendment generally does not tolerate restrictions on commercial speech that are premised "on the offensive assumption that the public will respond irrationally to the truth." *44 Liquormart, Inc. v. R.I.*, 517 U.S. 484, 503 (1996). The Court has also "reject[ed] the paternalistic assumption" that consumers of legal services "are no more discriminating than the audience for children's television." *Peel*, 496 U.S. at 105. Indeed, a state's general distaste for lawyer advertisements does not allow it to restrict truthful, non-misleading advertising to any greater extent than it can restrict similar advertising in other industries. *Zauderer*, 471

U.S. at 646-47 ("Prophylactic restraints that would be unacceptable as applied to commercial advertising generally are [] equally unacceptable as applied to [attorney] advertising.").  Yet, the restrictions on advertising under the proposed amendments would be unthinkable in other fields of commerce.  For example, a state could never justify regulating advertisements for athletic shoes to prohibit the use of actors to play athletes, referees, or spectators; the depiction of sports stadiums, tracks, or fields; the dramatization of sporting events; the use of celebrities; or the use of mottos that imply effectiveness (for example, "Be like Mike").

Because the proposed amendments would absolutely prohibit forms of commercial speech without evidence that these forms of speech are actually, or even potentially, misleading, the amendments would be an unconstitutional restriction on attorney advertising and for this reason should be withdrawn.

B.    *The Proposed Amendments' Required Disclosures Would Chill Protected First Amendment Expression.*

Section 1200.6(e) imposes additional requirements on a wide range of speech that would cover most statements about a lawyer's abilities and past successes, such as statements of the quality of a lawyer's services, statements of comparative advertising, testimonials by former clients, and "statements that are reasonably likely to create an expectation about results."  § 1200.6(e)-(f).  Although these forms of advertising are among the *most* relevant information a consumer could rely on in choosing an attorney,

the proposed amendments inexplicably subject these types of statements to special

restrictions that, in some cases, would effectively prohibit them.

First, under the proposed amendments each such statement would have to be

"objectively verified" by the lawyer.  § 1200.6(f)(2).  No exception is made for statements

that are not susceptible to objective verification.  A bar magazine's ranking of an attorney

as one of the "Ten Best Trademark Lawyers in New York," or the opinion of a former

client that an attorney is an "excellent litigator" would not be capable of objective

verification, and the lawyer would therefore be prohibited from advertising this sort of

favorable recognition.  A wide range of truthful and non-misleading advertising would

thus appear to be completely forbidden by this rule.

Many of New York's largest law firms have statements on their web sites that

either characterize the quality of their services or would tend to create an expectation

about results.  For example, the web site of Skadden, Arps, Slate, Meagher & Flom states

that "Skadden's diversified practice enables us to offer solutions to the most challenging

legal issues in virtually every area of corporate law, providing the specific legal advice

clients need to compete most effectively in a global business environment," and that

"[f]or more than 55 years, the firm has advised on many of the most significant corporate

and litigation matters worldwide." *See* http://www.skadden.com/Index.cfm?contentID=4.

White & Case claims that is it "known for unusual effectiveness in helping clients

accomplish their objectives in environments others find daunting and unfamiliar."

http://www.whitecase.com/about/.  Weil, Gotshal & Manges claims to be "a leader in the marketplace for sophisticated, international legal services" and to be "in the vanguard of the legal industry."  http://www.weil.com/wgm/pages/Controller.jsp?z=a&sz=0.  Nobody would claim that these law firms are engaging in false advertising, but the proposed amendments would nevertheless subject these claims to the requirement of objective verification.

Furthermore, each statement falling within this broad category of advertisement would have to be accompanied by an intrusive disclaimer, which would have to be spoken aloud in television and radio advertisements.  § 1200.6(f)(3) ("Prior results cannot and do not guarantee or predict a similar outcome with respect to any future matter, including yours, in which a lawyer or law firm may be retained.").  The length of this disclaimer would cause it to consume an unacceptable portion of time in a fifteen- or thirty-second television or radio commercial and an unacceptable amount of space in other forms of advertisements, such as business cards, yellow-pages listings, and billboards.  Although disclosure requirements are usually preferable to an outright ban, the Supreme Court in *Zauderer* recognized that unjustified or overly burdensome disclosure requirements can chill commercial speech and thereby themselves violate the First Amendment.  471 U.S. at 651.  Thus, the First Amendment does not permit a disclaimer requirement in the absence of evidence that the regulated form of speech is misleading.  *Ibanez*, 512 U.S. at 146-47.  A state "is not relieved of its burden to identify a genuine threat of danger simply

because it requires a disclaimer, rather than a complete ban on . . . speech." *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000).

