UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAMES L. ALEXANDER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:07-cv-00117-FJS-GHL |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS J. CAHILL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

————————————————————————————

## RESPONSE MEMORANDUM TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

————————————————————————————

Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax:    (202) 588-7795
Email: gbeck@citizen.org
       brian@citizen.org
       snelson@citizen.org

*Counsel for Plaintiffs*

May 25, 2007

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................1

I.     The First Amendment Protects Commercial Speech Regardless of Whether the State
       Considers It "Irrelevant" or "Frivolous." ...............................................................1

II.    The State Cannot Satisfy the *Central Hudson* Test. ................................................8

       A.     No Valid Interests Justify the State's Restrictions on Speech. ...............8

       B.     The State Has Not Shown That Its Restrictions Materially Advance Its
              Purported Goals. .......................................................................................12

       C.     The State Has Not Shown Any Reason to Reject Readily Available, Less
              Restrictive Alternatives. ..........................................................................16

III.   The Rules Are Unconstitutionally Vague. .............................................................17

IV.    The State Has Not Satisfied Its Burden to Justify the Thirty-Day Moratorium on
       Attorney Communications. ....................................................................................18

V.     The State's Advertising Restrictions Apply by Their Plain Language to
       Noncommercial Communications ..........................................................................20

CONCLUSION ....................................................................................................................22

## INTRODUCTION

The Supreme Court has repeatedly warned that restrictions on commercial speech cannot be upheld in the absence of actual evidence that the restrictions substantially alleviate real-world harms and that less restrictive alternatives to address those harms are not available.  Apparently realizing that it cannot meet its heavy burden under *Central Hudson*, the state now argues that it faces *no* burden to justify restrictions on speech that state officials believe to be "irrelevant trivialities."  Defs.' Mem. at 4.  Under the state's interpretation of the First Amendment, it could ban *any* communication it considers to be irrelevant, without the burden of proving that the restriction advances any state interest or even articulating what that state interest might be.  As both the Supreme Court and the Second Circuit have held, however, and as this Court has already recognized in this case, the state must justify its restrictions on commercial attorney communications under the *Central Hudson* test.  Under that test, the state's failure to present any evidence in support of the rules is fatal to its position.  Moreover, the state's extremely broad restrictions on communications are unconstitutionally vague, and the state has not even attempted to satisfy the strict scrutiny test for its restrictions on noncommercial speech.  For these reasons, the amended attorney advertising rules are unconstitutional, and the state's motion for summary judgment should be denied.

## ARGUMENT

### I.      The First Amendment Protects Commercial Speech Regardless of Whether the State Considers It "Irrelevant" or "Frivolous."

This Court has already recognized that the *Central Hudson* test governs restrictions on commercial attorney advertising.  *See* Order at 7 n.2, Apr. 20, 2007 (Doc. No. 26).  In an attempt to avoid this burden, the state now argues that what it considers to be "irrelevant trivialities" fall entirely outside the protection of the First Amendment and are thus subject to the unfettered

regulation of state officials. Defs.' Mem. at 4-13. As the state itself recognizes, however, *Central Hudson* provides the proper test for restrictions on commercial speech unless that speech is "false, deceptive, or misleading," *id.* at 10 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 142 (1994)), and, furthermore, speech may not be completely prohibited "if the information also may be presented in a way that is not deceptive." Defs.' Mem. at 7 (quoting *In re R.M.J.*, 455 U.S. 191, 202 (1982)). The Supreme Court has recognized only one other exception to the *Central Hudson* rule, for speech that advertises an unlawful activity. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980). The state's memorandum nevertheless asserts at various points new exceptions to *Central Hudson* for "irrelevant," "non-informational," "trivial," "frivolous," "unverifiable," "theatrical," or "comical" communications. Defs.' Mem. at 4, 10, 13. These exceptions are so broad that they would swallow the rule, leaving only a narrow class of provably "relevant," "verifiable," "restrained," and "unadorned" communications with the benefit of First Amendment protection. Defs.' Mem. at 4, 5, 9.

    In *Bates v. State Bar of Arizona*, the first case to recognize a First Amendment right to attorney advertising, the Supreme Court rejected what is essentially the state's position here. 433 U.S. 350, 372-75 (1977). In *Bates*, the state bar argued that attorney advertising should not be protected because of its potential to "highlight irrelevant factors" in the selection of a lawyer. *Id.* at 372. The Court refused to accept the state's asserted interest, noting that it "assumes the public is not sophisticated enough to realize the limits of advertising." *Id.* at 374-75. Later, the Court in *Shapero v. Kentucky Bar Association* held that a state may not prohibit an advertising device just because it is designed to "catch the recipient's attention," and may not limit lawyer advertising to "a bland statement of purely objective facts." 486 U.S. 466, 479 (1988). The state

in *Shapero* argued that the advertising at issue "stat[ed] no affirmative or objective fact,"

constituted "pure salesman puffery," and was an "enticement for the unsophisticated, which

committed [the lawyer] to nothing." *Id.* at 478 (internal quotation marks omitted). Noting,

however, that the state had not shown that the advertisement was misleading, the Court rejected

the state's argument and declared the restriction unconstitutional. *Id.* at 480; *see also In re RMJ*,

455 U.S. 191, 205-06 (1982) (holding that an attorney advertisement displayed in large, capital

letters was "relatively uninformative" and in "bad taste," but nevertheless constitutionally

protected in the absence of evidence that "such a statement could be misleading to the general

public").[1]

The Second Circuit has also squarely rejected an argument almost identical to, though

less extreme than, the one advanced by the state here. In *Bad Frog Brewery, Inc. v. New York

State Liquor Authority*, the court held unconstitutional New York's restriction of a beer label

depicting a frog that was extending its middle finger in an obscene gesture. 134 F.3d 87 (2d Cir.

