**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────────

**JAMES L. ALEXANDER; ALEXANDER & CATALANO**
**LLC; and PUBLIC CITIZEN, INC.,**

**Plaintiffs,**

v.

                                                          **5:07-CV-117**
                                                            **(FJS/GHL)**

**THOMAS J. CAHILL, in his official capacity as Chief**
**Counsel for the Departmental Disciplinary Committee for**
**the Appellate Division of the New York State Court of**
**Appeals, First Department; DIANA MAXFIELD KEARSE,**
**in her official capacity as Chief Counsel for the Second and**
**Eleventh Judicial District Grievance Committee; GARY L.**
**CASELLA, in his official capacity as Chief Counsel for the**
**Ninth Judicial District Grievance Committee; RITA E.**
**ADLER, in her official capacity as Chief Counsel for the**
**Tenth Judicial District Grievance Committee; MARK S.**
**OCHS, in his official capacity as Chief Attorney for the**
**Committee on Professional Standards for the Appellate**
**Division of the New York Court of Appeals, Third**
**Department; ANTHONY J. GIGLIOTTI, in his official**
**capacity as acting Chief Counsel for the Fifth Judicial**
**District Grievance Committee; DANIEL A. DRAKE, in his**
**official capacity as acting Chief Counsel for the Seventh**
**Judicial District Grievance Committee; and VINCENT L.**
**SCARSELLA, in his official capacity as acting Chief**
**Counsel for the Eighth Judicial District Grievance**
**Committee,**

**Defendants.**

─────────────────────────────────────────

| | |
|---|---|
| **APPEARANCES** | **OF COUNSEL** |
| **PUBLIC CITIZEN LITIGATION GROUP** | **BRIAN WOLFMAN, ESQ.** |
| 1600 20th Street NW | **GREGORY A. BECK, ESQ.** |
| Washington, D.C. 20009 | **SCOTT NELSON, ESQ.** |
| Attorneys for Plaintiffs | |

**OFFICE OF THE NEW YORK STATE**        **BRIDGET E. HOLOHAN, AAG**
**ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs filed their Complaint on February 1, 2007, seeking a declaratory judgment that

certain provisions of New York's amended rules on attorney advertising violate the First

Amendment and requesting a permanent injunction prohibiting Defendants from enforcing those

amendments.  On February 14, 2007, Plaintiffs moved for a preliminary injunction.  In response,

on March 27, 2007, Defendants filed their cross-motion to dismiss Plaintiffs' claims asserting

three arguments: (1) that Defendants have no independent disciplinary authority and, therefore,

are not proper parties to this action; (2) that Plaintiff Public Citizen lacks standing to sue on

behalf of its members; and (3) that *Burford* abstention is warranted.[1]  On April 13, 2007, the

Court heard oral argument on Plaintiffs' motion for a preliminary injunction and Defendants'

cross-motion to dismiss Plaintiffs' claims.  At that time, the Court denied Defendants' cross-

motion to dismiss Plaintiffs' claims, finding that Defendants are proper parties, that Plaintiffs

have standing, and that abstention is not warranted.  In addition, the Court reserved its decision

on Plaintiffs' motion for a preliminary injunction and ordered an expedited trial on the merits

---

[1] The *Burford* abstention doctrine applies when a case presents complex questions of state law that transcend the immediate case such that federal review would disrupt state efforts to establish a coherent policy on a matter of public concern.  *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814-15 (1976) (citations omitted).

pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Thereafter, the parties agreed

to stipulate to the material facts as well as the authenticity of several exhibits. In view of these

stipulations, the parties further agreed to resolve their differences by way of summary judgment.

Both parties filed motions for summary judgment, and the Court heard oral argument concerning

these motions on June 18, 2007. The following constitutes the Court's written determination of

these motions.


## II. BACKGROUND

Plaintiff James L. Alexander is a New York-licensed attorney and managing partner of

Plaintiff Alexander & Catalano LLC, which has offices in Syracuse and Rochester. Alexander &

Catalano advertises its legal services through broadcast media, print advertisements, and other

forms of public media. Prior to February 1, 2007, Alexander & Catalano's commercials often

contained jingles and special effects, including wisps of smoke and blue electrical currents

surrounding the firm's name. A number of the firm's commercials also contained fictional or

comical scenes.

Plaintiff Alexander & Catalano believes that some of its previously-used advertising

techniques may violate the amended rules. Since February 1, 2007, it has stopped running many

of its advertisements and has altered other advertisements in an effort to assure that it was in

compliance with the amended rules. Notably, it has stopped using its slogan "the heavy hitters."

Additionally, the firm has stopped running advertisements portraying its attorneys as giants

towering over downtown buildings, depicting its attorneys counseling space aliens concerning an

insurance dispute, and representing its attorneys running as fast as blurs to reach a client in distress.

Plaintiff Public Citizen, Inc. is a national non-profit corporation with approximately 100,000 members. Approximately 9,450 members reside in New York, and the members are consumers of legal services. A division of Public Citizen, referred to as the Public Citizen Litigation Group ("PCLG"), employs eight attorneys, two of whom are licensed in New York. PCLG has litigated public interest cases in a variety of contexts, including the First Amendment, consumer rights, and federal health and safety regulations. Plaintiff Public Citizen maintains that, although it is a non-profit organization, the amendments purport to restrict its speech as well.