We know of no proof that any of these forms of speech are particularly likely to mislead consumers.  On the contrary, consumers are unlikely to make the entirely irrational conclusion that an attorney's success in one case would necessarily lead to success in a different, unrelated case. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) ("We have [] rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information.").  Even if, theoretically, consumers were misled by this sort of advertising, they would be set straight as soon as they consulted with attorneys regarding the merits of their individual claims. Attorneys who advertise for clients, particularly those who represent their clients on a contingency basis, have no incentive to trick consumers into pursuing legal claims that have no reasonable probability of succeeding in court, and there is no evidence that this sort of trickery is in fact occurring.

A separate, equally unjustified disclaimer provision requires that the words "Attorney Advertising" must appear in all attorney print advertising, and a statement that the advertisement contains "an advertisement for legal services" must appear in all attorney television and radio advertisements.  § 1200.6(g)-(h).  There is no evidence, however, that consumers do not recognize attorney advertisements when they see them, or

that there is a widespread problem with attorneys disguising their advertisements in some difficult-to-recognize form.  Furthermore, when combined with the broad definitions of advertising and solicitation in the proposed rules, attorneys would be required to use these disclaimers in a wide variety of communications not typically considered to be advertising—such as articles in law journals, press releases, nonprofit educational materials, and web sites or blogs about developments in the law.  By flagging these communications as advertising, even though they may not be primarily designed to attract clients for pecuniary gain, the proposed amendments dramatically increase the likelihood that the communications will not reach their intended recipients.  For example, a recipient of an educational brochure by a nonprofit legal services organization would likely discard the brochure if it were prominently labeled "Attorney Advertising."  Similarly, an email with the subject line "ATTORNEY ADVERTISING" in all-capital letters, as required by the rule, would likely be deleted by the recipient without being read and might be blocked by a spam filter.  § 1200.6(h).

In short, the proposed rules would prohibit or unreasonably burden a wide range of speech for which there is no evidence that consumers would be misled.  Instead of helping consumers, the proposed rules would serve only to stifle legitimate competition, making it more difficult for consumers to learn of their rights and ultimately making legal services more expensive for everyone.

III.    **The Proposed Amendments Related to Internet Speech Are Burdensome, Unworkable, and Would Unconstitutionally Chill Speech.**

The proposed rules would explicitly extend to all forms of communication on the Internet, including web sites, email, and instant messaging.  In the context of the Internet, the rules would impose onerous restrictions that would severely chill both commercial and noncommercial Internet speech.

First, the proposed amendments would impose burdensome reporting and record-keeping requirements on Internet speech that would be effectively impossible to comply with.  Each time a web page is modified, the rules would require the page to be printed and kept on file for a period of at least a year.  § 1200.6(n).  Furthermore, the rules would require an additional printed copy of the web site to be sent to the state attorney disciplinary committee.  § 1200.6(o)(iii).  Given the broad definition of advertising and solicitation, these requirements would apply to the web pages of nonprofit organizations employing attorneys, legal blogs, and even an attorney's personal home page.  It is not uncommon for the web sites of public interest organizations and large law firms to have web sites that would fill hundreds of printed pages.  For example, ACLU's web site, one of its primary public education tools, comprises hundreds or even thousands of pages of materials concerning civil liberties issues.  In addition to descriptions of the cases worked on by ACLU's lawyers and legal blogs, this web site includes legislative updates, position papers, historical records, activist tools, and fundraising appeals.  PCLG and NYCLU

similarly use their web sites for a wide variety of public education purposes, including education concerning cases worked on by their lawyers.  Complying with the rule would involve an inordinate cost for the Commenters and countless other nonprofit organizations and attorneys in New York, and would generate untold amounts of useless paperwork for these attorneys and nonprofit organizations, and for the disciplinary commission.

The requirement of paper records would undermine one of the key advantages of the web—the ease of updating information.  Many attorneys, law firms, and nonprofit organizations that employ lawyers update their web sites often, perhaps even on a daily basis.  ACLU's web site is updated up to several times each day by its lawyers and nonlawyers responsible for educating the public about the ACLU's mission.  Attorney blogs are typically updated multiple times every day and, in some cases, multiple times every hour.  Yet, the rules would explicitly subject attorneys to the record-keeping requirements after each such "modification."  § 1200.6(n).  To make matters worse, the definition of "computer-accessed communication" includes *links* from a web site, § 1200.1(m), and the rules therefore appear to require the same record keeping requirement for all pages linked to by the attorneys' web page.  The same rules would also apply to email sent by lawyers to public listservs, and even to private email (including attachments), chats, or instant messages if the communication "concern[s] the availability for professional employment of a lawyer or law firm."  § 1200.1(l).  It is no

exaggeration to say that the burdens imposed under these rules would render the Internet essentially unusable by many attorneys and nonprofit organizations that employ attorneys.