1998). The state argued that the speech was entitled to a lesser degree of protection because it

"convey[ed] no useful consumer information." *Id.* at 93, 94. The court disagreed, holding that,

although the label conveyed "minimal information," it was nevertheless communicative because

it "attempted to identify to consumers a product of the Bad Frog Brewery" and, in addition,

"serve[d] to propose a commercial transaction." *Id.* at 96-97. Accordingly, the Court applied the

*Central Hudson* test, ultimately rejecting the state's claimed interests and striking down the

restriction as unconstitutional. *Id.* at 97-101; *see also Va. State Bd. of Pharmacy v. Va. Citizens*

---

[1] In some cases, giving undue emphasis to irrelevant information may render a
communication deceptive. For example, if an attorney were to prominently highlight
certification by an organization of which he is the founder and only member, consumers might
actually be misled into believing that the certification had some importance that it did not. Even
in such cases, however, it is the state's burden to show that the communication is actually
deceptive. *See Shapero*, 486 U.S. at 479; *RMJ*, 455 U.S. at 206. In this case, the state has not
even argued, much less proved, that any of the advertising at issue creates this kind of deception.

*Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) ("Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price."); *In re Shapiro*, 225 A.D.2d 215, 216, 656 N.Y.S.2d 80 (4th Dept. 1996) (declining to discipline a lawyer for an advertisement that, while "extremely offensive and degrading to the legal profession, [was] nonetheless constitutionally protected hyperbole").[2]

In support of its radical conception of the First Amendment, the state relies primarily on the Florida Supreme Court's decision in *Florida Bar v. Pape*, 918 So. 2d 240 (Fla. 2005). The court in *Pape* upheld restrictions—which it had itself adopted—prohibiting a law firm from using an image of a pit bull in its advertising. *Id.* at 247-49. Overruling a referee's conclusion that the advertisements were "tastefully done" and that pit bulls as a breed are perceived as "loyal, persistent, tenacious, and aggressive," *id.* at 243, the court in *Pape* engaged in a lengthy and entirely subjective attack on pit bulls as a breed, citing anti-pit-bull laws and judicial decisions involving pit bull attacks in support of its conclusion that pit bulls are associated with "malevolence, viciousness, and unpredictability." *Id.* at 245. The court expressed concern that, if it upheld the use of a pit bull image, "images of sharks, wolves, crocodiles, and piranhas could follow." *Id.* at 247. Without the benefit of any evidence and without applying the *Central Hudson* test, the court upheld the restriction on this basis, holding that "an advertising device that

---

[2] Like "irrelevant" speech, unverifiable speech is not excluded from protection by the *Central Hudson* test. Courts routinely hold that unverifiable claims are statements of opinion and are not deceptive to consumers. *See e.g., Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000) (holding that that Pizza Hut's slogan "Better Ingredients. Better Pizza" was not actionable as false advertising); *American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387 (8th Cir. 2004) (holding that the motto "America's Favorite Pasta" was unverifiable but neither false nor misleading). Indeed, courts view a statement's unverifiability as a factor justifying its protection under the First Amendment, because "a reader cannot rationally view an unverifiable statement as conveying actual facts." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 229 (2d Cir. 1985).

connotes combativeness and viciousness without providing accurate and objectively verifiable factual information falls outside the protections of the First Amendment." *Id.* at 249.

The court in *Pape* erred by concluding that the speech at issue was misleading merely because, in the court's opinion, the speech was not relevant to the selection of counsel. The decision flies in the face of *Central Hudson*, 447 U.S. at 566 (holding that commercial speech is protected by the First Amendment when it concerns lawful activity and is not misleading), and *Bad Frog Brewery*, 134 F.3d at 96-97 (holding that information that "lacks precise informational content" is entitled to First Amendment protection). Moreover, the case has been subjected to withering criticism as a paternalistic and subjective decision that "raises significant First Amendment difficulties." Rodney A. Smolla, 1 Law of Lawyer Advertising § 6:14 (2007). Even if *Pape* were correctly decided, however, it would not save the rules challenged here. The court in *Pape* held (albeit without any evidence) that the advertising at issue was misleading because it promised to "get results through combative and vicious tactics that will maim, scar, or harm the opposing party." 918 So. 2d at 246. The state here does not argue that its advertising restrictions target deceptive speech or speech that implies willingness to engage in unethical practices.[3]

Although the Supreme Court in reviewing the constitutionality of commercial speech