New York Judiciary Law § 90(2) authorizes the Appellate Division of the New York State Supreme Court to discipline attorneys for professional misconduct. *See* N.Y. Jud. Law § 90(2) (McKinney 2002). Pursuant to this authority, the four presiding justices from each of New York's four departments are responsible for adopting the Disciplinary Rules of the Code of Professional Responsibility (known as joint rules of the Appellate Division). These rules set the parameters for professional conduct and provide for the discipline of attorneys who violate the rules. The Appellate Division justices have appointed disciplinary committees for each department (and several departments have subdivided to allow district disciplinary committees to handle attorney disciplinary matters in smaller geographic areas).

Defendants are the Chief Counsels or Acting Chief Counsels of various departmental or district disciplinary committees. In their official roles, they are collectively charged with

initiating investigations into complaints concerning attorney misbehavior.  After an investigation, and in consultation with the relevant disciplinary committee, Defendants are empowered to take a number of actions including, but not limited to, dismissing the complaint, referring the complaint for mediation or monitoring, issuing a letter of caution, or recommending that formal disciplinary proceedings commence.  If formal disciplinary proceedings are warranted, Defendants commence these proceedings in the Appellate Division.[2]

In June 2006, the four presiding justices approved several proposed amendments to the existing disciplinary rules governing attorney advertising.  The presiding justices submitted the amendments for public comment and received comments from Defendant Public Citizen and the Federal Trade Commission.  On January 4, 2007, after further revision, the presiding justices adopted the final version of the amendments, which took effect on February 1, 2007.

The amendments effect a number of significant changes to the State's previous rules on law firm advertising.[3]  For the purposes of this motion, the Court has classified the amendments

---

[2] Discipline may include censure, suspension, or disbarment.

[3] In general, the rules provide broad definitions of what is covered in the terms "law firm" or "advertisement:"

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.1

> (b) Law firm includes, but is not limited to, a professional legal corporation, a limited liability company or partnership engaged in the practice of law, the legal department of a corporation or other organization and a qualified legal assistance organization.
> * * *
> (k) "Advertisement" means any public or private communication made by or on behalf of a lawyer or law firm about that lawyer or law firm's services, the primary purpose of which is for the

(continued...)

at issue into three groups.  The first group of amendments addresses restrictions on potentially

misleading advertisements and consists of several rules:

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.6:

      (c) An advertisement shall not:

      (1) include an endorsement of, or testimonial about, a lawyer or
      law firm from a client with respect to a matter still pending;

                            * * *

      (3) include the portrayal of a judge, the portrayal of a fictitious law
      firm, the use of a fictitious name to refer to lawyers not associated
      together in a law firm, or otherwise imply that lawyers are
      associated in a law firm if that is not the case;

                            * * *

      (5) rely on techniques to obtain attention that demonstrate a clear
      and intentional lack of relevance to the selection of counsel,
      including the portrayal of lawyers exhibiting characteristics clearly
      unrelated to legal competence;

                            * * *

      (7) utilize a nickname, moniker, motto or trade name that implies
      an ability to obtain results in a matter.

                            * * *

---

    [3](...continued)
          retention of the lawyer or law firm.  It does not include
          communications to existing clients or other lawyers.

(g) A lawyer or law firm shall not utilize:

(1) a pop-up or pop-under advertisement in connection with computer-accessed communications, other than on the lawyer or law firm's own web site or other internet presence . . . .

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.7:

(e) A lawyer or law firm may utilize a domain name for an internet web site that does not include the name of the lawyer or law firm provided:

(1) all pages of the web site clearly and conspicuously include the actual name of the lawyer or law firm;

(2) the lawyer or law firm in no way attempts to engage in the practice of law using the domain name;

(3) the domain name does not imply an ability to obtain results in a matter; and

(4) the domain name does not otherwise violate a disciplinary rule.

The second group of amendments addresses restrictions that impose a thirty-day

moratorium on certain communications following a personal injury or wrongful death event:

N.Y. Comp. Codes R. & Regs. tit. 22, §1200.8:

(b) For purposes of this section "solicitation" means any advertisement initiated by or on behalf of a lawyer or law firm that is directed to, or targeted at, a specific recipient or group of recipients, or their family members or legal representatives, the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain.  It does not include a proposal or other writing prepared and delivered in response to a specific request of a prospective client.

* * *

(g) No solicitation relating to a specific incident involving potential claims for personal injury or wrongful death shall be disseminated before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.

N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.41-a:

(a) In the event of an incident involving potential claims for personal injury or wrongful death, no unsolicited communication shall be made to an individual injured in the incident or to a family member or legal representative of such an individual, by a lawyer or law firm, or by any associate, agent, employee or other representative of a lawyer or law firm, seeking to represent the injured individual or legal representative thereof in potential litigation or in a proceeding arising out of the incident before the 30th day after the date of the incident, unless a filing must be made within 30 days of the incident as a legal prerequisite to the particular claim, in which case no unsolicited communication shall be made before the 15th day after the date of the incident.

The third group of amendments addresses the alleged application of the rules to non-profit legal organizations that do not charge clients. This category includes the above amendments, as well as document-retention and advertising-label requirements:

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.6:

(f) Every advertisement other than those appearing in a radio or television advertisement or in a directory, newspaper, magazine or other periodical (and any web sites related thereto), or made in person pursuant to section 1200.8(a)(1) of this Part, shall be labeled "Attorney Advertising" on the first page, or on the home page in the case of a web site. If the communication is in the form of a self-mailing brochure or postcard, the words "Attorney

Advertising" shall appear therein.  In the case of electronic mail, the subject line shall contain the notation "ATTORNEY ADVERTISING."