The rules also propose problematic restrictions on the use of domain names, requiring attorneys to use a domain name that includes the name of the lawyer or law firm unless certain additional restrictive requirements are met. § 1200.7(e). Many legal blogs and legal-oriented web sites, however, are not primarily designed as advertisements for a lawyer or law firm and tend to have names different from the names of the attorneys who operate them. For example, the Consumer Law & Policy Blog, co-sponsored by Public Citizen, has the domain name http://www.clpblog.org/. Despite its name, nothing about the web site is deceptive or likely to mislead consumers. Similarly, the ACLU summarizes its work in the area of free speech on a page with the domain name http://www.aclu.org/freespeech/index.html. Although this URL does not include the name of any ACLU attorney working on its First Amendment cases, nothing about this web site is deceptive or likely to mislead consumers. Furthermore, the rule does not specify whether some portion of a lawyer or law firm's name, or a reasonable derivation of the name, can be used. Most major law firms use domain names that contain less than the firm's full name or an acronym of the law firm's name. Thus, Skadden, Arps, Slate, Meagher & Flom LLP is at http://skadden.com/, not http://skaddenarpsslatemeagherandflomllp.com/, and O'Melveny & Myers LLP is at http://www.omm.com. In domain names, there is a premium on brevity, and

unreasonably long domain names would put a substantial burden on lawyers, law firms, and nonprofit organizations with web pages.

In the event a URL does not contain the name of the lawyer or law firm, the rule states that the lawyer can "in no way attempt[] to engage in the practice of law using the domain name." § 1200.7(e)(2). This rule is ambiguous because it is unclear whether the rule is intended to prohibit attorneys from using a domain name in advertising (as, for example, eBay.com routinely uses the ".com" after its name in advertising jingles), or whether it is instead intended to prohibit attorneys from giving legal advice on these web sites. Either way, the rule serves no legitimate purpose and should be withdrawn. Under the former interpretation, attorneys would be prohibited from listing their web addresses on business cards or in yellow-pages listings, making it difficult for potential clients to find their web sites. Under the latter interpretation, the rule would prohibit attorneys from giving legal advice over the Internet, a result that would needlessly restrict access by consumers to free legal advice provided by legal services organizations and by attorneys who answer consumers' questions in online message boards and discussion forums. The state has no legitimate interest in restricting these activities.

The rules also would impose other untenable restrictions that would force web sites and email to be cluttered and unattractive while serving no apparent purpose. Each web site or email falling under the broad definitions of advertising or solicitation would have to be branded with the words "Attorney Advertisement" and include the name,

office address, telephone number, and list of jurisdictions in which the lawyer is licensed

to practice law.  § 1200.6(h), (j) & (k).  None of this information would make sense to

display on web pages other than a lawyer's or law firm's home page, nor would it make

sense in the context of most email.  Even worse, in the event a domain name does not

contain the name of the attorney or firm, a web page must include the actual name of the

lawyer or firm in a type size as large as the largest type size used on the site.

§ 1200.7(e)(1).  The Consumer Law & Policy Blog has a banner headline in a 60-point

font, and it would thus have to display its name in an equivalent, unreasonably large size.

For nonprofit organizations that employ several lawyers, each lawyer's name would

apparently have to be displayed in this size.  This requirement would require the

Commenters to fill a large portion of their home pages with such material and drive away

many, if not most, readers.

Finally, the proposed rules would completely restrict pop-up advertisements,

regardless of whether these advertisements are deceptive or misleading.  § 1200.6(i)(1).

Presumably this amendment is based on the assumption that pop-up advertisements are an

intrusive form of advertising, but we are not aware of any evidence that Internet

consumers are deceived or unduly influenced by pop-up ads.  It seems likely that

consumers at this point are familiar with this form of advertising, which, although

sometimes annoying, can be closed with a single click (or eliminated with pop-up

blocking software) and is therefore at least as easy to dispose of as mailed solicitations.

Indeed, this provision seems entirely motivated by a distaste for this particular form of advertisement. A state may not, however, prohibit speech on grounds of taste. *See Zauderer*, 471 U.S. at 648 ("[T]he mere possibility that some members of the population might find advertising embarrassing or offensive cannot justify suppressing it.").

The burdens imposed on attorneys under the proposed rules are totally at odds with the promise of the Internet as a simple and inexpensive means of mass communication. Imposing such severe restrictions would violate the First Amendment by unreasonably burdening a wide range of commercial and noncommercial speech. For this independent reason, the proposed amendments should be withdrawn.

## Conclusion

The rules in their current form are an unconstitutional curtailment of both commercial and noncommercial speech. The rules appear to be motivated by a basic discomfort with attorney advertising. The Supreme Court has squarely held that discomfort is not a legitimate basis on which to adopt rules regulating attorney advertising. *See Zauderer*, 471 U.S. at 647-48. Mere amendments to the rules, even if they ameliorated some of the more objectionable sections, would not solve this core problem. We therefore urge that the proposed rules be withdrawn in their entirety, and that the state instead rely on enforcement of § 1200.6(b)(1)'s restriction on false, deceptive, or misleading advertising to vindicate its legitimate interest in protecting consumers.