---

[3] Contrary to the state's suggestion, the court in *Farrin v. Thigpen*, 173 F. Supp. 2d 427 (M.D.N.C. 2001), did not hold that the advertisement in that case fell outside the protection of the First Amendment merely because the advertisement was in the form of a fictional vignette. Defs.' Br. at 11. Indeed, the court disclaimed that interpretation of its holding, noting that "the use of dramatization was not a factor" in its decision, and that "no one contend[ed] that, through the dramatization, viewers will mistake the actors for actual insurance adjusters." *Farrin*, 173 F. Supp. 2d at 442. The rule at issue in *Farrin* prohibited only a single specified advertisement, and the court held only that the advertisement was a materially deceptive depiction of an insurance company's settlement process. *Id.* at 440. Although the court's conclusion that the advertisement was deceptive is questionable, the court at least relied on witness testimony in support of its conclusion. *Farrin*, 173 F. Supp. 2d at 440. The state has not even attempted to make a similar showing here.

restrictions has sometimes noted that the prohibited speech was relevant and useful to consumers, the Court has never *required* that speech be relevant to be entitled to First Amendment protection.  The state nevertheless suggests that this result might be dictated by the Supreme Court's dismissal of the Iowa Supreme Court's decision in *Committee on Professional Ethics v. Humphrey*, 377 N.W.2d 643 (Iowa 1985), for want of a substantial federal question. Defs.' Mem. at 11-12.  Such a summary dismissal by the Supreme Court, however, does not adopt the reasoning of the lower court's decision, and the precedential value of the dismissal is limited to "the precise issues presented and necessarily decided by" the dismissal.  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  Beyond its binding effect on the dismissed case itself, it is often difficult or impossible to determine what precedential value a summary dismissal should be given.  *Id.*  A summary dismissal thus "is not to be read as a renunciation . . . of doctrines previously announced in . . . opinions after full argument" and cannot be "understood as breaking new ground."  *Id.* (internal quotation omitted).  The import of a summary dismissal is also diminished to the extent it is inconsistent with subsequent doctrinal developments.  *Hicks v. Miranda,* 422 U.S. 332, 344 (1975).  Given the wealth of Supreme Court precedent on the commercial free speech doctrine, none of which has explained or even mentioned the import of *Humphrey*, the Court's summary dismissal in that case cannot be construed as adopting the broad new restrictions on commercial speech suggested by the state.

Moreover, the Supreme Court's precedents recognize that the question whether particular speech is relevant is not a decision that the state is competent to make.  Although the state may consider certain information to be "of slight worth," it is for "the speaker and the audience, not the government, [to] assess the value of the information presented."  *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).  Even if the state had an interest in making such distinctions, "no line between

publicly 'interesting' or 'important' commercial advertising and the opposite kind could ever be drawn." *Va. State Bd. of Pharmacy*, 425 U.S. 748, 765 (1976). Advertising techniques that the state may consider to be frivolous nevertheless serve "important communicative functions," including "attract[ing] the attention of the audience to the advertiser's message" and, often, "impart[ing] information directly." *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985). As noted by the FTC in its letter commenting on New York's draft rules, the sort of common advertising techniques prohibited by the rules can "be an effective way of reaching consumers who do not know how legal terminology corresponds to their experiences and problems," and can be "useful to consumers in identifying suitable providers of legal services." *See* Letter from the FTC's Office of Policy Planning, Bureau of Consumer Protection, and Bureau of Economics to Michael Colodner, Office of Court Administration (Sept. 14, 2006) ("FTC Letter"), at 3 (Stipulations ¶ 17).

If advertising really were trivial or unhelpful to consumers, consumers would be unlikely to respond to it, and advertisers would not use it for long. As the Supreme Court has recognized, "[m]ost businesses . . . are unlikely to underwrite promotional advertising that is of no interest or use to consumers." *Central Hudson*, 447 U.S. at 567. For this reason, the Supreme Court in *Central Hudson* held that advertising by a monopoly was subject to First Amendment protection, rejecting the view of the New York Court of Appeals that such advertising "could not improve the decisionmaking of consumers" and "convey[ed] little useful information." *Id.* at 566-67.

The most troubling aspect of the rule advocated by the state is that, by removing certain categories of speech from First Amendment protection, the government would be allowed to impose restrictions on speech without the need to prove or even articulate an interest in doing so, and without showing that the restrictions were either necessary or effective. States could thus

impose *any* restrictions on speech unless the affected speakers could "prove that their First Amendment rights [had been] implicated." Defs.' Mem. at 13. Such a rule would turn *Central Hudson* on its head, replacing the state's heavy burden of proof with a *presumption* that restrictions on speech are constitutional. As this Court has already noted, however, *Central Hudson* is the proper test to apply to "speech that is not inherently misleading or speech that has the potential to be presented in either a misleading or a non-deceptive manner." Order at 7 n.2, Apr. 20, 2007 (Doc. No. 26).

## II.     The State Cannot Satisfy the *Central Hudson* Test.

Having devoted the bulk of its argument to its contention that irrelevant speech has no constitutional protection, the state makes only a token effort to justify its restrictions under *Central Hudson*. Because the record is devoid of *any* evidence in support of its restrictions, however, the rules cannot survive constitutional scrutiny under *Central Hudson*. The Supreme Court has repeatedly held that the state's "burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. Without this requirement, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Id.* at 770. The state has not met its burden here.