* * *

(k) All advertisements shall be pre-approved by the lawyer or law firm and a copy shall be retained for a period of not less than three years following its initial dissemination.  Any advertisement contained in a computer-accessed communication shall be retained for a period of not less than one year.  A copy of the contents of any web site covered by this section shall be preserved upon the initial publication of the web site, any major web site redesign, or a meaningful and extensive content change, but in no event less frequently than once every 90 days.

### III. DISCUSSION

At oral argument, the Court answered the threshold question as to whether the First Amendment protects the speech that the State seeks to regulate in the affirmative.[4]

It is well-established that attorney advertising is commercial speech that enjoys some First Amendment protection.  *See Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (citations omitted).  Moreover, there is a long line of cases applying the *Central Hudson* test to attorney-advertising rules.  *See, e.g., Chambers v. Stengel*, 256 F.3d 397, 403-05 (6th Cir. 2001)

---

[4] At the first oral argument on April 13, 2007, the Court instructed the parties to apply the test in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980), to the challenged amendments.  However, despite the Court's directive, Defendants continued to assert that the State of New York could ban attorney advertising that was "irrelevant, unverifiable, [and] non-informational" without reference to the *Central Hudson* test.  *See* Defendants' Memorandum of Law at 4.  Defendants have provided no legal support for this proposition, and the Court finds none.  Although these characteristics may be evidence that an advertisement is misleading, they do not by themselves constitute a justification for banning commercial speech in the form of attorney advertising.

(involving Kentucky's 30-day moratorium on contacting victims); *Mason v. Fla. Bar*, 208 F.3d 952, 955-58 (11th Cir. 2000) (involving Florida's rule prohibiting "self-laudatory advertisements"); *Falanga v. State Bar of Ga.*, 150 F.3d 1333 (11th Cir. 1998) (involving Georgia's rule on in-person solicitations). In addition, the Second Circuit has stated generally that "minimal information, conveyed in the context of a proposal of a commercial transaction, suffices to invoke the protections for commercial speech, articulated in *Central Hudson*." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) (footnote omitted). Accordingly, the Court will analyze the State's amended rules pursuant to the test in *Central Hudson*.

Under the *Central Hudson* test, Defendants must (1) assert that there is a substantial State interest to be achieved by the restriction; (2) demonstrate that the restriction materially advances the state interest; and (3) establish that the restriction is narrowly drawn. *See Central Hudson*, 447 U.S. at 564-66. "This burden is not satisfied by mere speculation or conjecture; rather, [the defendant] . . . must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (citations omitted). Some form of empirical or anecdotal evidence is usually required.[5] *See Went*

---

[5] Defendants assert that they are entitled to rely on common sense, history, and consensus alone to support the State's restrictions in the absence of other evidence. However, the Court notes that this "evidence" alone has not sufficed in attorney-advertising cases. In *Went for It*, the State of Florida presented a two-year study of attorney advertising containing statistical evidence from a consumer survey and anecdotal evidence in the form of newspaper editorials and consumer complaints. *See* 515 U.S. at 626-27. Moreover, precedent from other circuits shows that the proponent of a restriction must present some actual evidence beyond the unsupported assertion that the state relied on common sense, history, or consensus. *See, e.g., Chambers*, 256 F.3d at 404 (finding adequate the defendants' submission of the study from *Went for It*, the

(continued...)

-10-

*for It*, 515 U.S. at 626; *Capobianco v. Summers*, 377 F.3d 559, 562 (6th Cir. 2004) (citation omitted) (finding adequate the State of Tennessee's presentation of newspaper articles documenting solicitation problems related to chiropractors, declarations of solicited individuals, and articles from scientific and business publications).

As stated above, the Court has divided the challenged amendments into three groups, which it will address *seriatim*, applying the legal standard set forth in *Central Hudson*.


**A.      Amendments That Concern Potentially Misleading Advertisements**

**1.  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.6(c)**

As noted above, amendments to § 1200.6(c) prohibit attorney advertisements from containing endorsements and testimonials about matters still pending, portrayals of judges, techniques to obtain attention that lack relevance to selecting counsel, portrayals of attorneys with characteristics unrelated to legal competence, and use of a nickname, moniker, motto, or trade name that implies an ability to obtain results in a matter.


**a.  Does the State have a substantial interest?**

Defendants assert that "[t]he State has a substantial interest in encouraging the clean flow

---

[5](...continued)
affidavit of a state legislator who had a personal experience with attorney solicitation following an accident, the affidavit of a state bar official summarizing a public survey, and articles and letters from a local newspaper and state bar journal); *Mason*, 208 F.3d at 957. *But see Falanga*, 150 F.3d at 1341.

of truthful, helpful, relevant, verifiable information about attorney services and, conversely, restricting the introduction of non-truthful, unhelpful, irrelevant material." *See* Defendants' Memorandum of Law at 14 (citations omitted). In addition, Defendants contend that the State has an interest in maintaining attorney professionalism and respect for the bar. *See id.* In response, Plaintiffs assert that the restrictions are impermissibly based on the State's desire to prohibit attorney advertisements that it finds offensive or distasteful. *See* Plaintiffs' Memorandum of Law at 6.

Defendants' essential argument that the State has a substantial interest in protecting consumers from misleading attorney advertisements is well-supported. *See, e.g., Mason*, 208 F.3d at 956 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978)). Moreover, the parties submitted a New York State Bar Association Task Force Report, dated October 21, 2005, indicating that the State genuinely held this asserted interest:

> The Committee identified a number of key issues and problems that exist under the current attorney advertising regime. These include: [f]alse, deceptive or misleading advertisements, in print, broadcast, and on-line advertisements . . . .
>
> * * *
>
> [A]lthough a very small minority of advertisements could be categorized as false or deceptive on their face, about a third of them . . . were found to be deceptive.