### A.     No Valid Interests Justify the State's Restrictions on Speech.

The most notable feature of the two interests asserted by the state in support of its restrictions on attorney speech is that the Supreme Court has specifically held both of them to be unconstitutional. Defs.' Mem. at 14-15. First, the state argues that it has an interest in restricting

irrelevant or unverifiable advertising because of the "potential impact" this advertising will have "on an audience with a comparative lack of knowledge and sophistication in the market for legal representation." *Id.* at 15. Ironically, the state cites *Bates* for this proposition, even though the Supreme Court there rejected the contention that attorney advertising is inherently misleading because it "highlight[s] irrelevant factors" or because "the public is not sophisticated enough to realize the limitations of advertising." 433 U.S. 350, 372-75. The Court wrote that "the argument rests on an underestimation of the public" and that, in any case, "[i]f the naivete of the public will cause advertising by attorneys to be misleading, then it is the bar's role to assure that the populace is sufficiently informed as to enable it to place advertising in its proper perspective." *Id.* at 375.

Since *Bates*, the Supreme Court has consistently reaffirmed the principle that the state cannot justify bans on speech merely by labeling it "potentially misleading." *See, e.g., Ibanez*, 512 U.S. at 146 (holding that courts "cannot allow rote invocation of the words 'potentially misleading' to supplant the [state's] burden"). In *RMJ*, for example, the Court struck down a restriction preventing a lawyer from truthfully advertising that he was a member of the United States Supreme Court Bar. 455 U.S. 191. Although the Court noted that the statement "could be misleading to the general public unfamiliar with the requirements of admission to the Bar of this Court," it found "nothing in the record to indicate that the inclusion of this information was misleading." *Id.* at 939. Similarly, the Supreme Court in *Peel v. Attorney Registration and Disciplinary Commission* held that the state violated the First Amendment by disciplining a lawyer for stating on his letterhead that the National Board of Trial Advocacy had certified him as a civil trial specialist. 496 U.S. 91 (1990). The Court rejected the state's "paternalistic assumption" that "the average consumer" would be confused or unable to understand the value

of the certification.  *Id.* at 105-06 & 106 n.13; *see also Capoccia v. Comm. on Prof'l Standards*,

No. 89-866, 1990 WL 211189, at *7 (N.D.N.Y. Dec. 20, 1990) (holding that the government's

generic assertion of an interest in prohibiting attorney advertising that is "potentially or

demonstrably misleading, overbearing or not susceptible to measurement or verification . . .

simply [did] not suffice as an articulation of a substantial governmental interest warranting the

prohibition").

     As its second claimed interest, the state, despite its previous disclaimer of this interest,

Defs.' Resp. Mem. to Mot. for Prelim. Inj., Mar. 27, 2007 (Doc. 21), at 9, now asserts a

"substantial interest in maintaining attorney professionalism and respect for members of the

State's bar."  Defs.' Mem. at 14-15.  Again, this interest was raised and rejected in *Bates*, 433

U.S. at 368-79.  In *Bates*, the bar argued that advertising would promote crass commercialism

that would undermine the dignity of lawyers.  433 U.S. at 368-72.  The Court was not persuaded,

finding the "postulated connection between advertising and the erosion of true professionalism to

be severely strained."  *Id.* at 368.  Since then, the Court has reaffirmed the principle that

attorneys have a First Amendment right to advertise even if the advertisements are

"embarrassing or offensive" to some members of the public or "beneath [the] dignity" of some

members of the bar.  *Zauderer*, 471 U.S. at 647-48.  Indeed, the principle that the state may not

regulate speech that it finds disagreeable is the "bedrock principle underlying the First

Amendment."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

     In support of its claimed interest in the dignity of the bar, the state relies only on *Florida*

*Bar v. Went For It, Inc.*, 515 U.S. 618 (1995).  The Supreme Court in *Went For It*, however,

based its decision on entirely different justifications:  the interest in the protection of privacy, and

the interest in the well-being and tranquility of the home.  *Id.* at 625 (citing *Carey v. Brown*, 447

U.S. 455, 471 (1980); *Frisby v. Schultz*, 487 U.S. 474, 484-485 (1988)).  The Court relied on extensive empirical evidence showing that consumers viewed a targeted direct-mail solicitation coming on the heels of a personal tragedy to be a traumatic invasion of personal privacy, *id.* at 626-27, and it viewed the state's interest in protecting the privacy of consumers from these solicitations as an application of the state's power "to protect the public health, safety, and other valid interests," *id.* at 625.  The Court mentioned the public's confidence in the bar only as it related to these interests.  *Id.* at 625-27.

The Court in *Went For It* did not overrule any of its long line of precedents holding that dignity alone is not a valid state interest.  In response to the dissent's contention that the Court was "unsettl[ing]" its precedents, the *Went For It* majority responded that it was doing "no such thing," emphasizing that "[t]here is an obvious difference between situations in which the government acts in its own interests, or on behalf of entities it regulates, and situations in which the government is motivated primarily by paternalism."  *Id.* at 632 n.2.  Indeed, the Court explicitly relied on *Bates* and reaffirmed that the state has the burden of proving a valid interest in its policies.  *Id.* at 625-26.