*See* Joint Stipulation at Exhibit 3 at 5, 26-27, 47. Accordingly, the Court finds that Defendants have established that the State has a substantial interest to ensure that attorney advertisements are not misleading and, therefore, have satisfied the first *Central Hudson* prong with respect to

-12-

§ 1200.6(c).[6]

### b. Do the amendments materially advance the State's interest?

In support of this prong of the *Central Hudson* test, Defendants submitted two short press releases which merely summarize the new restrictions, a DVD recording of a Monroe County Bar Association forum considering the scope of the amendments on August 17, 2006, at which former Presiding Justice Eugene F. Pigott was a panelist, and the New York State Bar Association Task Force Report.[7] Defendants did not submit any statistical or anecdotal evidence of consumer problems with or complaints about misleading attorney advertising. Nor did they specifically identify any studies from other jurisdictions on which the State relied in implementing the amendments. Compared to the evidence presented in *Went for It*, *Chambers*, and *Falanga*, the record as to this issue in this case is notably lacking.

Notwithstanding, the Court finds that the Task Force Report, by itself, is sufficient to support a finding that the State's interests are materially advanced with respect to two amendments: § 1200.6(c)(3) (prohibition on the portrayal of judges in attorney advertisements)

---

[6] The State's secondary interest in maintaining attorney professionalism and respect for members of the bar also appears to be substantial. The Supreme Court has noted that "'[s]tates have a compelling interest in the practice of professions within their boundaries, and . . . they have broad power to establish standards for licensing practitioners and regulating the practice of professions.'" *Went for It*, 515 U.S. at 625 (quotation and other citations omitted).

[7] The Task Force Report is a comprehensive document, which reviews the state of the law on attorney advertising in both its local and constitutional dimensions. In addition, it summarizes the Task Force's empirical research, which primarily consisted of reviewing a sample of actual New York attorney advertisements, as well as position papers, cases, and articles. Finally, the Task Force Report states that the Task Force conducted a fifty-state review of attorney-advertising regimes. *See* Joint Stipulation at Exhibit 3 at 6-7, 55.

and § 1200.6(c)(7) (prohibition on the use of trade names that imply an ability to obtain results).

### Task Force Report regarding judges

The following, if used in public communications or communications to a prospective client, are likely to be false, deceptive or misleading: . . . a communication that states or implies that the lawyer has the ability to influence improperly a court, court officer, governmental agency or government official . . . .

* * *

### Task Force Report regarding trade names

The Committee endorsed COSAC's continuation of the ban on use of trade names, which is also in the current DR's, believing that trade names are far too likely to be false, deceptive and misleading to consumers of legal services.[8]

*See id.* Tab 1 at 11; *id.* at 65. Accordingly, the Court finds that Defendants have satisfied the second *Central Hudson* prong with respect to these specific amendments.

However, Defendants have not shown how the remaining amendments of § 1200.6(c) materially advance the State's interests. The Task Force Report, rather than providing support for their adoption, recommended a different approach. For instance, the Task Force recommended imposing new disclosure and review requirements along with bolstering enforcement of the existing rules instead of imposing new content-based restrictions. *See* Joint Stipulation at Exhibit 3 at 58 ("The Committee agrees that the content [of attorney advertising]

---

[8] COSAC refers to the Committee on Standards of Attorney Conduct, a state bar committee formed in January 2003 to evaluate the revised Model Rules of Professional Conduct. The Task Force Report frequently references this Committee's conclusions. Aside from these references, Defendants did not submit the COSAC report for the Court's consideration.

should not be regulated."); *see also id.* at Tab 1 at 2.

Moreover, the Task Force recommended adopting guidelines such as those that the

Monroe County Bar Association issued, which would seem contrary to much of § 1200.6(c) in

that they permit dramatizations, pictures, and stylistic elements that might be prohibited under

§ 1200.6(c)(5).[9]   In contrast to the amended rules, the Monroe County Bar Association

guidelines contemplate such advertising techniques while providing guidance as to their proper

use rather than seeking their wholesale prohibition.  The relevant sections of the Monroe County

Bar Association guidelines provide as follows:

> Advertising that recreates, dramatizes or simulates
> situations or persons should fairly represent the underlying facts
> and properly disclose that they have been staged.

* * *

> Pictures and other stylistic elements should be used to
> reinforce traditional considerations, and should not unduly
> frighten, inflame or otherwise manipulate viewers into ignoring
> rational considerations.  Lawyer advertising should not be likely to
> shock or offend a substantial segment of the community or to
> foster disrespect for the law, the legal profession or the judicial
> system.

*See id.* at Exhibit 3 at 70-71.

Since Defendants have submitted no other evidence to support this requirement, the Court

---

[9] As noted above, this amendment prohibits the use of attention-drawing advertising
techniques that demonstrate a clear and intentional lack of relevance to the selection of counsel,
including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal
competence.

finds that Defendants have not satisfied their burden on the second *Central Hudson* prong, and, therefore, it **GRANTS** Plaintiffs' and **DENIES** Defendants' motion for summary judgment on Plaintiffs' claims concerning the following amendments:

- § 1200.6(c)(1) prohibiting endorsements and testimonials from a client about a pending matter;

- the portions of § 1200.6(c)(3) prohibiting the portrayal of a fictitious law firm, the use of a fictitious name to refer to lawyers not associated in a firm, or otherwise implying that lawyers are associated in a firm if that is not the case;

- § 1200.6(c)(5) prohibiting the use of techniques to obtain attention that demonstrate a clear and intentional lack of relevance to the selection of counsel, including the portrayal of lawyers exhibiting characteristics clearly unrelated to legal competence; and

- the portions of § 1200.6(c)(7) prohibiting the use of a nickname, moniker, or motto that implies an ability to obtain results.