Therefore, because neither of the interests asserted by the state have any constitutional validity, the state fails the *Central Hudson* test, and its restrictions on lawyer advertising are unconstitutional.[4]

---

[4] At one point in its brief, Defs.' Br. at 3 n.3, the state appears to suggest that electronic communications might be subject to a lower level of protection.  The state, however, does not develop this argument, probably because the Supreme Court has previously applied *Central Hudson* to electronic communications.  *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) (striking down restrictions on broadcasting lottery information under the *Central Hudson* test); *see also Tillman v. Miller*, 133 F.3d 1402 (11th Cir. 1998) (holding that the state had failed to meet its burden of justifying restrictions on television advertisements); *Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995) (striking down restrictions on a variety of common television advertising techniques); *In re Shapiro*, 225 A.D.2d 215, 216, 656 N.Y.S.2d 80 (4th Dept. 1996); *Grievance Comm. v. Trantolo*, 470 A.2d 228 (Conn. 1984) (holding that

## B.     The State Has Not Shown That Its Restrictions Materially Advance Its Purported Goals.

Even assuming the state's purported interests are legitimate, the state has failed to show "that its regulation will advance its interest . . . to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). Indeed, the state has failed even to explain which of its interest are supposed to justify which rules. Far from presenting actual evidence, the state thus leaves the plaintiffs and the Court to speculate about whether its restrictions have any connection with its claimed interests at all.

If the state is attempting to use its articulated interests in preventing potentially misleading speech and protecting the dignity of the bar to justify its ban on "techniques to obtain attention," 22 NYCRR § 1200.6(c)(5), it has not presented any evidence to show how these interests are served by the rule. The state's mere assertion that a particular advertisement is misleading is not a sufficient basis on which to ban it. *See Ibanez*, 512 U.S. at 145 (noting the "complete absence of any evidence of deception") (internal quotation omitted); *Peel*, 496 U.S. at 102-03 (noting that the state failed to show that anyone was actually confused); *RMJ*, 455 U.S. at 205-06 (noting that there was no evidence in the record that the statement was actually misleading or that any confusion could not be remedied by means short of an absolute prohibition); *Mason*, 208 F.3d at 957 (rejecting the state's reliance on "common sense" in asserting that a particular advertisement was deceptive). Nor has the state shown that these techniques cast the bar in a negative light. Almost all advertisements use some sort of attention-getting technique, and many of them are done tastefully in a way that appeals to consumers. As the Supreme Court noted in *Bates*, "[b]ankers and engineers advertise, and yet these professions are not regarded as undignified." 433 U.S. at 369-70.

---

television advertisements depicting humorous fictional scenes were informative and neither false nor misleading).

Moreover, the state does not explain, much less prove, how its asserted relevance and dignity interests have anything to do with use of "a nickname, moniker, motto or trade name that implies an ability to obtain results in a matter," portrayal of a judge, endorsements or testimonials by clients with regard to matters that are still pending, use of an Internet website that does not include the name of the lawyer or law firm, or use of pop-up and pop-under advertising. 22 NYCRR §§ 1200.6(c)(1), (3), (7), (g)(1); 1200.7(e).   Again, the state leaves the Court to guess at the purpose of these provisions.[5]

The state briefly contends that it need not rely on empirical evidence because it can rely instead on "the accumulated, common-sense judgments of local lawmakers and reviewing courts," noting that the Supreme Court in other contexts has allowed government entities to justify restrictions on speech by relying on studies from other jurisdictions.  Defs.' Mem. at 15. Even if this were true, the point would be purely academic, since the state has not put forward any studies from other jurisdictions or even court decisions upholding the forms of restrictions that it has chosen to implement.  *Cf. Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509 (1981) (relying on cases from a variety of jurisdictions upholding legislative judgments that billboards could pose a traffic hazard).  Indeed, the state's argument here is surprising given that its restrictions on attorney advertising are unprecedented among the states.  New York is the *only* state to prohibit attention-getting techniques, portrayal of a judge, testimonials or endorsements about matters that are still pending, use of pop-up advertisements, and restrictions on domain names, and it is one of only two states that prohibit trade names that imply an ability to attain

---

[5] In a footnote, the state asserts, without support, that portrayal of a judge creates the "potential that consumers will believe that the firm or the advertisements have somehow received the imprimatur of the Court."  Defs.' Mem. at 13 n.11.  That is not a reasonable interpretation of the Alexander & Catalano advertisement depicting a judge, and the state provides no evidence that any consumer has ever construed an advertisement depicting a judge in this way.

results. *See* American Bar Association, *Differences Between State Advertising and Solicitation Rules and the ABA Model Rules of Professional Conduct*, April 15, 2007 ("State Advertising Rules"), *available at* http://www.abanet.org/cpr/professionalism/State_Advertising.pdf. It is thus difficult to see how the state can rely on the "collective judgment" of other jurisdictions in support of its rules.

In any case, the state is wrong to assert that it can ban a form of attorney advertising without any specific record evidence of harm. The state relies on *Went For It*, where the Court noted only that restrictions on adult businesses had been upheld in the absence of empirical evidence. 515 U.S. at 628. In upholding the advertising rules in *Went For It*, however, the Court relied on extensive empirical evidence assembled by the state, expressly noting that the bar had satisfied its burden of producing evidence in support of its restriction. *Id.* at 625-28. In cases following *Went For It*, the Court has continued to review restrictions on commercial speech with rigorous scrutiny and to strike down those restrictions where the state has failed to meet its evidentiary burden. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) (striking down state restrictions on advertisements for smokeless tobacco and cigars); *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (striking down a statute prohibiting advertisements for compounded drugs).