### c. Are §§ 1200.6(c)(3) and (c)(7) narrowly tailored?

As noted above, the Court finds that Defendants have adequately justified § 1200.6(c)(3), concerning the portrayal of judges, and § 1200.6(c)(7), concerning the use of trade names that imply an ability to obtain results, under the second *Central Hudson* prong.

Under the third *Central Hudson* prong, a restriction is not narrowly drawn if it is "'"broader than reasonably necessary to prevent the" perceived evil.'" *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 107 (1990) (quotation, other citation, and footnote omitted). Therefore, recognizing the value of the free flow of commercial information, the Supreme Court has stated that a state may not impose a prophylactic ban on potentially

misleading speech merely to spare itself the trouble of "distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 646 (1985).

In *Zauderer*, the Supreme Court held that a state may not categorically ban illustrations in attorney advertisements. *See id.* at 649. Although the Court recognized the convenience of a blanket ban, it concluded that, due to the possibility of case-by-case enforcement, a prophylactic rule was impermissible. *See id.*; *see also Peel*, 496 U.S. at 110 (noting the possibility of requiring a disclaimer in a case involving advertising an attorney's certification as a trial specialist). Finally, in both *Zauderer* and *Peel*, the Court required the proponent of the restriction to make a showing of the need for a blanket ban rather than less restrictive means. *See Peel*, 496 U.S. at 109 (employing a "presumption that members of a respected profession are unlikely to engage in practices that deceive their clients and potential clients" and noting that the mere potential for misleading in an attorney's communications "does not satisfy the State's heavy burden of justifying a categorical prohibition . . . ." (citations omitted)); *Zauderer*, 471 U.S. at 648 (noting that the state offered only unsupported assertions without "evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban").

As written, that portion of § 1200.6(c)(3) that prohibits the portrayal of judges and that portion of § 1200.6(c)(7) that prohibits the use of trade names that imply an ability to obtain results are categorical bans. Defendants have failed to produce any evidence that measures short of categorical bans would not have sufficed to remedy the perceived risks of such advertising being misleading. There is nothing in the record to suggest that a disclaimer would have been

ineffective.  For portrayals of judges, the State could have required a disclaimer similar to that required for a fictional scene, which is found in § 1200.6(c)(4).  For trade names implying an ability to obtain results, there is no evidence that the existing disclaimer that "[p]rior results do not guarantee a similar outcome" in § 1200.6(e) or some other similar disclaimer would have been ineffective.[10]  Finally, and very importantly, Defendants have not given the Court any reason to believe that better enforcement of the then-existing rules on a case-by-case basis, as the Task Force Report recommended, would not accomplish the desired results.[11]  Accordingly, the Court finds that Defendants have not established that these amendments are narrowly tailored.  Therefore, the Court **GRANTS** Plaintiffs' and **DENIES** Defendants' motion for summary judgment on Plaintiffs' claims concerning §§ 1200.6(c)(3) and (7).

### 2.  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.6(g)(1)

As noted above, § 1200.6(g)(1) prohibits pop-up and pop-under advertisements on

---

[10] The Court notes that an existing provision labeled "Professional Notices, Letterheads, and Signs" already prohibits practicing under a trade name:

> (b) A lawyer in private practice shall not practice under a trade name, a name that is misleading as to the identity of the lawyer or lawyers practicing under such name, or a firm name containing names other than those of one or more of the lawyers in the firm . . . .

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.7(b).  The parties did not address this provision in their arguments.

[11] As previously stated, the Task Force Report counseled against additional content restrictions and recommended closer review and more effective enforcement of the then-existing rules.

websites other than those that the attorney or law firm owns. The Court need only consider this amendment briefly since Defendants do not discuss this restriction in their summary judgment papers and only argued at oral argument that a categorical ban on pop-up and pop-under advertisements was necessary because their fleeting nature is such that the State could not enforce lesser restrictions.[12] The Court rejects this argument as contrary to common sense: there is no evidence that the regulation, observation, or retention of pop-up and pop-under advertisements is any more difficult than the regulation, observation, or retention of advertisements on television, radio, or websites. Furthermore, Defendants' argument relates only to the third *Central Hudson* prong, and there is no evidence currently before the Court to meet Defendants' burden on the first two *Central Hudson* prongs. Accordingly, based on the limited evidence that Defendants presented, the Court **GRANTS** Plaintiffs' and **DENIES** Defendants' motion for summary judgment on Plaintiffs' claims concerning § 1200.6(g)(1).[13]

---

[12] In their summary judgment papers, Defendants assert that Plaintiffs only challenge this amendment as it relates to Plaintiff Public Citizen and non-commercial speech. In addition, Defendants assert that this amendment does not apply to non-commercial speech. Therefore, Defendants mention the ban on pop-up and pop-under advertisements only in a footnote and only to state that "no particular discussion of these regulations is required." *See* Defendants' Memorandum of Law at 22 n.21.