Finally, the state attempts to justify its restrictions on nicknames, monikers, mottos or trade names by relying on *Friedman v. Rogers*, 440 U.S. 1 (1979). Defs.' Mem. at 19. This argument is essentially a rehash of the state's argument that it can restrict commercial speech that it believes to be "irrelevant," and fails for the same reasons. *Friedman* was decided before the Supreme Court had formulated its standard of review for restrictions on commercial speech in *Central Hudson*, and the case therefore is of limited utility today. *See Bad Frog Brewery*, 134

F.3d at 96-97 (noting that Supreme Court doctrinal developments have undermined the holding

in *Friedman*); *Michel v. Bare*, 230 F. Supp. 2d 1147, 1150 (D. Nev. 2002) (striking down a

restriction on attorney trade names, and noting that *Friedman* appears to allow greater regulation

of trade names than would be allowed by *Central Hudson*).  Courts now recognize that trade

names are entitled to First Amendment protection.  *See Bad Frog Brewery*, 134 F.3d at 97;

*Sambo's Restaurants v. Ann Arbor*, 663 F.2d 686, 694 (6th Cir. 1981); *ACLU v. Miller*, 977 F.

Supp. 1228, 1233 (N.D. Ga. 1997).  And, as the FTC noted in its comments to the rules, trade

names and monikers are useful to consumers.  FTC Letter at 3 n.10.  Trade names make it easier

for businesses to develop reputations in the community and facilitate communication among

consumers about the quality of a firm's services.  Because consumers are unlikely to patronize a

firm with a trade name that has developed a negative reputation, this in turn creates an incentive

for firms to develop and maintain quality services.[6]

Even assuming it is still good law, *Friedman* does not sanction the sort of limitless

prohibition on trade names that the state attempts to draw from it.  The Court in *Friedman* relied

on the legislative record developed by the state showing that optometrists were deceiving

consumers by, among other things, operating under names other than their own.  *Friedman*, 440

U.S. at 13-14.  Thus, the Court held that the state's interest was not "speculative or

hypothetical," but "substantial and well demonstrated."  *Id.* at 14-15.  The Court did not sanction

restrictions on trade names even in the absence of evidence of a demonstrated need for

restrictions.  *See Michel v. Bare*, 230 F. Supp. 2d at 1150-51 (detailing the evidence in

*Friedman*); *Pete's Brewing Co. v. Whitehead*, 19 F. Supp. 2d 1004, 1013 n.7 (W.D. Mo. 1998)

---

[6] Unlike *Friedman*, where the Court considered the trade names at issue to be devoid of intrinsic meaning, 440 U.S. at 12, the state in this case targets *only* trade names that carry a specific meaning—in particular, trade names that "impl[y] an ability to obtain results in a matter."  22 NYCRR § 1200.6(c)(7).  *Friedman* does not purport to resolve content-based restrictions on speech, and for this reason alone it is inapplicable to this case.

(noting that Friedman relied on "compelling" evidence and never held that all trade names are inherently deceptive). Here, the state has no need to ban trade names, since it has already imposed detailed restrictions on firm names that, among other things, prohibit "a name that is misleading as to the identity of the lawyer or lawyers practicing under such name." 22 NYCRR § 1200.7(b). Moreover, even if trade names could be constitutionally prohibited, *Friedman* gives no support for the state's decision also to prohibit nicknames, monikers, and mottos. Alexander & Catalano's motto, "the heavy hitters," for example, is always displayed alongside the firm's name, so there is no risk that consumers will become confused about who is providing services.

### C.    The State Has Not Shown Any Reason to Reject Readily Available, Less Restrictive Alternatives.

In attempting to satisfy its burden on the final *Central Hudson* prong, the state argues only that the fit between its interest and the regulations "need not be perfect," citing *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989). The state *does* have to show, however, that the rules' "scope is in proportion to the interest served" and that the rules are "narrowly tailored to achieve the desired objective." *Id.* at 480 (internal quotation marks omitted). Moreover, the state must make this showing with actual evidence. *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 844 (2d Cir. 1994) (striking down a restriction on commercial speech in light of the state's "failure to determine empirically whether less restrictive measures . . . would provide an alternative means for effectively combating" the purported harm). Here, the state has not even attempted to show that its interests cannot be served by the readily available, less restrictive alternatives suggested by the New York State Bar.

First, the bar's advertising task force recommended that the state could simply enforce the existing prohibition against false and misleading advertising in 22 NYCRR § 1200.6(a). *See* New York State Bar Ass'n, *Report and Recommendations of Task Force on Lawyer Advertising*

(Oct. 21, 2005) ("Task Force Report") (Stipulations ¶ 16), at 2, 16, 46-48, 79-81.  Second, the task force suggested that the state could impose filing requirements that would allow it to review individual advertisements for false and misleading statements.  *Id.* at 79-81.  Third, it suggested that the state could impose disclosure or disclaimer requirements to clarify speech that would otherwise be misleading.  *Id.* at 2.  Finally, the task force suggested that the state could educate the public about what qualities it should consider in choosing an attorney.  *Id.* at 3.  The state has not provides any reasons or evidence justifying its decision not to adopt the state bar's recommendations, and has failed to meet its burden of showing that such means would not suffice to satisfy its purported interests.