Contrary to Defendants' assertions, Plaintiffs' Complaint and Notice of Motion indicate that they seek to generally enjoin enforcement of the amendment against commercial and non-commercial speech. *See* Complaint at 15; Notice of Motion. Moreover, and paradoxically, Defendants conceded at oral argument that, based on the broad definition of "advertisement," this amendment applies to non-commercial speech.

[13] Even if Defendants had satisfied the first two *Central Hudson* prongs, the Court notes that the pop-up and pop-under ban would not be narrowly drawn because it would go beyond regulating potentially misleading advertisements to prohibit bland, entirely truthful advertisements. *See generally Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 479 (1988) (striking Kentucky's ban on direct-mail solicitation and stating that "so long as the First

(continued...)

### 3. *N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.7(e)*

As noted above, § 1200.7(e) contains restrictions on attorney and law firm domain names and websites.

### a. *Does the State have a substantial interest?*

Defendants rely on the same interests noted above: the state's interest to encourage truthful attorney advertising and to avoid deceptive attorney advertising as well as its interest to maintain attorney professionalism and public respect for the bar. As noted above, these asserted interests satisfy the first *Central Hudson* prong.

### b. *Does the amendment materially advance the State's interest?*

The Task Force Report contained an extensive discussion of the need for regulation of attorney advertising on the internet, including the following consideration of domain names:

> Certain website URLs are unprofessional and distasteful, (e.g. "Vioxxattorney.com"), but taste is not perceived as a problem that can be regulated except to the extent that such a domain name violates the New York disciplinary rule against the use of trade names and should be prevented. See DR 2-102(B). The only practical means of finding such advertising, especially on the world-wide web, is to require filing and auditing.

---

[13](...continued)
Amendment protects the right to solicit legal business, the State may claim no substantial interest in restricting truthful and non-deceptive lawyer solicitations to those least likely to be read by the recipient.").

*See* Joint Stipulation at Exhibit 3 at 53.  In addition, the Task Force noted a problem with

advertisements in general, noting that approximately one-third were deceptive and that more than

half failed to include the firm's name, address, or telephone number.  *See id.* at 47-48.

Specifically concerning websites, the Task Force concluded that "readily identifiable issues with

on-line attorney advertising and websites include the failure of a web page or advertisement to

state the name, address, and telephone number of the law firm."  *See id.* at 52.  Moreover, it

stated that an attorney or firm's failure to include its location on a website may be deceptive

because the public would not know how local the firm is; therefore, the Task Force

recommended requiring inclusion of the attorney or firm name, its telephone number, and the

addresses of all offices within New York on the homepage.  *See id.*  The Court finds that this

evidence is sufficient to satisfy the second *Central Hudson* prong by demonstrating that the

State's restrictions on domain names may be appropriate to avoid deceptive attorney

advertisements.


### c.  Is the amendment narrowly tailored?

The adopted restriction on domain names closely conforms to the Task Force's

recommendation.  In fact, the Court finds that the amendment is narrower than the one that the

Task Force proposed because it does not apply to all websites but only to those which have

domain names that do not include the name of the lawyer or law firm.  Therefore,

§ 1200.7(e) would not apply to a website such as www.alexanderandcatalano.com or

www.publiccitizen.com.  Moreover, on its face, this amendment does not appear to be an

onerous restriction – an attorney can use any domain name as long as (1) all pages of the website contain his name; (2) he does not practice law using the domain name;[14] (3) the domain name does not imply an ability to obtain results; and (4) the domain name does not violate another disciplinary rule.  The Court finds that this amendment is narrowly tailored and that Defendants have satisfied the third *Central Hudson* prong.  Accordingly, it **DENIES** Plaintiffs' and **GRANTS** Defendants' motion for summary judgment on Plaintiffs' claim concerning this amendment.

### B.    Thirty-day Moratorium on Contacting Victims

As noted above, §§ 1200.8(g) and 1200.41-a contain a thirty-day moratorium on communications to victims, their families, or their representatives relating to a specific personal injury or wrongful death event.  In cases where a legal filing is required within thirty days, the moratorium is limited to a fifteen-day cooling off period.

Based on the language of these two provisions, New York's moratorium is broader than Florida's thirty-day moratorium in *Went for It*, which restricted only direct-mail solicitations.  *See* 515 U.S. at 620-21.  The moratorium provisions in this case extend by their plain language to television, radio, newspaper, and website solicitations that are directed to or targeted at a specific

---

[14] Although Plaintiffs asserted at oral argument that this second requirement makes the amendment overly broad, the Court construes this provision as parallel to the existing rule in § 1200.7(b), which prohibits practicing under a trade name.  Therefore, it does not appear to add any meaningful new restriction.  In other words, just as attorneys could not practice under a trade name, they cannot practice under a domain name that does not contain the name of an attorney.

recipient or group of recipients.[15]

### 1. Does the State have a substantial interest?

The State has substantial interests in protecting the privacy of its citizens and guarding against the indignity and offense of being solicited for legal services immediately following a personal injury or wrongful death event. *See Went for It*, 515 U.S. at 625. Moreover, the Task Force Report supports the conclusion that the State actually relied on these substantial interests in formulating its regulations. *See* Joint Stipulation at Exhibit 3 at 61-63 ("[T]he Committee believed the cooling off requirement would be beneficial in removing a source of annoyance and offense to those already troubled by an accident or similar occurrence, and would not preclude victims from seeking legal advice on their own initiative."). In reaching its conclusions, the Task Force considered moratoriums in Florida and eight other states, as well as the federal moratorium

---

[15] The moratorium provision in § 1200.8(g) applies to "solicitation[s]," which are defined as "any advertisement[s] initiated by or on behalf of a lawyer or law firm that [are] directed to, or targeted at, a specific recipient or group of recipients, or their family members or legal representatives, the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain. . . ." N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.8(b). By its terms, this provision applies to any advertisement that is targeted at a specific recipient or group of recipients regardless of medium. For instance, an advertisement in a newspaper during the moratorium period following an airplane crash would be prohibited if it targeted a specific group of recipients: *i.e.*, "Attention Flight #999 Survivors, call Smith Law Firm to protect your rights."