## III.    The Rules Are Unconstitutionally Vague.

The rules do not define a "technique[] to obtain attention" or explain what sorts of techniques are "relevan[t] to the selection of counsel."  22 NYCRR § 1200.6(c)(5).  Nor do they provide any guidance as to what lawyer characteristics are deemed to be "unrelated to legal competence" or what sorts of statements "impl[y] an ability to obtain results in a matter."  *Id.* § 1200.6(c)(5), (7).  The rules, by their plain language, are so broad in scope as to cover essentially every advertisement ever used by an attorney beyond a business card, letterhead, or resume.  Because *all* advertising will potentially be banned, bar authorities will be able to pursue enforcement against any attorneys whose advertisements they find personally distasteful, while ignoring most other ads.  Unfettered discretion to distinguish among different speakers invites arbitrary enforcement and inevitably chills free speech rights.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).  Moreover, in the absence of clear guidelines, attorneys will not know how to comply.  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 244 F. Supp. 2d 72, 90 (N.D.N.Y. 2003) (holding that the New York Code of Judicial Conduct ethics rule

requiring judges to "observe . . . standards so that the integrity and independence of the judiciary will be preserved" was unconstitutionally vague because it provided no reasonable opportunity to know what was prohibited), *vacated on other grounds*, 351 F.3d 65, 69 (2d Cir. 2003).

The state relies on the fact that the regulations are directed at attorneys who have the skill to interpret legal rules. Defs.' Mem. at 20. But in the absence of any legislative history or interpretive notes, there is nothing to assist an attorney in ascertaining the meaning of the rules' language. The state also asserts that the state bar plans to release Ethical Considerations at some time in the future, but the Court cannot base a narrowing interpretation of the rules on hypothetical guidance that may or may not resolve the rules' ambiguities. Indeed, the guidance from the bar so far gives the restrictions the broadest of interpretations, implying that the rules would prevent even the use of a stock photograph on a website unless the photograph is not on a section of the site intended for potential clients. New York State Bar Association, *Frequently Asked Questions About the Rules for Lawyer Advertising*, *available at* http://www.nysba.org/ Content/ContentGroups/Announcements/LawyerAdvertisingFAQs2.pdf.

## IV.    The State Has Not Satisfied Its Burden to Justify the Thirty-Day Moratorium on Attorney Communications.

Defendants attempt to defend the thirty-day ban on solicitations under §§ 1200.8(g) and 1200.41(a) of the new rules by relying on Florida's findings of fact that were upheld by the Supreme Court in *Went For It.* Defs.' Mem. at 20-21. But the state did not rely on the *Went For It* study in enacting its restrictions, and the study is accordingly nowhere in the record. The state relies on *Chambers v. Stengel*, 256 F.3d 397 (6th Cir. 2001), for the proposition that states can rely on *Went For It* to justify their own thirty-day restrictions on attorney communications. The state of Kentucky in *Chambers*, however, relied on and put in the record not only the study in *Went For It*, but additional evidence, including statistical and survey evidence, demonstrating

-18-

that the problems at issue in *Went For It* were also problems in Kentucky.  *Id.*

In any event, the Supreme Court's acceptance of a particular thirty-day moratorium on solicitations in *Went For It* cannot be used to justify *every* restriction on speech that is limited to thirty days, even if the restriction is much broader in scope and is implemented by another state more than a decade later.  *See Ficker v. Curran*, 119 F.3d 1150 (4th Cir. 1997) (striking down a thirty-day ban on solicitation of criminal and traffic defendants).  New York's thirty-day blackout period is far broader than the blackout period upheld by the Supreme Court in *Went For It*, affecting not just the targeted mailings at issue in that case but also any other form of communication, including broadcast, print, and Internet advertisements that in no way invade the privacy of consumers.  The Supreme Court has stressed that "the mode of communication makes all the difference" when assessing restrictions on attorney solicitations.  *Shapero*, 486 U.S. at 475.  The state interest upheld in *Went For It* therefore does not justify restrictions on forms of communication—such as websites and television ads—that do not intrude on the privacy of consumers.

The state also attempts to rely on rules from other states that include various thirty-day rules, but most of these restrictions are limited to written solicitations, and New York's rules are the only rules in the country to broadly restrict all "communications" to personal injury and wrongful death victims.  *See* State Advertising Rules, *supra*.  Even if other states *had* adopted New York's restrictive rule against communications, it would not make the rules any more constitutional.  The state has not shown that these other restrictions were adopted based on actual evidence, or that it relied on that evidence in enacting its own restrictions.[7]

---

[7] The state is correct that attorneys may advertise generally "their area of expertise" during the thirty-day period.  Defs.' Br. at 22.  An attorney may not, however, advertise that he is available and willing to take on a certain claim.  Thus, consumers looking for an attorney willing