The moratorium provision in § 1200.41-a is similarly broad, encompassing any "unsolicited communication . . . made to an individual injured in the incident or to a family member or legal representative of such an individual, by a lawyer or law firm . . . seeking to represent the injured individual . . . in potential litigation . . . ." N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.41-a. The term "communication" is not limited to any medium. Therefore, the unlimited term "communication" also encompasses media other than direct-mail.

for aviation disasters.  *See id.* at 61.  Accordingly, Defendants have satisfied the first *Central Hudson* prong concerning the moratorium.

### 2.  Do the amendments materially advance the State's interests, and, if so, are they narrowly tailored?

Defendants cite the Task Force Report for the proposition that this moratorium materially advances the State's interests and, in their briefs, assert that a developing history, an emerging consensus among the states, and common sense support New York's broader moratorium.

The Task Force reviewed direct-mail moratoriums in Florida and eight other states.  The Task Force also considered the federal airline disaster moratorium, which is not limited to direct-mail solicitations but prohibits "unsolicited communications" generally within forty-five days of an airline disaster.  *See* Joint Stip at Ex. 3 at 61-63 (quoting 49 U.S.C. § 1136(g)(2)).  Ultimately, the Task Force recommended a fifteen-day "cooling off requirement . . . [as] beneficial in removing a source of annoyance and offense to those already troubled by an accident or similar occurrence."  *See id.*

Plaintiffs note two potential infirmities in the adopted moratorium.  First, although the Task Force Report recommended a fifteen-day moratorium, the State adopted a thirty-day moratorium.  Second, Plaintiffs complain that the adopted moratorium covers a wide variety of media rather than merely the direct-mail solicitations that Florida banned in *Went for It*.

Although the thirty-day moratorium is more restrictive, First Amendment jurisprudence does not require that the State adopt the precise restriction that its expert panel recommends.

-24-

First Amendment jurisprudence only requires that the restriction must be proportionate to the State's interest. *See Went for It*, 515 U.S. at 632 (quotation omitted); *Hayes v. Zakia*, No. 01-CV-0907E, 2002 WL 31207463, *6 n.16 (W.D.N.Y. Sept. 17, 2002) (quotation omitted).

Furthermore, it is clear from the Task Force Report that there is an emerging consensus among authorities, state and federal, regarding the desirability of some form of moratorium. In reviewing the justification for Florida's thirty-day moratorium and considering the Supreme Court's rationale in *Went for It* (both of which the Task Force Report cited), the State had ample basis from which it could conclude that a thirty-day moratorium would better advance its interests. Moreover, the Court notes the existence of "ample alternative channels" for the public to receive information concerning legal services during the moratorium period – namely, general advertisements in any media, provided they do not reference a specific tragedy. *Went for It*, 515 U.S. at 633-34. Even casual observation of television, radio, and print advertisements since February 1, 2007, indicates that New York law firms have had little difficulty advertising their services and explaining their expertise to consumers without running afoul of the moratorium.[16]

With respect to the breadth of the moratorium, the Court likewise finds this provision to be reasonable insofar as it relates to a specific event. The federal airline moratorium that the Task Force considered is not limited to any specific medium. Furthermore, the Court credits the common sense notion that a solicitation concerning a specific personal injury or wrongful death event is no less disturbing when it enters a victim or family member's home through the newspaper, the internet, or the airwaves rather than through the mail. *Cf. id.* at 631 ("[T]he harm

---

[16] The fact that Congress adopted a forty-five day moratorium following airline disasters further supports the fact that a thirty-day moratorium is not an unreasonable length of time.

posited by the Bar is as much a function of simple receipt of targeted solicitations within days of accidents as it is a function of the letters' contents.").  Moreover, the State's interest in preventing its citizens from being offended is not necessarily limited to their personal offense in the abstract: it may also extend to the detrimental effects of such offense on the legal profession. *See id.*  Therefore, the Court finds that Defendants have satisfied the second and third *Central Hudson* prongs because the moratorium materially advances the State's interests and the amendments are narrowly tailored to those interests.

Accordingly, the Court **DENIES** Plaintiffs' and **GRANTS** Defendants' motion for summary judgment on Plaintiffs' claims concerning §§ 1200.8(g) and 1200.41-a.


**C.      The Amendments' Application to Non-commercial Communications**

Plaintiffs assert that the amendments and their broad definition of the term "advertisement" apply to non-profit legal organizations that do not charge clients.  *See, e.g.,* N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.6(f), (k).  Therefore, Plaintiffs assert that the amendments are subject to strict scrutiny pursuant to *In re Primus*, 436 U.S. 412, 428 (1978), because they apply with full force to *pro bono* organizations that use litigation as a means of political expression and association.[17]

---

[17] In *In re Primus*, the Supreme Court evaluated South Carolina's solicitation rule as applied to the American Civil Liberties Union ("ACLU").  The Court noted that, although providing legal services is a primary purpose of the ACLU, the organization used litigation as a form of political expression and political association.  *See In re Primus*, 436 U.S. at 427-28.  Therefore, it determined that "exacting scrutiny" applied: the state must demonstrate a compelling interest and means that are "'closely drawn to avoid unnecessary abridgment of

(continued...)