**V.    The State's Advertising Restrictions Apply by Their Plain Language to Noncommercial Communications.**

The state makes no effort to justify its restrictions on speech as applied to noncommercial communications, instead attempting to construe the rules in a way that would exclude noncommercial speech from coverage.  Defs.' Mem. at 22-25.  Although plaintiffs welcome the state's interpretation of the rules—and there is now no reason for the state not to amend the rules to exclude noncommercial speech explicitly—this interpretation finds no support in the rules' plain language.  The rules broadly define "advertising" as "*any* public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the retention of the lawyer or law firm."  22 NYCRR § 1200.1(k) (emphasis added). In its comments to the draft rules, Public Citizen alerted the presiding justices to this problem and requested that the definition of advertising be narrowed to exclude noncommercial speech.  *See Comments of Public Citizen Litigation Group, American Civil Liberties Union, and New York Civil Liberties Union on the Proposed Amendments to Rules Governing Lawyer Advertising*, Nov. 15, 2006, at 7-13 (Stipulations ¶ 18).  Instead, the justices added a much narrower noncommercial-speech exemption to the restrictions on "solicitation" in 22 NYCRR §1200.8, leaving all other restrictions, including the restrictions on the content of attorney advertising in §1200.6, the domain name restrictions in §1200.7, and the thirty-day moratorium in § 1200.41-a, outside the scope of the exemption.

Although federal courts may "presume [a] narrowing construction . . . to which [a] law is fairly susceptible," *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 176-77 (2d Cir. 2006) (internal quotation marks omitted), the plain language of the rules explicitly covers "any" communication by a lawyer, regardless of whether it involves pro bono representation.

---

and able to handle their claims would be forced to sift through the phone book, and might end up with a less specialized or qualified attorney than they otherwise would have had.

Furthermore, exclusion for nonprofit speech in § 1200.8 is expressly limited "[f]or purposes of this section," leaving the rules in all other sections without a nonprofit exception. Nonprofit attorneys reading the rules would thus have no reason to believe that they were excluded from the rules' coverage, and in the absence of a declaratory judgment by this Court, would be chilled from engaging in core First Amendment speech. *See NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

The state argues that the thirty-day moratorium "on its face" does not apply to noncommercial speech. Defs.' Mem. at 22. The state's interpretation again flies in the face of the rules' plain language. Although the state is correct that 22 NYCRR § 1200.8(b) is limited to "solicitations"—which are defined as communications "a significant motive for which is pecuniary gain"—the rules contain an *entirely separate* moratorium provision in § 1200.41-a that applies not to solicitations, but to all "unsolicited communication[s]." The state asserts that § 1200.41-a "repeats the pronouncements of 1200.8(b) and merely extends the moratorium to defense counsel," Defs.' Mem. at 21 n.19, but, if that were true, § 1200.41-a would have used the word "solicitation" as used in § 1200.8 instead of the word "communication[s]." And if the only purpose of § 1200.41-a is to extend the prohibition of § 1200.8(b) to defense counsel, it makes no sense that only § 1200.41-a(b) refers to defense counsel, while § 1200.41-a(a) is worded broadly to include all attorneys. The better explanation for the two provisions is that § 1200.41-a is designed to extend the moratorium to nonprofit communications that would not meet the definition of solicitation.[8]

---

[8] The state is correct that § 1200.41-a is limited to "unsolicited communications" and so would most likely not apply to a web page where the user has to actively request information. Defs.' Br. at 22. Section § 1200.8's separate moratorium, however, has a much narrower exception that applies only to "a proposal or other writing prepared and delivered in response to a specific request of a prospective client." § 1200.8(b). Although a web page might be considered a solicited communication, it cannot be said to have been "prepared and delivered in

Lacking any reasonable argument based on the statute's plain language, the state argues that construing the rules to cover nonprofit attorneys "would contradict the intent of the authors of the regulations."  Defs.' Mem. at 23.  But even if some notion of the justices' purported intent could contravene the rules' plain language, the drafters of the regulations have left no basis for ascertaining that intent beyond the plain text—no legislative history, no interpretive guidelines, and no other evidence.  The state's assurance that "the Presiding Justices were undoubtedly cognizant of the relevant distinctions between commercial and non-commercial speech" because they "specifically exempted non-commercial speech from the . . . limitations on solicitation" in § 1200.8 merely highlights that the justices did *not* exclude noncommercial speech from the other provisions in the rules.

## CONCLUSION

Defendants' motion for summary judgment should be denied.

---

response to a specific request."  This distinction serves as one possible explanation for the presiding justices' decision to split the thirty-day moratorium into for-profit and nonprofit components—nonprofit attorneys can respond to inquiries by potential clients, while for-profit attorneys are, in the absence of a request for a written proposal, prohibited from doing even that.

Respectfully submitted,


  /s/ Gregory A. Beck
Gregory A. Beck
N.D.N.Y. Bar Roll No. 514293 (pro hac vice)
Brian Wolfman
N.D.N.Y. Bar Roll No. 514292 (pro hac vice)
Scott L. Nelson
N.D.N.Y. Bar Roll No. 513515
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC 20009
Phone: (202) 588-1000
Fax:    (202) 588-7795
Email: gbeck@citizen.org
       brian@citizen.org
       snelson@citizen.org

*Counsel for Plaintiffs*


May 25, 2007