In response, Defendants assert that the Court should narrowly construe the amendments to avoid declaring them unconstitutional pursuant to *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 176-77 (2d Cir. 2006). Therefore, Defendants argue that the Court could reasonably construe the definition of "advertisement" to exclude non-commercial communications. Moreover, Defendants make an argument related to legislative intent, stating that "the Presiding Justices were undoubtedly cognizant of the relevant distinctions between commercial and non-commercial speech and the holding of In re Primus . . . ." *See* Defendants' Memorandum of Law at 23-24. Finally, Defendants contend that the Court should presume that the Presiding Justices will constitutionally enforce the amendments. *See* Defendants' Reply at 7 (citing *Willson v. DeBruyn*, 633 F. Supp. 1222, 1225-26 (W.D.N.Y. 1986)).

The Second Circuit has stated that courts should take a "holistic" approach to construing statutes. *Field Day*, 463 F.3d at 177. Thus, the courts should "'presume any narrowing construction or practice to which the law is fairly susceptible.'" *Id.* (quotation omitted). Moreover, the court must consider the law's background:

> In interpreting statutes, this Court reads statutory language in light of the surrounding language and framework of the statute. . . . "'[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems,' we may 'construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the Legislature].'"

*Id.* (quotation and internal citation omitted).

With the exception of § 1200.8, which applies to solicitations motivated by pecuniary

---

[17](...continued)
associational freedoms.'" *Id.* at 432 (quotation omitted).

gain, the amendments apply to "advertisements" generally and do not explicitly reference whether or not non-commercial communications are included within their scope. However, there is evidence of the presiding justices' intent before the Court. Defendants provided a DVD recording of former Presiding Justice Pigott's comments at a Monroe County Bar Association forum on August 17, 2006, concerning the scope of the then-proposed amendments. At that time, former Presiding Justice Pigott clearly indicated that presiding justices intended to focus the amendments on attorneys motivated by profit, and, therefore, inclined to "overreach." *See* Defendants' DVD Exhibit. Furthermore, Defendants conceded at oral argument that the amendments could not constitutionally limit non-commercial attorney communications motivated by an organization's interest in political expression and association.[18]

In light of this evidence, and pursuant to *Field Day*, the Court adopts a limited construction of the amendments vis-a-vis their application to non-commercial advertising. Accordingly, the Court **DENIES** Plaintiffs' and **GRANTS** Defendants' motion for summary judgment on Plaintiffs' claims concerning application of the amendments to non-commercial speech.[19]

---

[18] The Court also notes the absence of state interpretation concerning the scope of the challenged amendments. *See Field Day*, 463 F.3d at 177 ("In the absence of state interpretation, federal courts 'will presume any narrowing construction or practice to which the law is fairly susceptible.'" (footnote and quotation omitted)).

[19] Plaintiffs also assert that two amendments are unconstitutionally vague – N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.6(c)(5) and (c)(7). However, since the Court has determined that the amendments do not apply to non-commercial advertisements, it need not address Plaintiffs' vagueness challenge.

## IV. CONCLUSION[20]

Accordingly, having reviewed the parties' submissions and heard their arguments in support of, and in opposition to, the current motions, and for the reasons stated in this Order, as well as at oral argument, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment is **GRANTED** and Defendants' motion for summary judgment is **DENIED** on Plaintiffs' claims concerning N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.6(c)(1), (3), (5), (7), and (g)(1); and the Court further

**ORDERS** that Plaintiffs' motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **GRANTED** on Plaintiffs' claims concerning N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.7(e), 1200.8(g), and 1200.41-a and Plaintiffs' claims concerning the amended rules' applicability to non-commercial communications; and the Court further

**ORDERS** that Plaintiffs' request for a declaration that N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.6(c)(1), (3), (5), (7), and (g)(1) are unconstitutional based on the current record is

---

[20] In sum, the Court notes that it is altogether appropriate for the Appellate Division of the State of New York, having been charged by law with the responsibility of overseeing the professional conduct of attorneys admitted to practice before the courts of New York, to be concerned with the issue of attorney advertising. Without question there has been a proliferation of tasteless, and at times obnoxious, methods of attorney advertising in recent years. New technology and an increase in the types of media available for advertising have exacerbated this problem and made it more ubiquitous. As a result, among other things, the public perception of the legal profession has been greatly diminished. Although the Court finds it commendable that the Appellate Division of the State of New York and the disciplinary committees that function on its behalf pursue ways to regulate the manner and means by which attorneys who choose to advertise may do so, they must be mindful of the protections such advertising has been afforded and take the necessary steps to see that the regulation of such advertising is accomplished in a manner consistent with established First Amendment jurisprudence.

**GRANTED**; and the Court further

ORDERS that Plaintiffs' request for a permanent injunction is **GRANTED** according to the following terms:

Defendants are hereby enjoined from enforcing amendments to the Disciplinary Rules of the Code of Professional Responsibility contained in N.Y. Comp. Codes R. & Regs. tit. 22, §§ 1200.6(c)(1), (3), (5), (7), and (g)(1), which took effect on February 1, 2007; and the Court further

ORDERS that the Clerk of the Court shall enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: July 20, 2007
      Syracuse, New York

                               _____
                               Frederick J. Scullin, Jr.
                               Senior United States District Court Judge